# UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| Daniel Ramirez Medina,<br><br>      *Petitioner*,<br><br>      v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN KELLY, Secretary of Homeland Security; NATHALIE ASHER, Director of the Seattle Field Office of U.S. Immigration and Customs Enforcement,<br><br>      *Respondents*. | Case No: _____<br><br><br>Date:  February 13, 2017 |

## PETITION FOR WRIT OF HABEAS CORPUS

1

# INTRODUCTION

Petitioner Daniel Ramirez Medina ("Mr. Ramirez") is a law-abiding young father who has twice been granted deferred action and an employment authorization card under the Deferred Action for Childhood Arrivals ("DACA") program established by the U.S. Department of Homeland Security ("DHS").  Because he satisfied the specific and rigorous criteria set out by DHS under the DACA program (and indeed satisfied them again when his DACA status was renewed), he is authorized by DHS to live and work in the United States. But despite complying with all of the requirements of the DACA program, Mr. Ramirez was taken into custody by U.S. Immigration and Customs Enforcement ("ICE") – part of DHS – on Friday, February 10, 2017, and is being presently detained without justification.  Mr. Ramirez's detention breaks the promise made to him under the well-established framework of the DACA program, violates his reasonable expectations based on the DACA program, and violates his rights under the Fourth and Fifth Amendments to the United States Constitution.

The federal government established the DACA program with great fanfare in 2012. Under the framework of this program, individuals who meet certain specific criteria and pass a background check receive deferred action for a two-year period, subject to renewal.  Recipients of deferred action under DACA are authorized by DHS to be present in the United States and are eligible to receive employment authorization, in the form of a work authorization card reflecting their DACA status.

In order to apply for DACA, individuals must provide the government with highly sensitive information, pay a fee, and submit to a background check.  The program was met with skepticism by the immigrant community, which was understandably reticent to provide data to the federal government that, if used in a manner contrary to the stated purpose of the DACA

program, could lead to their removal. To combat this fear, DHS assured DACA applicants that information provided as part of the DACA application process would not be used for immigration enforcement purposes.

As a result, hundreds of thousands of individuals applied for, and were granted, deferred action pursuant to DACA. And to Petitioner's knowledge, the federal government has, until now, lived up to their promise. He is aware of no DACA beneficiary being subject to removal proceedings unless they had violated the criteria for receiving DACA by committing a crime. Indeed, DHS even maintains a toll-free "Law Enforcement Support Center hotline" open 24 hours a day and seven days a week, that it says DACA holders should call if they are arrested and "believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings." (https://my.uscis.gov/helpcenter/search?q=ICE&tag=tag_search.) In the past, DACA holders calling this number for this reason have been promptly released and not subject to removal. (Mr. Ramirez's counsel called this hotline and was told that they could not help.)

In establishing and continuously operating the DACA program under a well-defined framework and highly specific criteria, the federal government created a reasonable expectation among DACA recipients that they will be able to live and work in the United States for a specified period without being subject to arrest and deportation based on their immigration status. This reasonable expectation creates constitutionally-protected liberty and property interests for DACA recipients in the benefits they enjoy under DACA: being able to live and work in the United States without fear of deportation, so long as they satisfy DACA's requirements. *See*, *e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972) (reliance on informal policies and practices may establish a legitimate claim of entitlement to a

constitutionally-protected interest); *see also Texas v. United States*, 809 F.3d 134, 174 (2015),

affirmed by an equally divided court, 136 S. Ct. 2271 (2016) (explaining that "DACA

involve[s] issuing benefits" to certain applicants). And these benefits are entitled to

constitutional protections no matter how they may characterized by DHS. *See, e.g., Newman v.*

*Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002) ("[T]he identification of property

interests under constitutional law turns on the substance of the interest recognized, not the name

given that interest by the state or other independent source.") (internal quotations omitted).

Accordingly, the federal government may not arbitrarily or capriciously deprive DACA

recipients of these benefits, as they have here with Mr. Ramirez.

