The Hon. James P. Donohue
Chief Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Daniel Ramirez Medina,<br><br>              Petitioner,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN KELLY, Secretary of Homeland Security; NATHALIE ASHER, Director of the Seattle Field Office of U.S. Immigration and Customs Enforcement,<br><br>              Respondents. | CASE NO. 2:17-CV-00218-RSM-JPD<br><br>**PETITIONER'S RESPONSE BRIEF RE: COURT'S FEBRUARY 14, 2017, ORDER DIRECTING SERVICE, SETTING STATUS CONFERENCE, AND SETTING BRIEFING SCHEDULE** |

Attorneys for Petitioner
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
   mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
   jlondon@publiccounsel.org
KATHRYN A. EIDMAN (CA SBN 268053), *pro hac vice*
   keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
   aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*
   ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089


GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
   tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
   kmarquart@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*
   jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
   edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
   echemerinsky@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only
401 East Peltason Drive
Educ 1095
Irvine, California 92697
Telephone: (949) 824-7722


LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
   larry@tribelaw.com
Harvard Law School
*Affiliation for identification purposes only
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
Telephone: (617) 495-1767

ELIZABETH HAWKINS (SBN 43187)
 ehawkins@hawkinsimmigration.com
Hawkins Law Group
17544 Midvale Avenue, Suite 301
Shoreline, WA 98133
Telephone: (206) 728-4220
Facsimile: (206) 973-5326


BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
 lcortes@barreralegal.com
JOHN C. BARRERA (SBN 47658), *pro hac vice*
 jbarrera@barreralegal.com
JOSE GARCIA (SBN 46518), *pro hac vice*
 jgarcia@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591


NORTHWEST IMMIGRANTS RIGHTS PROJECT
MATT ADAMS (SBN 28287)
 matt@nwirp.org
615 Second Ave., Suite 400
Seattle, WA 98104
Telephone:  (206) 957-8611

## I. INTRODUCTION

In establishing the Deferred Action for Childhood Arrivals, or "DACA", program our country made a promise to Daniel Ramirez and to hundreds of thousands of other young people that if they gave their personal information and fingerprints to the government and passed a background check, they could study and work here without fear of arrest or deportation. The government's position in this case is, apparently, that that promise is not worth anything to Mr. Ramirez. And that broken promise is already creating fear and panic among other DACA beneficiaries and their loved ones. Perhaps even worse, to defend this arbitrary, cruel and unconstitutional action, the government has concocted a shifting, untrue, and demeaning story about Mr. Ramirez, who – contrary to the government's story – is a hard working young father who has already been found <u>twice</u> by the Department of Homeland Security in this case to be no threat to public safety or the national security. Mr. Ramirez respectfully requests that the Court make the government honor its promise, and order Mr. Ramirez released from detention.

Mr. Ramirez is a hardworking young man who was born in Mexico and brought here by his parents at a very young age. He has a young son of his own, who is a United States citizen. He works hard to support his son and dreams of continuing his education and getting a better job, perhaps as an auto mechanic. In 2014, he successfully applied for and received benefits under DACA, so that he could live and work in this country lawfully. He successfully renewed that status in 2016. He is what America has taken to calling a "DREAMer." He has no criminal record.

On Friday, February 10, he was arrested and thrown into an ICE detention facility (where he still sits today). This was done despite his status as a DACA beneficiary. It is for this reason that Mr. Ramirez filed this habeas petition. It cannot be that Mr. Ramirez and others like him, who adhere to the framework and rules set forth for them by the government to live and work here lawfully, must still live in fear that any day they could be arbitrarily and capriciously arrested and detained. Such actions violate Mr. Ramirez's constitutionally protected Fourth and Fifth Amendment rights.

The Respondents, in an effort to cover up their actions, have engaged in the following. ***First***, in an effort to distract from the constitutional issues at stake here, they apparently initiated removal proceedings despite his status as DACA beneficiary. ***Second***, they have launched a public campaign

to smear Mr. Ramirez's reputation with a constantly shifting story of gang membership and criminal history.  While the narrative has shifted multiple times in the last 48 hours alone, one thing has remained consistent: their claims are all unsubstantiated and untrue.   Even by the government's own account, the agents did not believe Mr. Ramirez was a gang member at the time they arrested him.  There was no basis to arrest Mr. Ramirez or rescind his DACA status and work authorization, and there is no basis to hold him in continued detention.

