# DECLARATION OF DANIEL RAMIREZ MEDINA

1. I, Daniel Ramirez Medina, make this declaration based on my own personal knowledge, and if called as a witness, I could and would testify to the following matters:

2. My name is Daniel Ramirez Medina. I was born near La Paz, Baja California Sur, Mexico, on March 9, 1993. When I was about 10 years old, my parents brought me to the United States so that my family could have a better life. I have never left the United States since then. I grew up in California living with my mom and my brother and sister. Now, I am a father of a three-year-old United States citizen son, and until my current detention, I had Deferred Action for Childhood Arrivals ("DACA") and employment authorization.

3. I first applied for DACA in late 2013. When I applied, I paid an application fee, and I gave the government all of my personal information, including my birth certificate, my school records, and information about where I lived. I marked on the application that I had no criminal record or gang affiliation. I also had to go to a United States Citizenship and Immigration Services (USCIS) biometrics appointment, where USCIS took my fingerprints and photograph so they could complete a background check on me.

4. I still remember the biometrics appointment because I was so nervous. I was afraid to go to the office because I did not know whether I could trust the government, and I thought that they might deport me. But everything went okay. When I got out of the appointment, I felt relieved, and my family and I went out to eat to celebrate.

5. It was a huge risk to apply for DACA because of all the personal information I had to share. But the government made me believe that it was worth it because DACA would protect me from detention and deportation so long as I qualified for the program, and because the employment authorization would let me

find a better job and make a better future for my family. I would not have applied if I had thought that the government would not keep up its side of the promise.

6. The government reviewed my application for multiple months. In 2014, my DACA application was approved, and I received an employment authorization card. I felt so happy. My understanding was that DACA and employment authorization meant that I could work in the country, and I would not be detained or deported while my DACA was valid.

7. With my employment authorization, I was able to work. My first job was picking oranges in the fields. It is hard work because you have to climb a ladder into a tree to pick the fruit and put them in a bag. In the summer it is very hot, and even the shade of the trees that we climb is not enough. The fruit also becomes very heavy in the bags. Sometimes I got bad chest pains from the weight of the oranges. But it helped me provide for my family.

8. In late 2013, my son Daniel was born. He is my world. I was at the hospital with his mom when he was born, and I could feel then how even more important it was to be able to provide for him and support my family.

9. On February 28, 2016, I submitted an application to renew my DACA and employment authorization. As part of the process, I re-submitted personal information, promised that I had no criminal record or gang affiliation, and I was required again to go to a USCIS biometrics appointment. USCIS took my fingerprints and photograph so that they could complete another background check. On May 5, 2016, USCIS approved my DACA renewal application. I received a notice from USCIS indicating that my renewed DACA is valid from May 5, 2016 to May 4, 2018. USCIS mailed me a new employment authorization card valid for the same time period.

10. About a month and a half ago, I left California and came to Washington to find work with my brother and father, so that I can provide better for my son. I have been looking for work ever since I got here. My hope is to work and finish my

education so that I can have a good career, maybe in auto repair or painting cars, which I really enjoy.

11. Looking back on things, I realize that I could have done better in middle and high school, but some subjects in school, like math and science, were challenging for me. But after I left school, I realized how important it is get the better jobs, so I started going to adult school. I am hopeful that in Washington I can go back to adult school so that I can finish my degree, which I need so that I can support my family better. My mother, my little sister who is in school, and my son are all counting on me.

12. In school, I behaved well. I do not remember ever being suspended or expelled.

13. Even though I am in Washington to find work to provide for my son, it is still very difficult to be away from him. I went back to California to see him on New Year's, and we played with his toys, shared meals, and spent time together. I cry when I think that New Year's was the last time I saw my son, and I do not know when I will get to see him again.

14. On Friday February 10, 2017, my world broke apart. At about 9:00 a.m., ICE agents arrested my father outside our apartment right after he had taken my little stepbrother to school. I was sleeping on the couch when I woke up to a lot of noise and saw ICE agents in the room with me. I could see inside the bedroom where my brother had been asleep, and I could hear my brother and two other ICE agents. I was so scared. I sat up and turned my head around in disbelief.

15. One ICE agent with short hair asked me my name, my birthdate, and where I was born. I said my name, my birthdate, and that I am from Mexico. At that point, the agent told me to stand up and turn around. Then, with my arms behind my back, he placed handcuffs around my wrists, which hurt and left me with marks. I said at least five times, "I have a work permit. You cannot take me." I kept saying it, but the agent did not care. I also asked for the warrant, but they would not show me.

16. He continued to ask me questions. And he never asked about my tattoo or about any gang involvement. The ICE agents arrested me and took me along with my father to a processing center.

17. At the processing center, they took my fingerprints, ran them, and confirmed that I had no criminal history and that my DACA was active. Then, the same officer with short hair who questioned me at the apartment continued to interrogate me. He searched me, removed my wallet from my shorts, and took out my identification and my employment authorization card, which shows that I have DACA. I told the agent again that I have employment authorization, but the agent said that it did not matter because I was not from the United States.

18. I was surprised and did not know what to say. I was thinking, "What does my employment authorization mean if not that I can live and work in this country without being deported?" It felt shocking because they were basically saying that my authorization and DACA meant nothing.

19. The officer then started asking me if I was in a gang. I think he asked me five to seven times. Each time I said, "No. I am not in a gang." I never said that I was involved with a gang or that I was "not no more" involved. I said that because I am not in a gang, and I have never been in a gang or gang-affiliate. In middle and high school, there were some kids involved in gangs at my school that I knew, but I was not one of them.

