1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 2:17-CV-00218-RSM-JPD

Daniel Ramirez Medina,

　　　　　　　Petitioner,

　　　v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; JOHN KELLY, Secretary of
Homeland Security; NATHALIE ASHER,
Director of the Seattle Field Office of U.S.
Immigration and Customs Enforcement; and
LOWELL CLARK, Warden of the Northwest
Detention Center,

　　　　　　　Respondents.

**AMENDED PETITION FOR WRIT OF
HABEAS CORPUS AND COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

Gibson, Dunn &
Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

Attorneys for Petitioner
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
  jlondon@publiccounsel.org
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089


GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
  kmarquart@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*
  jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520


ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA  94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
  echemerinsky@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only*
401 East Peltason Drive
Educ 1095
Irvine, California 92697
Telephone: (949) 824-7722

Gibson, Dunn &
Crutcher LLP

Amended Petition for Writ of Habeas Corpus and            Counsel Listed on Pages I and II
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

I

1  LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
     larry@tribelaw.com
2  Harvard Law School
   *Affiliation for identification purposes only
3  1575 Massachusetts Avenue
   Cambridge, Massachusetts 02138
4  Telephone: (617) 495-1767

5

6  ELIZABETH HAWKINS (SBN 43187)
     ehawkins@hawkinsimmigration.com
   Hawkins Law Group
7  17544 Midvale Avenue, Suite 301
   Shoreline, WA 98133
8  Telephone: (206) 728-4220
   Facsimile: (206) 973-5326

9

10  BARRERA LEGAL GROUP, PLLC
    LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
11     lcortes@barreralegal.com
    JOHN C. BARRERA (SBN 47658), *pro hac vice*
12     jbarrera@barreralegal.com
    JOSE GARCIA (SBN 46518), *pro hac vice*
13     jgarcia@barreralegal.com
    19309 68th Avenue South, Suite R102
14  Kent, WA 98032
    Telephone: (253) 872-4730
15  Facsimile: (253) 237-1591

16

17  NORTHWEST IMMIGRANTS RIGHTS PROJECT
    MATT ADAMS (SBN 28287)
       matt@nwirp.org
18  615 Second Ave., Suite 400
    Seattle, WA 98104
19  Telephone:  (206) 957-8611

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Amended Petition for Writ of Habeas Corpus and                     Counsel Listed on Pages I and II
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD
                                        II

**INTRODUCTION**

Petitioner Daniel Ramirez Medina ("Mr. Ramirez") was arrested in violation of his constitutional rights, and is still being unconstitutionally detained.  Our country promised him, through the Deferred Action for Childhood Arrivals ("DACA") program, that if he gave the government sensitive personal information and fingerprints, subjected himself to a thorough background check, and was found not to be a threat to public safety or national security, then he would be considered lawfully present in the country, and not subject to unconstitutional detention while he played by the rules.  Mr. Ramirez did all of that not once, but twice, most recently less than a year ago.  But instead of honoring this promise, the Respondents arrested Mr. Ramirez, have been holding him against his will, and have slandered him in the media—without evidence—as a "self-admitted gang member."  Mr. Ramirez asks this Court to order him immediately released from government custody, and respectfully requests declaratory and injunctive relief ordering that all current and future DACA beneficiaries be free from similarly unwarranted and unconstitutional arrest and detention.

The federal government established the DACA program with great fanfare in 2012.  Under DACA, individuals brought to the United States as children who meet certain specific criteria, and who are found by the Department of Homeland Security ("DHS") to pose no threat to public safety or national security, are granted deferred action for a two-year period, subject to renewal.  These young people are commonly referred to as "Dreamers" in recognition that they have played by the rules, cooperated with the government, and are working hard to be part of the American dream.  As the federal government has explained, Dreamers are "considered by DHS to be lawfully present during the period deferred action is in effect," and are eligible to receive employment authorization and other important benefits.[1]

---

[1] Ex. A, *Frequently Asked Questions*, U.S. Citizenship & Immigration Servs.: Consideration of Deferred Action for Childhood Arrivals Process, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last reviewed/updated Feb. 8, 2017) (hereinafter "USCIS DACA FAQs"), at 2 (Question 1).

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

1

In order to apply for DACA, eligible young people are required to provide DHS with highly sensitive personal information, pay a substantial fee, and submit to a rigorous background check. Initially, the DACA program was met with skepticism in the immigrant community, as many Dreamers were understandably reticent to disclose information that could help facilitate their removal from the country they have long called home.  To combat this fear, DHS repeatedly promised Dreamers that information provided as part of the DACA application process would "not later be used for immigration enforcement purposes."[2]  As a result, hundreds of thousands of individuals applied for, and were granted, deferred action under DACA.  Until now, the federal government has honored this promise.

Mr. Ramirez is a Dreamer.  He is a law-abiding young father who has twice been granted deferred action and employment authorization under DACA.  On multiple occasions—including as recently as May 2016—DHS determined that Mr. Ramirez is not a threat to national security or public safety.  Mr. Ramirez has not been convicted of any crime, nor has he ever been a gang member or engaged in any gang activity.  In short, as the government has twice concluded, he has done everything required under the specific terms of the DACA program.

Because of the government's promises in establishing and administering DACA, Mr. Ramirez—like hundreds of thousands of other Dreamers—has always expected that he would not be subject to arrest and detention based on his immigration status.  Indeed, the government itself has recognized that there are 750,000 Dreamers who have "relied on the U.S. government's representations" about DACA.[3]  As a result of these reasonable expectations, Mr. Ramirez and his fellow Dreamers have constitutionally-protected liberty and property interests in the benefits they enjoy under DACA, which include, among other things, being able to live and work in the United States without fear of arbitrary arrest and detention.  DACA has also provided Dreamers access to a host of other benefits (including, in some states, driver's licenses and in-state tuition at public

---

[2]  Ex. B, Letter from Sec'y Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016), *available at* https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20 Chu%2012.30.16.pdf.

