1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

10

11

CASE NO. 2:17-CV-00218-RSM-JPD

12

Daniel Ramirez Medina,

Petitioner,

**EMERGENCY MOTION FOR**
**CONDITIONAL RELEASE PENDING**
**FINAL DETERMINATION**

13

14

v.

15

U.S. DEPARTMENT OF HOMELAND
SECURITY; JOHN KELLY, Secretary of
Homeland Security; NATHALIE ASHER,
Director of the Seattle Field Office of U.S.
Immigration and Customs Enforcement; and
LOWELL CLARK, Warden of the Northwest
Detention Center,

16

17

18

Respondents.

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Attorneys for Petitioner
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
  jlondon@publiccounsel.org
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089


GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
  kmarquart@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*
  jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520


ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA  94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
  echemerinsky@law.uci.edu
LEAH M. LITMAN (DC SBN 1016310), *pro hac vice pending*
  llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only*
401 East Peltason Drive
Educ 1095
Irvine, California 92697
Telephone: (949) 824-7722

Gibson, Dunn &
Crutcher LLP

Emergency Motion for Conditional Release Pending Final
Determination
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

I

1   LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
      larry@tribelaw.com
2   Harvard Law School
    *Affiliation for identification purposes only
3   1575 Massachusetts Avenue
    Cambridge, Massachusetts 02138
4   Telephone: (617) 495-1767

5

6   ELIZABETH HAWKINS (SBN 43187)
      ehawkins@hawkinsimmigration.com
    Hawkins Law Group
7   17544 Midvale Avenue, Suite 301
    Shoreline, WA 98133
8   Telephone: (206) 728-4220
    Facsimile: (206) 973-5326

9

10  BARRERA LEGAL GROUP, PLLC
    LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
11    lcortes@barreralegal.com
    JOHN C. BARRERA (SBN 47658), *pro hac vice*
12    jbarrera@barreralegal.com
    JOSE GARCIA (SBN 46518), *pro hac vice*
13    jgarcia@barreralegal.com
    19309 68th Avenue South, Suite R102
14  Kent, WA 98032
    Telephone: (253) 872-4730
15  Facsimile: (253) 237-1591

16

17  NORTHWEST IMMIGRANTS RIGHTS PROJECT
    MATT ADAMS (SBN 28287)
      matt@nwirp.org
18  615 Second Ave., Suite 400
    Seattle, WA 98104
19  Telephone:  (206) 957-8611

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Emergency Motion for Conditional Release Pending Final                    Counsel Listed on Pages I and II
Determination
Case No. 2:17-cv-00218-RSM-JPD

                                              II

**INTRODUCTION**

On February 10, 2017, Immigration and Customs Enforcement ("ICE") unconstitutionally arrested and detained Petitioner Daniel Ramirez Medina ("Mr. Ramirez") absent reasonable suspicion or probable cause and contrary to clear evidence that he was lawfully present in the United States. Mr. Ramirez remains in government custody at the Northwest Detention Center in Tacoma.  And just today, Mr. Ramirez's counsel was told that Mr. Ramirez was to be transferred to the "Level 3" section of that facility, placing him in a category that is usually limited to violent offenders, drug traffickers, or individuals suspected to be a significant threat to national security.[1]  Such a transfer would result in a direct and immediate threat to Mr. Ramirez's physical safety, and would be entirely without justification, as Mr. Ramirez has no criminal history and the Department of Homeland Security ("DHS") has repeatedly determined that he poses no threat to public safety or national security. Mr. Ramirez's counsel was later told that this transfer was not being made. But the cruel and arbitrary threat to put Mr. Ramirez in such danger only serves to underscore the severity of the deprivation of liberty and due process that he is suffering every day in detention.

On the Monday after his arrest, February 13, 2017, Mr. Ramirez filed a Petition for Writ of Habeas Corpus. *See* Dkt. #1. His claims fall squarely within the traditional scope of habeas petitions challenging executive detention. They are based solely upon ICE's unconstitutional investigation, arrest, and detainment. They do not challenge commencement of removal proceedings. Mr. Ramirez filed an Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief on February 21, 2017. *See* Dkt. #41.

This Court has the authority to order Mr. Ramirez's conditional release pending the resolution of his Petition for Habeas Corpus. Every Circuit that has considered the question directly has held

---

[1]  Counsel for Respondents has asserted that Mr. Ramirez was transferred to a different location in the facility but that his classification remains the same.  Regardless, Mr. Ramirez should not be subject to such extreme uncertainty, vulnerability, and risk, which is entirely the result of Respondents unconstitutional deprivation of his fundamental rights.  Moreover, the new unit to which Mr. Ramirez has been transferred contains gang members who have just been transferred from prison, further jeopardizing Mr. Ramirez's safety.

Gibson, Dunn & Crutcher LLP

that federal courts have such authority.[2] A district court in this Circuit specifically granted bail pending habeas review in the immigration context. *See Tam v. INS*, 14 F. Supp. 2d 1184, 1186 (E.D. Cal. 1998) ("grant[ing] detained alien's] conditional release pending resolution of his petition for habeas corpus"). And the Ninth Circuit has three times assumed without deciding that district courts possess the authority to grant bail pending resolution of habeas petitions. *United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016); *In re Roe*, 257 F.3d 1077, 1080 (9th Cir. 2001); *Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989) (per curiam).

Given the substantial constitutional violations implicated by his continued detention and the exceptional circumstances surrounding this case, Mr. Ramirez respectfully requests this Court to order his immediate conditional release pending the resolution of his habeas petition.

