UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DANIEL RAMIREZ MEDINA,<br><br>Petitioner,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>Respondents. | NO.  C17-218-RSM-JPD<br><br>REPORT AND RECOMMENDATION |

## I.    INTRODUCTION

What role, if any, does the writ of habeas corpus play when those charged with the enforcement of the immigration laws abuse constitutional limits and power?  Specifically, is Petitioner entitled to seek redress for alleged constitutional violations in connection with his arrest, four-hour questioning, and subsequent detention through the vehicle of the Great Writ, or is this Court stripped of jurisdiction, leaving the immigration courts as the sole and exclusive means of recourse, with a possible appeal to the Ninth Circuit Court of Appeals four or five years down the road?  These are the narrow, but important, questions raised by the motions before the Court.

Daniel Ramirez Medina (hereinafter, "Petitioner"), a native and citizen of Mexico, brought this 28 U.S.C. § 2241 habeas action to obtain release from his allegedly unconstitutional

REPORT AND RECOMMENDATION - 1

arrest and detention, as well as a declaration that he and other Deferred Action for Childhood Arrivals ("DACA") beneficiaries have constitutionally protected interests in the benefits conferred under DACA and therefore cannot be arbitrarily arrested and detained because of their immigration status.  The governmental respondents[1] (hereinafter, "the Government") assert that DACA does not confer legal status and that the constitutional violations alleged in this case must proceed exclusively through the immigration courts, and eventually be raised in a petition for review to the Ninth Circuit Court of Appeals.

Currently before the Court is the Government's Motion to Dismiss, Dkt. 52, and Petitioner's Emergency Motion for Conditional Release Pending Final Determination, Dkt. 45. Both motions have been fully briefed, and the Court held an oral argument on March 8, 2017. Dkt. 60.  Having carefully considered the parties' submissions and the balance of the record, the oral argument of counsel, and the governing law, the Court recommends that the Government's Motion to Dismiss be DENIED because Petitioner's claims are independent of his removal proceedings.  In addition, because the full extent of the liberty interest, if any, held by Petitioner by virtue of his DACA status is not yet fully defined, but will be through these proceedings, the Court recommends that Petitioner's Motion for Conditional Release be DENIED at this time.

## II.     BACKGROUND

A.     Deferred Action and the DACA Program

The federal government has broad and plenary powers over the subject of immigration and the status of non-citizens. *Arizona v. United States*, 567 U.S. 387, 132 S. Ct. 2492, 2498 (2012); *see also* U.S. Const. art. I, § 8, cl. 4.  Through the Immigration and Nationality Act

---

[1] The respondents in this action are the U.S. Department of Homeland Security; John Kelly, the Secretary of Homeland Security; Nathalie Asher, the Director of the Seattle Field Office of U.S. Immigration and Customs Enforcement; and Lowell Clark, the Warden of the Northwest Detention Center.  Dkt. 41 at 1.

REPORT AND RECOMMENDATION - 2

("INA"), 8 U.S.C. § 1101 *et seq.*, Congress has created a complex and detailed federal immigration scheme governing the conditions under which foreign nationals may be admitted to and remain in the United States, *see, e.g.*, *id.* §§ 1181, 1182, 1184, and providing for the removal of non-citizens not lawfully admitted to this country, *see, e.g.*, *id.* §§ 1225, 1227-29, 1231.  Removal is a civil, not criminal, matter.  *Arizona*, 132 S. Ct. at 2499.

The INA charges the Secretary of Homeland Security with the administration and enforcement of all laws relating to immigration and naturalization.  8 U.S.C. § 1103(a)(1).  The U.S. Department of Homeland Security ("DHS") cannot practicably remove every removable non-citizen, and therefore "a principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499.  Under this delegation of authority, the Secretary may exercise a form of prosecutorial discretion and decide not to pursue the removal of a person unlawfully in the United States.  Deferred action is a "regular practice" in which the Secretary of Homeland Security exercises his or her prosecutorial discretion "for humanitarian reasons or simply for [his or her] own convenience" to notify a non-citizen of a decision to forbear from seeking his or her removal for a designated period of time. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 & n. 8 (1999) (recognizing the practice of "deferred action" where the Executive exercises discretion and declines to institute proceedings for deportation).  Through "this commendable exercise in administrative discretion, developed without express statutory authorization," a removable individual may remain present in the United States during that designated period of time. *Id.* at 484 (citations omitted).  Federal courts have held that deferred action does not confer lawful immigration status or provide a valid defense to removal. *See Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing the difference between "lawful presence" and "unlawful status").

REPORT AND RECOMMENDATION - 3

On June 15, 2012, Secretary of Homeland Security Janet Napolitano, acting pursuant to President Obama's directive, issued a policy memorandum ("the Napolitano memo") concerning "certain young people who were brought to this country as children and know only this country as home." Dkt. 41-6 at 1 (Memorandum from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children* (June 15, 2012)). The Napolitano memo announced that certain young people not lawfully present in the United States would be eligible to obtain deferred action if they met specified criteria under the newly instituted DACA program. *Id.* The Napolitano memo further asserts that DACA "confers no substantive right, immigration status or pathway to citizenship[,]" and that "[o]nly the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3. The memo does not explain or provide a process for termination of deferred action, or any for regaining DACA status after termination.

DACA was originally framed as a policy of administrative convenience, and was intended to ensure that immigration enforcement resources are not expended on "low priority" cases. DACA recipients are considered "low priority" because they were brought to the United States as children and therefore lacked the requisite intent to violate the law. DACA recipients are often colloquially referred to as "DREAMers," which is a term that originally took its name from an unsuccessful bill in Congress, but also captures the fact that many DACA recipients are immigrant youth who have big hopes and dreams for a better future in the United States.[2] Although there have been other changes in immigration enforcement policies made pursuant to

---

[2] The phrase "DREAMers" originated from the Development, Relief and Education for Alien Minors Act, or DREAM Act, a bill in Congress that would have granted legal status for certain undocumented immigrants who were brought to the United States as children and went to school here. Although several versions of the bill have been introduced in Congress since 2001, the DREAM Act has never passed.

REPORT AND RECOMMENDATION - 4

executive order, President Trump has indicated that the DACA program will continue. Dkt. 45-3; Dkt. 52-3.

Eligible persons must show that they (1) came to the United States under the age of 16; (2) continuously resided in the United States for at least five years preceding the date of the Napolitano memorandum and were present in the United States on the date of the memorandum; (3) currently attend school, have graduated from high school or obtained a general education development certificate, or have been honorably discharged from the Coast Guard or Armed Forces of the United States; (4) have not been convicted of a felony offense, a significant misdemeanor,[3] three or more misdemeanor offenses not arising from the same incident,[4] or otherwise pose a threat to national security or public safety; and (5) are not older than 30. Applicants are required to submit documentary proof that they satisfy each of these requirements, in addition to passing a biometric and biographic background checks. The U.S. Citizenship and Immigration Services ("USCIS") and DHS websites provide that indicators that an applicant poses a threat to national security or public safety include "gang membership, participation in criminal activities, or participation in activities that threaten the United States." Dkt. 41-3 (Frequently Asked Questions, USCIS: Consideration of Deferred Action for Childhood Arrivals Process ("USCIS DACA FAQs") at A. 65).[5] If DACA is denied, there is

---

[3] Regardless of the sentence imposed, a "significant misdemeanor" includes an offense of domestic violence, sexual abuse/exploitation, burglary, unlawful possession/use of a firearm, drug distribution or trafficking, or driving under the influence. Alternatively, a "significant misdemeanor" includes any misdemeanor resulting in 90 days or more in custody.

[4] "Misdemeanor" is defined as an offense where the maximum authorized term is one year or less but greater than five (5) days. Minor traffic offenses are not considered a misdemeanor.

[5] Form I-821D asks all applicants to indicate whether the applicant has now or ever been a member of a gang. USCIS completes a background check through the National Crime Information Center and other federal databases maintained by DHS and other federal

REPORT AND RECOMMENDATION - 5

no appeals process or ability to file a motion to reopen or reconsider.  *Id.* (USCIS DACA FAQs at A. 25).

As part of the DACA application process, would-be DACA recipients are required to pay a substantial application fee and apply for an Employment Authorization Document ("EAD"), which allows them to work in the United States.[6]  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1059 (9th Cir. 2014).  The USCIS website provides that applicants who fail to submit a request for an EAD will not be considered for deferred action.

Like recipients of other forms of deferred action, DACA recipients are granted no formal immigration status but are permitted by DHS to remain in the United States for a renewable two-year period.  At the end of that two-year period, applicants may apply to renew their status by again satisfying the same stringent requirements, including another equally extensive biographic and biometric background check.

The Ninth Circuit has observed that although "DACA recipients enjoy no formal immigration status . . . DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General."  *Id.* at 1058-59 (citing 8 U.S.C. § 1182(a)(9)(B)(ii); 8 C.F.R. § 214.14(d)(3)).  As the

---

government agencies, to ascertain whether there is any evidence of gang affiliation or membership.  If any information "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant will not be eligible absent "exceptional circumstances."  Dkt. 41-3 (USCIS DACA FAQs at A. 65).

[6] Specifically, DACA applicants must submit a Form-797, Application for Employment Authorization, to request an EAD, and submit an accompanying worksheet demonstrating "an economic necessity for employment."  *See* Dkt. 41-3 (USCIS DACA FAQs at A. 4). Additional benefits flowing from this work authorization include the ability to obtain a Social Security number and, in some states, access to driver's licenses and in-state tuition at public universities.  *See Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015) (enjoining defendants from enforcing any policy by which the Arizona Department of Transportation refuses to accept EADs from DACA holders "as proof that the document holders are authorized under federal law to be present in the United States for purposes of obtaining a driver's license or state identification card").

REPORT AND RECOMMENDATION - 6

court characterized it, "the federal government has allowed noncitizens to remain in the United States, has pledged not to remove them during the designated period, and has authorized them to work in this country." *Id.* at 1066. DHS policy, including the Napolitano memo, provides that U.S. Immigration and Customs Enforcement ("ICE") officers who encounter individuals eligible for DACA "should immediately exercise their discretion, on an individual basis, in order to *prevent* low priority individuals from being placed in removal proceedings or removed from the United States." Dkt. 41-6 at 2 (emphasis added). There are nearly 800,000 DACA beneficiaries in the United States today. Dkt. 38-1 at 8, 9 n. 2.

