**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

CASE NO. 2:17-CV-00218-RSM-JPD

Daniel Ramirez Medina,

                Plaintiff,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; MATTHEW E. HICKS,
[UNKNOWN FIRST NAME] PETER,
[UNKNOWN FIRST NAME] HERNANDEZ,
and KATHLYN LAWRENCE, U.S.
Immigration and Customs Enforcement
Officers (in their individual capacities); and
JOHN DOES 1-10 (in their individual
capacities),

                Defendants.

**SECOND AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL**

Attorneys for Plaintiff
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
  jlondon@publiccounsel.org
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089


GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
  kmarquart@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*
  jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520


ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
  echemerinsky@law.uci.edu
LEAH M. LITMAN (CA SBN 1016310), *pro hac vice*
  llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only*
401 East Peltason Drive
Educ 1095
Irvine, CA 92697
Telephone: (949) 824-7722

LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
  larry@tribelaw.com
Harvard Law School
*Affiliation for identification purposes only*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767


ELIZABETH HAWKINS (SBN 43187)
  ehawkins@hawkinsimmigration.com
Hawkins Law Group
17544 Midvale Avenue, Suite 301
Shoreline, WA 98133
Telephone: (206) 728-4220
Facsimile: (206) 973-5326


BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
  lcortes@barreralegal.com
JOHN C. BARRERA (SBN 47658), *pro hac vice*
  jbarrera@barreralegal.com
JOSE GARCIA (SBN 46518), *pro hac vice*
  jgarcia@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591


NORTHWEST IMMIGRANT RIGHTS PROJECT
MATT ADAMS (SBN 28287)
  matt@nwirp.org
615 Second Ave., Suite 400
Seattle, WA 98104
Telephone:  (206) 957-8611

**INTRODUCTION**

Plaintiff Daniel Ramirez Medina ("Mr. Ramirez") was arrested by U.S. Immigration and Customs Enforcement ("ICE") without a warrant or probable cause, and was detained for more than six weeks without justification, in clear violation of his constitutional rights.  Mr. Ramirez was targeted by Defendants despite their knowledge that he is a "Dreamer" who has twice been granted deferred action and work authorization under the Deferred Action for Childhood Arrivals ("DACA") program.  Mr. Ramirez now seeks relief from this Court to remedy his unconstitutional arrest and detention, restore his arbitrarily terminated DACA status, and confirm that the benefits he was provided under DACA are protected by the Due Process Clause.

The federal government established the DACA program with great fanfare in 2012.  Under DACA, individuals brought to the United States as children who meet certain criteria, and who are found by the Department of Homeland Security ("DHS") to pose no threat to public safety or national security, are granted deferred action for a two-year period, subject to renewal.  These young people are commonly referred to as "Dreamers" in recognition that they have played by the rules, cooperated with the government, and are working hard to be part of the American Dream.  As the government has explained, Dreamers are "considered by DHS to be lawfully present during the period deferred action is in effect," and are eligible to receive employment authorization and other important benefits.[1]  Indeed, on March 29, 2017, the Secretary of Homeland Security reaffirmed that "DACA status is a commitment . . . by the government towards the DACA person, or the so-called Dreamer."[2]

As a result of the government's representations and promises, hundreds of thousands of Dreamers have applied for, and been granted, deferred action under DACA.  To apply for DACA,

---

[1]  Ex. A, at 2 (*Frequently Asked Questions*, U.S. Citizenship & Immigration Servs.: Consideration of Deferred Action for Childhood Arrivals Process, https://www.uscis.gov/humanitarianhttps://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (hereinafter "USCIS DACA FAQs"); *see also Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015) *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) ("Deferred action . . . is much more than nonenforcement: It . . . affirmatively confer[s] 'lawful presence' and associated benefits . . . ."); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015).

[2]  Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico (Mar. 29, 2017), http://politi.co/2mR3gSN.

eligible young people are required to provide DHS with highly sensitive personal information, pay a substantial fee, and submit to a rigorous background check.  Mr. Ramirez did all of that not once, but twice, most recently less than a year ago when he successfully renewed his DACA status.  In so doing, Mr. Ramirez—like nearly 750,000 other Dreamers—"relied on the U.S. government's representations" that it would honor its commitments under the DACA program.[3]  As a result of their reasonable expectations, Mr. Ramirez and his fellow Dreamers have constitutionally protected liberty and property interests in the benefits granted under DACA, which include, among other things, the ability to live and work in the United States without fear of arbitrary arrest or detention.

Notwithstanding these promises, Defendants arrested and detained Mr. Ramirez without a warrant or probable cause.  They handcuffed him, forcibly removed him from a private residence, and transported him to an ICE detention facility where he was coercively interrogated.  They summarily revoked his DACA status and work authorization without notice, justification, or due process, and detained him with dangerous criminals for more than six weeks.  Once Mr. Ramirez filed a petition for habeas corpus in this Court, these agents doubled-down, mounting a sustained campaign to publicly vilify him as a "gang member," despite having no credible evidence to support that allegation.  Indeed, as the government later admitted to an Immigration Judge, there is insufficient evidence to even argue that Mr. Ramirez is a danger to the community.

There was no lawful basis for any of Defendants' actions against Mr. Ramirez.  At the time of his arrest and detention, Defendants knew (and had unmistakable proof of the fact) that Mr. Ramirez had been granted deferred action under DACA, and was therefore considered lawfully present in the United States.  And despite knowing that he had passed multiple DHS background checks and had no criminal history, the ICE agents asserted that Mr. Ramirez was a gang member based on his race and national origin and a single tattoo, which Mr. Ramirez and multiple experts have confirmed has nothing to do with gangs.  The government has since abandoned that allegation, and has conceded that it continued to detain Mr. Ramirez despite knowing that he presented no threat to public safety.

Mr. Ramirez respectfully requests that this Court:  (1) reinstate his DACA status and work authorization; (2) award him damages for the injuries he has sustained as a result of Defendants'

---

[3]  Ex. B, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I and II

unlawful conduct; and (3) issue declaratory relief confirming that the benefits provided under the DACA program are liberty and property interests protected by the Due Process Clause.

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.  This Court also has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

2.      All claims against employees and agents of the United States in their individual capacities are brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

3.      Venue properly lies within the Western District of Washington because a substantial part of the events or omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(e)(1).

4.      This is an amended version of the Amended Petition for Habeas Corpus and Complaint for Declaratory and Injunctive Relief that was filed in this action on February 21, 2017.[4]

## PARTIES

5.      Mr. Ramirez is the twenty-four year old father of a United States citizen.  He was brought to the United States from Mexico in or around 2003, when he was approximately 10 years old.  Mr. Ramirez was twice granted deferred action and work authorization under the DACA program.  He recently moved from California to Washington in order to obtain more lucrative employment so that he can better support his son.  After being arrested without a warrant or probable cause, Mr. Ramirez was detained in the Northwest Detention Center for more than six weeks.  His DACA status and work authorization were arbitrarily and capriciously terminated without notice or an opportunity to be heard.

6.      The Department of Homeland Security ("DHS") is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.

---

[4]  *See* Dkt. #41.  Because he has been released from detention, Mr. Ramirez is no longer bringing a petition for writ of habeas corpus.

7.       U.S. Immigration and Customs Enforcement ("ICE") is a law enforcement agency that is part of DHS.  According to its website, "ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration."[5]

8.       U.S. Citizenship and Immigration Services ("USCIS") is a federal agency that is part of DHS.  According to its website, USCIS "is the government agency that oversees lawful immigration to the United States."[6]  USCIS administers the DACA program, including by processing applications and issuing notices of termination.

9.       On information and belief, at all times relevant to this Complaint, Defendant Matthew E. Hicks was an ICE Deportation Officer.  Defendant Hicks participated in the arrest of Mr. Ramirez on February 10, 2017, and was personally responsible for his subsequent detention. Defendant Hicks is sued in his individual capacity.