Despite DHS having twice determined that Mr. Ramirez presents no threat to national

security or public safety, he was taken into custody and is being unlawfully detained by ICE.

Mr. Ramirez's unprecedented and unjustified detention violates the United States Constitution

and the promise made to him that he could live and work in this country without being subject

to arrest and deportation solely as a result of his immigration status. The agents who arrested

and questioned Mr. Ramirez were aware that he was a DACA recipient, yet they informed him

that he would be arrested, detained, and deported anyway, because he was not "born in this

country."

Mr. Ramirez respectfully petitions this Honorable Court for a writ of habeas corpus to

remedy his unlawful detention by Respondents.

## JURISDICTION AND VENUE

1. Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1361, 2241, 2243,

and the Habeas Corpus Suspension Clause of the U.S. Constitution. This court also has

remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

2.      Venue properly lies within the Western District of Washington because a substantial part of the events or omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(b).

3.      No petition for habeas corpus has previously been filed in any court and no removal proceedings are underway.

## PARTIES

4.      Mr. Ramirez is the twenty-three year old father of a United States citizen.  Mr. Ramirez has twice been granted deferred action under the DACA program.  He was brought to the United States from Mexico in or around 2001, when he was approximately 7 years old. Under the DACA program, DHS has twice determined that Mr. Ramirez poses no threat to national security or public safety.[1]  Mr. Ramirez has been in the custody of ICE in Tacoma, Washington since Friday, February 10, 2017.

5.      DHS is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.  ICE is an American federal law enforcement agency that is part of DHS.  According to its website, "ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration."

6.      Respondent John Kelly is the Secretary of DHS. He is sued in his official capacity.

7.      Respondent Nathalie Asher is the Director of the Seattle Field Office of ICE,

---

[1] *See* U.S. Dep't of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 12, 2015), *available at* https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

which has immediate custody of Petitioner.  She is sued in her official capacity

## STATEMENT OF FACTS

### Deferred Action for Childhood Arrivals

8.     On June 15, 2012, the Secretary of Homeland Security (the "Secretary") issued a memorandum concerning "Deferred Action for Childhood Arrivals."  Under the DACA framework, certain individuals who were brought to the United States as children and meet specific criteria identified in the order, may request deferred action for a period of two years, subject to renewal.  In exchange, DACA applicants are required to provide the government with highly sensitive and personal information, submit to a background check, and pay a fee which is considerable for many of them.

9.      Deferred action is a well-established form of prosecutorial discretion under which the government defers removal action against an individual for a certain period of time.  The Secretary explained that the DACA policy covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."

10.     The Secretary established criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."  They include that the individual:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;

- is currently in school, has graduated from high school, has obtained a general

6

education development certificate, or is an honorably discharged veteran of the Coast

Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense,

  multiple misdemeanor offenses, or otherwise poses a threat to national security or

  public safety; and

- is not above the age of thirty.

11.     In addition, the Secretary's memorandum provided that "[n]o individual should

receive deferred action . . . unless they first pass a background check."

12.     The official website of U.S. Citizenship and Immigration Services ("USCIS")

describes the effect of DACA as follows:  "Deferred action is a discretionary determination to

defer a removal action of an individual as an act of prosecutorial discretion.  For purposes of

future inadmissibility based upon unlawful presence, an individual whose case has been

deferred is not considered to be unlawfully present during the period in which deferred action is

in effect.  An individual who has received deferred action is authorized by DHS to be present in

the United States, and is therefore considered by DHS to be lawfully present during the period

deferred action is in effect.  However, deferred action does not confer lawful status upon an

individual, nor does it excuse any previous or subsequent periods of unlawful presence."[2]

13.     Recipients of deferred action under DACA are eligible for work authorization,

as reflected on the "work authorization" cards issued to them.  As USCIS has explained,

"[u]nder existing regulations, an individual whose case has been deferred is eligible to receive

employment authorization for the period of deferred action, provided he or she can demonstrate

---

[2] U.S. Citizenship and Immigration Services, Deferred Action for Childhood Arrivals,
Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-deferred-
action-childhood-arrivals-process/frequently-asked-questions (last visited Feb. 12, 2017).