As a DREAMer, Mr. Ramirez has constitutional rights that deserve to be protected.  The government made the mistake of arbitrarily and capriciously arresting and detaining a DREAMer.  As such, they will have to litigate that mistake in the appropriate court of law.

## II.   STATEMENT OF FACTS

### A.   The Dreamers

On June 15, 2012, the Secretary of Homeland Security (the "Secretary") issued a memorandum concerning "Deferred Action for Childhood Arrivals."  Under the DACA framework, individuals brought to the United States as children and who meet specific criteria, may request deferred action for a period of two years, subject to renewal.  The Secretary explained that the DACA policy covers "certain young people who were brought to this country as children and know only this country as home."

Since its inception, the DACA framework has been recognized as a highly successful program benefiting both its recipients and American society at large.  In the words of the Department of Homeland Security:

> [T]housands of Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books.  We continue to benefit as a country from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future.

Over 750,000 undocumented young people have received DACA authorization since 2012.

### 1. The DACA Framework

In enacting DACA, the government was careful to put in place a very precise framework under which the program was to operate. Specifically, the Secretary established criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion." They include that the individual:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

In addition, the Secretary's memorandum provided that "[n]o individual should receive deferred action . . . unless they first pass a background check." The official website of U.S. Citizenship and Immigration Services ("USCIS") states in part: "An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect." Recipients of deferred action under DACA are eligible for work authorization, as reflected on the "work authorization" cards issued to them.

### B. On The Day Of The Arrest Mr. Ramirez Had Valid DACA Status

Mr. Ramirez first applied for deferred action pursuant to DACA in late 2013, which was granted in 2014. (Ramirez ¶¶ 3, 6.) On May 5, 2016, Mr. Ramirez successfully renewed his DACA status, thereby undergoing all the same vetting as was previously undertaken. (Petition Ex. A; Ramirez ¶ 9). The notice approving his DACA renewal clearly states that the renewed DACA is

valid from May 5, 2016 to May 4, 2018, and "Unless terminated, this decision to defer removal action will remain in effect for 2 years from the date of this notice." (*Id.*)  Mr. Ramirez has thus twice demonstrated that he meets all of the requirements necessary to secure deferred action under the DACA program.  DHS has twice confirmed that he has never been convicted of a crime, and he does not pose any threat to national security or public safety.

In order to receive DACA status, participants must undergo biometric and biographic background checks. (USCIS, "Frequently Asked Questions," Q. 22, *available at* https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions) (hereinafter "FAQs"). When conducting these background checks, DHS reviews the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies." (*Id.,* Q. 23). If any information revealed during the review of a DACA application "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant will not be eligible absent "exceptional circumstances." (*Id.,* Q. 65.) Indicators that an individual poses a national security threat include "gang membership," *id,* and "[a]ll DACA requests presenting information that the reporter is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU)." (April 17, 2015 Letter to Charles E. Grassley, Chairman of the Committee on the Judiciary, from Leon Rodriguez, Director of USCIS, *available at* https://www.grassley.senate.gov/sites/default/files/judiciary/upload/2015-04-17%20USCIS%20to%20CEG%20(DACA%20for%20Gang%20Member).pdf) (hereinafter "USCIS Letter"). If gang membership is confirmed, the DACA application is denied absent a determination by USCIS Headquarters that an exception should be made given the totality of the circumstances. (*Id.;* FAQs, Q. 26).[1]

Mr. Ramirez recently moved from California to Washington in order to obtain more lucrative employment so that he could help support his three-year old son, a United States citizen. (Ramirez ¶ 10; Declaration of Josue L., ¶ 5; Declaration of Luz. L., ¶ 11; Declaration of Nancy L., ¶ 7.).

---

[1] In 2015, U.S. Citizenship and Immigration Services conducted an additional screening of all approved DACA cases "to identify records that contained information indicating known or suspected gang association." USCIS Letter, at p 2

Petitioner's Response Brief re: Court's Feb. 14 Order
Case No. 2:17-cv-00218-RSM-JPD                                                    Counsel listed on second page

**C.     Mr. Ramirez's Improper Arrest and Detention**

On Friday, February 10, 2017, at approximately 9:00 a.m., a team of multiple ICE agents arrested Mr. Ramirez's father in Tacoma, Washington, outside the apartment shared by Mr. Ramirez's father, Mr. Ramirez's brother, and Mr. Ramirez. (Ramirez ¶ 12.) The ICE agents subsequently entered the apartment without authorization; Mr. Ramirez's father did not consent to the agent's entry or search of the premises. (Josue ¶ 8.)