20. I was not and am not interested in gangs because that life ends badly, either in jail or in death. I do not and have not ever wanted that kind of life. I am a person who wants to build a career and who spends time with family. We go out shopping or share meals together at home.

21. Another agent who had a lot of tattoos on him came over. After I had said "no, I am not involved in a gang" so many times to the agent with short hair, the other one chimed in. The agents kept insisting that I was in a gang, naming different gangs. At one point, he said that I was a "bulldog" from Fresno because I had said that I was

from the Fresno area. I laughed because it was such a ridiculous idea, but the agent with tattoos said, "You see, that's why he's laughing. He's a gang member."

22. They would not stop. It felt like forever. I felt an intense amount of pressure, like if I did not give them something, they would not stop. So, I told them that I did nothing more than hang out with a few people who may have been Sureños, but that since I became an adult I have not spoken with any of those people. I never said that I was involved in that gang or any gang, or that I was a gang member. The opposite—I kept say "No." I just said that about "hanging out" because they would not stop. Really, when I was in high school, I knew people that were in gangs, which is impossible not to if you come from my community and go to the public school. I never said that I hang out with gang members in Washington.

23. The agents started asking me about my tattoo. I have only one tattoo, which is located on my left forearm and says "La Paz - BCS" and has a nautical star. The ink is bluish. When I was about 18, I really liked the way tattoos look—like a lot of people do. In California, I saw people with tattoos in public and at stores, like Wal-Mart. I talked about it with my friend and he did it for me.

24. "La Paz" is where I am from. "BCS" stands for Baja California Sur, which is where La Paz is located. I decided to go with my hometown because I have seen a lot of people do that. As for the star, my friend who did the tattoo for me designed it. We were at my aunt's house. I was trying to decide between a whale tail and the nautical star. In the end, I liked the way the star looked, so he had a notebook, and he drew various options of the design. I picked one that I liked.

25. When the agents asked me about my tattoo, I said, "It is where I am from." One of the agents asked me where I lived before Washington, and I said the "Fresno area." The agent said that if I was from Fresno, then I was definitely a gang member. He repeated it, saying that everyone from Fresno is in that gang. The agent then said the star was a tattoo from the Fresno area. I continued to tell them that I am not in a gang. The agents asked me to sign some papers, but I did not sign anything

saying that I was a gang member. I think that the papers I signed had to do with processing issues, like consular access.

26. After I received a call from my brother, the agents got upset because I would not say who I was speaking with, and they assumed I was speaking with a gang member. Right after that, they said that they were going to take me to the detention center. Then, they asked me if I would have any problems in the detention center with any gang members if they put me in a particular housing unit. I told the officers that I would not have any problems with any gang members. I said that if they were going to put me in a particular housing unit at the detention center, I did not want to be with the Sureños or Norteños. I would want to be with other "*paisas*." "*Paisa*" is short for "paisano" which is a colloquial term for other Mexican people at the detention center. It basically means Mexican people who are not in a gang.

27. The agents then transferred me to the detention center. They told me I had to wear orange because I was classified as a gang member. Orange means I am a higher security level. I asked to change the color because I am not a gang member and did not want to be classified at the higher security level. They told me to fill out a "Classification Appeal" form. On that form, I had to explain why I disagreed with my classification level. I wrote "I came in and the officer said I have gang affiliation with gangs so I wear orange uniform. I do not have a criminal history and I'm not affiliated with any gangs." I signed the form on February 10, 2017. I saw the form again today, but the part of my sentence that states "I came in and the officer said" is erased. This document is attached as Exhibit A. Now it looks like *I* said "I have gang affiliation," but that is not what I said. You can still see my original words on the paper. I did not erase it and I do not know who did.

28. I am currently and have been held in detention at an ICE Detention Center since Friday morning (February 10, 2017).

29. This detention has been very difficult on me, as well as my family. I have not seen my son. I am not able to work to provide for him while detained. I want to

stay in this country and provide a life for my son and family. I, too, want a better future. I just do not understand why I am being detained.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 16, 2017, in Tacoma, Washington.

*Daniel Ramirez*
Daniel Ramirez Medina

# Exhibit A

# Classification Appeal

Name: RAMIREZ - MEDINA        A#: 207 028 995

Current Classification Level: ☒ LEVEL TWO    ☐ LEVEL THREE

In the space provided explain why you disagree with your classification level assignment. Your appeal will be forwarded to the Classification Review Officer. The Classification Review Officer will review your appeal and forward a recommendation to the Associate Warden. The Associate Warden will make a determination regarding your appeal within five business days. You will receive notification of that decision within ten business days.

I came in and the officer said I have gang affiliation with gangs so I wear a orange uniform I do not have a criminal history and I'm not affiliated with any gangs.

_Danlo Ramirez_        2-10-2017
Detainee Signature            Date

## Recommendation of the Classification Review Officer

I recommend that the classification level of this detainee: ☐ Should be changed to _____    ☒ Should not be changed

I have based my recommendation on the following:
Detainee came into custody on 2/10/17. Detainee has no criminal convictions. The I-213 that ICE provided states that the detainee used to hang out with the Sereno's in California and still hangs out with the Paizas in Washington. Because of gang affiliation ICE standards do not allow a lower custody level. A classification reduction is not recommended.

_[signature]_        2/15/17
Staff Signature        Date

## Decision of the Associate Warden

I have determined that the classification level of this detainee:  ☐ Will be changed as recommended
☐ Will be changed to _____
☒ Will not be changed

I have based my decision on the following:
As stated above

_[signature]_        2-15-17
Signature        Date

RECEIVED
FEB 13 2017

Detainee acknowledgement of decision and notice of appeal rights on reverse.

Classification Appeal            CL 004            11-05-07