[3]  *Id.* at 1 ("We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.").

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and                    Counsel Listed on Pages I and II
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD
2

1   universities), and enabled them to open bank accounts, obtain credit cards, buy homes and cars, and

2   conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

3       Nevertheless, on February 10, 2017, agents from U.S. Immigration and Customs Enforcement

4   ("ICE") detained and arrested Mr. Ramirez without a warrant and without probable cause.  They

5   handcuffed him, forcibly removed him from his father's residence, and transported him to an ICE

6   detention facility where they questioned him extensively.  And they have held him in detention ever

7   since.  These agents had no lawful basis for their actions at the time they arrested Mr. Ramirez, nor

8   does the government have any basis for its continued detention of Mr. Ramirez, who has been

9   unjustly and unconstitutionally locked up for more than 10 days (at the time of the filing of this

10  Amended Petition).  Respondents assumed, and repeatedly stated in the media, that Mr. Ramirez is a

11  gang member, even though their only basis for this slander is the fact that Mr. Ramirez is a man of

12  Mexican heritage who has a visible tattoo on his forearm.  Mr. Ramirez's arrest and detention breaks

13  the promise our country made to him and other Dreamers, contravenes his reasonable expectations of

14  being exempt from such treatment, and violates his rights under the Fourth and Fifth Amendments to

15  the United States Constitution.

16      Indeed, when DHS notified Mr. Ramirez in May 2016 that it had approved his DACA

17  renewal request, it promised him that his DACA status would not be revoked, and that he would not

18  be detained, unless he engaged in "[s]ubsequent criminal activity."[4]  But Respondents here do not

19  claim that Mr. Ramirez has engaged in any sort of "criminal activity"—whether before or after his

20  DACA renewal was approved.

21      At the time of his arrest and detention, Respondents knew (and had official proof of the fact)

22  that Mr. Ramirez had employment authorization, and thus that he was considered lawfully in the

23  country and should have been released.  But Respondents accorded no weight to Mr. Ramirez's status

24  as a Dreamer, and ignored his reasonable expectations that the government would live up to its

25  promises to him.  Indeed, despite knowing that he was authorized under DACA to live and work in

26  the United States, and without any evidence, ICE agents assumed that Mr. Ramirez was a gang

27

28

---

[4]  Ex. C, I-797 Notice of Action, Approval of I-821D Consideration of Deferred Action for Childhood Arrivals (May 5, 2016) (hereinafter "DACA Approval Notice").

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and                    Counsel Listed on Pages I and II
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

3

member based on his race and his visible tattoo, and tried to coerce him into admitting that he was a gang member.  It appears that these official forms were altered in an attempt to justify their arbitrary, capricious, and unlawful behavior.  And once Mr. Ramirez filed a petition for habeas corpus in this Court, the government doubled-down, mounting a sustained national campaign to publicly vilify him as an "admitted gang member," despite having no evidence to support its false allegations.

As a direct and foreseeable consequence of the government's arbitrary arrest and detention of Mr. Ramirez, and racially-motivated false accusations of gang membership, Dreamers and their loved ones across the nation have been thrust into a state of panic and fear, and have begun questioning the integrity of the promises made to them under the DACA program.  As the Consul of Mexico in Seattle explained, "[Mr. Ramirez's] detention, which occurred during an operation aimed at a different person, has created unnecessary alarm and concern among the Mexican community in the U.S.  Particularly, among those who, like Mr. Ramirez, are recipients of a DACA work permit and thus substantially contribute to the economy and the development of the communities they live in."[5] Mr. Ramirez's immediate release, and the issuance of the relief he seeks, will quell these fears so much as is possible, and help reassure Dreamers and their families that the United States is a country that lives up to the promises it makes.

Mr. Ramirez respectfully petitions this Honorable Court for a writ of habeas corpus to remedy his own unlawful detention, and seeks declaratory and injunctive relief on his civil complaint to prevent further constitutional violations.

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1361, 2241, 2243, and the Habeas Corpus Suspension Clause of the U.S. Constitution (U.S. Const. art. I, § 9, cl. 2).  This Court also has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

2.      Venue properly lies within the Western District of Washington because a substantial part of the events or omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(b)(2).

---

[5]  Dkt. #36-1 (Letter from Mexican Consul Roberto Dondisch to the Honorable James P. Donohue (Feb. 16, 2017)), at 1.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

4

3.      This is an amended version of the Petition for Writ of Habeas Corpus that was filed in this action on February 13, 2017.  No other petition for habeas corpus has been filed in any court, nor has any answer been filed by Respondents.

4.      No proceeding has been held in this matter, or in any related matter, in Immigration Court.  Nor has there been any proceeding or substantive occurrences with respect to removal, which is a matter that is not the subject of this petition.

## PARTIES

5.      Mr. Ramirez is the twenty-three year old father of a United States citizen.  He was brought to the United States from Mexico in or around 2003, when he was approximately 10 years old.  Mr. Ramirez has twice been granted deferred action under the DACA program.  Under the DACA framework, DHS has determined on multiple separate occasions—most recently less than a year ago—that Mr. Ramirez poses no threat to national security or public safety.  Mr. Ramirez has been in ICE's custody in Tacoma, Washington since February 10, 2017.

6.      DHS is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws. ICE is a law enforcement agency that is part of DHS.  According to its website, "ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration."[6]

7.      Respondent John Kelly is the Secretary of DHS.  He is sued in his official capacity.

8.      Respondent Nathalie Asher is the Director of the Seattle Field Office of ICE, which has immediate custody of Petitioner.  She is sued in her official capacity

9.      Respondent Lowell Clark is the warden of the Northwest Detention Center.  He is sued in his official capacity.

---

[6]  *ICE Initiative to Increase Community Engagement*, U.S. Immigration & Customs Enforcement: News Releases (Mar. 10, 2016), https://www.ice.gov/news/releases/ice-initiative-increase-community-engagement.