## SUMMARY OF FACTS

### A.    Deferred Action for Childhood Arrivals

On June 15, 2012, the Secretary of Homeland Security ("the Secretary") issued a memorandum concerning "[i]ndividuals who came to the United States as children," laying out an immigration program now known as "Deferred Action for Childhood Arrivals" ("DACA"). Dkt. #41-6, at 1 (Memorandum from Janet Napolitano, Sec'y of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012)) ("Napolitano Memo"). Under DACA, individuals brought to the United States before the age of 16 and who meet certain criteria, including a determination that they do not "pose[] a threat to national security or public safety," may be approved for "deferred action" from immigration enforcement for a period of two years, subject to renewal. *Id.* These "Dreamers"—as America has come to call DACA recipients—are "authorized by DHS" to live in this country during this two-year period, and "are considered by DHS to be lawfully present during the period deferred action is in effect." Dkt. #41-3

[2]  *See, e.g.*, *Mapp v. Reno*, 241 F.3d 221, 226 (2nd Cir. 2001); *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986); *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985); *Pfaff v. Wells*, 648 F.2d 689, 693 (10th Cir. 1981); *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972); *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (per curiam); *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968); *Johnston v. Marsh*, 227 F.2d 528, 531 (3d Cir. 1955) ("One of the inherent powers of the judiciary with regard to proceedings before it has been the admission of a prisoner to bail where, in the exercise of his discretion, the judge deems it advisable.").

Gibson, Dunn & Crutcher LLP

1    (Frequently Asked Questions, U.S. Citizenship & Immigration Servs.: Consideration of Deferred

2    Action for Childhood Arrivals Process ("DACA FAQs") at Q.1). Dreamers who "can demonstrate

3    'an economic necessity for employment'" are eligible for work authorization. *Id.* at Q.4.

4          Mr. Ramirez has lawfully lived and worked in the United States since March 2014, when he

5    was first approved for deferred action and granted an employment authorization card under the

6    DACA program. Decl. of Daniel Ramirez Medina ("Ramirez Decl.") ¶ 6, Dkt. #35-1. Mr. Ramirez

7    successfully renewed his DACA status in May 2016. *See id.* ¶ 9; Form I-213 ("Form I-213") at 3,

8    Dkt. #32-3. Each time Mr. Ramirez applied for DACA, he provided highly sensitive personal

9    information, including biological and biometric data, and paid a substantial fee. Ramirez Decl.

10   ¶¶ 3-5, 9; DACA FAQs at Q.7, Q.22, Q.23. On each occasion, DHS subjected Mr. Ramirez to a

11   rigorous background check, examining, among other things, his biometric and biographic information

12   "against a variety of databases maintained by DHS and other federal government agencies," *id.* at

13   Q.23, and reviewing his application for any indication that his "presence in the United States

14   threatens public safety or national security," *id.* at Q.65. "[G]ang membership" is explicitly

15   considered an indicator that an individual poses such a threat. *Id.* Accordingly, "[a]ll DACA requests

16   presenting information that the requestor is or may be a member of a criminal street gang are referred

17   to the Background Check Unit (BCU)." Dkt. #41-7 (Letter from USCIS Director León Rodríguez to

18   Senate Judiciary Committee Chairman Charles E. Grassley (Apr. 17, 2015)) ("USCIS Letter"). If this

19   thorough background check reveals gang membership, the DACA application is denied absent a

20   determination by United States Citizenship and Immigration Services ("USCIS") that the totality of

21   the circumstances warrant a special exception. *Id.* at 2; DACA FAQs at Q.26. On two occasions,

22   then, DHS expressly determined that Mr. Ramirez was neither "a danger to national security" nor "a

23   risk to public safety." DACA FAQs at Q.69.

24         Mr. Ramirez has complied with all the requirements of the DACA program—he has no

25   criminal record and has worked hard to support his three-year-old U.S. citizen son. As such, DHS

26   "authorized" Mr. Ramirez to be present in the United States until at least May 4, 2018. *Id.* at Q.1.

27

28

Gibson, Dunn &
Crutcher LLP

Emergency Motion for Conditional Release Pending Final
Determination
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

3

### B.    The Unconstitutional Arrest and Detention of Mr. Ramirez

On Friday, February 10, 2017, at approximately 9:00 a.m., a team of multiple ICE agents arrested Mr. Ramirez's father near Tacoma, Washington, outside the apartment shared by Mr. Ramirez's father, Mr. Ramirez's brother, and Mr. Ramirez. Ramirez Decl. ¶ 14; Decl. of Josue L. ("Josue Decl.") ¶ 8, Dkt. #35-2; Form I-213 at 2-3. The ICE agents subsequently entered the apartment and interrogated and arrested Mr. Ramirez. Form I-213 at 3; Ramirez Decl. ¶¶ 14-15. Neither Mr. Ramirez nor his brother is aware of any consent granted to permit the ICE agents to enter the residence. Josue Decl. ¶ 8.

The agents did not have an arrest warrant for Mr. Ramirez, nor did they have reasonable suspicion, let alone probable cause, to believe that he had committed a crime. Rather, the agents had arrived at Mr. Ramirez's residence to arrest a different person, his father, and had completed that arrest outside the apartment before entering the apartment and encountering Mr. Ramirez. Form I-213 at 2-3. Mr. Ramirez repeatedly and truthfully told the ICE agents that he had a legal work permit. Ramirez Decl. ¶ 15. Despite the fact that this was instant proof that Mr. Ramirez was lawfully present in the United States, the ICE agents refused to release him. *Id.* Mr. Ramirez's father also repeatedly informed the ICE agents that Mr. Ramirez had a legal work permit, and questioned why he was being detained. Josue Decl. ¶ 11. By all accounts, ICE agents did not ask any questions at the apartment regarding whether Mr. Ramirez was a gang member or had ever engaged in gang activity, nor did they ask Mr. Ramirez about his tattoo. Ramirez Decl. ¶ 16; Josue Decl. ¶ 9. Even by Respondents' own account, which Mr. Ramirez disputes in other respects, his arrest was based solely on the fact that he was born in Mexico, had entered the country illegally, and had once been arrested—for speeding. *See* Form I-213 at 3, 4.[3]

At the ICE processing center in Tukwila, Washington, agents first took Mr. Ramirez's wallet, which contained his work permit. Ramirez Decl. ¶ 17. This permit included a "C-33" designation, which clearly identified Mr. Ramirez as a DACA recipient with work authorization pursuant to DACA. *Id.*; Form I-213 at 4. ICE also fingerprinted Mr. Ramirez and used this information to access

---

[3]   According to DHS, these facts are insufficient to justify the arrest or detention of a DACA beneficiary. Napolitano Memo at 1; DACA FAQs at Q.28, Q.51, Q.60-67.

his records, which confirmed that Mr. Ramirez had no criminal history, had been twice granted DACA, was currently a DACA beneficiary, and had an Employment Authorization Document valid through May 4, 2018. Ramirez Decl. ¶ 17; Form I-213 at 3-4.