B.      Overview of Removal Proceedings

        Removal proceedings are initiated in the immigration courts with the filing of a charging document known as a Notice to Appear. *See* https://www.justice.gov/eoir/eoir-at-a-glance (last visited Mar. 13, 2017); Dkt. 62 at 9, 10. The Notice to Appear provides notice of the removal proceedings and the alleged immigration law violations. *Id*. Once the immigration court receives the Notice to Appear from DHS, removal proceedings have ostensibly begun. However, the consistent underfunding of the immigration courts has resulted in a system rife with backlogs and delays such that the average case takes almost two years to wind its way through the immigration courts.[7] *See* TRAC, Immigration Court Backlog Tool; American Immigration Counsel, *Empty Benches: Underfunding of Immigration Courts Undermines Justice* (June 17, 2016).

---

[7] As of the current fiscal year, FY2017, there are over 542,000 cases pending in immigration courts nationwide, and the average wait time for resolution of cases in the immigration courts is 677 days, or just under two years. TRAC, Immigration Court Backlog Tool (FY 2017 data through January 2017). There are approximately 310 immigration judges nationwide to handle this enormous caseload. *See* https://www.justice.gov/eoir-immigration-court-listing (last visited Mar. 13, 2017).

REPORT AND RECOMMENDATION - 7

At the conclusion of the case in the immigration courts, the non-citizen is only a fraction of the way through the review process. Once the Immigration Judge ("IJ") issues a decision, the non-citizen, the government, or both, may appeal an unfavorable ruling to the Board of Immigration Appeals ("BIA"). *See* https://www.justice.gov/eoir/eoir-at-a-glance (last visited Mar. 13, 2017). Once the BIA decides the appeal, the non-citizen, if he or she disagrees with the BIA's ruling, may file a petition for review ("PFR") in the appropriate federal circuit court of appeals.[8] *Id.* It is not clear how long it would take the average case to proceed through these last two phases of the process, although counsel for the Government acknowledged at oral argument that it could be a matter of years.[9] Dkt. 62 at 76-77.

C.      Factual Background

         1.      *Petitioner's Background*

Petitioner was born near La Paz, Baja California Sur, Mexico, in 1993. Dkt. 35-1 (First Ramirez Decl.) at ¶ 2. His parents brought him to the United States when he was approximately ten years old, and he grew up in California with his mother, brother, and sister. In late 2013, Petitioner's son was born, and Petitioner applied for DACA for the first time. *Id.* at ¶ 8.

As part of the DACA application process, Petitioner paid an application fee, and provided substantial personal information including his birth certificate, school records, and

---

[8] DHS may not file a PFR of a BIA decision; only the respondent in such proceedings has the right to file a PFR.

[9] The BIA, in 2002, undertook steps to streamline its processes and expedite review of appeals resulting in a substantial reduction in its backlog of cases. *See* Lenni B. Benson, *Making Paper Dolls: How Restrictions on Judicial Review and the Administrative Process Increase Immigration Cases in the Federal Courts*, 51 N.Y.L. Sch. L. Rev. 37 (2006-2007). Thus, the BIA does not present the same bottleneck in the review process as do the immigration courts, but the BIA's streamlining has resulted in a dramatic increase in appeals to the federal circuit courts. *See id.* at 45-48. It is reasonable to assume that this dramatic increase has resulted in additional delays at this last phase of the process.

REPORT AND RECOMMENDATION - 8

information about where he lived.  On his application paperwork, Petitioner marked that he had no criminal record or gang affiliation.  *Id*. at ¶ 3.  He also completed a USCIS biometrics appointment, where USCIS took his fingerprints and photograph to complete a background check.  Several months later, in March 2014, Petitioner was approved for DACA and granted an EAD.  *Id*. at ¶ 6.  With his EAD, Petitioner was able to find work picking oranges in the fields.  *Id*. at ¶ 7.

In February 2016, Petitioner applied to renew his DACA and EAD.  *Id*. at ¶ 9.  Once again, Petitioner paid a fee, submitted his personal information, represented that he had no criminal record or gang affiliation, and attended a USCIS biometric appointment for a background check.  *Id*.  On May 5, 2015, USCIS approved Petitioner's DACA renewal application.  *Id*.  It is undisputed that, prior to the events giving rise to the early termination of Petitioner's DACA via the Notice to Appear dated February 10, 2017, Petitioner's DACA and EAD were valid until May 4, 2018.  *Id*.

A few months ago, Petitioner moved from California to Washington with his brother and father.  Petitioner asserts that he moved in an attempt to find work and better provide for his young son in California.  *Id*. at ¶¶ 10, 13.

2.    *Events Surrounding Petitioner's Arrest and Detention*

The parties in this case have differing accounts of the events giving rise to Petitioner's arrest on Friday, February 10, 2017, and leading to his subsequent detention.  The Court begins with Petitioner's version.

At approximately 9:00 a.m., a team of ICE officers arrested Petitioner's father outside the apartment he shared with Petitioner and Petitioner's brother. Dkt. 35-1 at ¶ 14.  Petitioner, who was sleeping on the couch, woke to a lot of noise in the apartment and the sight of several ICE officers in the room with him.  Petitioner asserts that an ICE officer asked for his name,

REPORT AND RECOMMENDATION - 9

birthdate, and where he was born. *Id*. at ¶ 15. Petitioner answered the officer's questions, and stated that he was from Mexico. At that point, the officer placed handcuffs around Petitioner's wrists behind his back. Petitioner advised the officer at least five times that he had a work permit, and also asked to see a warrant, but the officer declined to show him one. Of course, there was no warrant for Petitioner, but only one for his father. Petitioner asserts that the arresting ICE officer continued to ask him questions, but never asked about his tattoo or about any gang involvement. *Id.* at ¶ 16. The ICE officers took Petitioner, along with his father, to an ICE processing center, but did not take his brother into custody. *Id.*

At the processing center, Petitioner was fingerprinted and the ICE officers confirmed that Petitioner had no criminal history and that he was a DACA recipient. *Id*. at ¶ 17. Petitioner asserts that after the ICE officers had confirmed his active DACA status, the same officer who had questioned him at the apartment continued to interrogate him and search him. A search of Petitioner's wallet revealed Petitioner's identification and employment card, which shows that Petitioner was a DACA beneficiary.[10] *Id*. The ICE officer then asked Petitioner five or seven times if he was in a gang, and Petitioner consistently responded that he was not, and had never been, in a gang. Petitioner stated that although some kids he knew in his middle school and high school were involved in gangs, he was not one of them. *Id.* at ¶ 19.

Petitioner claims that another officer who had a lot of tattoos came over and joined the interrogation, and both officers began naming different gangs, such as the "bulldogs" in Fresno, and insisting that Petitioner was a gang member. *Id.* at ¶ 21. Petitioner laughed at the officers' suggestion that he was a member of the bulldogs, and he felt that the officers misinterpreted his laughter as an admission that he was a gang member. *Id*. Finally, because

---

[10] Petitioner told the officer again that he had an employment authorization, but the officer said that it did not matter because Petitioner was not from the United States. *Id.*

REPORT AND RECOMMENDATION - 10

Petitioner was feeling intense pressure, he told them that he did nothing more than hang out with a few people who may have been Sureños, but he has not spoken with any of those people since he became an adult. *Id*. at ¶ 22.

The officers then began questioning Petitioner about the tattoo located on his left forearm, which says "La Paz – BCS" and has a nautical star. *Id*. at ¶ 23. Petitioner asserts that "La Paz" is where he was born, and "BCS" stands for "Baja California Sur," which is where La Paz is located. *Id.* at ¶ 24. Petitioner asserts that he chose that particular star, which was designed by his friend, because he liked the way it looked, and that the words in his tattoo simply represented his hometown. *Id.* Petitioner declined to sign any papers that indicated he was a gang member. *Id.* at ¶ 25. Petitioner also has submitted a declaration from an expert that indicates that his tattoo is not affiliated with any known gangs, and it has been proffered that Petitioner was not in any known governmental gang membership database. Dkt. 35-7; Dkt. 43 at 14.

After Petitioner received a phone call from his brother and declined to advise the officers of the identity of the caller, the officers transferred him to the Northwest Detention Center. Dkt. 35-1 at ¶ 26. When they asked Petitioner if he would have any problems in the detention center with gang members in a particular housing unit, he told them that he would not have any problems with gang members but he did not want to be housed with Sureños and Norteños. Instead, Petitioner wanted to be with other "paisas," meaning other Mexican people at the detention center who are not gang members.[11]  *Id*.

---

[11] Petitioner asserts that "paisa" is short for "paisano," which is a colloquial term for other Mexican people. Dkt. 35-1 at ¶ 26.

REPORT AND RECOMMENDATION - 11

Once Petitioner arrived at the detention center, he was told to wear orange, signifying a higher security level due to being a gang member. *Id.* at ¶ 27. Petitioner attempted to appeal this classification, but later withdrew the appeal.[12]

The Government's account of the events of February 10, 2017 is based on the summary set forth in the Form I-213[13] prepared by Deportation Officer ("DO") Matthew Hicks following Petitioner's arrest. Dkt. 52-9. According to the Form I-213, after Petitioner's father was arrested and taken into custody at approximately 9:02 a.m., the father, upon questioning by the arresting officers, advised officers that his sons were inside the apartment and that they were in this country illegally. *Id.* at 4. The father then indicated that he wanted to talk to his kids and officers told him he could do that, but that officers would need to accompany him. *Id.*

The Form I-213 indicates that at approximately 9:10 a.m., officers requested, and were granted, permission by Petitioner's father to enter the apartment. *Id.* Upon entering the apartment, officers observed Petitioner sleeping on the living room floor. *Id.* DO Hicks

---

[12] Petitioner asserts that when he filled out his "Classification Appeal" form on February 10, 2017, he wrote "I came in and the officer said I have gang affiliation with gangs so I wear orange uniform. I do not have a criminal history and I'm not affiliated with any gangs." *Id.* When Petitioner saw the form again on February 16, 2017, he asserted that it appeared that someone had attempted to erase the words, "I came in and the officer said," to make it look like Petitioner made the statement, "I have gang affiliation." *Id.* Petitioner does not know who would have erased his words on the form. The Government's materials suggest that no alterations were made to Petitioner's appeal form, but that Petitioner was simply provided a faulty pen. The detention officer who provided Petitioner with the Classification Appeal form states that after filling out Petitioner's name, A-number, and current classification level, she gave the form to Petitioner along with a pen. Dkt. 52-14 at 2. As Petitioner began filling out the form, the pen provided by the officer was not writing well and the words were faint, so the officer got Petitioner a new pen to finish filling out the form. *Id.* at 2-3. The Court observes that the copy of the Classification Appeal form provided by the Government is readable in its entirety and contains no obvious alterations. *See* Dkt. 52-13. The parties' differing accounts of what took place with respect to Petitioner's classification appeal are immaterial to the Court's resolution of the jurisdictional questions at issue.