10.       On information and belief, at all times relevant to this Complaint, Defendant Peter (first name unknown) was an ICE Deportation Officer.  Defendant Peter participated in the arrest and detention of Mr. Ramirez on February 10, 2017, and was personally responsible for his subsequent detention.  Defendant Peter is sued in his individual capacity.

11.       On information and belief, at all times relevant to this Complaint, Defendant Hernandez (first name unknown) was an ICE Deportation Officer.  Defendant Hernandez participated in the arrest and detention of Mr. Ramirez on February 10, 2017, and was personally responsible for his subsequent detention.  Defendant Hernandez is sued in his individual capacity.

12.       On information and belief, at all times relevant to this Complaint, Defendant Kathlyn Lawrence was an ICE Supervisory Detention and Deportation Officer.  Defendant Lawrence supervised the processing of Mr. Ramirez at the ICE holding facility in Tukwila, Washington, on February 10, 2017, and was personally responsible for his subsequent detention. Defendant Lawrence is sued in her individual capacity.

---

[5]  *See, e.g.*, *ICE Initiative to Increase Community Engagement*, U.S. Immigration & Customs Enforcement: News Releases (Mar. 10, 2016), https://www.ice.gov/news/releases/ice-initiative-increase-community-engagement.

[6]  United States Citizenship & Immigration Servs., *About Us*, https://www.uscis.gov/aboutus.

13.     At all times mentioned in this Complaint, unless otherwise alleged, Defendants Hicks, Peter, Hernandez, and Lawrence were federal agents or employees acting under the color of federal law.

14.     Mr. Ramirez is currently unaware of the true identities and capacities of the remaining Defendants, Does 1-10, inclusive, and therefore sues those Defendants by fictitious names.  Mr. Ramirez is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is personally responsible and liable for the acts and/or damages alleged in this Complaint, and that among these Defendants are federal agents and employees who acted under the color of federal law.  Mr. Ramirez will seek leave to amend this Complaint to allege the true identities and capacities of these fictitiously named Defendants once they have been ascertained.

## STATEMENT OF FACTS

**Establishment of the DACA Program**

15.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum").[7]  Under the DACA framework, individuals who were brought to the United States as young children and meet certain specific criteria may request deferred action for a period of two years, subject to renewal.  In exchange, DACA applicants are required to provide the government with highly sensitive personal information, submit to a rigorous background check, and pay a considerable fee.

16.     Deferred action is a well-established form of prosecutorial discretion under which the government defers removal action against an individual for a specified period, subject to renewal.  The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."[8]

---

[7]  Ex. C, at 1 (Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012)) (hereinafter "2012 DACA Memorandum").

[8]  *Id.* at 1–2.

17.     The 2012 DACA Memorandum established criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."[9]  They are that the applicant:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.[10]

18.     In addition, the 2012 DACA Memorandum provided that "[n]o individual should receive deferred action . . . unless they first pass a background check."[11]

19.     USCIS describes DACA as follows:  "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion.  For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect.  An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect.  However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."[12]

20.     Like other forms of deferred action, DACA serves the government's interests by allowing the government to prioritize its resources and exercise discretion for its own convenience.  As the government has recognized, our nation "continue[s] to benefit . . . from the contributions of

_____

[9]  *Id.* at 1.

[10]  *Id.*

[11]  *Id.* at 2.

[12]  Ex. A, at 1 (USCIS DACA FAQs, Question 1).

those young people who have come forward and want nothing more than to contribute to our country and our shared future."[13]

21.     On February 20, 2017, Secretary of Homeland Security John D. Kelly issued a memorandum that "immediately rescinded" all "conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," but specifically exempted the 2012 DACA Memorandum.[14]

**The DACA Application Process**

22.     In order to apply for DACA, applicants must submit extensive documentation establishing that they meet the abovementioned criteria.[15]  Applicants must also submit a Form I-765 Application for Employment Authorization, and pay hundreds of dollars in fees.[16]

23.     DACA applicants must also undergo biometric and biographic background checks. When conducting these checks, DHS reviews the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies."[17]  If any information "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant will be ineligible for DACA absent "exceptional circumstances."[18]

24.     Indicators that an individual poses a national security threat include "gang membership."[19]  Accordingly, "[a]ll DACA requests presenting information that the requestor is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU)."[20]  If

---

[13] Ex. B, at 2 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[14] Ex. D, at 2 (Memorandum from Secretary John Kelly, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017)).

[15] Ex. A, at 9–15 (USCIS DACA FAQs, Questions 28–41).

[16] *Id.* at 3 (USCIS DACA FAQs, Question 7); *see also* USCIS, I-821D, Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d (explaining that the filing fee for a DACA application is currently set at $495 and cannot be waived).

[17] *Id.* at 7 (USCIS DACA FAQs, Question 23).

[18] *Id.* at 23 (USCIS DACA FAQs, Question 65).

[19] *Id.*

[20] Ex. E. at 1 (Letter from USCIS Director León Rodríguez to Senate Judiciary Committee Chairman Charles E. Grassley (Apr. 17, 2015)) (hereinafter "USCIS Letter").

gang membership is confirmed, the DACA application is denied absent a determination by USCIS that an exception should be made given the totality of the circumstances.[21]

25.    In 2015, USCIS conducted an additional screening of all individuals granted deferred action under DACA—including Mr. Ramirez—"to identify records that contained information indicating known or suspected gang association."[22]

26.    Once DACA has been granted, internal USCIS "Standard Operating Procedures" dictate that, absent an "Egregious Public Safety" issue, DACA status should not be revoked until the government has provided a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination."[23]  DHS policy further provides that the recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of DACA status.[24]

**Benefits Provided Under the DACA Program**

27.    DACA confers numerous benefits on those who apply for and are granted DACA status.  Notably, DACA recipients are granted the right not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect.[25]

28.    DACA recipients are also eligible for work authorization.  As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . .'"[26]

---

[21]  *Id.* at 2.

[22]  *Id.* at 4 ¶ 2.

[23]  Ex. F, at 132, Appendix I (DHS National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA) (Apr. 4, 2013)) (hereinafter "DACA SOP").

[24]  *Id.* at 132, Appendix I.

[25]  *See* Ex. A, at 5 (USCIS DACA FAQs, Question 9) ("[I]f an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended."); Ex. C, at 2 (2012 DACA Memorandum); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058–59 (9th Cir. 2014) ("DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General.").

[26]  Ex. A, at 1 (USCIS DACA FAQs, Question 1).

29.     DACA recipients are eligible to receive certain public benefits.  These include Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses or unemployment insurance.[27]  In Washington, DACA holders are also eligible for certain state financial aid programs and state-funded food assistance.[28]

30.      DACA serves as a gateway to numerous other benefits, and enables recipients to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants.[29]

31.     DACA has enabled hundreds of thousands of Dreamers to "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."[30]

32.     DACA also confers other immigration benefits and the ability to travel.  For example, DACA recipients do not accrue time under Section 212(a)(9)(B)(i) of the INA,[31] and may briefly depart the U.S. and legally return under certain circumstances.[32]

**The Government's Promise to Dreamers**

33.     When the DACA program was first launched, many Dreamers were reluctant to voluntarily disclose information that could help facilitate their removal from the United States.  To combat this fear, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes."[33]

34.     The government has reiterated this commitment in its correspondence with Dreamers.  Moreover, the approval notice granting deferred action under DACA lists only "fraud or

---

[27]  *See* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Texas*, 809 F.3d at 148; *Ariz. Dream Act Coal.*, 81 F. Supp. 3d at 811.

[28]  *See* Wash. Rev. Code § 28B.92.010; Wash. Admin. Code §§ 388-400-0050, 388-424-0001, 388-424-0030.

[29]  *See* Dkt. #38-1, at 2 (Amicus Curiae Brief of United We Dream).