'an economic necessity for employment.'"

**Petitioner Daniel Ramirez**

14.     Mr. Ramirez has twice demonstrated that he meets all of the requirements necessary to secure deferred action under the DACA program and twice been granted DACA status pursuant to that program.  He has never been convicted of a crime, and he does not pose any threat to national security or public safety – a fact that DHS has twice confirmed by granting and renewing his DACA status.

15.     Mr. Ramirez recently moved from California to Washington in order to obtain more lucrative employment so that he could help support his three-year old son, a United States citizen, and save money to continue his schooling.  Mr. Ramirez previously attended school in California, while also working long hours to help support his family.

16.     Mr. Ramirez first requested deferred action under the DACA program in or around 2014.  At that time, DHS determined that he met all of the requirements for DACA and granted him a DACA card confirming his status as a DACA recipient.

17.     Mr. Ramirez has remained in his DACA status since the date it was issued.  His most recent renewal occurred on May 5, 2016.  A photocopy of this renewal approval form from DHS is attached to this petition as Exhibit A.   This renewal clearly states, "Unless terminated, this decision to defer removal action will remain in effect for 2 years from the date of this notice."  Upon information and belief, this renewal has not been terminated and the 2-year time period has not yet expired.  As such, Mr. Ramirez is here in the United States living and working lawfully.

18.     Thus, as is expressly required by the DACA framework, DHS has *twice* determined, after performing background checks, that Mr. Ramirez does not pose any threat to

national security or public safety.  Nothing has changed with respect to this determination.

19.     Nevertheless, Mr. Ramirez was taken into custody by several ICE agents at or around 9:00 a.m. PST on Friday, February 10, 2017.  Mr. Ramirez was asleep at his father's home in Seattle, Washington when the agents arrived and arrested Mr. Ramirez's father.  The agents had an arrest warrant for Mr. Ramirez's father.

20.     Following his arrest, Mr. Ramirez's father granted the ICE officers permission to enter his home so that he could inform his two sons about his arrest.  When the ICE agents entered the home, they asked Mr. Ramirez, "Are you legally here?"  Mr. Ramirez replied, "Yes, I have a work permit."  On the recommendation of his brother (a DACA recipient who was also then present), Mr. Ramirez declined to answer additional questions at that time.

21.     The ICE agents then took Mr. Ramirez to a processing center in Seattle, Washington.  When he again informed them about his work permit, one of the ICE agents stated:  "It doesn't matter, because you weren't born in this country."  At this point, the ICE agents had Mr. Ramirez's wallet, which contained his work permit, which clearly identified him as a DACA recipient with a "C-33" code, which reflects a work authorization issued pursuant to DACA.  Despite this fact, Mr. Ramirez was questioned further, fingerprinted, booked, and taken to a detention center in Tacoma, Washington.

22.     At the time of filing, Mr. Ramirez has been in custody for at least 70 hours.

23.     Mr. Ramirez was not afforded notice of, or a hearing on, his arrest and detention, and there was no probable cause for his arrest.  He has not committed any crime.

24.     Mr. Ramirez has not received a judicial determination of probable cause after his detention.

## CAUSES OF ACTION

## COUNT ONE

## FIFTH AMENDMENT – PROCEDURAL DUE PROCESS

25.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

26.     Procedural due process requires that the government be constrained before it acts in a way that deprives individuals of liberty and property interests protected under the Due Process Clause  of the Fifth Amendment.  One of the first inquiries in any case of violation of procedural due process is whether the plaintiff has a protected property or liberty interest and, if so, the extent or scope of that interest.  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

27.     Here, a legitimate claim of a protected property interest exists by virtue of the promise made by the United States government to Mr. Ramirez, and those similarly situated, to adhere to the strict framework set out by the DACA program and by virtue of granting him deferred action and work authorization.  And, to the best of Mr. Ramirez's knowledge, the federal government has kept that promise until now.  Where, as here, an existing framework established by the government and individual's reasonable expectations based on that framework give those individuals benefits that they would not otherwise have, a property right to those benefits exists.  *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (A legitimate claim of entitlement is created "and [its] dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