Upon seeing Mr. Ramirez in the home, an ICE agent immediately began to question Mr. Ramirez about his name and birthplace. (Ramirez ¶ 13.) Mr. Ramirez provided the agents with his name and told them he was born in Mexico. (*Id.*) At this point, the agent placed Mr. Ramirez in handcuffs. (*Id.*) Mr. Ramirez stated multiple times to the ICE agents that he had a legal work permit, but despite this knowledge, the agents refused to release him. (*Id.*) The ICE agents did not ask any questions or regarding any alleged gang involvement or about Mr. Ramirez's tattoo. (*Id.*)

The ICE agents knew that Mr. Ramirez had a work permit and is therefore lawfully living and working in the United States. (*Id.*) The ICE agents did not have an arrest warrant for Mr. Ramirez, nor did they have any reasonable suspicion that he had committed any crime. Indeed, the I-831 attached to the government's brief makes clear, even on their account, that the agents arrested him solely because he was in the country illegally and had been arrested for speeding – neither of which would justify detaining or starting removal proceedings for a DACA recipient. Despite all these facts, the ICE agents took Mr. Ramirez with them to a processing center in Seattle, Washington. (*Id.*) At the processing center, ICE took Mr. Ramirez's wallet, which contained his work permit, which clearly identified him as a DACA recipient with a "C-33" code, which reflects a work authorization issued pursuant to DACA. (*Id.* ¶ 14.) ICE also fingerprinted Mr. Ramirez, which confirmed that had no criminal history, was granted DACA, and had a valid Employment Authorization Document through May 5, 2018. (DOJ Ex. 32-3; Ramirez ¶ 14).

ICE interrogated Mr. Ramirez for several hours. (Ramirez ¶ 14-16.) Mr. Ramirez again stated that he had a valid work permit, but the ICE agent interrogating him responded that the work permit did not matter because he was not from the United States. (*Id.* ¶ 14.) He was asked five to seven times whether he was in a gang, and he denied it each time. (*Id.* ¶ 16.) The agent repeatedly

pressed him as to whether he had ever known anyone who was a gang member. (*Id.*) Mr. Ramirez told the agent although that he knew students who had attended middle school and high school with him who were in gangs, he was not gang affiliated and never had been. (*Id.*; Nancy ¶ 8.)

Another ICE agent then began interrogating Mr. Ramirez about his tattoo. (Ramirez ¶¶ 17-19.) Mr. Ramirez has one tattoo on his arm, which he got when he was 18. (*Id.*) The tattoo says "La Paz – BCS" and has a nautical star. (*Id.*) Mr. Ramirez repeatedly told the ICE agents that the tattoo is not a gang tattoo. (*Id.* ¶ 19.) "La Paz" is Mr. Ramirez's birthplace, and "BCS" stands for Baja California Sur, the city in which La Paz is located. (*Id.*) He saw the nautical star in the tattoo shop and chose it because he "liked the way the star looked." (*Id.*) Another ICE agent said that if Mr. Ramirez was from Fresno, he was "definitely a gang member" because everyone in Fresno is a member of the "bulldogs" gang." (*Id.*) He said that Mr. Ramirez's tattoo was a "bulldogs" tattoo from the Fresno area. (*Id.*) Mr. Ramirez repeated that the tattoo was not a gang tattoo and that he was not affiliated with any gang. (*Id.*)[2]

Mr. Ramirez was then transferred to Northwest Detention Center (*id.*), where he has now remained in custody for nearly one week.

### III. THE DETENTION OF MR. RAMIREZ IS UNCONSTITUTIONAL. THE PURPOSE, FRAMEWORK, AND OPERATION OF DACA CREATE A REASONABLE EXPECTATION THAT A DACA BENEFICIARY CANNOT BE ARBITRARILY AND CAPRICIOUSLY ARRESTED AND DETAINED.

This court ordered the Respondents to answer the following questions: "Is the petitioner still detained? What is the basis for his detention, given that he has been granted deferred action under the Deferred Action for Childhood Arrivals program?" Today, the Respondents failed to provide any compelling (or believable) response to that critical threshold question.