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

5

Gibson, Dunn &
Crutcher LLP

## STATEMENT OF FACTS

**Deferred Action for Childhood Arrivals**

10.     On June 15, 2012, the Secretary of Homeland Security (the "Secretary") issued a memorandum concerning "Deferred Action for Childhood Arrivals."[7]  Under the DACA framework, individuals who were brought to the United States as children and meet specific criteria may request deferred action for a period of two years, subject to renewal.  In exchange, DACA applicants are required to provide the government with highly sensitive personal information, submit to a rigorous background check, and pay a considerable fee.

11.     Deferred action is a well-established form of prosecutorial discretion under which the government defers removal action against an individual for a specified period, subject to renewal.  The Secretary explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."[8]

12.     The Secretary established criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."[9]  They include that the individual:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for at least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

---

[7]  Ex. D, Memorandum from Sec'y Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), *available at* https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (hereinafter "DHS Memo"), at 1.

[8]  *Id.* at 1–2.

[9]  *Id.* at 1.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

6

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.[10]

13.     In addition, the Secretary's memorandum provided that "[n]o individual should receive deferred action . . . unless they first pass a background check."[11]

14.     The official website of U.S. Citizenship and Immigration Services ("USCIS") describes the effect of DACA as follows:  "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion.  For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect.  An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect.  However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."[12]

15.     Recipients of deferred action under DACA are eligible for work authorization, as reflected on the "work authorization" cards issued to them.  As USCIS has explained, "[u]nder existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate 'an economic necessity for employment.'"[13]

16.     In order to receive deferred action under DACA, participants must undergo biometric and biographic background checks.  When conducting these background checks, DHS reviews the applicant's biometric and biographic information "against a variety of databases

---

[10] *Id.*

[11] *Id.* at 2.

[12] Ex. A, at 1 (USCIS DACA FAQs, Question 1).

[13] *Id.*

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

7

Gibson, Dunn &
Crutcher LLP

maintained by DHS and other federal government agencies."[14]  If any information revealed during the review of a DACA application "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant will not be eligible absent "exceptional circumstances."[15]

17.     Indicators that an individual poses a national security threat include "gang membership."[16]  Accordingly, "[a]ll DACA requests presenting information that the requestor is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU)."[17]  If gang membership is confirmed, the DACA application is denied absent a determination by USCIS that an exception should be made given the totality of the circumstances.[18]

18.     In 2015, USCIS conducted an additional screening of all approved DACA beneficiaries—including Mr. Ramirez, who was a DACA holder at the time—"to identify records that contained information indicating known or suspected gang association."[19]

19.     On February 17, 2017, the current Secretary issued a memorandum that "immediately rescinded" all "conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal" but specifically <u>exempted</u> the June 15, 2012 DACA memorandum from being rescinded.

**Mr. Ramirez Had Been Granted Deferred Action Under DACA at the Time of His Arrest**

20.     In late 2013, Mr. Ramirez first applied for deferred action pursuant to DACA.  His application was granted in 2014.

21.     In 2016, Mr. Ramirez successfully reapplied for DACA, and was once again subject to the rigorous vetting required under the DACA framework.  The approval notice provided

---

[14]  *Id.* at 7 (USCIS DACA FAQs, Question 23).

[15]  *Id.* at 23 (USCIS DACA FAQs, Question 65).

[16]  *Id.*

[17]  Ex. E, Letter from USCIS Director León Rodríguez to Senate Judiciary Committee Chairman Charles E. Grassley (Apr. 17, 2015) (hereinafter "USCIS Letter"), at 1.

[18]  *Id.* at 2; Ex. A, at 8 (USCIS DACA FAQs, Question 26).

[19]  Ex. E, at 4 ¶ 2 (USCIS Letter).

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

8

confirming that Mr. Ramirez had again been granted deferred action pursuant to DACA clearly states that it is valid from May 5, 2016 to May 4, 2018, and that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years from the date of this notice."[20]  Mr. Ramirez has therefore twice demonstrated that he meets all of the requirements necessary to secure deferred action under the DACA program.

22.     The approval notice further provides that Mr. Ramirez's deferred action could be terminated based on "[s]ubsequent criminal activity."[21]

23.     During both the initial DACA application process and the DACA renewal process, Mr. Ramirez attested that he had no criminal record or gang affiliation, and the U.S. government researched and validated these statements.  USCIS also conducted an additional screening of all approved DACA beneficiaries—including Mr. Ramirez—in 2015.  DHS has therefore confirmed on three separate occasions that Mr. Ramirez does not pose a threat to national security or public safety.

24.     Mr. Ramirez recently moved from California to Washington in order to obtain more lucrative employment so that he can better support his three-year old son, a United States citizen. He also hoped to save money so that he could continue his education.

**Mr. Ramirez's Unconstitutional Arrest and Detention**

25.     On Friday, February 10, 2017, at approximately 9:00 a.m., a team of multiple ICE agents arrested Mr. Ramirez's father near Tacoma, Washington, outside the apartment shared by Mr. Ramirez's father, Mr. Ramirez's brother, and Mr. Ramirez.  The ICE agents subsequently entered the apartment; neither Mr. Ramirez nor his brother are aware of any consent to permit the ICE agents to enter or search the premises.

26.     Upon seeing Mr. Ramirez in the apartment, an ICE agent began to question him. Mr. Ramirez provided the agents with his name and birthdate, and told them that he was born in Mexico.  As already noted, Mr. Ramirez has a visible tattoo on his forearm.  At this point, one of the agents placed Mr. Ramirez in handcuffs.