Even assuming that the arresting agents had not understood at the residence that Mr. Ramirez was lawfully present in the United States, once the work permit was produced, there could be no question whatsoever about this fact. But instead of releasing Mr. Ramirez, the ICE agents told him: "it did not matter," because he "was not from the United States." Ramirez Decl. ¶ 17. In fact, Respondent's Form I-213 cites Mr. Ramirez's DACA application and approval as evidence of his "illegal" status: After noting that Mr. Ramirez's "alienage had already been established," the Form I-213 states "[*i*]*n addition*, upon running checks at the office, Officer Hicks discovered that subject had applied for [DACA] on 2/29/2016, as a Mexican citizen who had made an unlawful entry into the United States." Form I-213 at 3 (emphasis added).

At this point, ICE agents began to aggressively and coercively interrogate Mr. Ramirez, pressuring him to admit to gang membership. Ramirez Decl. ¶ 19. According to both Mr. Ramirez's and the agents' accounts, this occurred only after Mr. Ramirez's lawful presence and DACA status had been established, and there was no basis for further detention or interrogation. Nor did ICE agents have any legitimate basis to suspect that Mr. Ramirez was a member of a gang or had any involvement in gang activity. Nonetheless, the agents aggressively asked him repeatedly—at least five times—whether he was in a gang. *Id.* ¶¶ 19, 22. Each time he denied any gang affiliation. *Id.* ICE agents next pressed him as to whether he had ever known anyone who was a gang member. *Id.* ¶ 22. Mr. Ramirez told the agents that, although that he knew students who had attended middle school and high school with him who were in gangs, he was not gang-affiliated and never had been. *Id.*

ICE agents also aggressively interrogated Mr. Ramirez about his tattoo, which is visible on his forearm and is the only tattoo on his body. *Id.* ¶¶ 23-25. He obtained the tattoo when he was 18 years old—before he first applied for DACA status. *Id.* ¶ 23. The tattoo consists of the words "La Paz – BCS" and a nautical star. *Id.* ¶¶ 23-24. "La Paz," which translates to "the peace" in Spanish, is Mr. Ramirez's birthplace, and "BCS" stands for Baja California Sur, the region in which La Paz is

located. *Id.* ¶ 24. Mr. Ramirez decided to include the city of his birth because he had seen others do the same, and ultimately selected the nautical star (rather than a whale's tail, which he also considered) because he liked the way it looked. *Id.* Nautical stars are popular symbols on tattoos. Decl. of Martin Flores ("Flores Decl.") ¶ 14, Dkt. #35-7. Mr. Ramirez repeatedly told the ICE agents that the tattoo is not a gang tattoo, but the agents kept trying to coerce him to state otherwise. Ramirez Decl. ¶ 25. No evidence has ever been produced by DHS to refute Mr. Ramirez's denials.

Mr. Ramirez was then transferred to Northwest Detention Center. Though lacking any evidence of gang membership, ICE agents asked Mr. Ramirez if there were any gangs with which he would like to avoid being placed for his safety. Ramirez Decl. ¶ 26. Mr. Ramirez stated that he had no gang affiliation and would not have problems being placed with anyone. *Id.* Mr. Ramirez stated that if he had to be placed with any group, he would prefer to be with other "*paisas*." *Id.* Mr. Ramirez understands the colloquial use of "paisas" to mean Mexicans, and was trying to say that if placed with any group, he preferred being placed with other Mexicans. *Id.*; *see* Flores Decl. ¶ 9 ("The term 'paisa' is commonly used to refer to people who are recent immigrants and non-gang members."). Mr. Ramirez, who has no criminal history and has never previously been in custody, has no connection or affiliation whatsoever to a "paizas" gang in Washington or elsewhere. Ramirez Decl. ¶¶ 19-20, 26. At the time, Mr. Ramirez had been in Washington seeking work for just over a month. *Id.* ¶ 10.

Mr. Ramirez was initially told he had to wear an orange uniform because he had been classified as a "gang member." *Id.* ¶ 27. He again explained that he was not a gang member and asked to be reclassified. The agents provided Mr. Ramirez with a "Classification Appeal" form, on which he clearly wrote: "I came in and the officer said I have gang affiliation with gangs so I wear orange uniform. I do not have a criminal history and I'm not affiliated with any gangs." *Id.*

On February 22, 2016, counsel for Mr. Ramirez was informed that he was to be transferred to the "Level 3" section of the Northwest Detention Center, placing him in a category that is usually limited to violent offenders, drug traffickers, or individuals suspected to be a significant threat to national security. Such a transfer would result in a direct and immediate threat to Mr. Ramirez's

physical safety, and would be entirely without justification, as Mr. Ramirez has no criminal history and DHS has repeatedly determined that he poses no threat to public safety or national security.

Mr. Ramirez has been detained in the Northwest Detention Facility for more than 11 days.

## C.     Respondents' Unsubstantiated and Shifting Account of Events and Effort to Vilify Mr. Ramirez

In response to Mr. Ramirez's arrest and detention, and despite his DACA status, Respondents have conducted a well-publicized campaign to stigmatize and disparage him by branding him a gang member. But despite access to numerous federal and state criminal and gang databases, Respondents have never produced any evidence to support their claim that Mr. Ramirez is a gang member. By way of a few examples:

- On February 14, 2017, ICE spokesperson Rose Richeson stated that "ICE officers took Mr. Ramirez into custody *based on* his admitted gang affiliation and risk to public safety." Decl. of Jesse Gabriel ("Gabriel Decl."), Exs. A, B, Dkt. #35-11 (emphasis added). This directly contradicts Respondents' Brief , as well as the Form I-213, attached thereto as Exhibit C, both of which note that ICE agents did not discuss Mr. Ramirez's purported gang affiliation until after he was transported to the ICE holding facility in Tukwila. Resp't Br. at 2, Dkt. #32; Form I-213 at 3.