[13] The Form I-213, titled "Record of Deportable/Inadmissible Alien" provides details regarding Petitioner's identity, criminal history, immigration history, and basis for removal and immigration detention. Dkt. 52-9 at 2-5.

REPORT AND RECOMMENDATION - 12

approached Petitioner and identified himself as an immigration officer. *Id*. In response to DO Hicks' questions, Petitioner responded that he was born in Mexico, that he was here illegally, and that he had previously been arrested. *Id.* DO Hicks placed Petitioner under arrest at approximately 9:15 a.m., and Petitioner was transported to the ICE holding facility in Tukwila, Washington. *Id.*

Once at the ICE holding facility, DO Hicks interviewed Petitioner. *Id.* According to the Form I-213, when asked if he had any reason to believe he is a citizen of the United States, Petitioner stated "yeah,"[14] and when asked if he was involved in any gang activity, Petitioner purportedly stated "No, not no more." *Id.* Petitioner was thereafter questioned further about what DO Hicks identified as a "gang tattoo" on Petitioner's forearm. *Id*. Petitioner responded that "he used to hang out with the Sureños in California" and that "he fled California to escape from the gangs." *Id*. at 4. Petitioner further stated that "he still hangs out with the Paizas in Washington State." *Id*.

---

[14]  These facts are taken from the Form I-213 provided in conjunction with the Government's motion to dismiss. Dkt. 52-9. The Government's account of events in what appears to be an earlier version of the Form I-213, which was submitted by the Government in conjunction with its initial brief in this matter, *see* Dkt. 32-3, contains additional language that does not appear in the version submitted in support of the Government's motion to dismiss. Specifically, in the first version of the document submitted to the Court, DO Hicks, after noting that Petitioner responded "yeah" to the question of whether he had reason to believe that he is a citizen of the United States, offered the following further account of the interaction:

> *The response was in a sarcastic and disrespectful tone.* On initial inspection, subject's alienage had already been established, as the subject had told Officer Hicks that he was born in Mexico, that he was a citizen of Mexico, and that he was in the United States illegally. *In addition, upon running checks at the office*, Officer Hicks discovered that subject had applied for Deferred Action for Childhood Arrival (DACA) on 2/29/2016, as a Mexican citizen who had made an unlawful entry into the United States. USCIS approved the DACA application on 05/05/2016.

Dkt. 32-3 at 3 (emphases added). All of this language was excised from the version of the Form I-213 submitted with the Government's motion to dismiss. No explanation has been offered for these discrepancies.

REPORT AND RECOMMENDATION - 13

In the portion of the Form I-213 detailing Petitioner's criminal history, DO Hicks notes that Petitioner has no criminal history, though Petitioner acknowledged a recent arrest for speeding. *Id*. at 5.  DO Hicks goes on to state that Petitioner "claims past and present association with the Sureños and Paizano gangs and subject has a gang affiliated tattoo on his arm." *Id*. at 5.  The Form I-213 indicates DO Hicks concluded, following his interrogation of Petitioner, that Petitioner did not qualify for deferred prosecution under DACA because of "gang association."[15] *Id*. at 4.

ICE thereafter issued a Notice to Appear, thereby commencing removal proceedings against Petitioner.  Dkt. 52-10.  It was charged in the Notice to Appear that Petitioner is subject to removal from the United States pursuant to INA 212(a)(6)(A)(i) based on the fact that he is "an alien present in the United States without being admitted or paroled or who arrived in the United States at any time or place other than as designated by the Attorney General." *Id.* at 2.  At 1:27 p.m. on February 10, 2017, Kathlyn Lawrence, an ICE Supervisory Detention and Deportation Officer ("SDDO"), and the "Examining Officer" on Petitioner's case, made a "no bond" custody determination. *See* Dkt. 52-12 at 2; Dkt. 52-9 at 2.  Petitioner refused to sign the Custody Determination form, and did not indicate one way or the other whether he intended to seek review by an IJ of SDDO Lawrence's custody determination.  Dkt. 52-12 at 2.

On February 17, 2017, a Notice of Action letter was directed to Petitioner by USCIS advising him that his DACA status and his employment authorization terminated automatically as of the date the Notice to Appear was issued, and he was directed to return his Employment Authorization Document to USCIS immediately.  Dkt. 52-11.

---

[15] It is unclear from the Government's materials how long the interrogation lasted, although it was presumably several hours given that Petitioner was transferred to the ICE holding facility at approximately 9:15 a.m., and the Custody Determination form was not completed until 1:27 p.m. *See* Dkt. 52-9 at 4; Dkt. 52-12 at 2.

REPORT AND RECOMMENDATION - 14

D.       Procedural History and Grounds for Relief

Petitioner initiated this action on February 13, 2017, seeking his release from the Northwest Detention Center and an injunction prohibiting the Government from re-arresting him based on the conduct that led to his initial arrest.  Dkt. 1.  The Court directed service, scheduled a status conference for February 17, 2017, to discuss Petitioner's detention status, and ordered preliminary briefing from the parties regarding detention.  Dkt. 30 at 2-3.

At the February 17, 2017 status conference, the Court trifurcated this matter.  The issue of immediate release was addressed by directing an expedited bond hearing before an IJ.  Dkt. 43 at 26-28.  The Court then set an expedited briefing schedule for the Government's jurisdictional challenges, and scheduled oral argument.  *Id.* at 29-30; *see also* Dkt. 39 (2/17/2017 Order Setting Briefing Schedule).  If the case survived the jurisdictional challenges, it would then proceed to the substantive merits of Petitioner's claims.  *Id.* at 29-30.  The instant Report and Recommendation is directed to the second phase—jurisdiction.

Petitioner ultimately decided not to ask for an expedited bond hearing before an IJ because he wanted the issue heard as part of his habeas action in this Court, and filed an emergency motion for conditional release.  Dkt. 45.  On March 8, 2017, the Court heard the oral argument of counsel regarding the Government's motion to dismiss and Petitioner's motion for conditional release.  Dkts. 60 & 62.

The operative pleading in this case is Petitioner's amended habeas petition and complaint for declaratory and injunctive relief.  Dkt. 41.  The gravamen of the petition is that ICE officers should not have detained Petitioner in the first place, or, at a minimum, should have released him as soon as they discovered he was a DACA beneficiary.  In his first claim, Petitioner alleges that he has a liberty interest under the Fifth Amendment Due Process Clause to be free from imprisonment.  *Id.* at 19.  He further claims that DACA confers liberty benefits,

REPORT AND RECOMMENDATION - 15

including the ability to live and work in the United States for a specified period without being subject to arrest or detention based on immigration status, and that these liberty interests were terminated in violation of his procedural due process rights, by his arrest and subsequent detention, despite ICE officers having knowledge that he was a DACA beneficiary.[16] *Id.* In Count Two, petitioner claims a substantive due process right to be free from detention and argues that the Government has no reason to detain him given that he is neither a flight risk nor a danger to the public. *Id.* at 22. In Count Three, Petitioner alleges a Fourth Amendment unlawful seizure claim based on the Government's decision to arrest, detain and question him, despite their knowledge that he was granted deferred action under DACA. *Id.* at 24. Finally, in Count Four, Petitioner alleges that the ICE officers arrested and detained him "in substantial part because of unconstitutional racial and national origin discrimination and invidious stereotypes about men of Mexican heritage who have tattoos," in violation of his Equal Protection rights under the Fifth Amendment. *Id.* at 25.

Petitioner seeks relief in the form of his immediate release from detention, as well as an injunction prohibiting his arrest or detention based on the conduct described in the amended petition. *Id.* at 27. He further seeks a declaratory judgment that he and other DREAMers have constitutionally-protected interests in their status conferred under DACA, that arbitrary arrest and detention violates his and other DREAMers' Due Process rights, and that the Government lacks the authority to arrest or detain him or other DREAMers on the basis of their immigration status or the conduct described in the petition. *Id.*

---

[16] Petitioner also alleges that under DHS policy regarding DACA beneficiaries, he "should not have been arrested or detained, nor should he have been placed in removal proceedings." Dkt. 41 at 21. At oral argument, however, counsel for Petitioner conceded he was not contesting the DACA termination. Dkt. 62 at 51-52.

REPORT AND RECOMMENDATION - 16

### III.   LEGAL DISCUSSION

The Government moves to dismiss the Petitioner's habeas corpus petition before the Court has the opportunity to address the underlying merits of his claims regarding DACA or the alleged constitutionality of the ICE officers' pre-removal actions leading to his arrest and detention, contending that all of these claims must be prosecuted through the immigration court process, with an appeal at the end of that process to the Ninth Circuit.  The Government also asks the Court to dismiss Petitioner's claims for declaratory and injunctive relief based on standing.  Finally, the Government contends, both as a basis to dismiss Petitioner's ultimate request for release as well as his motion for immediate conditional release, that Petitioner must first exhaust all of the administrative remedies available in the immigration courts before he can ask this Court to order his release.

Petitioner responds that the statutory framework stripping the district court of habeas jurisdiction is limited to final orders of removal.  Because he is not seeking to stop the immigration removal process and is focused on the pre-removal conduct of the ICE officers, he asserts he is free to seek habeas remedies in this Court.  Petitioner asserts that he has legal standing to bring the claims in the petition and maintains that exhaustion of his administrative remedies related to his release should be waived.  Finally, he contends that he is entitled to immediate conditional release pending the Court's final resolution of this action.