[30]  Ex. B, at 2 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[31]  8 U.S.C. § 1182(a)(9)(B)(i).

[32]  *See* Ex. A, at 19 (USCIS DACA FAQs, Question 57).

[33]  Ex. B, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA.[34]

35.     The government's commitment to the DACA program is further codified in its publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA)" (the "DACA SOP").[35]  This document effectively limits the exercise of agency discretion concerning DACA applications with "nearly 150 pages of specific instructions for granting or denying deferred action." *Texas*, 809 F.3d at 173 (citation omitted) (citing the DACA SOP as evidence that DACA is not truly a discretionary program).

36.     Numerous public officials from both political parties have reinforced this promise, and have recognized that Dreamers have relied on the government to keep its word.  For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are 750,000 Dreamers who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."[36]

37.     In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" Dreamers, who have "organize[d] [their] li[ves] around" the DACA program.[37]

38.     In February 2017, Congressman Raúl Grijalva described DACA as a "commitment," and called for "the federal government to honor its word to protect" Dreamers.[38]

39.     On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer."[39]

---

[34]  Ex. G (DACA Approval Notice).

[35]  Ex. F (DACA SOP).

[36]  Ex. B, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[37]  Transcript of CNN Town Hall with Speaker Paul Ryan, CNN (Jan. 12, 2017), http://cnn.it/2oyJXJJ.

[38]  Congressional Progressive Caucus Leaders Respond to ICE Arrest of DACA Recipient (Feb. 16, 2017), https://cpc-grijalva.house.gov/press-releases/congressional-progressive-caucus-leaders-respond-to-ice-arrest-of-daca-recipient.

[39]  Hesson & Kim, *supra* note 2.

40.      On April 21, 2017, President Trump confirmed that his Administration's policy is not to deport Dreamers, and suggested that "[D]reamers should rest easy."[40]

**Mr. Ramirez was Twice Granted Deferred Action Under DACA**

41.      In late 2013, Mr. Ramirez first applied for deferred action and work authorization pursuant to DACA.  As part of this process, Mr. Ramirez provided the government with his birth certificate, school records, and information about where he lived, and was required to attend a biometrics appointment so that USCIS could take his fingerprints and photographs.  Mr. Ramirez was nervous about providing this information, but trusted that the government would keep its word. Mr. Ramirez was granted deferred action and work authorization in 2014.

42.      In 2016, Mr. Ramirez reapplied for DACA, and once again was granted deferred action and work authorization after being subject to rigorous vetting.  As part of this process, the government sent Mr. Ramirez an approval notice (the "2016 DACA Approval Notice") informing him that his request for deferred action had been granted.  The 2016 DACA Approval Notice provides that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years" and is valid to May 4, 2018.[41]  The 2016 DACA Approval Notice informed Mr. Ramirez that his deferred action could be terminated if he engaged in "[s]ubsequent criminal activity."[42]

43.      DHS has therefore confirmed on three separate occasions that Mr. Ramirez does not pose a threat to national security or public safety—first in 2014 when he applied for DACA, then again in 2015 when USCIS conducted an additional screening of all DACA beneficiaries, and finally in 2016 when he reapplied for DACA.

**Mr. Ramirez's Unconstitutional Arrest and Subsequent Interrogation**

44.      On February 10, 2017, at approximately 9:00 a.m., a team of ICE agents, which included Defendants Hicks, Peter, and Hernandez, arrested Mr. Ramirez's father outside of the apartment where Mr. Ramirez, his father, and his brother were then living.  The ICE agents

---

[40]  Excerpts from AP interview with President Donald Trump, The Associated Press (Apr. 21, 2017), http://www.mcclatchydc.com/news/politics-government/national-politics/article146093899.html.

[41]  Ex. G (DACA Approval Notice).

[42]  *Id.*

subsequently entered the apartment; neither Mr. Ramirez nor his brother are aware of any consent to permit the ICE agents to enter or search the premises.

45.     Upon seeing Mr. Ramirez in the apartment, the ICE agents began to question him. Mr. Ramirez provided the agents with his name and birthdate, and told them that he was born in Mexico.  At this point, one of the agents placed Mr. Ramirez in handcuffs.

46.     Mr. Ramirez told the ICE agents repeatedly that he had a legal work permit, but the ICE agents refused to release him.  Mr. Ramirez's father also repeatedly informed the ICE agents that Mr. Ramirez had a legal work permit, and questioned why he was being detained.  The ICE agents did not ask any questions at the apartment regarding whether Mr. Ramirez was involved with a gang, nor did they ask him about his tattoo.

47.     The ICE agents did not have an arrest warrant for Mr. Ramirez, nor did they have any reason to believe that he had committed a crime or was not authorized to be in the United States. On the contrary, the ICE agents had reason to know that Mr. Ramirez had a work permit and was therefore lawfully living and working in the United States.  Despite these facts, Mr. Ramirez was taken into custody and transported to an ICE holding facility in Tukwila, Washington.  On information and belief, Defendant Lawrence supervised the processing of Mr. Ramirez at the ICE holding facility.

48.     At the holding facility, the ICE agents confiscated Mr. Ramirez's work permit.  This permit was marked with a "C33" designation, which clearly identified Mr. Ramirez as a DACA recipient with work authorization pursuant to DACA.[43]

49.     The ICE agents also fingerprinted Mr. Ramirez and used this information to access his records, which revealed that Mr. Ramirez has no criminal history, had twice been granted DACA status, and possessed valid employment authorization through May 4, 2018.

50.     Defendants refused to release Mr. Ramirez even after they confirmed his DACA status.  When Mr. Ramirez again protested that he had a work permit, he was told by Defendants

---

[43] Ex. F, at 112 (DACA SOP) ("To distinguish DACA-related EADs from other deferred action EADs, the (c)(33) code will be used.").

that it did not matter because he "was not from the United States."  Defendants subsequently cited Mr. Ramirez's receipt of DACA as evidence of his "illegal" status in the Form I-213.[44]

51.     The ICE agents then began to interrogate Mr. Ramirez.  They asked him at least five times whether he was in a gang, and each time he denied any gang affiliation.  The ICE agents repeatedly pressed him as to whether he had ever known anyone who was a gang member.  Mr. Ramirez told the agents that although that he knew students who had attended middle school and high school with him who were in gangs, he was not gang affiliated and never had been.

52.     The ICE agents also interrogated Mr. Ramirez about the tattoo on his forearm.  Mr. Ramirez obtained this tattoo when he was 18 years old—before he first applied for DACA.  The tattoo consists of the words "La Paz – BCS" and a nautical star.  "La Paz" is Mr. Ramirez's birthplace, and "BCS" stands for Baja California Sur, the region in which La Paz is located.  Mr. Ramirez decided to include the city of his birth because he had seen others do the same, and ultimately selected the nautical star (rather than a whale's tail, which he had also considered) because he liked the way it looked.  Nautical stars are popular symbols on tattoos.

53.     During the interrogation, one of the ICE agents stated that if Mr. Ramirez was from Fresno, he was "definitely a gang member" because everyone in Fresno is a member of the "bulldogs" gang.  He said that Mr. Ramirez's tattoo was a "bulldogs" tattoo.  Mr. Ramirez repeatedly told the ICE agents that the tattoo is not a gang tattoo, but they refused to believe him.

54.     Prior to his transfer to the Northwest Detention Center, the ICE agents asked Mr. Ramirez if there were any gangs with which he would like to avoid being placed for his safety.  Mr. Ramirez again stated that he had no gang affiliation and would not have problems being placed with anyone.  Upon continued questioning, Mr. Ramirez ultimately indicated that if he had to be placed with any group, he would prefer "the Paisas."  Mr. Ramirez understands the colloquial use of "Paisas" to mean Mexicans, and was attempting to communicate that if given the option, he would prefer to be placed with other Mexicans.  Mr. Ramirez, who has no criminal history and has never previously been in custody, has no connection or affiliation whatsoever to the Paizas gang.