28.     While DACA is premised on the exercise of prosecutorial discretion, that discretion is necessarily limited and constrained by the rules and criteria that DACA is based on and by the decision to twice grant Mr. Ramirez deferred action and work authorization.  These constraints on discretion further support Mr. Ramirez's claim of a protected property interest here.  *See Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1190–91 (9th Cir. 2015) *citing Griffeth v. Detrich*, 603 F.2d 118, 121 (9th Cir. 1979) (Holding that plaintiffs have a protected property right in public benefits when, as here, a statute authorizes those benefits and the "implementing regulations" "greatly restrict the discretion" of the people who administer those benefits).

29.     Indeed, "Deferred action . . . is much more than nonenforcement:  It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens.  Though revocable, that change in designation would trigger (as we have already explained) eligibility for federal benefits—for example, under title II and XVIII of the Social Security Act—and state benefits—for example, driver's licenses and unemployment insurance—that would not otherwise be available to illegal aliens."  *See*, *e.g.*, *Texas*, 809 F.3d at 166.

30.     "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Courts employ the *Eldridge* test when an alien's due process liberty interests are at stake.  *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160–61 (9th Cir. 2004).  The test considers three factors: (1) the private interest affected by the official action, (2) the risk of erroneous deprivation of that interest through the procedures used, and (3) the government's

interest.  *Id.* at 1061.  It requires courts to balance the affected interests to see "whether the administrative procedures provided here are constitutionally sufficient."  *Id.*

31.     DHS policy provides that ICE officers who encounter individuals eligible for DACA "should immediately exercise their discretion, on an individual basis, in order to *prevent* low priority individuals from being placed in removal proceedings or removed from the United States."  *See* U.S. Dep't of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 12, 2015) (emphasis added).  Consistent with this directive, Mr. Ramirez—who unquestionably meets all of the criteria for DACA—should not have been arrested or detained, and he should not be placed in removal proceedings.

32.     Respondents, having knowledge that Mr. Ramirez met the criteria for DACA and was granted deferred action under the program, violated Mr. Ramirez's procedural due process rights by arresting and detaining him.  And indeed, not only was Mr. Ramirez denied adequate due process prior to his arrest and detention, but the mechanisms DHS put in place to remedy after-the-fact the occasional errors that ICE agents or state or local police may make also failed him.  UCSIS has provided explicit instructions for DACA beneficiaries who have been apprehended or placed into removal proceedings improperly, including a Law Enforcement Support Center hotline that is staffed 24 hours a day, 7 days a week.  When Mr. Ramirez's counsel called the hotline, he was provided no assistance in remedying the mistake that had been made by the arresting ICE agents.

33.     Mr. Ramirez's interest affected by Respondents' actions is profound—his physical liberty.  Mr. Ramirez was arrested and is being unlawfully detained, despite the fact that he committed no crime, and is neither a flight risk nor a danger to the public safety nor

national security.  *See Matter of Patel*, 15 I. & N. Dec. 666, 666 (B.I.A. 1976) ("An alien

generally is and should not be detained or required to post bond except on a finding that he is a

threat to the national security, or that he is a poor bail risk.").  Therefore, *at best*, the

government's interest in his continued detention is minimal.

34.      Under the *Eldridge* test, Mr. Ramirez's expansive liberty interest far outweighs

the government's minor interest in his continued detention.  He has twice met the specific

criteria for the DACA program outlined by DHS, been found to be no risk to the public safety

or national security, and has been granted deferred action under that framework.  And Mr.

Ramirez received no due process before his arrest and detention, as he was denied both notice

and a hearing.

35.      For all of the foregoing reasons, Mr. Ramirez's detention is in violation of the

procedural due process rights guaranteed by the Fifth Amendment.