At the time of arrest and detention, Mr. Ramirez was authorized to live and work in the United States, pursuant to his DACA status. And yet, because he was at the wrong place at the wrong time, he had all his benefits summarily cancelled, he got arrested, and he got thrown in

---

[2] There is ample further evidence that Mr. Ramirez is not a gang member. *See* Declaration of Martin Flores; Declaration of Edwina Barvosa.

detention. Essentially, Mr. Ramirez is asserting questions about what it means to be a DREAMer – whether he and others can safely rely on the implicit promises made to them by the United States government.

The Respondents assert that the issuance of the NTA by a single immigration officer immediately terminated Mr. Ramirez's DACA deferred action without notice. The Notice of Action dated February 17, 2017, states that the employment authorization terminated automatically as of the date the NTA was issued as well. The Due Process Clause does not permit this result.

Here there is no question that the benefits provided under DACA are property interests protected by the Constitution. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing."). Moreover, the protections and work authorization that Mr. Ramirez has received under the DACA program have "become essential in the pursuit of [his] livelihood." *Bell v. Burson*, 402 U.S. 535, 539 (1971).

Termination of DACA and the work authorization "involves state action that adjudicates important rights," *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), and "[t]his constitutional challenge cannot be answered by the argument that [the] benefits are a 'privilege' and not a 'right,'" *Id.* (citation omitted) (holding that termination of welfare benefits requires pre-deprivation notice and "opportunity to be heard"). That is the case here.

Mr. Ramirez had a reasonable expectation that the benefits conferred to him under DACA would be protected. And, in fact, he did rely on the government's promises implied in the strict framework of DACA. When filling out his initial DACA application on October 16, 2013, Mr. Ramirez wrote: "I would appreciate my work authorization request to be granted so that I can work without fear of being deported." To expect the government to honor its promise and follow its own rules should not have been too much for Mr. Ramirez to expect. *Cf. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954).

The due process violations here are even more insidious, as they involve the government essentially attempting a bait-and-switch with respect to Mr. Ramirez's DACA benefits. The

government affirmatively encouraged Mr. Ramirez to come forward and identify himself, to submit to rigorous screening, and to register as a DREAMer. Now, without any notice or due process, they are taking back their promise. As the Supreme Court has long recognized, the Due Process Clause forbids the government from punishing people for engaging in conduct that the government itself has encouraged. *See, e.g., Cox v. State of La.*, 379 U.S. 559, 571 (1965) (holding that the government could not punish protestors for demonstrating in a location where state officials had said the protest was allowed). For the government now "'to say to [Mr. Ramirez], 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government.'" *Moda Health Plan, Inc. v. United States*, No. 16-649C, 2017 WL 527588, at *26 (Fed. Cl. Feb. 9, 2017) (*quoting Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)). In establishing and continuously operating the DACA program under a well-defined framework and highly specific criteria, the federal government created a reasonable expectation that DACA recipients will be able to live and work in the United States for a specified period without being subject to arrest.

### IV. The Petition Does Not Relate To A Bond Hearing Or A Removal Petition, Instead It Raises The Precise Issues Habeas Corpus Relief Was Designed To Address.

This is a ***classic case*** in which habeas corpus relief is required in order to protect the rights of a detained individual. *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody."); *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (finding that "the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers").[3] The only issue presented in this habeas petition is whether Mr. Ramirez's current detention (and previous arrest leading to that detention) is unconstitutional, given his status as a DACA beneficiary.

On Friday, February 10, Mr. Ramirez was arrested (without a warrant or probable cause), and he has now been in detention for one week. This is exactly the situation that habeas corpus relief was

---

[3] Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1361, 2241, 2243, and the Habeas Corpus Suspension Clause of the U.S. Constitution. This court also has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

Petitioner's Response Brief re: Court's Feb. 14 Order
Case No. 2:17-cv-00218-RSM-JPD                                                  Counsel listed on second page
Gibson, Dunn & Crutcher LLP
11

designed to address.  This petition alleges specific constitutional violations, including procedural and substantive due process violations and Fourth Amendment violations.