---

[20]  Ex. C (DACA Approval Notice).

[21]  *Id.*

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

9

Gibson, Dunn &
Crutcher LLP

27.     Mr. Ramirez told the ICE agents repeatedly that he had a legal work permit, but despite the fact that this meant that Mr. Ramirez was considered lawfully present in the United States, the ICE agents refused to release him.  Mr. Ramirez's father also repeatedly informed the ICE agents that Mr. Ramirez had a legal work permit, and questioned why he was being detained. The ICE agents did not ask any questions at the apartment regarding whether Mr. Ramirez was involved with a gang, nor did they ask him about his tattoo.

28.      The ICE agents did not have an arrest warrant for Mr. Ramirez, nor did they have any reason to believe that he had committed a crime.  On the contrary, the ICE agents knew that Mr. Ramirez had a work permit and was therefore lawfully living and working in the United States. Despite these facts, Mr. Ramirez was handcuffed and taken by force to an ICE processing center in Seattle, Washington.

29.     At the processing center, ICE agents took Mr. Ramirez's wallet, which contained his work permit.  This permit included a "C-33" designation, which clearly identified Mr. Ramirez as a DACA recipient with work authorization pursuant to DACA.

30.     ICE also fingerprinted Mr. Ramirez and used this information to access his records, which revealed that Mr. Ramirez has no criminal history, has been granted DACA twice, and has a valid Employment Authorization Document through May 4, 2018.

31.     Thus, even assuming without basis they had somehow not understood earlier that Mr. Ramirez was considered lawfully present in the United States, there could now be no question whatsoever of this fact.  But instead of releasing Mr. Ramirez, ICE agents began to aggressively and coercively interrogate him. Mr. Ramirez again stated that he had a valid work permit, but the ICE agent interrogating him responded that the work permit did not matter because he was not from the United States.  Instead, the ICE agents erroneously assumed that Mr. Ramirez was a gang member, and questioned him aggressively in an effort to get him to admit that he was a gang member.  Mr. Ramirez was asked repeatedly—at least five times—whether he was in a gang, and each time he denied any gang affiliation.  ICE agents repeatedly pressed him as to whether he had ever known anyone who was a gang member.  Mr. Ramirez told the agents that although that he knew students

Amended Petition for Writ of Habeas Corpus and                    Counsel Listed on Pages I and II
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

10

Gibson, Dunn &
Crutcher LLP

1    who had attended middle school and high school with him who were in gangs, he was not gang

2    affiliated and never had been.

3          32.      ICE agents also aggressively interrogated Mr. Ramirez about his tattoo, based on the

4    assumption that a man of Mexican heritage with a tattoo must be a gang member.  As already noted,

5    Mr. Ramirez has one tattoo visible on his forearm, which he obtained when he was 18 years old—

6    before the time he first applied for DACA status.  The tattoo consists of the words "La Paz – BCS"

7    and a nautical star.  "La Paz" is Mr. Ramirez's birthplace, and "BCS" stands for Baja California Sur,

8    the region in which La Paz is located.  Mr. Ramirez decided to include the city of his birth because

9    he had seen others do the same, and ultimately selected the nautical star (rather than a whale's tail,

10   which he had also considered) because he liked the way it looked.  Nautical stars are popular

11   symbols on tattoos.  Mr. Ramirez repeatedly told the ICE agents that the tattoo is not a gang tattoo,

12   but they refused to believe him because of their assumption that a man of Mexican heritage with a

13   tattoo must be a gang member.

14         33.      Another ICE agent stated that if Mr. Ramirez was from Fresno, he was "definitely a

15   gang member" because everyone in Fresno is a member of the "bulldogs" gang.  He said that

16   Mr. Ramirez's tattoo was a "bulldogs" tattoo.  Again, the ICE agent's statement demonstrated that

17   he was assuming that Mr. Ramirez must be a gang member based on the fact of his ethnic heritage

18   and the fact that he had a tattoo.  Mr. Ramirez again explained that his tattoo is not a gang tattoo,

19   and that he has never been affiliated with any gang, but the ICE agents refused to listen to him or

20   change their pre-conceived, racially-motivated, and erroneous beliefs.

21         34.      Mr. Ramirez was then transferred to Northwest Detention Center, where he has

22   remained in custody for nearly two weeks as of the time of this Amended Petition.  Prior to his

23   transfer to the detention center, ICE agents again assumed, based on Mr. Ramirez's race and the fact

24   that he has a visible tattoo, and asked Mr. Ramirez if there were any gangs with which he would like

25   to avoid being placed for his safety.  Mr. Ramirez stated that he had no gang affiliation and would

26   not have problems being placed anywhere.  The ICE agents continued to ask Mr. Ramirez which

27   gangs he would like to avoid in detention.  Mr. Ramirez ultimately indicated that if he had to be

28

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

11

placed with any group, he would prefer "the Paisas." Mr. Ramirez understands the colloquial use of "Paisas" to mean Mexicans, and was attempting to communicate that if he had to choose with whom he would be placed in detention, he would like to be placed with other Mexicans. Mr. Ramirez, who has no criminal history and has never previously been in custody, has no connection or affiliation whatsoever to the Paizas gang.

35.    The Northwest Detention Center is a privately owned detention facility located on a contaminated "Superfund" site.[22] According to the Environmental Protection Agency, industrial pollutants have been found in the soil and water near the Northwest Detention Center, and environmental remediation efforts at the site remain ongoing.[23]

36.    On information and belief, detainees at the Northwest Detention Center are forced to spend as many as 23 hours a day inside, and for some detainees, the one hour they are able to spend outside is underneath a tarp, surrounded by walls.