- On February 15, 2017, ICE officials were pressed by the news media for additional evidence demonstrating that Mr. Ramirez was a gang member. In response, ICE officials informed the media that they had "additional evidence including photos and social media content that illustrate his gang affiliation." Gabriel Decl., Ex. C. But Respondents' Brief makes no mention of any such evidence.

- On February 15, 2017, an unnamed ICE official informed members of the national news media that there was corroborating evidence to support their allegations of gang membership. Gabriel Decl., Ex. D. But Respondents have not provided any such corroborating evidence to support these unfounded allegations.

- On February 15, 2017, DHS issued a statement describing Mr. Ramirez as "a gang member." Gabriel Decl., Ex. E. Respondents' Brief, however, backed away from that conclusion, and instead asserts only that Mr. Ramirez purportedly "hangs out with" gang members. Resp't Br. at 2.

The tattoo on Mr. Ramirez's forearm has never been shown to be associated with any gang, yet Respondents have repeatedly characterized it as a "gang tattoo." Resp't Br. at 2; Form I-213 at 3. They offered no expert testimony in support of their claim. Martin Flores, an expert on interpreting gang tattoos, signs, symbols and codes, has consulted on over 700 cases in the past ten years. Flores Decl. ¶¶ 1, 2, 7. Upon reviewing a picture of Mr. Ramirez's tattoo he concluded: "In my extensive experience with gang-related symbols and tattoos, I would not identify this tattoo as gang-related. I have never seen a gang member with a similar tattoo nor would I attribute this tattoo to have any gang-related meaning." *Id.* ¶ 11. Counsel for Mr. Ramirez have requested that Respondents provide any corroborating evidence on these issues but have received none. *See* Declaration of Ethan Dettmer ("Dettmer Decl.") ¶ 8, Dkt. #35-9.

### D.   Impact of Mr. Ramirez's Arrest and Detention on Dreamers Throughout the United States

Predictably, Respondents' disregard of Mr. Ramirez's DACA status "instilled fear and confusion in the hundreds of thousands of DACA recipients who placed their trust in, and organized their lives around, the Government's promise." Proposed Amicus Curiae Brief from United We Dream ("UWD Brief") at 3, Dkt. #38-1. Roberto Dondisch, Consul of Mexico, has similarly expressed concern that Mr. Ramirez's "detention, which occurred during an operation aimed at a different person, has created unnecessary alarm and concern among the Mexican community in the U.S. Particularly, among those who, like Mr. Ramirez, are recipients of a DACA work permit and thus substantially contribute to the economy and the development of the communities they live in." Letter from Mexican Consul Roberto Dondisch to the Honorable James P. Donohue (Feb. 16, 2017)

1  ("Consul Letter") at 1, Dkt. #36-1. Yet only last week, President Trump assured the nation "[w]e're

2  gonna deal with DACA with heart."[4] And yesterday, DHS stated that DACA would remain in place.[5]

3  **MR. RAMIREZ SHOULD BE RELEASED ON BAIL**

4      A.    **This Court Has the Authority To Release Mr. Ramirez on Bail Pending the**

5                  **Resolution of His Habeas Petition.**[6]

6        Consistent with every court that has addressed this issue, the Ninth Circuit has assumed on

7  three occasions that district courts have the power to conditionally release habeas petitioners pending

8  the resolution of their underlying claim. *See McCandless*, 841 F.3d at 822; *In re Roe*, 257 F.3d at

9  1080; *Land*, 878 F.2d 318; *see also Mapp*, 241 F.3d at 226; *Dotson*, 900 F.2d at 79; *Martin*, 801 F.2d

10  at 329; *Cherek*, 767 F.2d at 337; *Pfaff*, 648 F.2d at 693; *Woodcock*, 470 F.2d at 94; *Baker*, 420 F.2d

11  at 1343; *Boyer*, 402 F.2d at 968; *Johnston*, 227 F.2d at 531. At least one district court in this Circuit

12  has specifically invoked this authority in the immigration context, conditionally releasing a habeas

13  petitioner who was challenging his detention by the Immigration and Naturalization Service (the

14  predecessor to ICE) pending the final resolution of his habeas petition. *See Tam*, 14 F. Supp. 2d at

15  1186 ("grant[ing detained alien's] conditional release pending resolution of his petition for habeas

16  corpus"); *see also Mapp*, 241 F.3d. at 223 ("[T]he Federal Courts have the same inherent authority to

17  admit habeas petitioners to bail in the immigration context as they do in criminal habeas cases.");

18  *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) ("The Real ID Act of 2005

---

20  [4]  Declaration of Katherine M. Marquart ("Marquart Decl."), Ex. A, Full Transcript and Video: Trump News Conference, N.Y. Times, February 17, 2017, https://www.nytimes.com/2017/02/16/us/politics/donald-trump-press-conference-transcript.html.

22  [5]  *Id.*, Ex. B, Memorandum from John Kelly, Sec'y of Homeland Sec., Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017).

23  [6]  This motion seeks only the *conditional* release of Mr. Ramirez from the Northwest Detention Center, pending resolution of his habeas petition. If the court were to order such release, it would not terminate Mr. Ramirez's custodial status for purposes of this Court's ongoing habeas jurisdiction. *See Jones v. Cunningham*, 371 U.S. 236, 239-40 (1963) (holding that a paroled prisoner was still "in custody" for habeas purposes when the conditions of his parole "restrain[ed] petitioner's liberty to do those things which in this country free men are entitled to do"); *Williamson v. Gregoire*, 151 F.3d 1180, 1182 (9th Cir. 1998) (same); *Xiaoyuan Ma v. Holder*, 860 F. Supp. 2d 1048, 1052 (N.D. Cal. 2012) ("Although petitioner is not, literally, a prisoner of the INS, courts have long recognized that the writ is available to those who suffer such a curtailment of liberty as to render them 'in custody' for the purposes of 28 U.S.C. § 2241(c).").