As discussed below, the Court concludes (1) the jurisdiction stripping and channeling provisions of the INA, as amended—specifically 8 U.S.C. §§ 1252(a)(5), 1252(b)(9), and 1252(g)—do not preclude this Court's adjudication of Petitioner's pre-removal habeas claims; (2) Petitioner has standing to bring his claims for declaratory and injunctive relief; (3) administrative exhaustion of Petitioner's ultimate request for release should be waived; but

REPORT AND RECOMMENDATION - 17

(4) Petitioner has not shown that he should be conditionally released pending the Court's resolution of his habeas claims on the merits.

A.         Overview of Habeas Jurisdiction in the Immigration Context

Federal district courts may grant a writ of habeas corpus if a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see also* U.S. Const. Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). Thus, there is a "strong presumption in favor of judicial review of administrative action" and a "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *Id.* at 298.

Congress began limiting habeas jurisdiction in immigration cases in 1996 with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009-546, and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214. Section 306 of IIRIRA amended the INA to add the following provision:

> Except as provided in this section . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to *commence* proceedings, *adjudicate* cases, or *execute* removal orders against any alien under this chapter.

8 U.S.C. § 1252(g) (emphases added). The Supreme Court has emphasized that this provision applies only to the three discrete listed actions: the commencement of proceedings, adjudication of cases, and execution of removal orders. *Reno v. Am.-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) ("*AADC*"). Section 1252(g) must be interpreted

REPORT AND RECOMMENDATION - 18

narrowly, *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc), as it "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion," *AADC*, 525 U.S. at 485 n.9. Courts still have jurisdiction over "many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation [or] to surveil the suspected violator . . . ." *Id.* at 482.

Congress next passed the REAL ID Act of 2005, which amended the INA to "expressly eliminate[] habeas review over all final orders of removal . . . ." *A. Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007). It provided that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5); *see Martinez-Rosas v. Gonzales*, 424 F.3d 926, 928-29 (9th Cir. 2005) (under REAL ID Act, a PFR to the court of appeals "is now the exclusive means for challenging final removal orders by the BIA, except those issued pursuant to 8 U.S.C. § 1225(b)(1)").

The REAL ID Act also amended a provision that had been first introduced by IIRIRA to expressly limit habeas jurisdiction:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).[17] Courts have described § 1252(b)(9) as a "zipper" clause because it consolidates judicial review to the courts of appeals. *See, e.g.*, *AADC*, 525 U.S. at 483.

---

[17] The first sentence of § 1252(b)(9) was added by IIRIRA § 306. The second sentence was added by the REAL ID Act. *A. Singh*, 499 F.3d at 977-78.

REPORT AND RECOMMENDATION - 19

"Through this section, 'Congress made clear that review of a final removal order is the only mechanism for reviewing any issue raised in a removal proceeding.'" *A. Singh*, 499 F.3d at 976 (quoting H.R. Rep. No. 109-72, at 173, 2005 U.S.C.C.A.N. 240, 298).

The REAL ID Act's modifications "effectively limit all aliens to one bite of the apple with regard to challenging an order of removal." *Id.* at 977 (internal quotation marks and citation omitted). Thus, even habeas "claims that indirectly challenge a removal order" are prohibited. *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012). "When a claim by an alien, however it is framed, challenges the procedure and substance of an agency determination that is *inextricably linked* to the order of removal, [a district court's review of the claim] is prohibited by section 1252(a)(5)." *Id.* at 623 (internal citation and quotation marks omitted, emphasis added).

However, the REAL ID Act was "not intended to 'preclude habeas review over challenges to detention that are independent of challenges to removal orders.'" *V. Singh v. Holder*, 638 F.3d 1196, 1211 (9th Cir. 2011) (quoting H.R. Rep. No. 109-72 at 175). Accordingly, as a general rule, "'post-[REAL ID Act] aliens may continue to bring collateral legal challenges to the Attorney General's detention authority . . . through a petition for habeas corpus.'" *Id.* (quoting *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 946 (9th Cir. 2008) (alteration in *V. Singh*)). The determination of whether a case raises independent claims or indirectly challenges a final removal order requires "a case-by-case inquiry turning on a practical analysis." *Id.* The "distinction between an independent claim and indirect challenge will turn on the substance of the relief that a plaintiff is seeking." *Martinez*, 704 F.3d at 622 (internal quotation marks and citation omitted).

REPORT AND RECOMMENDATION - 20

B.        Sections 1252(a)(5) and 1252(b)(9) Do Not Preclude Petitioner From Seeking Habeas Relief in the District Court

The parties' chief disagreement regarding the question of habeas jurisdiction is whether 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9) strip this Court of the ability to consider the merits of Petitioner's constitutional claims regarding his arrest and detention.  Petitioner argues that the jurisdiction "stripping" and "channeling" provisions of §§ 1252(a)(5) and 1252(b)(9) do not apply to (1) proceedings that do not involve final orders of removal, or (2) proceedings that raise claims that are collateral to, or independent of, the removal process.  Dkt. 46 at 8-12; Dkt. 57 at 15.  Petitioner argues, however, that the Court should focus on whether a final order of removal has been entered because "virtually all cases concluding claims are 'inextricably linked' to removal proceedings involve final orders of removal."  Dkt. 57 at 16.  The Government's position is that § 1252(b)(9) requires that all questions "arising from any action taken or proceedings brought to remove an alien from the United States" be brought in a PFR of a final order of removal, as provided in § 1252(a)(5), because they are inextricably linked to removal proceedings regardless of whether a final order of removal has been entered.  Dkt. 52 at 16-19.  According to the Government, Petitioner's habeas claims "arise from" his removal proceedings and therefore can only be brought through the PFR process.  *Id.* at 19-22.

Resolution of this issue is complicated by the fact that recent Ninth Circuit caselaw discussing the scope of these statutory provisions appears somewhat inconsistent.  However, these cases can be reconciled by focusing on the distinction between claims that are wholly intertwined with removal proceedings, and those that are independent of removal proceedings.  Because Petitioner's constitutional claims relate to the ICE officers' actions *before* removal proceedings were filed, and do not seek to disrupt the outcome of removal proceedings, the

REPORT AND RECOMMENDATION - 21

Court finds that they are independent of the removal process. As a result, §§ 1252(a)(5) and 1252(b)(9) do not strip this Court of jurisdiction.

1.   *Ninth Circuit Caselaw Supports the Court's Interpretation of the Scope of §§ 1252(a)(5) and 1252(b)(9)*

To support his argument that §§ 1252(a)(5) and 1252(b)(9) only divest a federal district court of habeas jurisdiction where a final order of removal has been entered, Petitioner primarily relies on *Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006), *A. Singh v. Gonzales*, 499 F.3d at 978, *Flores-Torres v. Mukasey*, 548 F.3d 708 (9th Cir. 2008), and *V. Singh v. Holder*, 638 F.3d at 1196. The Government responds that Petitioner's argument is inconsistent with the Ninth Circuit's most recent decision on point, *J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016), *pet. for re'hrg or re'hrg en banc filed* (Dec. 6, 2016), which expanded the reach of these statutory provisions to encompass cases like this one where a final order of removal has not yet been entered. The Court is unpersuaded by Petitioner's focus on whether a final order of removal has been entered, as that interpretation does not square with *J.E.F.M.* However, the Court also finds it unnecessary to adopt the Government's overly broad reading of the *J.E.F.M.* opinion.

In *Nadarajah*, the Ninth Circuit considered a challenge to indefinite detention brought by a non-citizen who had prevailed at every level of judicial review but remained in detention because the BIA, in a rare move, referred his case to the Attorney General for further review. 443 F.3d at 1071-75. The court held that "[b]y its terms, the jurisdiction-stripping provision does not apply to federal habeas corpus petitions that do not involve final orders of removal. Here, as we have noted, there is no final order of removal . . . Therefore, *in cases that do not involve a final order of removal, federal habeas corpus jurisdiction remains in the district*

REPORT AND RECOMMENDATION - 22

*court*, and on appeal to this Court, pursuant to 28 U.S.C. § 2241." *Id.* at 1075-76 (citing § 1252(b)(9), emphasis added).[18]

Similarly, in *A. Singh*, counsel for the habeas petitioner missed the deadline for filing a PFR in the Ninth Circuit, and the petitioner brought a habeas action alleging ineffective assistance of counsel. 499 F.3d at 972-93. After the district court dismissed for lack of jurisdiction, the Ninth Circuit reversed, holding that "a narrow claim of ineffective assistance of counsel in connection with a post-administrative filing of an appeal with the court of appeals *does not require review of an order of removal*. Thus, this claim falls outside the jurisdiction-stripping provisions of the REAL ID Act." *Id.* (emphasis added). In so holding, the Ninth Circuit provided a useful discussion of the scope of §§ 1252(a)(5) and 1252(b)(9):

> By virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal. Section 1252(a)(5) is prominently directed to "judicial review of an order of removal." Section 1252(b)(9) explicitly covers "any action taken or proceeding brought to remove an alien." To the extent that this language could be viewed as broader than § 1252(a)(5), as argued by the government, we are guided by the Supreme Court. In *St. Cyr*, the Court confirmed that § 1252(b)(9) "applies *only* 'with respect to review of an order of removal under [8 U.S.C. § 1252(a)(1)].'" 533 U.S. at 313, 121 S. Ct. 2271 (emphasis added) (citing 8 U.S.C. § 1252(b)).

*Id.* at 978 (alteration in *A. Singh*).[19] The court went on to explain that the applicability of § 1252 turns on whether the petitioner's claim amounts to a challenge to an order of removal,

---

[18] The Ninth Circuit has reiterated *Nadarajah*'s holding that the REAL ID Act should be construed as being confined to addressing final orders of removal in several cases. *See Trinidad y Garcia v. Thomas*, 683 F.3d 952, 958 (9th Cir. 2012) (en banc) (per curiam); *V. Singh*, 638 F.3d at 1211, 1212 n. 7; *Flores-Torres*, 548 F.3d at 711. Other circuits have taken the same approach. *Chehazeh v. Att'y Gen. of U.S.*, 666 F.3d 118, 131-33 (3d Cir. 2012); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006).