---

[44]  Ex. H, at 3 (I-213 Record of Deportable/Inadmissible Alien (Feb. 10, 2017)).

**Mr. Ramirez's Unconstitutional Detention**

55.     Mr. Ramirez was then transferred to Northwest Detention Center, where he remained in custody for the next 47 days.

56.     The Northwest Detention Center is a privately owned detention facility located on a contaminated "Superfund" site.[45]  According to the Environmental Protection Agency, industrial pollutants have been found in the soil and water near the Northwest Detention Center, and environmental remediation efforts at the site remain ongoing.[46]

57.     In April 2017, hundreds of detainees at the Northwest Detention Center went on a hunger strike to protest the inhumane conditions at the facility, including poor hygiene, lack of access to medical care, lack of recreational opportunities, poor quality food, and unreasonable commissary prices.[47]

58.     The more than six weeks that Mr. Ramirez spent at the Northwest Detention Center were extremely difficult for him.  He spent his twenty-fourth birthday in detention, and was unable to see or speak to his young son for the duration of his detention.  Mr. Ramirez had difficulty sleeping, and experienced significant distress, sadness, fear, and anxiety as a result of his unjust detention.  Mr. Ramirez also began to experience vision problems, and was informed by the medical staff at the Northwest Detention Center that this was likely due to depression.

59.     Defendants classified Mr. Ramirez as a "medium-high" security risk, and placed him in a housing unit with gang members and dangerous criminals.  Mr. Ramirez requested that he be reclassified because, as he again explained, he was not, and never had been, gang affiliated, but this request was denied.  Because of the government's false statements to the media, many of the detainees at the Northwest Detention Center believed that Mr. Ramirez was a gang member and

---

[45]  U.S. Envtl. Prot. Agency, Fourth Five-Year Review Report for Commencement Bay Nearshore/Tideflats Superfund Site, Pierce Cty., Wash., at vi (Dec. 1, 2014), https://www3.epa.gov/region10/pdf/sites/cb-nt/4th_fyr_cbnt_2014.pdf.

[46]  *Id.* at vi–vii.

[47]  Mike Carter, *Hundreds of immigrant detainees at Tacoma ICE facility on hunger strike, activists say*, The Seattle Times (Apr. 12, 2017), http://www.seattletimes.com/seattle-news/group-hundreds-of-detainees-at-tacoma-ice-facility-on-hunger-strike; Steve Miletich, *ICE: Hunger strike winding down at Tacoma immigration detention center*, The Seattle Times (Apr. 14, 2017), http://www.seattletimes.com/seattle-news/crime/ice-hunger-strike-abates-at-detention-center.

1   questioned him about his gang affiliation.  This caused Mr. Ramirez to fear for his personal safety,

2   and he was afraid to leave his cell out of fear that he would be assaulted.

3   **The Government Revokes Mr. Ramirez's DACA Status and Work Authorization**

4   60.   Defendants issued a Notice to Appear ("NTA") on February 10, 2017.[48]  Defendants

5   assert that Mr. Ramirez's DACA status terminated on the day the NTA was issued.[49]

6   61.   USCIS sent Mr. Ramirez a Notice of Action ("NOA") dated February 17, 2017.

7   The NOA states that Mr. Ramirez's deferred action and employment authorization terminated on the

8   date the NTA was issued, and provides that "[a]n appeal or motion to reopen/reconsider this notice

9   of action may not be filed."[50]

10   62.   Under DHS policy, the government must provide a "Notice of Intent to Terminate"

11   and 33 days for a response prior to terminating DACA status, unless the case involves an "Egregious

12   Public Safety" issue.[51]  Mr. Ramirez was never provided with a Notice of Intent to Terminate, nor

13   was he given 33 days to respond to such a notice or otherwise contest the revocation of his DACA

14   status or work permit.

15   **The Government Publicly Labels Mr. Ramirez as a "Gang Member"**

16   63.   After Mr. Ramirez sought relief from this Court on February 13, 2017, Defendants

17   concocted a shifting story about the circumstances surrounding his arrest and detention.  Defendants

18   sought to justify their unlawful actions based on the false assertion that Mr. Ramirez is a gang

19   member, and initiated a sustained campaign to publicly vilify him as such, despite knowing that

20   there existed no reliable evidence to support such a characterization.

21   64.   Spokespersons for ICE and DHS issued statements alleging that Mr. Ramirez was a

22   gang member, and falsely informed the national media that the government possessed

23   "corroborating evidence" to support that allegation.  Additionally, on information and belief,

---

[48]   Ex. I, at 1 (Notice to Appear).

[49]   *See* Dkt. #32, at 2–3 (Respondents' Brief Regarding the Court's February 14, 2017 Order).

[50]   Ex. J, at 1 (Notice of Action).

[51]   Ex. F, at 132, Appendix I (DACA SOP).

Defendants coordinated with each other and leaked false information to members of the media in furtherance of this smear campaign.

65.     On February 14, 2017, an ICE spokesperson stated that "ICE officers took Mr. Ramirez into custody *based on* his admitted gang affiliation and risk to public safety."[52]  This false allegation contradicts the Form I-213 prepared by Defendants, which notes that ICE agents did not discuss Mr. Ramirez's purported gang affiliation with him until *after* he was transported to the ICE holding facility in Tukwila, Washington, at which point his DACA status and lack of a criminal record had been confirmed.[53]

66.     On February 15, 2017, ICE officials were pressed by the news media for additional evidence demonstrating that Mr. Ramirez was a gang member.  In response, Defendants informed the media that they had "additional evidence including photos and social media content that illustrate his gang affiliation."[54]

67.     On February 15, 2017, an unnamed ICE official informed members of the national news media that there was corroborating evidence to support their allegations of gang membership.[55]  No such corroborating evidence has been produced or filed in any court, despite requests by Mr. Ramirez and his counsel.

68.     On February 15, 2017, DHS issued a statement labeling Mr. Ramirez as "a gang member."[56]

---

[52]  Ex. K, at 1 (Sue Horton et al., *Mexican 'DREAMer' Nabbed in Immigrant Crackdown*, Reuters U.S. Top News (Feb. 14, 2017), http://www.reuters.com/article/us-usa-trump-immigration-arrest-exclusiv-idUSKBN15T307) (emphasis added).

[53]  Ex. H, at 3 (I-213 Record of Deportable/Inadmissible Alien (Feb. 10, 2017)).

[54]  Ex. L, at 9 (*First 100 Days: Chaffetz: We Want Inspector General to Investigate Leaks; Attorney for Arrested 'Dreamer' Speaks Out*, FoxNews.com (Feb. 15, 2017), http://www.foxnews.com/transcript/2017/02/15/chaffetz-want-inspector-general-to-investigate-leaks-attorney-for-arrested/).

[55]  Ex. M, at 2 ('*DREAMer' Protected under Obama Detained in Seattle Area*, CBSnews.com (Feb. 15, 2017), http://www.cbsnews.com/news/daniel-ramirez-medina-dreamer-protected-under-obama-detained-in-seattle/).

[56]  Ex. N, at 1–2 (*DHS Statement on Arrest of Alien Gang Member in Washington* (Feb. 15, 2017), https://www.dhs.gov/news/2017/02/15/dhs-statement-arrest-admitted-alien-gang-member-washington).

69.     Defendants have since backed away from these false and defamatory allegations. For example, in their filings in this Court, Defendants have alleged merely that Mr. Ramirez "hangs out" with gang members.[57]  And in the Immigration Court, the government has admitted that the evidence does not support any conclusion that Mr. Ramirez is a threat to public safety.