## COUNT TWO

## FIFTH AMENDMENT – SUBSTANTIVE DUE PROCESS

36.      Petitioner repeats and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

37.      Mr. Ramirez's continued detention violates his right to substantive due process

through a deprivation of the core liberty interest in freedom from detention and bodily restraint.

38.      Aliens who are physically present in the United States are guaranteed the

protections of the Due Process Clause of the Fifth Amendment.  *See*, *e.g.*, *Zadvydas v. Davis*,

533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United

States, including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens

within the jurisdiction of the United States.  The Fifth Amendment, as well as the Fourteenth

Amendment, protects every one of these persons from deprivation of life, liberty, or property

without due process of law.").

39.     "Freedom from imprisonment—from government custody, detention, or other

forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause

protects." *Zadvydas*, 533 U.S. at 690.  Any deprivation of this fundamental liberty interest must

be accompanied not only by adequate procedural protections, but also by a "sufficiently strong

special justification" to outweigh the significant deprivation of liberty.  *Id.*; *see also Phan v.

Reno*, 56 F.Supp.2d 1149, 1154 (W.D. Wash. 1999) ("Above and beyond the procedural

guarantee explicit in the Due Process Clause itself, federal courts have long recognized a

limited 'substantive' component that 'forbids the government to infringe certain 'fundamental'

liberty interests at all, no matter what process is provided, unless the infringement is narrowly

tailored to serve a compelling state interest.'") (citing *Reno v. Flores*, 507 U.S. 292, 301–02

(1993)).

40.     Mr. Ramirez applied for and was granted deferred action under the DACA

program, and has been living and working in the United States under that framework.  He is

neither a flight risk, nor a risk to public safety or national security.  Accordingly, Respondents

cannot show any justification—let alone a sufficiently strong special justification—for

depriving Mr. Ramirez of his constitutional right to due process.

41.     Mr. Ramirez relied on DHS's promise that, so long as he continued to meet the

criteria established by DACA, any immigration action against him would be deferred.  As such,

his detention is an "indefensible sort of entrapment by the [government]—convicting a citizen

14

for exercising a privilege which the [government] had clearly told him was available to him"—and deprives Mr. Ramirez of his constitutional right to due process.  *Raley v. State of Ohio*, 360 U.S. 423, 425–26 (1959) (finding a violation of the Due Process Clause when individuals were convicted for asserting a privilege on which "they had a right to rely" as the State had informed them of that privilege).

42.     For all of the foregoing reasons, Mr. Ramirez's detention is in violation of his substantive due process rights.

## COUNT THREE

## FOURTH AMENDMENT – UNLAWFUL SEIZURE

43.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

44.     The Fourth Amendment requires that all arrests entail a neutral judicial determination of probable cause, either before the arrest (in the form of a warrant) or promptly afterward (in the form of a prompt judicial probable cause determination).  *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975).  Absent a bona fide emergency or other extraordinary circumstance, failure to receive a judicial probable cause determination within 48 hours of detention violates the Fourth Amendment as a matter of law.  See *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991). The 48 hours includes weekends.

45.     As set forth above, Respondents did not provide a judicial probable cause determination at any time for Mr. Ramirez.  Respondents' failure to provide Mr. Ramirez with a prompt, judicial probable cause determination resulted in his continued and prolonged imprisonment in violation of his Fourth Amendment right to be free from unreasonable seizures.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Ramirez prays that this Court  grant the following relief:

(1)    Issue a Writ of Habeas Corpus requiring Respondents to release Mr. Ramirez forthwith;

(2)    Issue an injunction ordering Respondents not to arrest or detain Mr. Ramirez on the basis

of the conduct described herein;

(3)    Award Mr. Ramirez reasonable costs and  attorney's fees; and

(4)    Grant any other and further relief that this Court may deem fit and proper.