The Respondents now apparently claim that this is, in fact, an arrest and detention relating to a removal proceeding.  That is not the case.  The situation surrounding the arrest and detention clearly demonstrate that this was not a thoughtful, intentional action on the part of ICE.  The ICE agents did not have an arrest warrant for Mr. Ramirez when they arrived at the home of his father.  They clearly did not know whether he was a United States citizen or not, as they asked him upon arrival: "Were you born here in the United States?"  This removal proceeding they have initiated is a clear distraction and is wholly irrelevant to the habeas petition currently facing this court.  *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1075-76 (9th Cir. 2006) ("By its terms, the jurisdiction-stripping provision does not apply to federal habeas corpus petitions that do not involve final orders of removal.  Here, as we have noted, there is no final order of removal.")

As stated above, the question before this court on this habeas petition is whether, given this complex and precise framework, a reasonable expectation was created that a DACA beneficiary (such as Mr. Ramirez) could not be arbitrarily and capriciously arrested and detained.  That is a question squarely within the jurisdiction and expertise of this court, and one that cannot be adjudicated by an Immigration Judge.

## V. Respondents, Aware That Mr. Ramirez's Constitutional Rights Have Been Violated, Have Concocted A Narrative To Attempt To Prevent Mr. Ramirez From Vindicating His Constitutional Rights.

DHS, aware that Mr. Ramirez's constitutional rights have been violated, has concocted a constantly shifting narrative to attempt to prevent him from having his rights vindicated by this court.  The government's shifting narrative about the circumstances of its arrest and detention of Mr. Ramirez is highly-troubling, and suggests a post-hoc effort to justify its improper conduct.  By way of example:

- On February 14, 2017, ICE spokesperson Rose Richeson stated that "ICE officers took Mr. Ramirez into custody *based on* his admitted gang affiliation and risk to public safety." Declaration of Jesse Gabriel ("Gabriel Decl."), Exs. A, B (emphasis added).  This contradicts Respondents' Brief, as well as Form I-213 attached thereto as Exhibit C, both of which note

that ICE agents did not discuss Mr. Ramirez's purported gang affiliation until after he was transported to the ICE holding facility in Tukwila, Washington.  Br. at 2; Ex. C at 3.

- On February 15, 2017, ICE officials were pressed by the news media for additional evidence demonstrating that Mr. Ramirez was a gang member.  In response, ICE officials informed the media that they had "additional evidence including photos and social media content that illustrate his gang affiliation."  Gabriel Decl., Ex. C.  Tellingly, Respondents' Brief makes no mention of any such evidence.

- On February 15, 2017, an unnamed ICE official informed members of the national news media that there was "corroborating evidence" to support their allegations of gang membership.  Gabriel Decl., Ex. D.  But Respondents have not provided any corroborating evidence to support these unfounded allegations.

- On February 15, 2017, DHS issued a statement labelling Mr. Ramirez as "a gang member."  Gabriel Decl., Ex. E.  Respondents' Brief, however, backs away from that conclusion, and instead meekly asserts that Mr. Ramirez purportedly "hangs out with" gang members.  Br. at 2.

What is missing, however, is any evidence that these claims (any of them) are true.  Unlike Mr. Ramirez, the Respondents find themselves in the lucky position of having access to a wide range of databases that could potentially offer them the proof that is woefully missing here.  For example, law enforcement maintains comprehensive databases of gang members, or individuals affiliated with gang members.  The Respondents do not allege that Mr. Ramirez has been found in any of those databases.  Furthermore, both in the press and in their brief, Respondents seem to put a lot of stock in the alleged "gang tattoo."  Mr. Ramirez unequivocally denies that it is a gang tattoo.  However, they do not point to any evidence that the tattoo on Mr. Ramirez is one commonly associated with gang membership.  Again, this is information readily available to the Respondents.  Counsel for Mr. Ramirez have requested any additional corroborating evidence available to the Respondents on these issues but have received none.  *See* Declaration of Ethan Dettmer, ¶ 8.

Much more troubling still is the government's apparent attempt to cover up evidence that would, in fact, disprove their gang affiliation allegations.  On February, 10, 2017, Mr. Ramirez appealed his classification assignment at the detention center, which had been assigned based on his purported gang affiliation.  In his appeal he wrote, "I came in and the officers said I have gang affiliation with gangs so I wear an orange uniform.  I do not have a criminal history and I'm not affiliated with any gangs."  The truly disturbing fact, however, is that it is clear from the document

1  that someone attempted to erase the following part of his statement: "I came in and the officers said."
2  *See* Ramirez Decl., Ex. A (Classification Appeal).