**The Government's Actions Following Mr. Ramirez's Filing of a Habeas Petition**

37.    On February 13, 2017, Mr. Ramirez filed a Petition for Writ of Habeas Corpus ("Initial Petition) challenging his arbitrary and capricious arrest and detention, which violated his rights under the Fourth and Fifth Amendments to the United States Constitution. *See* Dkt. #1.

38.    At the time he filed his Initial Petition, Mr. Ramirez had been in custody for at least 70 hours. *Id.* at 9 ¶ 22. As of filing of this Amended Petition for Writ of Habeas Corpus, Mr. Ramirez has been in custody for at least 240 hours.

39.    Mr. Ramirez was not afforded notice of, or a hearing regarding, his arrest and detention, and there was no probable cause for his arrest. No judicial officer has determined that there was probable cause for his arrest—as indeed there was not—and he has not been accused of committing any crime.

---

[22] U.S. Envtl. Prot. Agency, Fourth Five-Year Review Report for Commencement Bay Nearshore/Tideflats Superfund Site, Pierce Cty., Wash., at vi (Dec. 1, 2014), *available at* https://www3.epa.gov/region10/pdf/sites/cb-nt/4th_fyr_cbnt_2014.pdf.

[23] *Id.* at vi-vii.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

12

40.     Respondents assert that they issued a Notice to Appear ("NTA") on February 10, 2017, which was filed with the Immigration Court on February 14, 2017.  Dkt. #32 at 5. Respondents further assert that Mr. Ramirez's status as a DACA beneficiary terminated automatically on the day ICE issued his NTA.  *Id.* at 2–3.

41.     Rather than release Mr. Ramirez from detention as they should, Respondents have concocted a constantly-shifting story about the circumstances surrounding his arrest and detention. After Mr. Ramirez sought relief from this Court on February 13, 2017, Respondents doubled-down on the false assertion that Mr. Ramirez is a gang member, and began a sustained campaign to publicly vilify him as such, despite knowing that there existed no reliable evidence to support such a characterization, and that their only basis for this assertion is the fact that he is of Mexican heritage and has a visible tattoo, which is simply not a "gang tattoo."  Respondents attempted to coerce Mr. Ramirez to admit that he was a gang member.  Spokespersons for ICE and DHS have issued statements alleging that Mr. Ramirez admitted to gang membership at the time of his arrest, and told the media that the government possessed "corroborating evidence" that Mr. Ramirez is a gang member.  In addition, on information and belief, federal officials have reached out privately to leak to members of the media false information in furtherance of this campaign.

42.     On February 14, 2017, ICE spokesperson Rose Richeson stated that "ICE officers took Mr. Ramirez into custody *based on* his admitted gang affiliation and risk to public safety."[24] This contradicts the Form I-213 prepared by ICE officials, which notes that ICE agents did not discuss Mr. Ramirez's purported gang affiliation with him until after he was transported to the ICE holding facility in Tukwila, Washington.[25]

43.     On February 15, 2017, ICE officials were pressed by the news media for additional evidence demonstrating that Mr. Ramirez was a gang member.  In response, ICE officials informed

---

[24]  Dkt. #35-11, Ex. B (Sue Horton et al., *Mexican 'DREAMer' Nabbed in Immigrant Crackdown*, Reuters U.S. Top News (Feb. 14, 2017)), at 1 (emphasis added).

[25]  Dkt. #32-3, Ex. C (I-213 Record of Deportable/Inadmissible Alien (Feb. 10, 2017)), at 3.

Amended Petition for Writ of Habeas Corpus and                              Counsel Listed on Pages I and II
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD
13

Gibson, Dunn &
Crutcher LLP

the media that they had "additional evidence including photos and social media content that illustrate his gang affiliation."[26]

44.     On February 15, 2017, an unnamed ICE official informed members of the national news media that there was corroborating evidence to support their allegations of gang membership.[27] No such corroborating evidence has been produced to Mr. Ramirez or his counsel, despite requests for it; and no such corroborating evidence has been filed with this Court.

45.     On February 15, 2017, DHS issued a statement labeling Mr. Ramirez as "a gang member."[28]

46.     This shifting story suggests a post-hoc effort to justify Respondents' improper conduct and unjustifiable treatment of Mr. Ramirez.

47.     What is noticeably absent from Respondents' narrative, however, is *any* evidence that *any* of the government's allegations against Mr. Ramirez are true.  Unlike Mr. Ramirez, Respondents have access to many—perhaps all—law enforcement and public safety databases that could provide them with the evidence that is woefully missing here.  Yet Respondents do not allege that Mr. Ramirez's name or supposed gang "affiliation" has been located in any of those databases. Indeed, according to its own guidelines, Respondents searched those databases at least three times before to see whether Mr. Ramirez had any gang membership or affiliation, and have repeatedly found instead that he was no threat to the public safety or national security.  Furthermore, Respondents place great weight on Mr. Ramirez's alleged "gang tattoo," yet they do not point to any evidence that this type of tattoo is associated with gang membership.  Again, such information is

---

[26] Dkt. #35-11, Ex. C (*First 100 Days: Chaffetz: We Want Inspector General to Investigate Leaks; Attorney for Arrested 'Dreamer' Speaks Out*, FoxNews.com (Feb. 15, 2017), http://www.foxnews.com/transcript/2017/02/15/chaffetz-want-inspector-general-toinvestigate-leaks-attorney-for-arrested/), at 9.

[27] Dkt. #35-11, Ex. D ('*DREAMer' Protected under Obama Detained in Seattle Area*, CBSnews.com (Feb. 15, 2017), http://www.cbsnews.com/news/daniel-ramirez-medina-dreamer-protected-under-obamadetained-in-seattle/), at 2.