1   further altered the landscape of immigration law, but did not qualify our inherent authority to admit to

2   bail petitioners in immigration cases.").

3          The Ninth Circuit has three times stated the test a habeas petitioner must satisfy in order to be

4   released on bail pending resolution of the underlying petition. Specifically, a petitioner must

5   demonstrate either (1) a "high probability of success" on the merits of his habeas petition, or (2) that

6   his is an "extraordinary case[] involving special circumstances." *McCandless*, 841 F.3d at 822; *Roe*,

7   257 F.3d at 1080; *Land*, 878 F.2d at 318; *see also Pfaff*, 648 F.3d at 693.[7]

8          **B.     Mr. Ramirez Has Alleged Substantial Constitutional Claims that Have a High**

9                  **Probability of Success on the Merits.**

10         Mr. Ramirez's petition for habeas relief is premised exclusively on Respondents' violations of

11  his rights under the U.S. Constitution. Mr. Ramirez has alleged that Respondents have violated his

12  right to Substantive Due Process under the Fifth Amendment, his right to Procedural Due Process

13  under the Fifth Amendment, his right to be free from unlawful seizure under the Fourth Amendment,

14  and his right to equal protection under the Fifth Amendment. Am. Pet. ¶¶ 50-82. These claims raise

15  serious constitutional questions of the nature that courts in this Circuit have held warrant release on

16  bail. For example, in *Tam v. INS*, a California district court held that an undocumented immigrant had

17  asserted "substantial constitutional claims" by claiming his continued detention violated his

18  substantive due process rights. The court concluded that the petitioner was "entitled to have his

19  detention reviewed for compliance with the Constitution." *Tam*, 14 F. Supp. 2d at 1190.

20         Mr. Ramirez has a high probability of prevailing on the constitutional claims raised by his

21  amended habeas petition. Even by Respondents' own shifting account of events, the government's

22  arrest and detention of Mr. Ramirez was in violation of his Fourth and Fifth Amendment rights.

23         ***Fourth Amendment:*** ICE agents arbitrarily and capriciously arrested and detained Mr.

24  Ramirez without a warrant, reasonable suspicion, or probable cause. Like all individuals physically

25  present in the United States, Mr. Ramirez is entitled to Fourth Amendment protection from unlawful

26

27  ---

    [7]  Other circuits have articulated a similar test, holding that the petitioner must demonstrate: (1) a
    high probability of success, (2) substantial constitutional claims, and (3) extraordinary
    circumstances. *See, e.g.*, *Mapp*, 241 F.3d at 226. Regardless of the test applied, Mr. Ramirez
    easily qualifies for release.

28

Emergency Motion for Conditional Release Pending Final                Counsel Listed on Pages I and II
Determination
Case No. 2:17-cv-00218-RSM-JPD

Gibson, Dunn &
Crutcher LLP

1   seizures.  *See Orhorhaghe v. INS*, 38 F.3d 488, 497-501 (9th Cir. 1994); *Benitez-Mendez v. INS*, 760

2   F.2d 907, 909 (9th Cir. 1983).

3         The Fourth Amendment requires that all arrests entail a neutral judicial determination of

4   probable cause, either before the arrest (in the form of a warrant) or promptly afterward (in the form

5   of a prompt judicial probable cause determination).  *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975).

6   Absent a bona fide emergency or other extraordinary circumstance, failure to receive a judicial

7   probable cause determination within 48 hours of detention (including weekends) violates the Fourth

8   Amendment as a matter of law.  *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).

9         To support a warrantless arrest and detention for a civil immigration violation, the arresting

10  officer must be aware of sufficient facts to support a reasonable belief that the alien is in the United

11  States illegally.  *Benitez-Mendez*, 760 F.2d at 909.  Absent such facts, a warrantless arrest violates the

12  Fourth Amendment.  *Orhorhaghe*, 38 F.3d at 497-501.  Here, Respondents arrested and are detaining

13  Mr. Ramirez despite their knowledge that he was granted deferred action under DACA, and is

14  therefore authorized to live and work in the United States according to DHS's own promise to

15  Mr. Ramirez and other DACA holders like him.[8]  By arresting and detaining Mr. Ramirez under these

16  circumstances, Respondents are violating his Fourth Amendment rights. *See Benitez-Mendez*, 760

17  F.2d at 909 (no basis for detention where immigrant admitted foreign alienage but alleged he

18  possessed documents establishing his legal status).

19        Respondents also violated Mr. Ramirez's Fourth Amendment rights by failing to provide him

20  with a prompt judicial probable cause determination, which has resulted in his continued detention.

21        ***Substantive and Procedural Due Process***: The federal government arrested and detained

22  Mr. Ramirez despite knowledge that, as a DACA recipient, Mr. Ramirez was authorized to live and

23  work in the United States.  There is no question that the benefits provided under DACA are property

24  interests protected by the Constitution. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("A person's

25  interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually

---

27  [8]   By their own admission, Respondents did not inquire into Mr. Ramirez's alleged gang-
28  affiliation—their only grounds for his ongoing incarceration—until after his arrest and initial
   detention. Form I-213 at 3.

Gibson, Dunn &
Crutcher LLP

Emergency Motion for Conditional Release Pending Final
Determination
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

11

1   explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a

2   hearing.") Moreover, the protections and work authorization that Mr. Ramirez has received under the

3   DACA program have "become essential . . . in pursuit of [his] livelihood." *Bell v. Burson*, 402 U.S.

4   535, 539 (1971).

5           Termination of DACA and the corresponding work authorization "involves state action that

6   adjudicates important rights," *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), and "[t]his constitutional

7   challenge cannot be answered by the argument that the benefits are a 'privilege' and not a right," *Id*;

8   *see id.* at 268 (holding that termination of welfare benefits requires pre-deprivation notice and

9   "opportunity to be heard" (citation omitted)). That is the case here: Mr. Ramirez had a reasonable

10  expectation that the benefits conferred to him under DACA would be protected. And, in fact, he did

11  rely on the government's promises embodied in DACA's strict framework. *Cf. Accardi v.*

12  *Shaughnessy*, 247 U.S. 260, 266-67 (1954).