[19] In *St. Cyr*, a pre-REAL ID Act case, the habeas petitioner pleaded guilty to a crime that qualified him for deportation. 533 U.S. at 293. Under the immigration laws in effect at the time of his conviction, the Attorney General had the discretionary authority to waive the petitioner's removal. *Id.* at 293-94. But by the time the petitioner was ordered removed, Congress had enacted AEDPA and IIRIRA, which stripped the Attorney General's authority to

REPORT AND RECOMMENDATION - 23

or whether that claim arises independently. *Id.* In *A. Singh*, the court concluded that although the petitioner was subject to a final order of removal, his habeas petition was independent of that removal order because the only remedy would be the restarting of the 30-day period for filing a PFR; "[i]n other words, a successful habeas petition in this case will lead to nothing more than 'a day in court' for Singh, which is consistent with Congressional intent underlying the REAL ID Act." *Id.* at 979.

The Ninth Circuit's decision in *Flores-Torres* is in accord. In that case, the petitioner challenged his pre-removal order detention under 8 U.S.C. § 1226, which authorizes discretionary detention of "aliens" in removal proceedings, on the basis that he is a U.S. citizen. 548 F.3d at 709. The parties agreed that if the petitioner proved his citizenship, he could not be held under § 1226. *Id.* at 710. The court held that the district court had habeas jurisdiction because the petitioner was challenging his detention *prior* to issuance of an order of removal, and therefore did not seek to overturn an order of removal.[20] *Id.* at 713.

---

waive his removal. The petitioner's habeas petition claimed that the new restrictions did not apply to removal proceedings brought against a non-citizen who pleaded guilty to a deportable crime before their enactment. *Id*. at 293. The Supreme Court rejected the government's argument that § 1252(b)(9) stripped habeas jurisdiction, explaining, "Its purpose is to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals, but it applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'" *Id.* at 313 (quoting 8 U.S.C. § 1252(b) (1994 ed., Supp. V)). Ultimately, the Supreme Court concluded that neither AEDPA nor the relevant IIRIRA provisions expressed a clear and unambiguous statement of Congress' intent to bar § 2241 petitions and, thus, that AEDPA and IIRIRA did not deprive the court of jurisdiction to review the petitioner's habeas petition. *Id.* at 315-26. Congress passed the REAL ID Act in response to *St. Cyr* to clarify that federal courts lack habeas jurisdiction over orders of removal. *See J.E.F.M.*, 837 F.3d at 1034 n. 6.

[20] In reaching this conclusion, the Ninth Circuit distinguished *Iasu v. Smith*, 511 F.3d 881 (9th Cir. 2007), which held that challenges to removal orders based on citizenship must be brought in a PFR, and relied on *Nadarajah*'s holding that "the jurisdiction-stripping provision [of the REAL ID Act] does not apply to federal habeas corpus petitions that do not involve final orders of removal." *Flores-Torres*, 548 F.3d at 711 (quoting *Nadarajah*, 443 F.3d at 1075); *see also id.* at 712 n. 6 ("Although the government does not raise 8 U.S.C. § 1252(b)(9) in its argument, we hold that this section does not provide a 'clear statement' foreclosing

REPORT AND RECOMMENDATION - 24

In *V. Singh*, the Ninth Circuit reaffirmed the scope of §§1252(a)(5) and 1252(b)(9) as interpreted by *Nadarajah* and *A. Singh*, by focusing on whether the petitioner's habeas claims were independent of, or "wholly intertwined" with, the merits of the removal order. *See V. Singh*, 638 F.3d at 1211, 1212 n. 7 (citing *Nadarajah*'s holding). The IJ determined that the habeas petitioner was ineligible for cancellation of removal because he had committed an aggravated felony within the meaning of the INA. *Id.* at 1201. The petitioner challenged this determination in a PFR, as well as in a habeas petition. *Id.* Because the petitioner's substantive due process claim required the court to look at the merits of his underlying removal order to determine whether he raised a substantial argument that he was unremovable, the court held that the REAL ID Act stripped habeas jurisdiction. *Id.* at 1210-11. The court noted that "as a technical matter" the habeas petition did not ask the court to exercise jurisdiction over his final order of removal, but that his petition was "wholly intertwined with the merits of his removal order," which was particularly evident given that he made the same arguments in his habeas petition and PFR. *Id.* at 1211. The court also reasoned that it would be contrary to Congressional intent to allow a district court to "examine the arguments against removal that an alien expects to present" in a PFR and potentially release the habeas petitioner based on a prediction of how the court of appeals would rule.[21] *Id.* at 1212.

Finally, the Ninth Circuit recently decided *J.E.F.M.*, the Government's key case. In *J.E.F.M.*, nine minors in various stages of removal proceedings brought a putative class action asserting that they were statutorily and constitutionally entitled to have government-appointed

habeas review in this circumstance. We have previously held that § 1252(b)(9) does not preclude habeas petitions that challenge detention or do not otherwise involve final orders of removal. *See Casas-Castrillon*, 535 F.3d at 946; *Nadarajah*, 443 F.3d at 1075.").

[21] This statement implicitly supports the argument that §§ 1252(a)(5) and 1252(b)(9) should not be construed to encompass claims that would not preclude removal. As discussed below, however, *J.E.F.M.* stands for a broader understanding of the statutes.

REPORT AND RECOMMENDATION - 25

attorneys in removal proceedings. *J.E.F.M. v. Holder*, 107 F. Supp. 3d 1119, 1123 (W.D. Wash. 2015). The district court concluded that §§ 1252(a)(5) and 1252(b)(9) precluded review of the plaintiffs' statutory claims but did not prevent the court from hearing the right-to-counsel claim alleging a Fifth Amendment due process violation. *Id.* at 1134.

The Ninth Circuit reversed, holding that the plaintiffs' right to counsel claims must be raised in PFRs of their orders of removal because "§§ 1252(a)(5) and 1252(b)(9) channel review of all claims, including policies-and-practices challenges, through the PFR process whenever they 'arise from' removal proceedings." *J.E.F.M.*, 837 F.3d at 1035. The court provided the following discussion of the scope of §§ 1252(a)(5) and 1252(b)(9):

> The section titled "Exclusive means of review," 8 U.S.C. § 1252(a)(5), prescribes the vehicle for judicial review: "[A] petition for review . . . shall be the sole and exclusive means for judicial review of an order of removal . . . ." Lest there be any question about the scope of judicial review, § 1252(b)(9) mandates that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order . . . ."
>
> Section 1252(b)(9) is, as the First Circuit noted, "breathtaking" in scope and "vise-like" in grip and therefore swallows up virtually all claims that are tied to removal proceedings. *See Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007). Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the PFR process. [citations omitted]
>
> Although §§ 1252(a)(5) and 1252(b)(9) might seem draconian at first glance, they have two mechanisms that ensure immigrants receive their "day in court." *Singh v. Gonzales*, 499 F.3d 969, 979 (9th Cir. 2007). First, while these sections limit how immigrants can challenge their removal proceedings, they are not jurisdiction-stripping statutes that, by their terms, foreclose all judicial review of agency actions. Instead, the provisions channel judicial review over final orders of removal to the courts of appeals. [citation omitted] The Supreme Court has thus characterized § 1252(b)(9) as a "'zipper' clause," *Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*, 525 U.S. 471, 483, 119 S. Ct. 936, 142 L.Ed.2d 940 (1999), explaining that the statute's purpose "is to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals[.]" *INS v. St. Cyr*, 533 U.S. 289, 313 & n.37, 121 S. Ct. 2271, 150 L.Ed.2d 347 (2001).

REPORT AND RECOMMENDATION - 26

> Second, and equally importantly, § 1252(b)(9) has built-in limits.  By channeling only those questions "arising from any action taken or proceeding brought to remove an alien," the statute excludes from the PFR process any claim that does not arise from removal proceedings.  Accordingly, claims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9).  [citations omitted]

*Id.* at 1031-32 (footnote omitted, citations omitted where noted).

The Ninth Circuit went on to discuss *Nadarajah* and *A. Singh* as examples of habeas petitions that raised claims that were collateral to, or independent of, the removal process.[22]  *Id.* at 1032.  Because the plaintiffs' right-to-counsel claims "arose from" removal proceedings, *i.e.*, were bound up in and an inextricable part of the administrative process, the court determined that they could be raised only in a PFR.  *Id.* at 1032-33, 1035.  The court also rejected the plaintiffs' argument that they would not be able to obtain judicial review of their constitutional claims, noting too that "[r]ight-to-counsel claims are routinely raised in petitions for review filed with a federal court of appeals."  *Id.* at 1033.

> 2.      *Consistent with Ninth Circuit Case Law, Petitioner's Claims are Independent of the Removal Process and Therefore Not Barred by §§ 1252(a)(5) and 1252(b)(9)*

If *J.E.F.M.*'s discussion of §§ 1252(a)(5) and 1252(b)(9) is read broadly to mean that *any* issue arising from *any* removal-related activity is inextricably linked to removal proceedings, the decision might appear to be in conflict with cases such as *Nadarajah* and *A.*

---

[22] Specifically, the court quoted *Nadarajah*'s holding that § 1252(b)(9) "does not apply to federal habeas corpus provisions that do not involve final orders of removal," and noted that there was no final order of removal in that case because the petitioner had been granted asylum.  *Id.*  With respect to *A. Singh*, the court emphasized the fact that the petitioner could not have raised his claim during the administrative process because it did not arise until after his administrative proceedings had concluded.  *Id.*

REPORT AND RECOMMENDATION - 27

*Singh*, which interpreted the statutes as applying only when there is a final order of removal.[23] Indeed, *A. Singh* expressly rejected the government's argument that § 1252(b)(9) was broader than § 1252(a)(5), limiting both to "review of an order of removal." 499 F.3d at 978 (quoting *St. Cyr*, 533 U.S. at 313). *J.E.F.M.*, on the other hand, focuses on the language "arising from any action taken . . . to remove an alien from the United States," 8 U.S.C. § 1252(b)(9), to conclude that a habeas petitioner need not be subject to an order of removal before §§ 1252(a)(5) and 1252(b)(9) bar habeas jurisdiction.[24] Nevertheless, *J.E.F.M.* did not overrule *Nadarajah* or *A. Singh*, nor did it seek to limit or distinguish those cases. *J.E.F.M.*, 837 F.3d at 1032. Indeed, as noted above, the panel cited those cases in support of its conclusion. *Id.*

The Court believes the best way to reconcile these cases is to focus on the distinction between claims that are independent of removal proceedings, as in *Nadarajah* and *A. Singh*, and claims that arise from removal proceedings, as in *J.E.F.M.* In *Nadarajah*, the petitioner's indefinite detention claim was independent of the removal proceedings because it would not

---

[23] As noted above, plaintiffs in *J.E.F.M.* have filed a petition for panel rehearing or rehearing en banc, and one of the grounds they raise is that *J.E.F.M.* conflicts with *Nadarajah*. *J.E.F.M. v. Sessions*, No. 15-35738, Dkt. 106 at 12-23 (9th Cir. Dec. 5, 2016). If the Ninth Circuit grants the petition for rehearing en banc, the effect is that the three-judge panel opinion shall no longer be cited as precedent in this Circuit, except to the extent adopted by the en banc court. *See* Circuit Advisory Committee Note to Ninth Cir. R. 35-1 to 35-3; Ninth Cir. General Order 5.5(d).