**The Government Fails to Provide Any Credible Evidence to Support its Gang Allegations**

70.     Defendants have been unable to produce any credible evidence to support their false allegations that Mr. Ramirez is gang affiliated.  In sharp contrast, Mr. Ramirez has submitted extensive evidence demonstrating that he is not, and never has been, a gang member.  In addition to evidence demonstrating that he successfully passed three separate DHS background checks, Mr. Ramirez has submitted numerous sworn declarations attesting to the fact that he has never had any gang affiliation.[58]

71.     Additionally, three independent experts have rebutted Defendants' allegations that Mr. Ramirez is gang affiliated.  Martin Flores, who has served as a gang expert in more than 700 cases, stated that he has "never seen a gang member with a similar tattoo nor would [he] attribute this tattoo to have any gang-related meaning."[59]  Another gang expert, Dr. Edwina Barvosa, similarly stated that there is "no apparent evidence that Mr. Ramirez Medina has ever been a gang member himself."[60]  And Carlos García, a Mexican researcher who has written extensively on gangs in California and Central America, noted that "[a]ny argument about gang ties based on [Mr. Ramirez's] tattoo is weak at best; this tattoo does not show any gang affiliation."[61]

72.     Despite the means and ample opportunity to collect evidence to support their claims, Defendants have failed to produce *any* credible evidence to support any of their allegations against Mr. Ramirez.  Unlike Mr. Ramirez, Defendants have access to numerous (and perhaps all) law

---

[57]  *E.g.*, Dkt. #52, at 7 (Respondents' Motion to Dismiss).

[58]  *E.g.*, Ex. O, ¶¶ 19–20 (Declaration of Daniel Ramirez Medina); Ex. P, ¶ 4 (Declaration of Josue L.); Ex. Q, ¶¶ 8–9 (Declaration of Luz L.); Ex. R, ¶ 8 (Declaration of Nancy L.).

[59]  Ex. S, ¶ 11 (Declaration of Martin M. Flores).

[60]  Ex. T, ¶ 10 (Declaration of Edwina Barvosa, PhD).

[61]  Ex. U, at 4 (Jonathan Blitzer, *A case that could determine the future for Dreamers*, The New Yorker (Mar. 15, 2017), http://www.newyorker.com/news/news-desk/a-case-that-could-determine-the-future-for-dreamers).

1   enforcement and public safety databases.  Yet Defendants have never suggested that they have

2   located Mr. Ramirez's name or supposed gang affiliation in any of those databases, and instead have

3   been forced to concede that Mr. Ramirez is not, and never has been, a threat to the public safety.

4           73.     Likewise, Defendants placed great weight on Mr. Ramirez's alleged "gang tattoo,"

5   yet have never provided *any* evidence (from an expert or otherwise) that this tattoo is associated

6   with gang membership.  Defendants have been unable to do so because it is not a gang tattoo.

7   **Defendants' Defamatory Statements Harmed Mr. Ramirez**

8           74.     Defendants were aware that Mr. Ramirez was repeatedly vetted by DHS and found

9   not to be a threat to public safety or national security.  Defendants also confirmed at the ICE holding

10  facility that he had no criminal history.  Despite these facts, and in the absence of any credible

11  evidence otherwise, Defendants falsely slandered Mr. Ramirez as a "gang member."

12          75.     Defendants' false allegations regarding Mr. Ramirez's purported gang membership

13  placed Mr. Ramirez at risk while he was detained at the Northwest Detention Center.  After

14  Defendants' allegations were reported in the news, other detainees at the Northwest Detention

15  Center began questioning Mr. Ramirez about his gang membership.

16          76.     Defendants' false and unfounded gang allegations also caused Mr. Ramirez to fear

17  for his personal safety.  For example, Mr. Ramirez was scared to leave his cell at the Northwest

18  Detention Center because he was concerned that other detainees might assault him based on the

19  misperception that he was in a gang—a misperception caused by Defendants' false allegations.

20          77.     Defendants' false gang allegations have also damaged Mr. Ramirez's reputation.

21  Before Defendants engaged in their campaign to smear his reputation, Mr. Ramirez was a respected

22  member of his community.  Now, because of Defendants' conduct, many people incorrectly believe

23  that Mr. Ramirez is gang affiliated.  As a result, Mr. Ramirez has lost the respect of some prior

24  friends and acquaintances, and many members of the public have formed a negative opinion of him.

25

26

27

28

**Mr. Ramirez is Released from Custody After 47 Days In Detention**

78. Pursuant to an order of this Court, Mr. Ramirez received a bond hearing in Immigration Court on March 28, 2017.[62]  At the bond hearing, Mr. Ramirez testified about his arrest, interrogation, and detention.  Mr. Ramirez was released on bond on March 29, 2017.[63]

79. In a startling admission, counsel for the government conceded at the conclusion of the bond hearing that Mr. Ramirez is not a danger to the community.  The government's statements (and lack of evidence) at the bond hearing affirm that the government has never had any justification for revoking Mr. Ramirez's DACA status or for detaining him for more than six weeks.

80. After considering the evidence, the Immigration Judge concluded that Mr. Ramirez is neither a flight risk nor a danger to the community and should be released on bond.[64]  The Immigration Judge's decision to release Mr. Ramirez underscores Defendants' inability to support their allegations of gang-affiliation.

**Mr. Ramirez Continues to Suffer Harm as a Result of Defendants' Unlawful Conduct**

81. Mr. Ramirez was detained from February 10, 2017 to March 29, 2017.  He will never get back the six weeks that he spent in the Northwest Detention Center.

82. Since his release, Mr. Ramirez has reunited with his family, but has been unable to fully piece his life back together.  Mr. Ramirez no longer has his DACA status or work authorization, and Defendants have refused to return Mr. Ramirez's Washington State identification card, which they confiscated following his arrest.  Mr. Ramirez must work to provide for himself and his family, but Defendants' actions have prevented him from obtaining employment.

83. Mr. Ramirez also continues to experience the profound emotional and psychological consequences of his detention.  For more than six weeks, he was confined under conditions that caused him to experience significant distress, humiliation, embarrassment, discomfort, fear, and anxiety.  He constantly feared that he would be attacked based on Defendant's false claims about his supposed gang affiliation.

---

[62] *See* Dkt. #69, at 3.

[63] Ex. V, at 1 (Notice to EOIR).

[64] Ex. W, at 1 (Custody Order); *see also* 8 C.F.R. § 236.1(c)(8) (2017).

84.     Mr. Ramirez also continues to suffer the stigma of being associated with a gang. Not only has Mr. Ramirez's reputation been damaged as a result of Defendants' conduct, but the reputation of his family has suffered as well.  Mr. Ramirez cares deeply about his family, and it has been very difficult for him to see how Defendants' actions have caused his family harm.

**CAUSES OF ACTION**

**COUNT ONE**

**ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS ACTION**

85.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

86.     This Count is brought against the DHS, ICE, and USCIS (collectively, the "Agency Defendants") and seeks declaratory and injunctive relief under the Administrative Procedure Act ("APA").

87.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2017).  Here, the Agency Defendants violated the APA because their revocation of Mr. Ramirez's DACA status and work authorization was arbitrary, capricious, an abuse of discretion, and in violation of their own established procedures.  The revocation of Mr. Ramirez's DACA status and work authorization constitutes final agency action and cannot be appealed.[65]

88.     The abrupt and unsupported decision by the Agency Defendants to revoke Mr. Ramirez's DACA status and work authorization despite the fact that multiple prior and more thorough analyses had concluded that he was eligible for DACA is the sort of inconsistency that is the hallmark of arbitrary action.  *See, e.g.*, *Nat'l Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1145 (9th Cir. 2015).[66]  Indeed, as discussed above, the Agency Defendants examined Mr. Ramirez's

---

[65]   As discussed above, the NOA expressly provides that an "appeal or motion to reopen/reconsider this notice of action may not be filed."  Ex. J, at 1.