DATED:  February 13, 2017
Seattle, Washington

Respectfully submitted,

/s/  Elizabeth Hawkins


PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice pending*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice pending*
  jlondon@publiccounsel.org
KATHRYN A. EIDMAN (CA SBN 268053), *pro hac vice pending*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice pending*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice pending*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice pending*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice pending*
  kmarquart@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice pending*
  jgabriel@gibsondunn.com

333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER (CA SBN 196046), *pro hac vice pending*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA  94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice pending*
  echemerinsky@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only*
401 East Peltason Drive
Educ 1095
Irvine, California 92697
Telephone: (949) 824-7722

LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice pending*
  larry@tribelaw.com
Harvard Law School
*Affiliation for identification purposes only*
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
Telephone: (617) 495-1767

ELIZABETH HAWKINS (SBN 43187)
  ehawkins@hawkinsimmigration.com
Hawkins Law Group
17544 Midvale Avenue, Suite 301
Shoreline, WA 98133
Telephone: (206) 728-4220
Facsimile: (206) 973-5326

BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice pending*
  lcortes@barreralegal.com
JOHN C. BARRERA (SBN 47658), *pro hac vice pending*
  jbarrera@barreralegal.com
JOSE GARCIA (SBN 46518), *pro hac vice pending*
  jgarcia@barreralegal.com

19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

NORTHWEST IMMIGRANTS RIGHTS PROJECT
MATT ADAMS (SBN 28287)
matt@nwirp.org
615 Second Ave., Suite 400
Seattle, WA 98104
Telephone:  (206) 957-8611

# EXHIBIT A

Department of Homeland Security
U.S. Citizenship and Immigration Services

Case 2:17-cv-00218-RSM   Document 1   Filed 02/13/17   Page 20 of 20

**I-797, Notice of Action**

# THE UNITED STATES OF AMERICA

| Receipt Number | USCIS Account Number | Case Type |
| --- | --- | --- |
| IOE0900414397 | 002054432260 | I821D - CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS |

| Receipt Date | Priority Date | Applicant |
| --- | --- | --- |
| 03/02/2016 | 02/28/2016 | A207 028 995 |
| | | DANIEL  RAMIREZ MEDINA |

| Notice Date | Page |
| --- | --- |
| 05/05/2016 | 1 of 1 |

RAMIREZ MEDINA, DANIEL
354 N WESTWOOD AVE
LINDSAY CA 93247

**Notice Type:** Approval Notice
Valid from: 05/05/2016 to 05/04/2018

Notice of Deferred Action:

This notice is to inform you regarding U.S. Citizenship and Immigration Services's (USCIS) decision on your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

USCIS, in the exercise of its prosecutorial discretion, has decided to defer action in your case. Deferred action is an exercise of prosecutorial discretion by USCIS not to pursue the removal of an individual from the United States for a specific period. Deferred action does not confer or alter any immigration status.

Unless terminated, this decision to defer removal action will remain in effect for 2 years from the date of this notice.

This form does not constitute employment authorization, nor may it be used in place of an Employment Authorization Document. The 90-day period for reviewing Form I-765, Application for Employment Authorization, filed together with Form I-821D begins as of the date of this approval notice. If Form I-765 is granted, you will receive your Employment Authorization Document separately by mail. Subsequent criminal activity after your case has been deferred is likely to result in termination of your deferred action. This notice does not provide permission to travel outside of the United States.

You are required to notify USCIS if you change your address. You may use the Alien's Change of Address Card, Form AR-11, to report a new address. That form may be found at www.uscis.gov. There is no fee for this change of address form.

NOTICE: USCIS and the U.S. Department of Homeland Security (DHS) reserve the right to verify the information submitted in this request and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of the verification will be used to determine whether termination of deferred action and/or removal proceedings are appropriate if, for example, the requestor committed fraud or misrepresentation in his or her request for consideration of deferred action for childhood arrivals, or engaged in subsequent criminal activity following the submission of his or her request. Individuals for whom removal action is deferred under Deferred Action for Childhood Arrivals may, in the sole discretion of USCIS and DHS, be provided an opportunity to address derogatory information before deferred action is terminated and/or removal proceedings are initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS/Nebraska Service Center
P.O. Box 82521
Lincoln NE 68501-2521

Customer Service Telephone: 800-375-5283

Form I-797 (Rev. 01/31/06) N