3  To be perfectly clear:

4  **Mr. Ramirez Wrote:** "I came in and the officers said I have gang affiliation with gangs so I
5  wear an orange uniform. I do not have a criminal history and I'm not affiliated with any gangs."

6  **"Edited" Version:** "I have gang affiliation with gangs so I wear an orange uniform. I do not
7  have a criminal history and I'm not affiliated with any gangs."

8  Instead, Respondents appear to have based his arrest, detention and purported DACA
9  revocation on the answers that Mr. Ramirez gave to a series of questions. Again, as discussed above,
10 even this story has shifted over time. And, certainly, Mr. Ramirez's account of events differs
11 dramatically from the account given in Respondents' brief. Of particular note is the Respondents'
12 claim that when asked if he had ever been arrested, Mr. Ramirez answered "yes." Respondents Brief,
13 at 2. According to Mr. Ramirez, that conversation never took place. And it does seem especially
14 puzzling given that, according to their own exhibit, he has no criminal record. The exhibit does
15 reflect one speeding violation on Mr. Ramirez's record. Nonetheless, it is certainly not sufficient to
16 justify what happened here. DHS twice determined that he poses no threat to national security or
17 public safety. And the published guidelines for the DACA program specifically say that a minor
18 traffic violation does not count towards the three non-serious misdemeanors that would disqualify
19 someone from receiving deferred action. The guidelines say "[a] minor traffic offense will not be
20 considered a misdemeanor for purposes of DACA."[4] It strains credibility that, after all that, his
21 lawful status under DACA would be revoked (even in part) because of an old speeding violation.

22 Respondents' claims regarding gang affiliation (though it is worth noting not even the
23 Respondents have asserted that he was ever a gang member), are also implausible. Mr. Ramirez was
24 twice vetted twice by DHS and was found to pose no threat to public safety or national security.
25 Gang membership is one of the factors explicitly listed by DHS as determinative in successfully
26 passing the background check to obtain DACA status. "If the background check or other information

---

[4] *See* https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca#guidelines

Petitioner's Response Brief re: Court's Feb. 14 Order
Case No. 2:17-cv-00218-RSM-JPD                                Counsel listed on second page

uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, you will not be able to receive consideration for an exercise of prosecutorial discretion … Indicators that you pose such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States."[5]

It is beyond troubling that a young man who voluntarily subjected himself to this type of rigorous screening (not once but twice), in order to make a better life for himself and his family, would find himself in the position of having the DHS determinations thrown aside because several ICE agents took it upon themselves to arrest and detain him for absolutely no reason at all. The attempt to manufacture such a story lacks credibility, especially given the vetting Mr. Ramirez went through (as recently as May 2016).

The questions raised by the government's actions in this case are extensive and Mr. Ramirez deserves the opportunity to, if necessary, litigate those claims in federal court. And, again, these are not the types of questions that can be resolved in immigration court as they all center around and relate to Mr. Ramirez's status as a DACA beneficiary, which an immigration judge is not able to adjudicate.[6]

## VI.     EXHAUSTION IS NOT NECESSARY BECAUSE THE IMMIGRATION COURT LACKS THE CAPACITY TO ADJUDICATE ANY OF THESE QUESTIONS GOING TO THE CONSTITUTIONALITY OF THE DETENTION FOR A DACA BENEFICIARY.

---

[5] Questions re: Consideration of Deferred Action for Childhood Arrivals Process (updated Oct. 27, 2015) at Q65 https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited February 16, 2017).

[6] If the Respondents want to engage in such tactics, Mr. Ramirez is entitled to a full and fair opportunity to litigate his claims. This would include the opportunity to take discovery in a case proceeding in federal court: What investigations did DHS have going on with respect to Mr. Ramirez at the time of his arrest? What documents did they have linking him to gang activity? What gang members in particular is he believed to be associated with? What type of criminal activity is he suspected of involvement in? When did the gang affiliation start? Did it start before his DACA application? If so, what, if any findings did DHS make regarding his gang membership during his background check? If the gang affiliation has started since his most recent DACA application (May 2016), what evidence do they have of such a change in circumstance? Have they ever applied for an arrest warrant for Mr. Ramirez? Were the ICE agents who arrested Mr. Ramirez's father under instruction to also arrest Mr. Ramirez? If so, by whom? If not, at what point did they decide to make the arrest? Why did they only arrest Mr. Ramirez and not his brother?