[28] Dkt. #35-11, Ex. E (*DHS Statement on Arrest of Alien Gang Member in Washington* (Feb. 15, 2017), https://www.dhs.gov/news/2017/02/15/dhs-statement-arrest-admitted-alien-gang-memberwashington), at 1–2.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

14

readily available to Respondents and is noticeably absent because, in fact, Mr. Ramirez's tattoo is not a gang tattoo.

48.     Respondents should have, and would have, known that because Mr. Ramirez had DACA status, he had already been subject to a background check for gang membership or affiliation.  And after they ran his name and fingerprints through their databases at the time he was processed into detention, they knew that he had been subject to three background checks for gang membership or affiliation, and found not to have had any such membership or affiliation.  They should have, in the ordinary course, released him immediately upon discovering this fact and that he was, therefore, considered lawfully present in the United States.  They nevertheless pressured him to admit to gang membership, and labeled him a gang member in the public, based on nothing other than the fact that he is of Mexican heritage and has a tattoo.

49.     Much more troubling is Respondents' apparent attempt to cover up evidence that would disprove their groundless and racially-motivated assumption of gang affiliation.  Notably, on February, 10, 2017, Mr. Ramirez appealed his classification assignment at the detention center, which he had received based on his purported gang affiliation.  In his appeal he wrote, "I came in and the officers said I have gang affiliation with gangs so I wear an orange uniform.  I do not have a criminal history and I'm not affiliated with any gangs."  However, the photocopy of the document given to him days following his submission of the appeal shows an apparent erasure of part of this statement making it appear that Mr. Ramirez had admitted to gang membership.  As "revised" the statement now begins, "I have gang affiliation with gangs so I wear an orange uniform."  The portion stating "I came in and the officers said . . ." is still visible, although barely so.

## CAUSES OF ACTION

## COUNT ONE

## FIFTH AMENDMENT – PROCEDURAL DUE PROCESS

50.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

15

51.     Aliens who are physically present in the United States are guaranteed the protections of the Due Process Clause of the Fifth Amendment.  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

52.     "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  One of the first inquiries in any case involving a violation of procedural due process "is whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of that interest."  *Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1190–91 (9th Cir. 2015) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972)).

53.     Respondents have deprived Mr. Ramirez of liberty interests protected by the Due Process Clause of the Fifth Amendment.  Indeed, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."  *Zadvydas*, 533 U.S. at 690.

54.     Respondents have also deprived Mr. Ramirez of protected property interests.  The property interests protected by the Due Process Clause "extend beyond tangible property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'"  *Nozzi*, 806 F.3d at 1191 (citing *Roth*, 408 U.S. at 576–77).  "A legitimate claim of entitlement is created [by] . . . 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Id.*  Therefore, an individual has a protected property interest where they have a reasonable expectation of entitlement to that interest.

55.     Here, Mr. Ramirez possesses a protected property interest in his DACA status and the numerous benefits provided to him under the DACA program.  These benefits include, among other things, the ability to live and work in the United States for a specified period without being subject to arrest or detention based on his immigration status.  This protected property interest exists because of the government's decision to grant Mr. Ramirez these benefits, and by virtue of its

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

16

promise to Mr. Ramirez (and to hundreds of thousands of similarly situated young people) to adhere to the strict framework of the DACA program.  In establishing and continuously operating DACA under a well-defined framework and highly specific criteria, the federal government created a reasonable expectation among DACA recipients—including Mr. Ramirez—that they are entitled to the benefits provided under that program.

56.     While DACA is premised on the exercise of prosecutorial discretion, that discretion is necessarily limited and constrained by the published rules and criteria on which DACA is based and operated, and by the government's decision to twice grant Mr. Ramirez deferred action and work authorization.  These constraints on discretion further support Mr. Ramirez's claim of a protected property interest.  *See Nozzi*, 806 F.3d at 1191 (finding a protected property right in government benefits where government regulations "greatly restrict the discretion" of those who administer the benefits).

57.     Indeed, "[d]eferred action . . . is much more than nonenforcement:  It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens.  Though revocable, that change in designation would trigger (as we have already explained) eligibility for federal benefits—for example, under title II and XVIII of the Social Security Act— and state benefits—for example, driver's licenses and unemployment insurance—that would not otherwise be available to illegal aliens." *Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015) (footnotes omitted), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016).

58.     Respondents' conduct in depriving Mr. Ramirez of his protected liberty and property interests will be evaluated under the three-part *Eldridge* test.  "[I]n *Mathews v. Eldridge*, the Supreme Court set forth a three-part inquiry to determine whether the procedures provided to protect a liberty or property interest are constitutionally sufficient.  First, courts must look at the nature of the interest that will be affected by the official action, and in particular, to the degree of potential deprivation that may be created.  Second, courts must consider the fairness and reliability of the existing procedures and the probable value, if any, of additional procedural safeguards. Finally, courts must assess the public interest, which includes the administrative burden and other

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

17

societal costs that would be associated with additional or substitute procedures." *Nozzi*, 806 F.3d at 1192–93 (internal quotations and citations omitted).  This test requires courts to balance the affected interests to see whether the procedures provided are constitutionally sufficient.

59.     Here, the procedures that the government provided to Mr. Ramirez fail the *Eldridge* test.  There is no question that Mr. Ramirez's private interests are extremely significant (and include, among other things, his physical liberty, his right to be free from arrest and deportation, and his ability to earn a living to help support himself and his family), the procedures provided were inadequate, and the government's interest in in detaining Mr. Ramirez is non-existent.