13          The due process violations here are even more insidious, as they involve the government

14  essentially attempting a bait-and-switch with respect to Mr. Ramirez's DACA benefits. The

15  government affirmatively encouraged Mr. Ramirez to come forward and identify himself, to submit

16  to rigorous screening, and to register as a Dreamer. Now, Respondents are trying to take back this

17  country's promise to Mr. Ramirez, without any notice or due process. As the Supreme Court has long

18  recognized, the Due Process Clause forbids the government from punishing people for engaging in

19  conduct that the government itself has encouraged. *See, e.g.*, *Cox v. State of La.*, 379 U.S. 559, 571

20  (1965) (holding that the government could not punish protestors for demonstrating in a location

21  where the state officials had said the protest was allowed). For the government now "to say to

22  [Mr. Ramirez], 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great

23  government'" *Moda Health Plan, Inc. v. United States*, No. 16-649C, 2017 WL 527588, at *26

24  (Fed. Cl. Feb. 9, 2017) (quoting *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)).

25          In establishing and continuously operating the DACA program under a well-defined

26  framework and highly specific criteria, the federal government created a reasonable expectation that

27

28

Emergency Motion for Conditional Release Pending Final
Determination
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

DACA recipients will be able to live and work in the United States for a specific period without being subject to arrest and detention based on their immigration status.

*Equal Protection:* Mr. Ramirez, like all persons in the United States, is protected by the Fifth and Fourteenth Amendments of the Constitution and is guaranteed the rights of due process and equal protection. *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."). As recently as the day of this filing (February 22, 2017), the Supreme Court reiterated the principle that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Buck v. Davis*, 2017 WL 685534, at *16 (U.S. Feb. 22, 2017) (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). More specifically, the Court held that racial stereotyping is repugnant to the justice system, stating that "[i]t would be patently unconstitutional for a state to argue that a defendant is liable to be a future danger because of his race" and that "[o]ur law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle." *Id.* at *14; *see also Flores v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (using an analysis under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) and holding that where city officials "used stereotypic references to individuals" a trier of fact could infer "an intent to disguise a racial animus.").

Inferring that a person is a gang member based solely on that person's race is a clear form of race discrimination. *Williams v. Lindenwood Univ.*, 288 F.3d 349, 356-57 & n.7 (8th Cir. 2002) (finding discriminatory intent in a race discrimination case where officials "interchangeably used race to describe people who allegedly were criminals and whose presence supposedly put the safety of the female students at risk" and noting that the "use of the term 'black' as a proxy for 'gang member' still reflects a negative attitude about black people."). And this discriminatory intent is only underscored by Respondents' insistence—contrary to all evidence—that it is a "gang tattoo." As gang expert Flores determined and Mr. Ramirez confirmed, that tattoo is not associated with any gangs. Flores Decl. ¶ 11. But Respondents' automatic assumption and continued insistence that Mr. Ramirez's

tattoo is gang-related is striking evidence of the pernicious and unlawful racial stereotyping at work in the arrest. It is the same as saying that a man of Mexican heritage with a tattoo is by necessity a gang member.

Here, ICE agents had no factual basis for their assumption that Mr. Ramirez was a gang member. Instead, the ICE agents engaged in pernicious racial stereotyping, assuming that Mr. Ramirez was a gang member based only on an ordinary tattoo and on his Mexican heritage. And ICE agents ignored the many indicia that Mr. Ramirez is not a gang member, including his own statements and the rigorous background checks conducted by DHS on multiple occasions.

C.   **This Case Is Extraordinary and Involves Special Circumstances**.

Although the Ninth Circuit has not specified the precise contours of an "extraordinary" case, the Supreme Court decision that informed the Circuit's first articulation of the test for habeas bail is instructive. *See Land*, 878 F.2d at 318 (citing *Aronson v. May*, 85 S. Ct. 3, 5 (1964) (Douglas, J. in chambers) to support the proposition that "[b]ail pending a decision in a habeas case is reserved for extraordinary cases involving special circumstances or a high probability of success."). *Aronson* is an in-chambers opinion authored by Justice Douglas denying a habeas petitioner's appeal on application for bail pending the appeal of a habeas petition. In rejecting petitioner's claim, Justice Douglas noted that where a petitioner has been "tried, convicted, and sentenced by a court of law," there must be "some circumstance making [the] application exceptional and deserving of special treatment in the interests of justice." 85 S. Ct. at 5. Here, where the petitioner has a clean criminal record and has twice been determined not to be a threat to national security or a risk to the public, the standard must surely be far lower. Nonetheless, Mr. Ramirez's case also involves external exceptional circumstances of national and international import and his conditional release is consequently "in the interests of justice." *Id.*

1.   ***Mr. Ramirez, a two-time DACA recipient, is neither a threat to public safety nor a flight risk.***

The government's arbitrary and unlawful detention of Mr. Ramirez serves no purpose, as Mr. Ramirez is neither a threat to public safety nor a flight risk. Mr. Ramirez has twice been vetted for

Gibson, Dunn &
Crutcher LLP

Emergency Motion for Conditional Release Pending Final
Determination
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

14

and received DACA, and he has no criminal record. *See* Dkt. #32-3 at 2 ("Subject has no criminal history"); Am. Pet. ¶¶ 23, 30; Ramirez Decl. ¶¶ 3, 9; 17; Marquart Decl., Ex. C, Suppl. Decl. of Daniel Ramirez Medina ("Ramirez Suppl. Decl.") ¶ 6. Mr. Ramirez is not a gang member. *See* Ramirez Decl. ¶ 19; Josue Decl. ¶ 4; Decl. of Luz L. ("Luz Decl.") ¶¶ 9, 12, Dkt. #35-3; Decl. of Nancy L. ("Nancy Decl.") ¶ 8, Dkt. #35-5; Marquart Decl., Ex. D, Decl. of Juan Lemus ("Lemus Decl.") ¶ 4; Marquart Decl., Ex. E, Decl. of Francisco Hernandez ("Hernandez Decl.") ¶ 7; Marquart Decl., Ex. F, Decl. of Maria Contreras ("Contreras Decl.") ¶ 3, Marquart Decl., Ex. G, Decl. of Teresa Lemus ("Teresa Decl.") ¶ 10. Nor does he have any gang affiliation or gang tattoos. Ramirez Decl. ¶ 19, 23-25; Luz Decl. ¶¶ 8, 9; Nancy Decl. ¶ 10; Lemus Decl. ¶ 5; Hernandez Decl. ¶ 8-9; Contreras Decl. ¶¶ 3-4; Teresa ¶ 9-10. The government's characterizations of Mr. Ramirez to the contrary are slanderous vilifications.