[24] The Third Circuit, in a pre-*J.E.F.M.* opinion, identified a split within the circuits regarding the interpretation of §§ 1252(a)(5) and 1252(b)(9). *Chehazeh v. Att'y Gen. of U.S.*, 666 F.3d 118, 1232-33 (3d Cir. 2012). The Third Circuit recognized that the Ninth and Eleventh Circuits applied those statutes only where there was a final order of removal, *id.* (citing *A. Singh*, 499 F.3d at 978, and *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006)), while the First Circuit did not limit § 1252(b)(9) to challenges to removal orders, *id.* (citing *Aguilar v. U.S. ICE*, 510 F.3d 1, 9 (1st Cir. 2007)). Ultimately, the Third Circuit sided with the Ninth and Eleventh Circuits. *Id.*

REPORT AND RECOMMENDATION - 28

affect how those proceedings were resolved.[25]  Likewise, in *A. Singh*, the petitioner's ineffective assistance of counsel claim was independent of the removal proceedings because it would remedy a procedural error—failure to timely file a PFR—and did not affect the administrative process, which had already concluded, or challenge the merits of the removal order.  By contrast, in *J.E.F.M.*, the plaintiffs sought to have counsel appointed, a remedy that would affect every step of the administrative removal process and necessarily arose only because of the removal proceedings.

Unlike in *J.E.F.M.*, where the plaintiffs' right-to-counsel claims were wholly intertwined with the removal proceedings and therefore "arose from" the government's decision to file removal proceedings, in this case, Petitioner's claims "arose from" actions several ICE officers took *before* the Government decided to initiate removal proceedings against him.  Petitioner is challenging the ICE officers' actions in connection with his arrest, initial detention, and four-hour interrogation even after those officers knew he was a DACA beneficiary.  Petitioner further alleges that in arresting him and then interrogating him after confirming that he was a DACA beneficiary, the ICE officers were motivated by racial animus and false assumptions.  None of these constitutional claims challenge the removal process or a final order of removal.[26]

The Government nevertheless contends that Petitioner's arrest and detention claims arose from removal proceedings because he can raise these claims in his immigration

---

[25] Whether removal proceedings will be affected by the habeas claim is not always dispositive of whether the habeas action is independent of the removal proceedings.  As explained above, the petitioner in *Flores-Torres* was permitted to proceed with his citizenship claim even though it would invalidate the removal proceedings if he prevailed.  The habeas claim was independent of the removal proceedings, however, because it attacked the government's ability to hold him under the detention statute, 8 U.S.C. § 1226.

[26] Notably, the Government has not cited any cases that apply §§ 1252(a)(5) and 1252(b)(9) to bar actions that challenge conduct taken before removal proceedings began.

REPORT AND RECOMMENDATION - 29

proceedings by bringing a motion to suppress and terminate.  Dkt. 52 at 18-19 (citing *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016-19 (9th Cir. 2008) (reversing denial of motion to suppress based on egregious Fourth Amendment violation and remanding with instructions to dismiss removal proceedings because no properly admitted evidence established alienage); *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994); *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1443 (9th Cir. 1994)).  The Court is not persuaded, however, that by allowing Petitioner's arrest and detention claims to proceed, it is running afoul of Congress's purpose in passing § 1252(b)(9), namely to limit non-citizens to "one bite at the apple" in challenging their removal orders.  The questions before the Court are different than those that would be raised in the immigration court.  Here, the issues are whether the alleged Fourth and Fifth Amendment violations entitle Petitioner to declaratory relief and release pending removal proceedings.  None of the relief requested would directly affect whether Petitioner is subject to removal.  *See Martinez*, 704 F.3d at 622-23 (form of relief relevant to determination of whether challenge is independent to removal order).

The Court concludes that Petitioner's arrest and detention claims are independent of any future removal order.  Accordingly, §§ 1252(a)(5) and 1252(b)(9) do not preclude this Court from exercising jurisdiction over these claims, and the Government's motion to dismiss on this basis should be denied.

C.    Section 1252(g) Also Does Not Bar Consideration of Petitioner's Arrest and Detention Claims

The Government also argues that § 1252(g)—which strips the district courts of jurisdiction over claims "arising from the decision or action by [DHS] to commence proceedings"—operates as an independent bar to the Court's consideration of Petitioner's arrest and detention claims.  Dkt. 52 at 16 (citing *AADC*, 525 U.S. at 484-85 (noting that

REPORT AND RECOMMENDATION - 30

§ 1252(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.")).  The Government cites to pre-REAL ID Act caselaw holding that deferred action determinations are not subject to judicial review in district court.  *Id*. at 16-17 (citing *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1025 (9th Cir. 1985)).

The Government's argument is not persuasive, as Petitioner's constitutional claims in this case do not challenge the decision to revoke his DACA benefits or initiate removal proceedings against him.  As discussed above, Petitioner's constitutional claims regarding his arrest and detention relate only to events that occurred *prior* to the decision to commence removal proceedings by filing a Notice to Appear.  Thus, § 1252(g) does not bar the Court's consideration of Petitioner's arrest and detention claims.

The Ninth Circuit's decision in *Wong v. United States*, 373 F.3d 952 (9th Cir. 2004), although it was an action brought under *Bivens*[27] rather than habeas, supports this conclusion. In *Wong*, a non-citizen alleged constitutional violations based on "discriminatory animus that motivated and underlay the actions of the individual defendants, which *resulted in* the INS's decision to commence removal proceedings . . . ."  *Id.* at 964 (emphasis in original).  The Ninth Circuit determined that § 1252(g) did not bar the court's review because the alleged constitutional violations occurred *prior to* the decision to "commence proceedings."  *Id.*

Here, although there are factual disputes regarding Petitioner's arrest and initial interrogation at the ICE processing center, there is no evidence that the ICE officers intended to initiate removal proceedings against Petitioner at the time they arrested him or even until they had concluded their initial interrogation.  Like in *Wong*, Petitioner challenges actions that

---

[27] *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

REPORT AND RECOMMENDATION - 31

occurred *prior to* the decision to commence removal proceedings.  The Court thus concludes that § 1252(g) does not bar his arrest and detention claims.[28]

D.      Petitioner has Standing at this Stage of the Proceedings to Seek his Requested Relief

The Government also asserts that Petitioner lacks standing to seek declaratory and injunctive relief in this action. Dkt. 58 at 11.  The Government maintains that even if Petitioner's allegations that his arrest violated the Fourth and Fifth Amendments are true, he has not established that this would provide standing for him to seek an injunction against a future hypothetical arrest.  *Id.*  The Government further argues that, to the extent Petitioner seeks prospective declaratory relief, not only on his behalf, but on behalf of DACA beneficiaries nationwide, he has not established that he has standing to act as an advocate for these individuals.  *Id.* at 11-12.  Finally, the Government asserts that the Court need not decide these issues in this federal habeas proceeding because Petitioner can raise them with the Ninth Circuit in a future PFR.  *Id.*

Petitioner argues, in his surreply, that the allegations in his amended petition satisfy Article III's standing requirements, and that he has standing to seek both injunctive and declaratory relief in this action.  Dkt. 61.  Petitioner argues as well that the Government's argument that Petitioner lacks standing to seek equitable relief is premature as consideration of

---

[28] The Ninth Circuit's decision in *Sissoko v. Rocha*, 509 F.3d 947 (9th Cir. 2007) ("*Sissoko II*"), is distinguishable and does not dictate a different result.  The arresting immigration officer in *Sissoko* took the non-citizen into custody promptly after learning that his application for legal status had been denied and therefore he was inadmissible.  *Sissoko v. Rocha*, 440 F.3d 1145, 1150-51 (9th Cir. 2006) ("*Sissoko I*"), *withdrawn in part by Sissoko II*; *Sissoko II*, 509 F.3d at 948.  In other words, she arrested the petitioner in the first instance with the intent and purpose of initiating expedited removal proceedings against him, and not, for example, to further investigate his immigration status.  On these facts, the Ninth Circuit concluded that the non-citizen's detention arose from the officer's decision to commence expedited removal proceedings, and therefore his false arrest claim was barred by § 1252(g). *Sissoko II*, 509 F.3d at 949-50.

the appropriateness of such relief must be undertaken with the benefit of an evidentiary record which has not yet been developed in this case. *Id*. at 5-6.

To bring suit in federal court, a litigant must establish three constitutional elements of standing: "(1) an injury in fact (*i.e.*, a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (*i.e.*, a "'fairly ... trace[able]'" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is "'likely'" and not "merely 'speculative'" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 273-74 (2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (calling these the "irreducible constitutional minimum" requirements)).

The Court begins by noting that the Government does not argue that Petitioner lacks standing to bring this federal habeas action on his own behalf. As to the elements set forth above, the record before the Court makes clear that Petitioner did in fact suffer an injury in this action; *i.e.*, he was arrested, detained, and had his DACA status revoked, based on actions of ICE employees. Thus, the first and second prongs of the standard set forth above are easily met. The third prong, it appears, is also easily met in this instance. "When the lawsuit at issue challenges the legality of government action, and the plaintiff has been the object of the action, then it is presumed that a judgment preventing the action will redress his injury." *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (citing *Defenders of Wildlife*, 504 U.S. at 561-62). Petitioner here seeks various forms of relief, including release, and declaratory and injunctive relief, against the type of government action that caused his alleged injury. He is therefore entitled to a presumption of redressability. *Id.* Thus, the three constitutional elements of standing have been met in this case.