[66]   *See also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  While an agency may change course based upon new "factual findings that contradict those" upon which it based its prior determination, it must provide a "detailed justification," particularly when the "prior policy has engendered serious reliance interests that must be taken into account."  *Id.* at 515–16 (citing *Smiley v. Citibank (South Dakota), N. A.,* 517 U.S. 735, 742 (1996)).

background on at least three separate occasions and concluded that he was eligible for DACA.  The decision to summarily reverse that conclusion was arbitrary, capricious, and an abuse of discretion. That the government again acknowledged that Mr. Ramirez is not a threat to public safety at his bond hearing further underscores the arbitrary and capricious nature of his DACA revocation.

89.     The Agency Defendants' assertion that Mr. Ramirez is gang affiliated is implausible and "runs counter to the evidence before the agency."  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016) (citation omitted).  Notably, the Agency Defendants based this determination in large part on the unsupported conclusion that Mr. Ramirez's tattoo is a "gang tattoo," despite the fact that multiple independent experts have reached the opposite conclusion.  The Agency Defendants have provided no analysis or expert opinion to support their conclusion regarding Mr. Ramirez's tattoo, and their refusal to engage with contrary evidence violates the APA.

90.     Relatedly, the Agency Defendants acted unlawfully and in violation of the *Accardi* doctrine because they failed to "adhere to [their] own internal operating procedures" when they summarily revoked Mr. Ramirez's DACA status and work authorization.  *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) (citing *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 268 (1954)).[67]  By way of example, DHS policy provides that—absent an "Egregious Public Safety" issue—the government must provide DACA beneficiaries with a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the proposed termination of their DACA status.[68]  DHS policy further directs that individuals served with such a notice are to be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of their DACA status.[69]  Here, the Agency Defendants failed to follow their own internal operating procedures, and instead summarily revoked Mr. Ramirez's

---

[67]  The *Accardi* requirement "extends beyond formal regulations," including to "policy statement[s]," "handbook[s]," "operating procedures," "Order[s]," "Weekly Bulletin[s]," unpromulgated rules documenting "usual practice," "Standards," and "Directive[s]."  *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) (citing cases).

[68]  Ex. F, at 132, Appendix I (DACA SOP).

[69]  *Id.*

DACA status and work authorization without providing him any notice or an opportunity to address the allegations against him.

91.     For all of the foregoing reasons, the revocation of Mr. Ramirez's DACA status and work authorization was in violation of the APA.

### COUNT TWO

### ADMINISTRATIVE PROCEDURE ACT – UNCONSTITUTIONAL ACTION

92.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

93.     This Count is brought against the Agency Defendants and seeks declaratory and injunctive relief under the APA.

94.     The APA dictates that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  Here, the Agency Defendants violated the APA because their revocation of Mr. Ramirez's DACA status and work authorization violated his rights under the Due Process Clause.  The revocation of Mr. Ramirez's DACA status and work authorization constitutes final agency action and cannot be appealed.[70]

95.     Aliens who are physically present in the United States are guaranteed the protections of the Due Process Clause.  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

96.     The Constitution "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  A threshold inquiry in any case involving a violation of procedural due process "is whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of that interest."  *Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1190–91 (9th Cir. 2015) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972)).

---

[70]  *See supra* note 65.

97.     Here, the Agency Defendants deprived Mr. Ramirez of liberty interests protected by the Due Process Clause.  As previously discussed, DACA grants beneficiaries the right not to be arrested or detained based solely on their immigration status during the time period that their deferred action is in effect.  Such "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.  The term "liberty" also encompasses the ability to work, raise a family, and "form the other enduring attachments of normal life." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Roth*, 408 U.S. at 572.  Where, as here, an individual reasonably relies on a conferred status to pursue these activities, the government cannot revoke that status without adequate procedural due process.  *See Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that once a benefit is granted "continued possession may become essential in the pursuit of a livelihood").

98.     The fact that the Agency Defendants revoked Mr. Ramirez's DACA status and work authorization based on false allegations of gang affiliation also deprived him of protected liberty interests in his reputation.  *See Paul v. Davis*, 424 U.S. 693 (1976) (explaining that while reputation alone may not be a protected liberty interest, "the invocation of procedural safeguards" is justified when defamatory allegations accompany an altered legal status); *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").

99.     The Agency Defendants also deprived Mr. Ramirez of property interests protected by the Due Process Clause.  The property interests protected by the Due Process Clause "extend beyond tangible property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'" *Nozzi*, 806 F.3d at 1191 (citing *Roth*, 408 U.S. at 576–77).  "A legitimate claim of entitlement is created [by] . . . 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Id.*  Therefore, an individual has a protected property interest where they have a reasonable expectation of entitlement to that interest.

100.     Here, Mr. Ramirez possessed a protected property interest in his DACA status and the numerous benefits provided to him under the DACA program.  As discussed above, these benefits

include, among other things, the ability to legally work in the United States,[71] eligibility for important state and federal benefits,[72] and the ability to travel internationally under certain circumstances. *See Texas*, 809 F.3d at 166 ("Deferred action . . . is much more than nonenforcement:  It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens. Though revocable, that change in designation would trigger . . . eligibility for federal benefits—for example, under title II and XVIII of the Social Security Act—and state benefits—for example, driver's licenses and unemployment insurance—that would not otherwise be available to illegal aliens."); *Ariz. Dream Act Coal.*, 757 F.3d at 1058–59 ("DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General.").

101.     These protected property interests exist because of the government's decision to grant Mr. Ramirez these benefits, and by virtue of its promise to Mr. Ramirez (and hundreds of thousands of similarly situated young people) to adhere to the strict framework of the DACA program. *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.").  In establishing and continuously operating DACA under a well-defined framework and highly specific criteria, the government created a reasonable expectation among DACA recipients—including Mr. Ramirez—that they are entitled to the benefits provided under the program.[73]

102.     While DACA is premised on the exercise of prosecutorial discretion, that discretion is limited and constrained by the rules and criteria on which DACA is based and operated, and by the government's decision to twice grant Mr. Ramirez deferred action and work authorization.  These

---

[71] Revocation of DACA is therefore the sort of "complete prohibition of the right to engage in a calling" that directly implicates the Due Process Clause.  *Conn v. Gabbert*, 526 U.S. 286, 292 (1999).

[72] Courts routinely find that revocation of public benefits triggers the Due Process Clause.  *See, e.g.*, *Mathews*, 424 U.S. at 332.

[73] "[T]he identification of property interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the state."  *Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002) (citations omitted).

1   constraints on discretion further support Mr. Ramirez's claim of a protected property interest. *See*

2   *Nozzi*, 806 F.3d at 1191 (finding a protected property right in government benefits where government

3   regulations "greatly restrict the discretion" of those who administer the benefits) (citation omitted).

4   103.   Defendants' conduct in depriving Mr. Ramirez of his protected liberty and property

5   interests is evaluated under the three-part *Eldridge* test. "[I]n *Mathews v. Eldridge*, the Supreme

6   Court set forth a three-part inquiry to determine whether the procedures provided to protect a liberty

7   or property interest are constitutionally sufficient. First, courts must look at the nature of the interest

8   that will be affected by the official action, and in particular, to the degree of potential deprivation that

9   may be created. Second, courts must consider the fairness and reliability of the existing procedures

10   and the probable value, if any, of additional procedural safeguards. Finally, courts must assess the

11   public interest, which includes the administrative burden and other societal costs that would be

12   associated with additional or substitute procedures." *Nozzi*, 806 F.3d at 1192–93 (internal quotations

13   and citations omitted). This test requires courts to balance the affected interests to see whether the

14   procedures provided are constitutionally sufficient.