Exhaustion is a red herring. Exhaustion is appropriate where an administrative body should be afforded the first opportunity to adjudicate an issue. There is no administrative body that could decide any of these claims. This is not a case where Mr. Ramirez is challenging a bond hearing result or a removal order (as Respondents try to suggest), those are things that might properly belong in front of an administrative body.

Instead, Mr. Ramirez is asserting violations of his Fourth and Fifth Amendment Rights. It is well-established that where constitutional claims are being asserted in the context of a habeas petition, exhaustion is not required. *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 977 (9th Cir 2006) (holding that because the Board of Immigration Appeals couldn't have exercised jurisdiction over the constitutional claims, exhaustion is not required.); *Garcia Ramirez v. Gonzales*, 423 F.3d 935, 938 (9th Cir. 2005) ("retroactivity challenges to immigration laws implicate due process don't need not be exhausted in administrative proceedings because the BIA cannot give relief on such claims.")

As discussed above, Ramirez's constitutional claims turn on his status as a DACA beneficiary. Determinations pertaining to deferred action under DACA are not subject to review by an Immigration Judge. *Matter of Quintero*, 18 I. & N. Dec. 348, 350 (BIA 1982) (deferred action status is a matter of the District Director's prosecutorial discretion and, therefore, neither the immigration judge nor the Board may grant such status or review a decision of the District Director to deny it).

Exhaustion is not appropriate here and the habeas petition should proceed in this court.[7]

Respectfully submitted,

/s/ Theodore J. Boutrous, Jr.

---

[7] Even if exhaustion were an option here, on habeas review pursuant to § 2241, exhaustion is merely prudential rather than jurisdictional. *See Arango Marquez v. I.N.S.*, 346 F.3d 892, 897 (9th Cir. 2003). As such, courts can exercise their discretion to waive the exhaustion requirement and reach the issue. *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). Here, all the factors would weigh in favor of excusing exhaustion. Additionally, the strong public interest in preserving and protecting the DACA framework strongly favors adjudication of these issues by this court.

PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice pending*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice pending*
  jlondon@publiccounsel.org
KATHRYN A. EIDMAN (CA SBN 268053), *pro hac vice pending*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice pending*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice pending*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice pending*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice pending*
  kmarquart@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice pending*
  jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER (CA SBN 196046), *pro hac vice pending*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA  94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice pending*
  echemerinsky@law.uci.edu
University of California, Irvine School of Law
\**Affiliation for identification purposes only*
401 East Peltason Drive
Educ 1095
Irvine, California 92697
Telephone: (949) 824-7722


LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice pending*
  larry@tribelaw.com
Harvard Law School
\**Affiliation for identification purposes only*
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
Telephone: (617) 495-1767

Petitioner's Response Brief re: Court's Feb. 14 Order
Case No. 2:17-cv-00218-RSM-JPD                                      Counsel listed on second page

17

| | |
|---|---|
| 1 | ELIZABETH HAWKINS (SBN 43187) |
| | ehawkins@hawkinsimmigration.com |
| 2 | Hawkins Law Group |
| | 17544 Midvale Avenue, Suite 301 |
| 3 | Shoreline, WA 98133 |
| | Telephone: (206) 728-4220 |
| 4 | Facsimile: (206) 973-5326 |

BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice pending*
lcortes@barreralegal.com
JOHN C. BARRERA (SBN 47658), *pro hac vice pending*
jbarrera@barreralegal.com
JOSE GARCIA (SBN 46518), *pro hac vice pending*
jgarcia@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

NORTHWEST IMMIGRANTS RIGHTS PROJECT
MATT ADAMS (SBN 28287)
matt@nwirp.org
615 Second Ave., Suite 400
Seattle, WA 98104
Telephone:  (206) 957-8611

Petitioner's Response Brief re: Court's Feb. 14 Order
Case No. 2:17-cv-00218-RSM-JPD                                              Counsel listed on second page

Gibson, Dunn &
Crutcher LLP

18

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document should automatically be served this day on all counsel of record *via* transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Theodore J. Boutrous, Jr.