60.     DHS policy provides that ICE officers who encounter individuals eligible for DACA "should immediately exercise their discretion, on an individual basis, in order to *prevent* low priority individuals from being placed into removal proceedings or removed from the United States."[29]  Consistent with this directive, Mr. Ramirez—who unquestionably meets all of the criteria for DACA—should not have been arrested or detained, nor should he have been placed in removal proceedings.  Despite their knowledge that Mr. Ramirez met the criteria for DACA and was granted deferred action under the program, Respondents violated Mr. Ramirez's procedural due process rights by arresting and detaining him.

61.     Moreover, not only was Mr. Ramirez denied adequate due process prior to his arrest and detention, but the DHS procedures put in place to remedy errors by law enforcement officials also failed him.  For example, UCSIS provides explicit instructions for DACA beneficiaries who are improperly apprehended or placed into removal proceedings, which include calling a Law Enforcement Support Center hotline that operates 24 hours a day, 7 days a week.  When Mr. Ramirez's counsel called the hotline immediately after Mr. Ramirez was detained, he was provided no assistance in remedying the mistake that had been made by the ICE agents who arrested Mr. Ramirez.  And Mr. Ramirez received no due process before his arrest and detention, as he was denied both notice and a hearing.

---

[29]  *See* Ex. D (DHS Memo), at 2 (emphasis added).

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

18

Gibson, Dunn & Crutcher LLP

62.     Under the *Eldridge* test, Mr. Ramirez's expansive liberty interests far outweigh the government's non-existent interest in his continued detention.  He has twice met the specific criteria for the DACA program and twice been granted deferred action under that framework, and DHS itself has determined on multiple occasions that he poses no risk to public safety or national security.

63.     For all of the foregoing reasons, Mr. Ramirez's detention is in violation of his procedural due process rights guaranteed by the Fifth Amendment.

**COUNT TWO**

**FIFTH AMENDMENT – SUBSTANTIVE DUE PROCESS**

64.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

65.     Mr. Ramirez's continued detention violates his right to substantive due process protected by the Fifth Amendment.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.  Any deprivation of this fundamental liberty interest must be accompanied not only by adequate procedural protections, but also by a "sufficiently strong special justification" to outweigh the significant deprivation of liberty.  *Id.*; *see also Phan v. Reno*, 56 F. Supp. 2d 1149, 1154 (W.D. Wash. 1999) ("Above and beyond the procedural guarantee explicit in the Due Process Clause itself, federal courts have long recognized a limited substantive component that forbids the government to infringe certain fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" (internal citations and quotations omitted)).

66.     Here, there is no reason that Mr. Ramirez should be detained.  He is neither a flight risk, nor a risk to public safety or national security, and has twice passed the rigorous vetting conducted by DHS, as well as the additional screening for gang affiliation in 2015.  Accordingly, Respondents cannot show any valid justification—let alone a "sufficiently strong special justification"—for depriving Mr. Ramirez of his fundamental rights.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

19

67.     Respondents' unconstitutional bait-and-switch further violates Mr. Ramirez's substantive (and procedural) due process rights.  As the Supreme Court has long recognized, the Due Process Clause forbids the government from punishing people for engaging in conduct that the government itself has encouraged.  *See, e.g.*, *Cox v. State of La.*, 379 U.S. 559, 571 (1965) (holding that the government could not punish protestors for demonstrating in a location where state officials had said the protest was allowed); *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959) (holding that witnesses could not be punished for refusing to answer self-incriminating questions from a State legislative commission when the commission itself had told the witnesses they could decline to answer such questions as doing so would amount to "the most indefensible sort of entrapment by the State").

68.     Here, the federal government vigorously promoted the DACA program and promised Mr. Ramirez—and hundreds of thousands of young people just like him—that if they met the DACA criteria, provided sensitive personal information to the government, and passed a background check they would be able to live and work in the United States for a specified period without being subject to arrest or detention based on their immigration status.  The federal government also encouraged Mr. Ramirez to voluntarily disclose highly sensitive personal information by promising that such information would not be used for immigration enforcement purposes.  By arresting Mr. Ramirez, and then using the information he disclosed against him, the government has broken both of those promises.  For the government to now "say . . . 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government."  *Moda Health Plan, Inc. v. United States*, --- Fed. Cl. ---, No. 16-649C, 2017 WL 527588, at *26 (Fed. Cl. Feb. 9, 2017) (citing *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)).

69.     For all of the foregoing reasons, Mr. Ramirez's continued detention is in violation of his substantive due process rights.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

20

## COUNT THREE

## FOURTH AMENDMENT – UNLAWFUL SEIZURE

70.    Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

71.    Aliens are entitled to Fourth Amendment protection from unlawful seizures. *See Orhorhaghe v. INS*, 38 F.3d 488, 497–501 (9th Cir. 1994); *Benitez-Mendez v. INS*, 760 F.2d 907, 909 (9th Cir. 1983).

72.    The Fourth Amendment requires that all arrests entail a neutral judicial determination of probable cause, either before the arrest (in the form of a warrant) or promptly afterward (in the form of a prompt judicial probable cause determination). *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975).  Absent a bona fide emergency or other extraordinary circumstance, failure to receive a judicial probable cause determination within 48 hours of detention (which includes weekends) violates the Fourth Amendment as a matter of law. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).

73.    To support a warrantless arrest and detention for a civil immigration violation, the arresting officer must be aware of sufficient facts to support a reasonable belief that the alien is in the United States illegally. *Benitez-Mendez*, 760 F.2d at 909.  Absent such facts, a warrantless arrest violates the Fourth Amendment. *Orhorhaghe*, 38 F.3d at 497–501.  Here, Respondents arrested and are detaining Mr. Ramirez despite their knowledge that he was granted deferred action under DACA and is therefore authorized to live and work in the United States according to DHS's own promise to Mr. Ramirez and other DACA holders like him.  By arresting and detaining Mr. Ramirez under these circumstances, Respondents are violating his Fourth Amendment rights.