   Mr. Ramirez is "a dedicated father, son, and brother as well as a benefit to the community. He is not a threat to anyone." Hernandez Decl. ¶ 9. He is known to be "kind, calm, generous, and very humble." *Id.* ¶ 3. He is "very shy and quiet." Nancy Decl. ¶ 3; *see* Josue Decl. ¶ 5 ("[H]e is generally a shy and quiet person."); Teresa Decl. ¶ 5. "He is not a violent person." Nancy Decl. ¶ 3; *see* Luz Decl. ¶ 12 ("He's a kind person who would never do harm to someone else."). In fact, "[m]ost people that know Daniel would describe him as timid and calm." Luz Decl. ¶4. Mr. Ramirez is a "very family oriented" person who "spends most of his time hanging out at home and talking with family." Hernandez Decl. ¶3; *see* Josue Decl. ¶ 5; Luz Decl. ¶ 9; Lemus Decl. ¶ 3; Contreras Decl. ¶ 8; Teresa Decl. ¶ 7 ("[Daniel] is a big homebody and prefers to be at home with his family."). He is a religious person who has attended church and other religious services, who has pursued spiritual education, and for whom "[i]t is very important . . . to pass on his faith to his son." Marquart Decl., Ex. H, Suppl. Decl. of Nancy L. ("Nancy Suppl. Decl.") ¶4; *see id.* ¶¶ 3-7; Contreras Decl. ¶¶ 7, 10. He "is always willing to help others," Marquart Decl., Ex. I, Suppl. Decl. of Luz L. ("Luz Supp. Decl.") ¶ 4, and is "a little kid at heart." Hernandez Decl. ¶¶ 3, 4; *see* Luz Decl. ¶ 9 ("My son is the opposite of a bad person; he is very noble and has a big heart."); Luz Suppl. Decl. ¶ 4; Teresa Decl. ¶ 8.

Gibson, Dunn & Crutcher LLP

1    Mr. Ramirez is not a flight risk. The focal points of Mr. Ramirez's life are his son—a United

2  States citizen—and his family, both of which are firmly rooted in this country. Ramirez Decl. ¶¶ 8

3  ("[Daniel Jr.] is my world."), 10 ("I left California and came to Washington . . . so that I can provide

4  better for my son."), 13, 29; Luz Decl. ¶¶ 10 ("Ever since Daniel Jr. was born, my son has lived for

5  that child."), 11; Josue Decl. ¶ 2, 13; Nancy Decl. ¶¶ 6, 7 ("Daniel's motivation is his family . . .);

6  Hernandez Decl. ¶ 4 ("Daniel's life revolves around his son and his mother. Daniel is so loving

7  towards his son. Every decision and every opportunity is about Daniel Jr."). "[F]amily is the most

8  important thing to him." Contreras Decl. ¶ 8; *see* Teresa Decl. ¶¶ 3-4, 11.

9    Mr. Ramirez's son relies on his father: "Daniel buys his son diapers, food, clothes, baby

10  formula, toys, and makes sure his son has a safe crib to sleep in." Josue Decl. ¶ 13. Mr. Ramirez's

11  son depends on him not only for financial support but also for emotional wellbeing. *See* Nancy Decl.

12  ¶ 6 ("As soon as he gets home from work [Daniel] takes Daniel Jr. to the park or watches TV with

13  him."); Luz Suppl. Decl. ¶¶ 5-12 ("My nephew misses [Daniel] a lot right now."); Nancy Decl. ¶ 6;

14  *see* Hernandez Decl. ¶ 10 ("His son asks for him every day."); Contreras Decl. ¶ 11. Recently, when

15  Daniel Jr. saw Daniel on the news on the television he "started screaming 'Papa! Papa, es mi papa!'

16  ('Dad! Dad, that's my dad!')." Luz Decl. ¶ 10; *see* Nancy Decl. ¶ 6; Hernandez Decl. ¶ 10. Mr.

17  Ramirez would not leave his son or his family, much less the only country he has known since he was

18  a child, and upon which he rests his hopes for an education and better life. *See* Ramirez Decl. ¶ 11,

19  29; Nancy Decl. ¶ 8("[Daniel] would never be involved in anything that would put his child at risk");

20  Nancy Suppl. Decl. ¶ 10 ("[Daniel] would keep his immigration appointments because he wants to be

21  able to stay in this country with his family. He has no reason to leave."). In the words of Daniel's

22  brother, "Daniel's son needs him. Our mom needs him. Our siblings need him. Daniel should not be

23  in detention." Josue Decl. ¶ 13; *see* Luz Suppl. Decl. ¶¶ 3, 14-15, 16 ("Daniel's release would be an

24  economic relief for our family."); Contreras Decl. ¶ 11 ("As a family, we miss Daniel a lot and it

25  hurts us to know he is locked up. His son misses him and his mother is suffering because of his

26  absence.").