REPORT AND RECOMMENDATION - 33

With respect to the Government's specific argument regarding the availability of injunctive and declaratory relief, the Court acknowledges that equitable remedies are "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'" *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999). Whether, and to what extent, Petitioner may be entitled to any of the relief he seeks in this action is difficult to discern at this early stage of the proceedings and, as Petitioner points out, the question of whether he is entitled to the relief he seeks goes to the merits of his claims. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 151 n.1 (2010). The merits of Petitioner's claims are not currently before the Court. At this stage in the proceedings, the Government's argument that Petitioner lacks standing should be rejected.

E.      Petitioner Should Not be Required to Exhaust his Request for Release Before Seeking Habeas Relief from the Court, but He is Not Entitled to Immediate Release

As a final basis to dismiss Petitioner's request for habeas relief in the form of release and to deny Petitioner's pending motion for immediate conditional release, the Government argues that Petitioner must exhaust his administrative remedies by seeking release in the immigration courts. Petitioner responds that any administrative exhaustion requirement should be waived and that he has shown a strong likelihood of success on the merits of his claims, thus entitling him to conditional release pending a final determination in this case. As discussed below, the Court concludes that any exhaustion requirement should be waived but that Petitioner is not entitled to immediate release.

REPORT AND RECOMMENDATION - 34

1.      *Statutory Framework for Detention Pending Removal Proceedings*

Title 8 U.S.C. § 1226 provides the framework for the arrest, detention, and release of non-citizens, such as Petitioner, who are in removal proceedings.  8 U.S.C. § 1226; *see also Demore v. Kim*, 538 U.S. 510, 530 (2003) ("Detention during removal proceedings is a constitutionally permissible part of that process.").  Section 1226(a) grants DHS discretionary authority to determine whether a non-citizen should be detained, released on bond, or released on conditional parole pending the completion of removal proceedings, unless the non-citizen falls within one of the categories of criminals described in § 1226(c), for whom detention is mandatory.[29]  8 U.S.C. § 1226.

When a non-citizen is arrested and taken into immigration custody pursuant to § 1226(a), DHS makes an initial custody determination, including the setting of bond.  8 C.F.R. § 236.1(c)(8).  After the initial custody determination, the detainee may request a bond redetermination by an IJ.  8 U.S.C. § 236(d)(1).  At the bond redetermination hearing, the burden is on the detainee to show to the satisfaction of the IJ that he warrants release on bond.  *See In re Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006).

If the IJ denies bond, the detainee may appeal to the BIA.  8 C.F.R. § 236.1(d)(3).  Then the detainee may seek habeas review in a federal district court under 28 U.S.C. § 2241.  *See Leonardo v. Crawford*, 646 F.3d 1157, 1159-61 (9th Cir. 2011).  Courts do not have jurisdiction over DHS's "discretionary judgment regarding the application" of § 1226 and "[n]o court may set aside any action or decision by [DHS] under [§ 1226] regarding the

---

[29] Although the relevant statutory sections refer to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107-296 § 471, 116 Stat. 2135 (2002), transferred most immigration law enforcement functions from the Department of Justice ("DOJ") to DHS, while the DOJ's Executive Office for Immigration Review retained its role in administering immigration courts and the BIA.  *See Hernandez v. Ashcroft*, 345 F.3d 824, 828 n.2 (9th Cir. 2003).

detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e). Nevertheless, the Ninth Circuit has held that § 1226(e) "does not limit habeas jurisdiction over constitutional claims or questions of law." *V. Singh*, 638 F.3d at 1202. "In addition, although the Attorney General's 'discretionary judgment . . . shall not be subject to review,' claims that the discretionary process itself was constitutionally flawed are 'cognizable in federal court on habeas because they fit comfortably within the scope of § 2241.'" *Id.* (quoting *Gutierrez-Chaves v. INS*, 298 F.3d 824, 829 (9th Cir. 2002)).

> 2.   *Administrative Exhaustion of Petitioner's Request for Release Should be Waived*

Challenges to the Government's detention authority are subject to administrative exhaustion requirements. *See Leonardo*, 646 F.3d at 1159-61; *see also Sun v. Ashcroft*, 370 F.3d 932, 941 (9th Cir. 2004). As the Ninth Circuit has explained, the proper procedure to challenge an IJ's adverse bond determination is to appeal to the BIA, wait for the BIA to render its decision, and then file a habeas petition in the district court. *Leonardo*, 646 F.3d at 1159-61.

Administrative exhaustion in this context is prudential, rather than jurisdictional. *V. Singh*, 638 F.3d at 1203 n.3; *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). In other words, exhaustion is not mandated by statute but rather required by the courts as a matter of prudence. Because prudential exhaustion requirements are not jurisdictional, they may be waived. *Puga*, 488 F.3d at 815. The Ninth Circuit has cautioned, however, that "[p]rudential limits, like jurisdictional limits are limits on venue, are ordinarily not optional." *Puga*, 488 F.3d at 815 (quoted source omitted).

When deciding whether to require prudential exhaustion, courts consider whether "(1) agency expertise makes agency consideration necessary to generate a proper record and

REPORT AND RECOMMENDATION - 36

reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Id.* (quoting *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003)).  Even if these factors weigh in favor of prudential exhaustion, waiver of exhaustion may be appropriate "where administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (quoting *S.E.C. v. G.C. George Sec., Inc.*, 637 F.2d 685, 688 (9th Cir. 1981)).

There is no real dispute that Petitioner has not exhausted available administrative remedies regarding his request for release; in fact, he cancelled the expedited bond hearing ordered by the Court.  Petitioner contends that he is not required to exhaust his claims for release because "the INA requires administrative exhaustion only for claims that fall within the ambit of the jurisdiction-stripping provisions," and that is not true in this case.  Dkt. 57 at 16. The Ninth Circuit has held, however, that prudential exhaustion applies to challenges to detention pending removal proceedings. *See Leonardo*, 646 F.3d at 1159-61. The Court, therefore, will consider whether the prudential exhaustion requirements should be waived in this case.

The Government argues that each of the *Puga* factors weigh in favor of dismissing Petitioner's claims for release for failure to exhaust because (1) an IJ is better positioned to generate a proper record and expeditiously grant potential release without reaching constitutional questions; (2) failing to require Petitioner to seek a bond hearing before a IJ would encourage future habeas petitioners to bypass the administrative scheme; and (3) review

REPORT AND RECOMMENDATION - 37

by an IJ may preclude the need for judicial review regarding Petitioner's detention and allow an IJ to correct any mistakes alleged by Petitioner.  Dkt. 42 at 11-14.

Petitioner responds that (1) a bond hearing would not create a transcribed record for judicial review or involve adjudication of Petitioner's constitutional claims; (2) Petitioner's DACA status makes this case exceptional, and therefore allowing Petitioner to bypass the administrative scheme would not necessarily encourage others to follow suit; and (3) an IJ is not better positioned to make a bond determination than the U.S. District Court.  Dkt. 57 at 18-20.

The first *Puga* factor is whether agency expertise makes agency consideration "necessary" to generate a proper record and reach a proper decision.  If the Court were to require prudential exhaustion, an IJ would consider whether Petitioner presents a flight risk or a danger to the community.  In this case, Petitioner asks the Court to consider whether the alleged constitutional violations entitle him to release pending his removal; he does not request a bond hearing.  The immigration courts would not be able to consider Petitioner's constitutional claims in conjunction with a bond hearing, and although a bond hearing may develop a factual record to some extent, it is unlikely that such a hearing would involve the same factual determinations that may need to be made in this habeas action.  Accordingly, agency expertise is not necessary to reach a proper decision.  *See V. Singh*, 638 F.3d at 1203 n.3 ("[A] record of administrative appeal is not germane to the purely legal question of what standard is most appropriate for [*Casas* bond] hearings.").

The second *Puga* factor is whether waiving the prudential exhaustion requirement would encourage a deliberate bypass of the administrative scheme.  The Government argues that it would, citing *Resendiz v. Holder*, No. C12-04850 WHA, 2012 WL 5451162 (N.D. Cal. Nov. 7, 2012).  Dkt. 52 at 13.  In *Resendiz*, the habeas petitioner sought a bond hearing while

REPORT AND RECOMMENDATION - 38

her PFR was pending. 2012 WL 5451162, at *1. The IJ found no jurisdiction to grant a bond because the petitioner's detention was not prolonged. *Id.* Instead of appealing to the BIA, the petitioner filed a habeas petition seeking a bond hearing before a different IJ. *Id.* The district court declined to waive the prudential exhaustion requirement, in part because the petition sought the same relief that could have been sought before the BIA. *Id.* at *6.

But unlike the petitioner in *Resendiz*, Petitioner does not seek a bond hearing. He seeks release from detention based on alleged constitutional violations in his arrest and detention. Indeed, this case raises novel questions regarding the Government's authority to arrest and detain a DACA recipient. Given the unusual factual scenario, the Court concludes that allowing Petitioner to go forward with his claim for release would not unduly encourage future litigants to deliberately bypass the administrative scheme to seek release pending removal proceedings.

The final *Puga* factor is whether administrative review is likely to allow the agency to correct its own mistakes and preclude the need for judicial review. If Petitioner proceeded to a bond redetermination hearing before an IJ, the agency would have the opportunity to correct any mistake in its initial determination regarding his flight risk and/or dangerousness. If Petitioner were released, he would no longer be able to seek release as a remedy in this action. Indeed, the Government argues that principles of constitutional avoidance mandate administrative exhaustion of Petitioner's request for release because if an IJ were to release him, the Court would avoid confronting constitutional issues. Dkt. 52 at 12.

Nevertheless, Petitioner's release would not render this action moot, as the Government acknowledges. Dkt. 62 at 19. Petitioner could still seek a ruling on his constitutional claims for declaratory and injunctive relief. The only question the Court would not confront would be whether release was a proper remedy for the alleged violations. In other words, if the Court

REPORT AND RECOMMENDATION - 39

waives exhaustion, it will not confront constitutional claims it otherwise would have avoided; it merely will need to decide whether any proven constitutional violation entitles Petitioner to release.  Constitutional avoidance does not counsel against waiver of prudential exhaustion.[30]

The Court concludes that the *Puga* factors weigh in favor of waiving the prudential exhaustion requirements as to Petitioner's request for release.  Accordingly, the Government's motion to dismiss on this ground should be denied.