15   104.   Here, the revocation of Mr. Ramirez's DACA status and work authorization without

16   adequate procedural protections fails the *Eldridge* test. First, Mr. Ramirez's protected interests are

17   extremely significant—they include, among other things, his physical liberty, his right to be free from

18   arrest or detention based solely on his immigration status, and his ability to earn a living to help

19   support himself and his family. Second, the procedures provided were wholly inadequate. "The

20   essence of due process is the requirement . . . [of] notice . . . [and] a meaningful opportunity to

21   present [one's] case." *Mathews*, 424 U.S. at 348–49. Here, Defendants revoked Mr. Ramirez's

22   DACA status without any advance notice.[74] And third, there is no credible burden "associated with

23   additional or substitute procedures," or public benefit from their absence. *Nozzi*, 806 F.3d at 1193

24   (internal quotations and citations omitted).[75]

---

[74] The risk of "erroneous deprivation" is particularly high where, as here, an agency disregards its own extensive prior due diligence in favor of a spur-of-the-moment judgment by a few individuals based on extremely limited evidence. Under these circumstances, *any* "additional procedural safeguards" would have had obvious "probable value." *Nozzi*, 806 F.3d at 1193.

[75] As previously noted, Defendants also violated the government's policy of providing notice and 33 days to respond before terminating DACA status. *See* Ex. F, at 132, Appendix I (DACA SOP).

105.     For all of the foregoing reasons, the revocation of Mr. Ramirez's DACA status and work authorization violated his rights under the Due Process Clause, and was therefore in violation of the APA.

## COUNT THREE

### BIVENS CLAIM:  FOURTH AMENDMENT – UNLAWFUL SEIZURE

106.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

107.     This Count is brought against Defendants Hicks, Peter, Hernandez, Lawrence, and Does 1-5 (collectively, the "Individual Defendants") in their individual capacities only pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

108.     Aliens are entitled to Fourth Amendment protection from unlawful seizures.  *See Orhorhaghe v. INS*, 38 F.3d 488, 497–501 (9th Cir. 1994); *Benitez-Mendez v. INS*, 760 F.2d 907, 909 (9th Cir. 1983).  To support a warrantless arrest and detention for a civil immigration violation, the arresting officer must be aware of sufficient facts to support a reasonable belief that the alien is in the United States illegally.  *Benitez-Mendez*, 760 F.2d at 909.  Absent such facts, a warrantless arrest violates the Fourth Amendment.  *Orhorhaghe*, 38 F.3d at 497–501.

109.     Here, the Individual Defendants arrested and detained Mr. Ramirez despite their knowledge that he was granted deferred action under DACA and was therefore authorized to live and work in the United States.  By arresting and detaining Mr. Ramirez under these circumstances, the Individual Defendants violated his rights under the Fourth Amendment.

110.     Each of the Individual Defendants was personally involved in and proximately caused the aforementioned violation of Mr. Ramirez's constitutional rights.

111.     As a result of Defendants' actions, Mr. Ramirez suffered damages, including, but not limited to, loss of liberty, loss of earnings and earning capacity, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

**COUNT FOUR**

**BIVENS CLAIM:  FIFTH AMENDMENT – PROCEDURAL DUE PROCESS**

112.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

113.     This Count is brought against the Individual Defendants in their individual capacities only pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

114.     Aliens who are physically present in the United States are guaranteed the protections of the Due Process Clause.  *See Zadvydas*, 533 U.S. at 693.

115.     The Constitution "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews*, 424 U.S. at 332.

116.     Here, the Individual Defendants deprived Mr. Ramirez of liberty and property interests protected by the Due Process Clause.  *See supra* ¶¶ 97–102.  This deprivation was without adequate procedural protections and fails the *Eldridge* test.  *See supra* ¶¶ 103–04.  Accordingly, the Individual Defendants violated Mr. Ramirez's rights under the Due Process Clause.

117.     Each of the Individual Defendants was personally involved in and proximately caused the aforementioned violation of Mr. Ramirez's constitutional rights.

118.     As a result of Defendants' actions, Mr. Ramirez suffered damages, including, but not limited to, loss of liberty, loss of earnings and earning capacity, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

**COUNT FIVE**

**BIVENS CLAIM:  FIFTH AMENDMENT – SUBSTANTIVE DUE PROCESS**

119.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.     This Count is brought against the Individual Defendants in their individual capacities only pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

121.    "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.  Any deprivation of this fundamental liberty interest must be accompanied not only by adequate procedural protections, but also by a "sufficiently strong special justification" to outweigh the significant deprivation of liberty.  *Id.*; *see also Phan v. Reno*, 56 F. Supp. 2d 1149, 1154 (W.D. Wash. 1999) ("Above and beyond the procedural guarantee explicit in the Due Process Clause itself, federal courts have long recognized a limited substantive component that forbids the government to infringe certain fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" (internal citations and quotations omitted) (emphasis in original)).

122.    Here, Mr. Ramirez's detention violated his right to substantive due process protected by the Fifth Amendment.  There was no reason that Mr. Ramirez should have been detained.  He was neither a flight risk, nor a risk to public safety or national security, and twice passed the rigorous vetting conducted by DHS, as well as the additional screening for gang affiliation in 2015.  Moreover, Defendants have explicitly conceded that Mr. Ramirez posed no risk to public safety.  Accordingly, Defendants cannot show any valid justification—let alone a "sufficiently strong special justification"—for depriving Mr. Ramirez of his fundamental rights.

123.    Defendants also violated Mr. Ramirez's substantive (and procedural) due process rights through their unconstitutional bait-and-switch.  As the Supreme Court has recognized, the Due Process Clause forbids the government from punishing people for engaging in conduct that the government itself has encouraged.  *See, e.g.*, *Cox v. State of La.*, 379 U.S. 559, 571 (1965) (holding that the government could not punish protestors for demonstrating in a location where state officials had said the protest was allowed); *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959) (holding that witnesses could not be punished for refusing to answer self-incriminating questions from a legislative commission when the commission had told the witnesses they could decline to answer such questions as to do so would amount to "the most indefensible sort of entrapment by the State").

124.    Here, the government vigorously promoted the DACA program and promised Mr. Ramirez—and hundreds of thousands of other young people—that if they disclosed sensitive

personal information and passed a background check they would be able to live and work in the United States without being subject to arrest or detention based on their immigration status.  The government further encouraged Mr. Ramirez to voluntarily disclose highly sensitive personal information by promising that such information would not be used for immigration enforcement purposes.  By arresting and detaining Mr. Ramirez, and then using the information he disclosed against him, the government has broken both of those promises.  For the government to now "say . . . 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government." *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436, 466 (Fed. Cl. 2017) (citing *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)).

125.     By arresting and detaining Mr. Ramirez under these circumstances, the Individual Defendants violated his rights under the Fifth Amendment.

126.     Each of the Individual Defendants was personally involved in and proximately caused the aforementioned violation of Mr. Ramirez's constitutional rights.

127.     As a result of Defendants' actions, Mr. Ramirez suffered damages, including, but not limited to, loss of liberty, loss of earnings and earning capacity, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

## COUNT SIX

### BIVENS CLAIM:  FIFTH AMENDMENT – EQUAL PROTECTION

128.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

129.     This Count is brought against the Individual Defendants in their individual capacities only pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

130.     The Fifth Amendment protects individuals against actions of the federal government that deny them equal protection of the laws.  *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954) (applying Equal Protection Clause to the federal government).