74.    Respondents also violated Mr. Ramirez's Fourth Amendment rights by failing to provide him with a prompt judicial probable cause determination, which has resulted in his continued detention.

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

21

# COUNT FOUR

## FIFTH AMENDMENT – EQUAL PROTECTION

75.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

76.     The Fifth Amendment protects individuals against actions of the federal government that deny the equal protection of the laws.  *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954) (applying Equal Protection Clause to the federal government).

77.     The Fifth Amendment forbids federal officials from acting with a discriminatory intent or purpose.  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977).

78.     Here, Respondents arrested Mr. Ramirez in substantial part because of unconstitutional racial and national origin discrimination and invidious stereotypes about men of Mexican heritage who have tattoos. Respondents' discriminatory intent is further evidenced by their decision to question Mr. Ramirez about his place of birth, their decision to depart from established procedures and arrest and detain Mr. Ramirez without a warrant and in spite of his DACA status, and in their statement to him that his DACA status did not matter because he was not from the United States.

79.     Respondents arrested Mr. Ramirez without a warrant after he said that he was born in Mexico, even though Mr. Ramirez told Respondents that he had a work permit.  The arrest itself is a departure from "the normal practice and procedure" of Respondents, in that they did not have a valid arrest warrant.  In the ordinary course and according to Respondents' regular procedures, Mr. Ramirez should never have been arrested or detained because he has DACA status and a work permit and was thus expressly authorized by DHS to live and work in the United States. Respondents arrested Mr. Ramirez without a warrant and have continued to detain him to this day

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

22

Gibson, Dunn &
Crutcher LLP

despite being aware of these facts.  Again, this is a major departure from their "normal practice and procedure."  Mr. Ramirez should never have been arrested in the first place.  Respondents did not do so, however, instead concluding that Mr. Ramirez was a gang member based on his Mexican heritage, the fact that he was born in Mexico, and the tattoo visible on his forearm, which they have insisted and continue to insist—contrary to all evidence—is a "gang tattoo."  This shows that the agents who arrested and detained Mr. Ramirez did so because he was of Mexican heritage and had a visible tattoo, thus indicating to them, and based on false and invidious stereotypes, that he is a member of a gang.  Respondents' consideration of these factors amounts to unconstitutional racial and national origin discrimination in violation of the Equal Protection Clause.

80.     The decision at the processing center to continue to detain Mr. Ramirez was also motivated by unconstitutional racial and national origin discrimination.  Mr. Ramirez should not have been detained because he has been granted deferred action under DACA, and DHS has repeatedly confirmed that he is not a threat to public safety.  Respondents told Mr. Ramirez that he was being detained despite his DACA status because he is not from the United States.

81.     Despite knowing that Mr. Ramirez had twice been granted deferred action under DACA, Respondents concluded that Mr. Ramirez was nevertheless "gang affiliated" based on his Mexican heritage and his tattoo.  Indeed, one of the ICE agents insisted that he was "definitely a gang member" because everyone in Fresno is a member of the "bulldogs" gang.  He said that Mr. Ramirez's tattoo was a "bulldogs" tattoo.  Furthermore, one of the ICE agents told Mr. Ramirez that it did not matter that he had a work permit because he was not from the United States, emphasizing that they were not following the ordinary procedures—that is, releasing DACA holders who are considered lawfully present—because of his national origin.  ICE's assumption and insistence that Mr. Ramirez is a gang member because he is of Mexican heritage, has a visible tattoo, and had lived in the Fresno area, demonstrates racial and national origin discrimination in violation of the Equal Protection Clause.

82.     Finally, the fact that Respondents have continued to insist, in multiple statements to the media and in spite of all of the evidence to the contrary, that Mr. Ramirez is a gang member

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

23

demonstrates racial and national origin discrimination in violation of Mr. Ramirez's right to Equal Protection.  Respondents make this serious accusation, and broadcast it to the world, despite the fact that their <u>only</u> evidence in support of this accusation is that he is of Mexican heritage and has a tattoo.  This shows that Respondents' beliefs about Mr. Ramirez are based solely on false and invidious racial and national origin stereotyping.

### PRAYER FOR RELIEF

**WHEREFORE**, Mr. Ramirez prays that this Court grant the following relief:

(1)    Issue a Writ of Habeas Corpus requiring Respondents to immediately release Mr. Ramirez;

(2)    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that: (a) Mr. Ramirez, and other Dreamers, have constitutionally-protected interests in their status conferred under DACA; (b) arbitrary arrest and detention violates Mr. Ramirez's, and other Dreamers', due process rights; and (c) Respondents lack the authority to arrest or detain Mr. Ramirez or other Dreamers on the basis of their immigration status, or the conduct described herein;

(3)    Enjoin Respondents from arresting or detaining Mr. Ramirez on the basis of the conduct described herein;

(4)    Award Mr. Ramirez reasonable costs and  attorney's fees; and

(5)    Grant any other and further relief that this Court may deem fit and proper.


DATED:  February 21, 2017

Seattle, Washington




Respectfully submitted,

/s/ Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*

Gibson, Dunn & Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

24

/s/ Marc D. Rosenbaum
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
JUDY LONDON (CA SBN 149431), *pro hac vice*
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*

/s/ Erwin Chemerinsky
ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
University of California, Irvine School of Law
*\*Affiliation for identification purposes only*

/s/ Laurence H. Tribe
LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
Harvard Law School
*\*Affiliation for identification purposes only*

/s/ Luis Cortes Romero
BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
JOHN C. BARRERA (SBN 47658), *pro hac vice*
JOSE GARCIA (SBN 46518), *pro hac vice*

Attorneys for Petitioner

Gibson, Dunn &
Crutcher LLP

Amended Petition for Writ of Habeas Corpus and
Complaint for Declaratory and Injunctive Relief
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

25