27

28

Gibson, Dunn & Crutcher LLP

Emergency Motion for Conditional Release Pending Final                    Counsel Listed on Pages I and II
Determination
Case No. 2:17-cv-00218-RSM-JPD

16

There is no reason for Mr. Ramirez to continue to be detained pending resolution of the merits of his petition. DHS's ugly characterizations about him are a stain on his reputation and integrity. He means to fight against them so that he might defend his good name, and make certain that his ordeal is not repeated for the thousands of Dreamers who have publicly pronounced their support for him. Ramirez Suppl. Decl. ¶¶ 3, 5, 7. In Mr. Ramirez's own words, "I want to stay in this country and provide a life for my son and family." Ramirez Decl. ¶ 29; *see* Ramirez Suppl. Decl. ¶¶ 3, 4.

At the same time, the false branding of Mr. Ramirez as a gang member and his placement in a unit reserved exclusively for gang members makes his continuing presence within the facility a matter of high risk to his personal safety and well-being. That vilification cannot be undone, and even standing alone, in the circumstances here, constitutes exceptional circumstances for his immediate release from custody.

### 2. *Mr. Ramirez's continued detention has created panic and confusion among hundreds of thousands of DACA recipients throughout the United States.*

Mr. Ramirez's case is an unprecedented attack on DACA, a federal program upon which hundreds of thousands of young people rely to live and work without fear of deportation in the only country they know as home. The integrity of the program has been called into question by Respondents' treatment of Mr. Ramirez, and the highly public campaign against him. Mr. Ramirez's arbitrary and capricious arrest and continued detention have set off panic and confusion amongst Dreamers and their loved ones, so much so that Roberto Dondisch, Consul of Mexico, wrote to this Court to express his concern over the "sense of vulnerability" that Mr. Ramirez's arrest and detention has caused, noting that "[t]he fear of being arrested and deported has a direct impact on their personal and professional development, and also affects their emotional well-being." Consul Letter at 1-2. As United We Dream explained in its amicus brief to this Court:

> [DACA] did more than guarantee its enrollees a form of lawful status. . . . DACA allowed its recipients to access a host of other benefits that would otherwise have remained unavailable to them. These benefits include work authorizations, the ability to obtain a Social Security number and, depending on the state, access to driver's licenses and in-state tuition at public universities. DACA enabled recipients to open bank accounts, apply for credit cards, buy homes and cars, and conduct other aspects of daily life that are often impossible for undocumented immigrants. Put differently, DACA granted its recipients not just a form of liberty, but also access to property.

UWD Brief at 2.  Since DACA's inception, over 860,000 young people have been approved for deferred action.[9]  Dreamers have relied upon DACA "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."[10]  In the words of the Department of Homeland Security, "[w]e continue to benefit as a country from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."[11] *Id.*

Mr. Ramirez's ongoing detention without due process and in violation of his rights to be free from unlawful seizure and to equal protection under the law has created a state of uncertainty about Dreamers' status and their rights, causing significant harm to communities throughout the United

---

[9] Marquart Decl., Ex. J (U.S. Citizenship and Immigration Services, Number of I-821D Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2016_qtr4.pdf.)

[10] Marquart Decl., Ex. K (Letter from Secretary of Homeland Security Jeh Charles Johnson to Representative Judy Chu (Dec. 30, 2016)).

[11] An estimated 95% of Dreamers are currently employed or enrolled in school. Many have pursued advanced degrees in higher education. Almost 40% have already obtained or are currently pursuing a bachelor's degree, and 70% of those currently enrolled in school are pursuing a bachelor's degree or higher. These types of educational opportunities were not always available to this population. Over 60% of Dreamers reported pursuing educational opportunities they previously could not, while 37% plan to pursue more education but have not yet. Dreamers are also employed in a diverse array of industries, including educational and health services, the non-profit sector, wholesale and retail trade, professional and business services, leisure and hospitality, manufacturing, financial activities, and construction. Impressively, 5.5% started their own business, which is higher than American public as a whole—3.1%—and the entire immigration population in the U.S.—3.6%. (Marquart Decl., Ex. L, (Tom K. Wong, et al., New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes, Oct. 18, 2016, https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/).) Dreamers' improved finances have led to increased state tax revenue and economic growth: 54% bought their first car (generating sales tax), 12% bought a home (generating property taxes), 90% obtained a driver's license or state identification card for the first time (generating state fees), 47% opened a bank account, 57% obtained their first credit card, and 66% obtained health insurance. (Marquart Decl., Ex. M, (Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey, Center for American Progress (2016), https://cdn.americanprogressaction.org/content/uploads/2016/10/21111136/2016-daca_survey_draft_updated-FINAL2.pdf.) The Cato Institute has estimated that DACA will add $280 billion of economic growth to the US economy over the next decade. (Marquart Decl., Ex. N, Cato Institute, The Economic And Fiscal Impact of Repealing DACA, Jan. 18, 2017, https://www.cato.org/blog/economic-fiscal-impact-repealing-daca).

---

Emergency Motion for Conditional Release Pending Final Determination
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

Gibson, Dunn & Crutcher LLP

States and undermining the very legitimacy of the DACA program.  Leaving Mr. Ramirez in

detention signals that arresting and detaining a Dreamer without probable cause or reasonable

suspicion is permissible, potentially putting all DACA holders at risk.

## CONCLUSION

Mr. Ramirez respectfully requests that this Court order his immediate release on bail pending

the resolution of his habeas petition.

DATED:  February 22, 2017

Seattle, Washington

Respectfully submitted,

/s/ Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*

/s/ Marc D. Rosenbaum
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
JUDY LONDON (CA SBN 149431), *pro hac vice*
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*

/s/ Erwin Chemerinsky
ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
LEAH M. LITMAN (DC SBN 1016310), *pro hac vice pending*
University of California, Irvine School of Law
*\*Affiliation for identification purposes only*

/s/ Laurence H. Tribe
LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
Harvard Law School
*\*Affiliation for identification purposes only*

/s/ Luis Cortes Romero
BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
JOHN C. BARRERA (SBN 47658), *pro hac vice*
JOSE GARCIA (SBN 46518), *pro hac vice*

Attorneys for Petitioner

# CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2017, I electronically filed documents located at Docket No. 45 with the Clerk of the Court using CM/ECF. I also certify that the documents located at Docket No. 45 should automatically be served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Theodore J. Boutrous, Jr.