3. *Petitioner is Not Entitled to Conditional Release*

Petitioner seeks his conditional release pending a final determination on the merits of his habeas petition.  As just discussed, the Court does not agree with the Government's argument that Petitioner's motion should be denied for failure to exhaust administrative remedies.  Nevertheless, the Court concludes that the record is not sufficiently developed to enable the Court to grant Petitioner's request for release at this time, and therefore, Petitioner's motion should be denied.

The Ninth Circuit has not yet decided whether a district court has the authority to conditionally release a habeas petitioner pending a decision on the merits of the petition.  *United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016), *pet. for cert. filed* (Feb. 16, 2016) (citing *In re Roe*, 257 F.3d 1077, 1080 (9th Cir. 2001) (per curiam)).  Authority from other circuits strongly supports the conclusion that this Court may exercise such authority in the appropriate circumstances.  *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) (federal courts have inherent authority to grant bail to immigration habeas petitioners); *Dotson v. Clark*, 900 F.2d 77 (6th Cir. 1990) (district court may release state prisoner pending determination on habeas);

[30] The Government also asserts that requiring Petitioner to exhaust his detention claim would be more expedient than waiting for this Court's resolution of the merits of his claims, which may take some time. Dkt. 52 at 12. While this may be so, expedience is not one of the *Puga* factors.

REPORT AND RECOMMENDATION - 40

*Martin v. Solem*, 801 F.2d 324 (8th Cir. 1986) (same); *Cherek v. United States*, 767 F.2d 335 (7th Cir. 1985) (same); *Pfaff v. Wells*, 648 F.2d 689 (10th Cir. 1981) (same); *Woodcock v. Donnelly*, 470 F.2d 93 (1st Cir. 1972) (same); *Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969) (per curiam) (same); *Boyer v. City of Orlando*, 402 F.2d 966 (5th Cir. 1968) (same); *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955) (same).

The Ninth Circuit has indicated that *if* district courts do have the authority to grant bail pending resolution of a habeas petition, "it is reserved for 'extraordinary cases involving special circumstances or a high probability of success.'" *McCandless*, 841 F.3d at 822 (quoting *Land v. Deeds*, 878 F.2d 318, 318 (9th Cir. 1989) (per curiam)). Petitioner asserts that he prevails under both prongs.

Petitioner argues that his case is extraordinary and involves special circumstances because he is a DACA recipient, he is not a threat to the public or a flight risk, and his continued detention has created panic and confusion among the hundreds of thousands of DACA recipients. Dkt. 45 at 17-23. Petitioner also claims that he has shown a high probability of success on the merits. He asserts a Fourth Amendment violation based on his arrest and detention despite the ICE officers' knowledge that he was a DACA beneficiary. *Id.* at 14. He maintains that the same conduct—his arrest and detention as a DACA beneficiary—violated his Fifth Amendment substantive and procedural due process rights because the federal government created a reasonable expectation that DACA recipients would be able to live and work in the United States for a specific period without being subject to arrest and detention based on their immigration status. *Id.* at 15-16. Petitioner also argues that the ICE officers who interrogated him violated his Fifth Amendment equal protection rights by assuming he was a gang member based only on an ordinary tattoo and his Mexican heritage. *Id.* at 17.

REPORT AND RECOMMENDATION - 41

Disputed issues of fact and unresolved questions of law preclude the Court from concluding at this time that Petitioner's case presents special circumstances or a high probability of success on the merits.  The lawfulness of an ICE officer's seizure of a non-citizen turns on the familiar principles of reasonable suspicion and probable cause:  If an officer detains a person for a brief, investigatory stop, the stop must be supported by reasonable suspicion that the person is "an alien illegally in the United States," 8 C.F.R. § 287.8(b)(2), and if an officer arrests a person, the arrest must be supported by probable cause that the person is "an alien illegally in the United States," 8 C.F.R. § 287.8(c)(2).  *See Orhorhaghe*, 38 F.3d at 497; *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980); *Zepeda v. U.S. INS*, 753 F.2d 719, 725 (9th Cir. 1983); 8 U.S.C. §§ 1357(a)(1), (2).  Generally, "a detention involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons."  *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001).  "If the stop proceeds beyond these limitations, an arrest occurs, which requires probable cause."  *Id.*

Under the Government's version of the facts, the ICE officers had a reasonable suspicion to enter the apartment and question Petitioner because Petitioner's father indicated that his adult children were in the apartment, that they were in the United States illegally, and that the officers were allowed to enter.  Dkt. 52-9 at 4.  The Government's facts also support the conclusion that the ICE officers had probable cause to arrest Petitioner because he allegedly admitted to being here illegally and that he previously had been arrested.  *Id.*

However, early on in the process, ICE officers discovered that Petitioner was a DACA beneficiary.[31]  Dkt. 53-1 at 4 ("At the processing center, they took my fingerprints, ran them, and

---

[31] The evidence does not support the inference that the ICE officers knew Petitioner was a DACA beneficiary before they arrived at the ICE processing center.  Petitioner's declaration states that at the apartment, he told the ICE officers he had a work permit, but he does not state that he told them he was a DACA beneficiary.  Dkt. 53-1 at 3.

REPORT AND RECOMMENDATION - 42

confirmed that I had no criminal history and that my DACA was active. Then, the same officer with short hair who questioned me at the apartment continued to interrogate me.").[32] Herein lies the rub: Only individuals who are not lawfully present in the United States may apply for DACA, and DACA does not confer lawful immigration status. Dkt. 41-6 at 4; Dkt. 41-1 (USCIS DACA FAQs at A. 1). Thus, unless DACA provides some form of protection, the regulations governing the interrogation and arrest of individuals believed to be unlawfully present could be understood as authorizing the arrest and interrogation of DACA beneficiaries. The Napolitano memo makes clear, however, that this was not the intent and purpose of the DACA program. *See* Dkt. 41-6.

Courts have recognized that DACA confers lawful presence. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058-59 (9th Cir. 2014) ("DACA recipients enjoy no formal immigration status . . . . DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General."); *Texas v. United States*, 809 F.3d 134, 148 (5th Cir. 2015) ("'Lawful presence' is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences."). But courts have not defined the rights that flow from this "lawful presence" or discussed whether DACA gives rise to greater protection in the form of a constitutionally protected liberty interest. Thus, whether the ICE officers had probable cause to continue questioning Petitioner *after* they learned he was a DACA beneficiary depends on the scope of the benefits attendant to "lawful presence" and the exact

---

[32] The Government's evidence confirms that ICE officers discovered Petitioner's DACA status and lack of criminal history at the processing center, but it does not establish a timeline. *See* Dkt. 32-3 at 4; Dkt. 52-9 at 3-5. At oral argument, counsel for the Government stated that he did not disagree with the Court that it was likely the ICE officers discovered Petitioner was a DACA beneficiary before he was questioned about gang affiliation. Dkt. 62 at 15.

REPORT AND RECOMMENDATION - 43

nature of any liberty interest conferred by DACA.  The record is not sufficiently developed to make those determinations now.  These questions go directly to the third part of the trifurcated process established at the February 17, 2017 status conference.  And given these unresolved issues, the Court cannot conclude that Petitioner's case is extraordinary or involves special circumstances that would warrant conditional release at this time.  Accordingly, the Court recommends that Petitioner's motion for conditional release be denied pending resolution of these questions.

## IV.    CONCLUSION

When this case is concluded, it could result in a determination that the ICE officers acted improperly by taking Petitioner into custody and questioning him even after they discovered that he was a DACA beneficiary.  Alternatively, it could result in a determination that although DACA establishes a basis for lawful presence in the United States, it does not create a constitutionally protected liberty interest, and the actions of the ICE officers were constitutionally appropriate.  These questions are not yet before the Court.

Instead, the limited issue before the Court at this time is whether the Court has *any* meaningful role to play in protecting non-citizens from the excesses of those charged with the enforcement of the immigration laws.  During the oral argument, the Court asked the Government's counsel to explain what role federal district courts would have if the Government engaged in unconstitutional racial profiling and instituted a roadblock to pull over all Hispanic-looking drivers, detaining those who possessed a DACA card, and filing a Notice to Appear document, thereby initiating the immigration removal process.  Dkt. 62 at 20-21.  The possession of the DACA card by itself would indicate that the person was a non-citizen and by the mere act of filing a Notice to Appear, officers could claim that the courts had no jurisdiction to consider whether the law enforcement actions were legal.

REPORT AND RECOMMENDATION - 44

Counsel for the Government candidly acknowledged that under its theory of the case, the Court indeed would be powerless to order the release of a person so detained. *Id.* at 21. Instead, the non-citizen so arrested would be forced into a labyrinthine immigration process, possibly lasting multiple years, and into a process where the immigration authorities would be unable to even review the constitutional claims asserted. Only after that process ran its course would the non-citizen be able to file a petition for review to have the Court of Appeals consider the constitutional deprivation claims. While this process may be required for claims arising during the course of the removal process or seeking a review of a final order of removal, this cannot be true as it relates to claims involving pre-removal unconstitutional conduct. It is not required by statute. Moreover, to hold otherwise would be to relegate the so-called Great Writ to the museum and history books, as nothing more than a matter of historical interest. The Court recommends that the Government's Motion to Dismiss (Dkt. 52) be DENIED. For the reasons set forth above, the Court also recommends that the Petitioner's Emergency Motion for Conditional Release (Dkt. 45) be DENIED.

Because Petitioner remains in custody, and because there are nearly 800,000 DACA beneficiaries who are interested in the outcome of these proceedings, the Court also recommends that the merits phase of the case be treated on an expedited schedule. If this Report and Recommendation is adopted in whole or in part, the Court recommends that the parties be directed to meet and confer about how the merits of this case might be expedited. Without limiting counsel, examples would include agreement upon an accelerated discovery schedule, submission of stipulations identifying admitted and disputed material facts, and accelerated briefing schedules on the merits.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **March 28, 2017**. Failure to file

REPORT AND RECOMMENDATION - 45

objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **March 31, 2017.**

This Report and Recommendation is not an appealable order.  Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this 14th day of March, 2017.

*James P. Donohue*

JAMES P. DONOHUE
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 46