131.     The Fifth Amendment forbids federal officials from acting with a discriminatory intent or purpose.  To succeed on a claim alleging a violation of the Equal Protection Clause, a plaintiff "must prove that [Defendants] 'acted in a discriminatory manner and that the discrimination was intentional.'"  *Wingate v. City of Seattle*, 198 F. Supp. 3d 1221, 1228 (W.D. Wash. 2016) (quoting *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003)).  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

132.     Here, the Individual Defendants arrested Mr. Ramirez in substantial part because of unconstitutional racial and national origin discrimination and invidious stereotypes about men of Mexican heritage who have tattoos.  The Individual Defendants' discriminatory intent is evidenced by, among other things, their decision to question Mr. Ramirez about his place of birth, their decision to depart from established procedures and arrest and detain Mr. Ramirez without a warrant and in spite of his DACA status, and their statement to Mr. Ramirez that his DACA status did not matter because he was not from the United States.[76]

133.     The decision at the ICE holding facility to continue to detain Mr. Ramirez was also motivated by unconstitutional racial and national origin discrimination.  Despite knowing that Mr. Ramirez had passed numerous DHS background checks and had no criminal history, Defendants alleged that Mr. Ramirez was a gang member based on his Mexican heritage and his tattoo.  Furthermore, one of the ICE agents told Mr. Ramirez that it did not matter that he had DACA status because he was not from the United States, thereby demonstrating that Defendants were intentionally discriminating against Mr. Ramirez because of his national origin.  The Individual Defendants' conduct amounts to unconstitutional racial and national origin discrimination in violation of the Equal Protection Clause.

134.     Each of the Individual Defendants was personally involved in and proximately caused the aforementioned violation of Mr. Ramirez's constitutional rights.

---

[76] Discriminatory remarks made during an arrest or processing are evidence of an equal protection violation.  *See, e.g.*, *Usher v. City of L.A.*, 828 F.2d 556, 562 (9th Cir. 1987); *Holland v. King Cty. Adult Det.*, No. 12–cv–0791–JLR, 2013 WL 3354414, at *14 n.14 (W.D. Wash. July 3, 2013).

135.     As a result of Defendants' actions, Mr. Ramirez suffered damages, including, but not limited to, loss of liberty, loss of earnings and earning capacity, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

## COUNT SEVEN

## BIVENS CLAIM:  DEFAMATION

136.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

137.     This Count is brought against Defendants Does 1-5 (the "Doe Defendants") in their individual capacities only pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

138.     To prevail on a claim for defamation under Washington law, a plaintiff must establish:  (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages.  *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1132 (W.D. Wash. 2007) (citing *Mark v. Seattle Times*, 96 Wash. 2d 473, 486 (1981)).

139.     A claim for defamation is actionable under *Bivens* where a plaintiff can show that an injury to his reputation was inflicted *in connection with* the deprivation of a federally protected right. *See Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006) (addressing claims brought under 42 U.S.C. § 1983).  In other words, "a plaintiff must allege loss of a recognizable property or liberty interest in conjunction with the allegation of injury to reputation."  *Cooper v. Dupnik*, 924 F.2d 1520, 1532 (9th Cir. 1991), *aff'd en banc on other grounds*, 963 F.2d 1220 (9th Cir. 1992) (same).

140.     Here, the Doe Defendants engaged in a sustained campaign to publicly malign Mr. Ramirez as a "gang member," despite knowing that there was no reliable evidence to support such a characterization.  In so doing, the Doe Defendants caused irreparable harm to Mr. Ramirez's reputation in connection with the deprivation of his liberty and other constitutionally protected rights.

141.     Defendants made a number of false statements about Mr. Ramirez, including describing him as a "gang member" and as having "admitted [to] gang affiliation."  On information and belief, the Doe Defendants reached out to members of the media to spread false and defamatory information regarding Mr. Ramirez's purported gang membership.  And on February 15, 2017, the

Doe Defendants told members of the media that they had corroborating evidence to support their allegations of gang membership, "including photos and social media content that illustrate [Mr. Ramirez's] gang affiliation." These statements were false and defamatory. Mr. Ramirez is not now, and never has been, a member of any gang, he has never admitted to gang affiliation, and Defendants do not have any evidence of his purported gang membership.

142.    None of the Doe Defendants' false and defamatory statements were privileged.

143.    At the time they made these defamatory statements, the Doe Defendants knew that they were false or failed to take the proper steps to ascertain their accuracy. By virtue of the fact that Mr. Ramirez had twice been granted DACA status, the Doe Defendants knew or should have known that he had already passed multiple background checks for gang membership or affiliation. And after they ran his name and fingerprints through their databases at the ICE holding facility, Defendants knew that he had no criminal history. The Doe Defendants acted knowingly and/or recklessly in making these false and defamatory statements about Mr. Ramirez.

144.    The Doe Defendants' defamatory statements injured Mr. Ramirez's character and reputation and put him in danger. Before the Doe Defendants defamed Mr. Ramirez, he was a respected community member; now many people incorrectly believe he is an admitted gang member and have formed a negative opinion of him. Moreover, while Mr. Ramirez was detained at the Northwest Detention Center, Defendants' false statements regarding his purported gang membership caused him to be placed in a dangerous housing unit with gang members and convicted criminals. Mr. Ramirez feared for his safety because other detainees were aware of Defendants' unfounded allegations, and he was concerned that he would be assaulted based on the misperception that he was in a gang. Mr. Ramirez continues to suffer from the emotional and psychological consequences of his detention, as well as from the stigma of being wrongfully associated with a gang.

145.    In conjunction with these false and defamatory statements, Mr. Ramirez was deprived of his liberty and other important constitutionally protected rights, including his constitutionally protected rights under DACA.

146.    Each of the Doe Defendants was personally involved in and proximately caused the aforementioned violation of Mr. Ramirez's constitutional rights.

147.     As a result of Defendants' actions, Mr. Ramirez suffered damages, including, but not limited to, loss of liberty, loss of earnings and earning capacity, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

## COUNT EIGHT

## DECLARATORY RELIEF

148.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.     As explained above, Defendants' revocation of Mr. Ramirez's DACA status and work authorization violated his rights under the Fifth Amendment.  Mr. Ramirez therefore seeks a declaration that:  (i) he has constitutionally protected interests in his DACA status and the benefits conferred thereunder; and (ii) Defendants' revocation of these interests was unlawful and invalid. *See Akhtar v. Burzynski*, 384 F.3d 1193, 1202 (9th Cir. 2004); *Walters v. Reno*, 145 F.3d 1032, 1036, 1042–44 (9th Cir. 1998).

150.     For the same reasons, Mr. Ramirez is entitled to an order directing Defendants to reinstate his DACA status.  5 U.S.C. § 706.

## DEMAND FOR JURY TRIAL

151.     Mr. Ramirez demands a jury trial on his claims.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Ramirez prays that this Court grant the following relief:

(1)  Award damages according to proof;

(2)  Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that:  (i) Mr. Ramirez has constitutionally protected interests in his DACA status and the benefits conferred thereunder; and (ii) Defendants' revocation of Mr. Ramirez's DACA status and benefits was unlawful and in violation of his constitutional rights;

(3)  Order Defendants to reinstate Mr. Ramirez's DACA status and work authorization;

(4)  Award Mr. Ramirez reasonable costs and attorneys' fees; and

(5)  Grant any other and further relief that this Court may deem fit and proper.

1   DATED:  April 25, 2017

2   Seattle, Washington

3                                    Respectfully submitted,

4                                    /s/ Theodore J. Boutrous, Jr.

5                                    GIBSON, DUNN & CRUTCHER LLP
                                     THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
6                                    ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
                                     KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
7                                    JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*

8                                    /s/ Marc D. Rosenbaum
                                     PUBLIC COUNSEL
9                                    MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
                                     JUDY LONDON (CA SBN 149431), *pro hac vice*
10                                   KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
                                     ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
11                                   ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*

12                                   /s/ Erwin Chemerinsky
                                     ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
13                                   LEAH M. LITMAN (DC SBN 1016310), *pro hac vice*
                                     University of California, Irvine School of Law
14                                   *Affiliation for identification purposes only*

15                                   /s/ Laurence H. Tribe
                                     LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
16                                   Harvard Law School
                                     *Affiliation for identification purposes only*

17                                   /s/ Luis Cortes Romero
                                     BARRERA LEGAL GROUP, PLLC
18                                   LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
                                     JOHN C. BARRERA (SBN 47658), *pro hac vice*
19                                   JOSE GARCIA (SBN 46518), *pro hac vice*

20                                   Attorneys for Plaintiff

21

22

23

24

25

26

27

28