1
2
3
4
5

The Honorable Ricardo S. Martinez

6
7
8
9
10
11
12
13
14

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

DANIEL RAMIREZ MEDINA,

               Plaintiff,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

               Defendants.

Case No. 2:17-cv-00218-RSM-JPD

**INDIVIDUAL DEFENDANTS HICKS,
PETER, HERNANDEZ, AND
LAWRENCE'S MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

Noted for Consideration: October 13, 2017

15

## INTRODUCTION

16
17
18
19
20
21
22
23
24

       Plaintiff Daniel Ramirez Medina seeks to recover money damages from the personal

assets of four Immigration and Customs Enforcement ("ICE") officers following his arrest and

placement into removal proceedings. Plaintiff's chief complaint is that because he had received

deferred action, no one at ICE should have arrested or detained him. Invoking *Bivens v. Six

Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Plaintiff

asserts that Matthew Hicks, Lance Hernandez, Taula Peter, and Kathlyn Lawrence ("individual

defendants") violated his Fourth and Fifth Amendment rights.[1]

25
26

       Plaintiff's claims may not proceed for three discrete reasons. First, this court lacks

subject matter jurisdiction over all of Plaintiff's claims because Congress, through the

27
28

---

[1] This Motion is submitted solely on behalf of these four defendants, as sued in their individual
capacities. The federal agency defendants have filed a separate motion to dismiss. Dkt. #90.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

1

Immigration and Nationality Act, has precluded or otherwise channeled into his removal proceedings the claims he seeks to pursue here in district court. Second, even if this court were to determine that it has jurisdiction over any of Plaintiff's claims, all claims against the individual defendants should be dismissed because Plaintiff seeks to extend the Supreme Court's *Bivens* holding into a new context notwithstanding the existence of several alternative comprehensive schemes and in the face of a number of special factors that counsel against the court creating a damages remedy here. Finally, even were this court to craft an implied damages remedy in this distinct context, the individual defendants are entitled to qualified immunity because Plaintiff has not adequately alleged that they violated a clearly established constitutional right. Accordingly, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), all claims against Defendants Hicks, Hernandez, Peter, and Lawrence should be dismissed.

## BACKGROUND

### I.    The INA

Through the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101, *et seq.*, Congress established a comprehensive system for the regulation of immigration and naturalization, including a detailed scheme for determining whether an alien is subject to removal. *Id*. Under federal law, aliens may be subject to removal proceedings if they are inadmissible or deportable on various statutory grounds. *E.g.*, 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled . . . is inadmissible."); § 1227(a)(1)(B) ("Any alien who is present in the United States in violation of this chapter or any other law of the United States . . . is deportable"); *see also id*. §§ 1181-84, 1225, 1227-29, 1231.

The INA includes provisions governing removal proceedings and sets forth specific procedures for those proceedings. 8 U.S.C. § 1229a. It prescribes procedures for detention pending removal as well as requirements for relief from detention. *Id*. §§ 1225, 1226, 1231.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

2

Congress has delineated when and how to challenge these government actions, taking into account aliens' status in the United States and the likelihood and imminence of their removal. *See id*. §§ 1225, 1229, 1229a-b, 1252. Congress has specifically provided that aliens may raise certain constitutional questions on a petition for review in a court of appeals. *Id*. §§ 1252(a)(2)(D), 1252(b)(9).

The Secretary of the Department of Homeland Security ("DHS") is charged "with the administration and enforcement" of the INA and "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). ICE, formed pursuant to the Homeland Security Act of 2002, is charged with enforcing the nation's immigration laws.

## II.   Deferred Action

Even when aliens are inadmissible or deportable, courts and the Executive Branch recognize that the federal government cannot practicably remove every removable alien. In keeping, "[a]t each stage the Executive has discretion to abandon the endeavor." *Reno v. Am.-Arab Anti-Discrimination Comm*., 525 U.S. 471, 483 (1999) ("*AADC*"). One recognized way in which the Executive Branch exercises its discretion over removal is through deferred action. Deferred action was "developed without express statutory authorization." *Id*. at 484 (citation omitted). It nonetheless has become "a regular practice" in which the Secretary exercises his prosecutorial discretion "for humanitarian reasons or simply for [his] own convenience," to notify an alien of a non-binding decision to forbear from seeking his removal. *See AADC*, 525 U.S. at 483-84; *see also* 8 C.F.R. § 274a.12(c)(14) ("an act of administrative convenience to the government which gives some cases lower priority").

Through "[t]his commendable exercise in administrative discretion," *AADC*, 525 U.S. at 484 (citations omitted), a removable individual may remain present in the United States so long

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

3

as the Executive Branch continues to forebear. Deferred action does not confer any immigration status or establish any enforceable legal right to remain in the United States. It may be revoked by immigration authorities at their discretion. *Id.*[2]

### III.   The Deferred Action for Childhood Arrivals (DACA) Policy

On June 15, 2012, the Secretary of DHS issued a policy memorandum entitled, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Dkt. #78-3, Compl. Ex. C ("2012 DACA Memo"). That policy, known as "DACA," outlines under what circumstances DHS may grant deferred action, on a case-by-case basis, to a certain subset of individuals who are unlawfully in this country. *Id.* The DACA policy states that officers who encounter individuals eligible for DACA should exercise their discretion, on an individual basis, in order to prevent low priority individuals from being removed. *Id.* at 2. The DACA policy is not codified in the United States Code or Code of Federal Regulations. Nor has Congress amended the INA to include it. The 2012 DACA Memo expressly states, "[t]his memorandum confers no substantive right, immigration status or pathway to citizenship. Only

---

[2] While *AADC* speaks generally of discretion to defer removal, part and parcel of the discretion to defer removal is the discretion to terminate that deferral, as relevant Executive policy makes clear. *E.g.*, Memorandum from Sec'y Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents*, at 2 (Nov. 20, 2014) (explaining that "deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion"), *rescinded on other grounds by* Memorandum from Sec'y Kelly, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")* (June 15, 2017), *available at* https://www.dhs.gov/publication/deferred-action-parents-americans-and-lawful-permanent-residents-recession-memo-dapa. The June 15, 2017 memorandum "remind[s]" officers that "deferred action, as an act of prosecutorial discretion … may be terminated at any time at the agency's discretion." *Id.* at 2 n.2.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

4

the Congress, acting through its legislative authority, can confer these rights." *Id*. at 3.[3] The 2012

DACA Memo does not describe any particular grounds that DHS will consider in terminating

deferred action nor does it prohibit removal of a recipient of deferred action under the DACA

policy.

### IV.    Plaintiff's Allegations[4]

Plaintiff was bought to the United States from Mexico when he was about ten years old.

Dkt. #78, ¶ 5. In 2013, he applied for deferred action from U.S. Citizenship and Immigration

Services ("USCIS") pursuant to the Executive's DACA policy. He received deferred action and

work authorization in 2014. He reapplied and received deferred action and work authorization in

2016, both of which extended through May 4, 2018. *Id*. ¶¶ 41-42, Compl. Ex. G.

On February 10, 2017, pursuant to a warrant, a team of ICE agents, including Defendants

Hicks, Peter, and Hernandez, arrested Plaintiff's father outside of the apartment where Plaintiff,

his brother, and his father were living. *Id*. ¶ 44; *see also id*., Compl. Ex. H (stating that ICE's

Criminal Alien Program team was serving a warrant on Plaintiff's father, a convicted felon who

had been previously removed).[5] Plaintiff's father reported that his two sons, who were "here

---

[3] Congress has considered legislation that would limit the practice of granting deferred action, *e.g.*, H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011), as well as legislation that would have barred funding for DACA and certain deferred action programs, H.R. 5272, 113th Cong. (2014), but it has not enacted such measures. Congress has specified through legislation that certain individuals may be eligible for deferred action for other reasons, including, for example, immediate family members of legal permanent residents who were killed on 9/11, USA PATRIOT ACT of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain family members of U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703, 117 Stat. 1392, 1693-94.

[4] The facts in this section are taken from the Second Amended Complaint, Dkt. #78, and are assumed to be true for the limited purpose of this motion only.

[5] Plaintiff attached to his Complaint as exhibits declarations that he and his brother executed on February 16, 2017, as well as the I-213 Form, entitled "Record of Deportable/Inadmissible

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

5

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

illegally," were inside the apartment and he wanted to speak to them. *Id.*, Ex. H. Once inside, "ICE agents"[6] encountered Plaintiff. The agents then "began to question" him. Dkt. #78 ¶ 45. Plaintiff provided his name, birthdate, and place of birth, which was Mexico. *Id.*[7] An agent then placed Plaintiff in handcuffs. Plaintiff and his father both told the agents that Plaintiff had a legal work permit. *Id.* ¶ 46. The agents took Plaintiff into custody and transported him to an ICE facility in Tukwila, Washington. *Id.* ¶ 47.

At the facility, "ICE agents" fingerprinted Plaintiff and conducted records checks. *Id.* ¶ 49. When Plaintiff protested that he had a work permit and should be released, he was told by "Defendants" that it did not matter because he was not from the United States. *Id.* ¶ 50. The agents asked Plaintiff whether he was in a gang. Plaintiff denied any gang affiliation. *Id.* ¶ 51. When asked whether he knew gang members, Plaintiff stated that he knew people who were in gangs, but was not affiliated with a gang. *Id.* The agents also asked Plaintiff about a tattoo on his

---

Alien." Dkt. #78, Compl. Exs. H, O, P. By attaching these documents to his Complaint, Plaintiff incorporated them into his pleading. *See* Fed. R. Civ. P. 10(c); *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). "A court may ... consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[6] Although Plaintiff identifies Hicks, Peter, and Hernandez as part of the team that arrested his father, he does not identify what any particular officer did to him. Similarly, Plaintiff refers to multiple "agents" throughout the fact section of the Complaint, without distinguishing the conduct of named defendants, or any other ICE employee. In his Declaration, Plaintiff describes only one agent questioning him prior to arresting him. He reports that the same agent questioned him at the Tukwila facility. Dkt. #78, Compl. Ex. O ¶ 17. Plaintiff alleges, on information and belief, that Defendant Lawrence supervised the processing of Plaintiff at the ICE facility. Dkt. #78 ¶ 47.

[7] According to the Declaration of Plaintiff's brother, while an agent was questioning Plaintiff, two agents asked Plaintiff's brother what his status was. Dkt. #78, Compl. Ex. P ¶ 9. Plaintiff's brother stated that he was legally here and did not answer any other questions. *Id.* Only Plaintiff and his father were taken to the ICE facility. *Id.*, Ex. O ¶ 16.

---

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

6

forearm. Plaintiff stated that it referred to the place of his birth and contained a nautical star that he liked. *Id*. ¶ 52. Plaintiff alleges that an ICE agent said that Plaintiff's tattoo was a Bulldogs' gang tattoo and, if he was from Fresno, he was definitely a gang member because everyone in Fresno is a member of the Bulldogs gang. *Id*. ¶ 53. "Defendants" issued a Notice to Appear ("NTA") to Plaintiff that same day. *Id*. ¶ 60.

Before transferring Plaintiff to the detention center, "agents" asked him whether there were any gangs with whom he would like to avoid being placed. Plaintiff denied gang affiliation, but stated that if he had to be placed with any group, he would prefer the "Paisas." *Id*. ¶ 54. In his Complaint, Plaintiff reports that he meant to refer colloquially to "Mexicans," and denies that he is affiliated with the Paisas gang. *Id*. Plaintiff was transferred to the Northwest Detention Center. Once the NTA issued, USCIS sent Plaintiff a Notice of Action, which stated that his deferred action and employment authorization terminated on the date the NTA was issued. *Id*. ¶ 61.

Three days later, on February 13, 2017, Plaintiff filed a petition for habeas corpus in this court. Dkt. #1. Magistrate Judge Donohue directed that an expedited bond hearing be conducted before an Immigration Judge. Dkt. #43 at 26-28; Dkt. #64 at 15. A bond hearing was scheduled, but Plaintiff declined a bond hearing before an Immigration Judge because he preferred the district court to address his habeas petition and request for conditional release. Dkt. #45. On March 24, 2017, this court denied Plaintiff's request for conditional release. Dkt. #69. The court also ordered that, should Plaintiff desire a bond re-determination hearing, the government should schedule one within one week of Plaintiff's request. *Id*. at 3. Plaintiff thereafter requested a bond hearing and, on March 28, 2017, one was held. Plaintiff was ordered released on $15,000 bond. Dkt. #78, ¶ 78; Compl. Ex. W. Plaintiff left immigration custody on March 29, 2017. Dkt. #72. He remains in removal proceedings.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

7

Plaintiff filed a Second Amended Complaint on April 25, 2017. Dkt. #78. He asserts two claims under the Administrative Procedure Act against DHS, ICE, and USCIS, alleging that the revocation of his "DACA status" and work authorization was arbitrary and in violation of established procedures (Count One). Plaintiff also asserts that revocation by these agencies was in violation of the Due Process Clause, depriving him of liberty and property interests (Count Two). In Counts Three through Six, Plaintiff seeks money damages from Defendants Hicks, Peter, Hernandez, and Lawrence personally. In Count Three, Plaintiff asserts that all four individual defendants violated his Fourth Amendment rights by arresting and detaining him despite their knowledge that he was granted deferred action. In Count Four, Plaintiff claims that the individual defendants deprived him of liberty and property interests protected by the Due Process Clause, without adequate procedural protections. Plaintiff also raises a substantive due process claim, contending that his detention was unjustified and that "Defendants" engaged in an unconstitutional bait-and-switch (Count Five). In Count Six, Plaintiff asserts that the individual defendants arrested and detained him because of racial and national origin bias, in violation of the Equal Protection component of the Fifth Amendment.[8] Finally, in Count Eight, Plaintiff seeks declaratory and injunctive relief from "Defendants," including an order "directing Defendants to reinstate his DACA status."[9] *Id.* ¶¶ 148-150. In his prayer for relief, he seeks a

---

[8] Count Seven is a defamation claim against unnamed defendants. The unidentified John Does 1-10 are not parties, have not been served, and are not represented by the undersigned. Because Count Seven is not asserted against Hicks, Hernandez, Peter, or Lawrence, no argument is presented with regard to that claim.

[9] Plaintiff cannot obtain injunctive relief from Hicks, Peter, Hernandez, or Lawrence in their personal capacities because it is well-settled that "*Bivens* suits are individual capacity suits and thus cannot enjoin official government action." *See Ministerio Roca Solida v. McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016) (collecting cases); *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) ("The only remedy available in a *Bivens* action is an award for monetary damages

---

declaratory judgment, attorneys' fees, damages, and an order that "Defendants" reinstate his "DACA status" and work authorization.[10]

## LEGAL STANDARD

A plaintiff seeking to invoke the jurisdiction of the federal courts has the burden of establishing that it exists. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). If a plaintiff fails to show that the court has subject matter jurisdiction over his claims, the court should dismiss them pursuant to Federal Rule of Civil Procedure 12(b)(1).

Dismissal is required under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff fails to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the court must assume the truth of well-pleaded factual allegations in ruling on a motion to dismiss, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* As *Iqbal* teaches, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability," it has failed to state a claim. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Consequently, if the facts presented by the plaintiff do not "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to

___

from defendants in their individual capacities."). Accordingly, to the extent Plaintiff is trying to seek equitable relief from the individual defendants, such a claim must be dismissed.

[10] Courts have made clear that attorneys' fees are not recoverable in *Bivens* suits. *Kreines v. United States,* 33 F.3d 1105, 1109 (9th Cir. 1994); *see also Couden v. Duffey*, 826 F. Supp. 2d 711, 717 n.23 (D. Del. 2011) (collecting cases); *GasPlus, LLC v. United States Dep't of Interior*, 593 F. Supp. 2d 80, 84, 88-89 (D.D.C. 2009) (same). Plaintiff therefore is not entitled to attorneys' fees for his *Bivens* claims.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD
9
U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

relief,'" and dismissal should be granted. *Id.* at 679 (citing Fed. R. Civ. P. 8(a)(2)).

## ARGUMENT

**I.     This Court Lacks Subject Matter Jurisdiction Over All Claims.**

**A.   Section 1252(g) Bars All of Plaintiff's Claims Arising From the Decision to Commence Proceedings.**

Through the INA, Congress prohibits federal courts from exercising jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action … to commence [removal] proceedings … against any alien under this chapter." 8 U.S.C. § 1252(g). The Supreme Court has observed that Section 1252(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9. The Court has explained that Section 1252(g) should be read narrowly, concluding that the section encompasses "three discrete" events – decisions or actions to "commence proceedings, adjudicate cases, or execute removal orders." *Id*. at 482. As long as the challenged conduct falls within one of these three areas, however, Section 1252(g) bars a claim. *Id.* at 487. Here, Section 1252(g) bars Plaintiff's Fifth Amendment procedural due process (Count Four) and equal protection claims (Count Six) as well as those aspects of his Fourth Amendment and substantive due process claims stemming from his detention following the decision to commence proceedings against him (Counts Three and Five).

First, Plaintiff cannot proceed with his procedural due process challenge. Here, the factual bases and legal assertions in support of Plaintiff's due process claims against the individual defendants appear to be virtually identical to the due process claims asserted under the APA against the agency defendants. *Compare* Dkt. #78 ¶¶ 95-97 *with* ¶¶ 114-116.[11] To avoid

---

[11] In particular, Plaintiff incorporates his allegations against the agency defendants into his procedural due process claim against the four individuals by simply placing "Individual

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

10

duplication, the individuals incorporate, by reference, the agency defendants' argument that Section 1252(g) bars the court from hearing this type of claim. Dkt. #90 at 10-13.[12]

Second, this court lacks jurisdiction over all of Plaintiff's claims under the Fourth and Fifth Amendments arising from ICE's actions to detain him (Counts Three and Five) after issuance of the NTA on February 10, 2017, as those actions *followed and flowed directly from* the decision to commence proceedings against him. The gravamen of Plaintiff's substantive due process claim—that Plaintiff was detained even though he had been vetted previously by DHS and posed no flight risk, Dkt. #78 ¶¶ 121-122—and Plaintiff's Fourth Amendment claim challenging his detention (as opposed to initial arrest), *id*. ¶¶ 107-109, both fall well within the purview of the Ninth Circuit's decision in *Sissoko v. Rocha,* 509 F.3d 947 (9th Cir. 2007). In that case, the Ninth Circuit concluded that because the plaintiff's detention arose from the decision to commence removal proceedings, jurisdiction over his *Bivens* claim against the immigration officer who placed him in expedited removal proceedings was barred by 8 U.S.C. § 1252(g). *Id.* at 949. The Ninth Circuit's holding is consistent with the Fifth and Eighth Circuits, which interpret the phrase "arising from" in Section 1252(g) to include all claims connected "directly

---

Defendants" in front of a citation to the seven paragraphs containing his assertions against the agency defendants. *Id.* ¶ 116. While Section 1252(g) therefore applies equally to the procedural due process claims against all defendants, as described below, the individual defendants' other defenses against such claims based on agency action are wholly distinct from those of the agencies, given that the Supreme Court has never recognized a *Bivens* remedy to vindicate procedural rights and because a threshold requirement for stating a *Bivens* claim is an allegation of personal—not agency—participation in the alleged deprivation.

[12] Although the claims against the agency defendants are brought under the APA, courts also have found Section 1252(g) to bar due process *Bivens* claims. *E.g.*, *Foster v. Townsley*, 243 F.3d 210, 213-14 (5th Cir. 2001) (interpreting the phrase "arising from" in Section 1252(g) to include "those claims connected directly and immediately with a decision or action … to commence proceedings" which therefore barred a *Bivens* due process claim stemming from an officer's decision to execute an alien's deportation despite non-discretionary regulations requiring that the deportation be stayed).

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

11

and immediately" with a decision or action to commence proceedings or execute removal orders. *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 943 (5th Cir. 1999); *Silva v. United States*, -- F.3d --, 2017 WL 3399882, at *2 (8th Cir. Aug. 9, 2017). Detention following a decision to commence proceedings is a direct outgrowth of that decision and thus is an action "connected directly and immediately" to it. *See Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016), *cert. denied*, No. 16-879 (U.S. June 26, 2017) (holding that 1252(g) foreclosed *Bivens* claims challenging the method in which plaintiff's proceedings were commenced and the initial decision to detain plaintiff during those proceedings); *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) (per curiam) (concluding that plaintiff's *Bivens* claims were barred by 1252(g) because "[s]ecuring an alien while awaiting a removal determination constitutes an action taken to commence proceedings"). That Plaintiff disputes that he posed any risk and therefore should not have been detained pending his removal does not undermine Section 1252(g)'s application here: that sort of risk assessment is exactly the type of "decision or action" that "aris[es] from" ICE's authority to commence proceedings. *Gupta,* 709 F.3d at 1065 (explaining that because the action was taken to secure plaintiff and prevent the perceived threat he posed while he awaited a deportation hearing, 1252(g) barred his detention claims). As a result, Section 1252(g) bars Plaintiff's detention-based claims in Counts Three and Five.

Finally, Plaintiff's equal protection claim, as it pertains to his placement in removal proceedings and resulting detention, also falls squarely within the reach of Section 1252(g).[13] In *AADC*, the plaintiffs claimed that they had been targeted for removal because of their beliefs. As

---

[13] The individual defendants do not raise Section 1252(g) as a bar to Plaintiff's initial arrest (or the equal protection claim stemming therefrom) in this motion, but instead show below that Congress, through 8 U.S.C. § 1252(b)(9), has channeled those claims into his removal proceedings.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

12

the Court explained, "[a]s a general matter . . . an alien unlawfully in this country has no

constitutional right to assert selective enforcement as a defense against his deportation." *AADC*,

525 U.S. at 488;[14] *see also Mirmehdi v. United States,* 689 F.3d 975, 983 n.4 (9th Cir. 2012)

(noting that, to the extent plaintiffs purported to bring a claim for conspiracy to selectively

enforce the immigration laws, such a claim does not exist). Like the petitioners in *AADC,*

Plaintiff's equal protection claim attempts to assert selective enforcement. Plaintiff contends that

"defendants" continued to detain him based on invidious stereotypes about men of Mexican

heritage who have tattoos and because of his "national origin." Dkt. #78 ¶ 133. His "cause or

claim" is "connected directly and immediately with" the decision to "commence proceedings"

against Plaintiff because it challenges the underlying basis for the decision to place him in

removal proceedings. *Foster*, 243 F.3d at 214-15 (concluding that *Bivens* equal protection claims

were barred by 1252(g) because they were "directly connected" to execution of deportation

order); *see also Sissoko*, 509 F.3d at 948-50 (finding *Bivens* claim arose from decision to

commence proceedings and was, thus, barred by 8 U.S.C. § 1252(g));[15] *Humphries*, 164 F.3d at

945 (finding First Amendment *Bivens* claim asserting that INS agents excluded plaintiff in

retaliation for his criticism of the government was barred under § 1252(g)). Because all of

---

[14] The Supreme Court left open the possibility "of a rare case in which the alleged basis of discrimination is so outrageous" that an exception might lie. *Id*. at 491.

[15] The *Sissoko* court distinguished an earlier Ninth Circuit case that discussed 8 U.S.C. § 1252(g), and another INA provision, *Wong v. United States*, 373 F.3d 952 (9th Cir. 2004). *Id*. at 949. In *Wong*, with regard to Section 1252(g), plaintiff's counsel disclaimed any challenge to the execution of a removal order and explained that her claims only implicated actions prior to the decision to commence removal proceedings, in particular, the "INS officials' allegedly discriminatory decisions regarding advance parole, adjustment of status, and revocation of parole." *Id*. at 964-65. Because none of those challenged decisions were listed as one of the three discrete actions in Section 1252(g), the Ninth Circuit found that 1252(g) did not preclude those claims. In contrast, here, Plaintiff claims that animus infected the decision to commence removal proceedings, Dkt. #78 ¶ 133, which is one of the "discrete events" barred by Section 1252(g).

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

13

1    Plaintiff's claims, except for his Fourth Amendment and Equal Protection claims stemming from

2    his initial arrest, arise from the decision to commence proceedings against him, they are barred.

3                    **B.   Section 1252(b)(9) Limits Plaintiff to Pursuing His Constitutional Claims in
                          His Removal Proceedings and in the Court of Appeals.**
4

5            This court lacks jurisdiction over Plaintiff's remaining claims (those aspects of Counts

6    Three and Six challenging actions during his initial arrest and his "bait-and-switch" assertion in

7    Count Five) because those claims fall within the purview of 8 U.S.C. § 1252(b)(9). That section

8    of the INA streamlines judicial review by requiring that all legal and factual questions arising

9    from actions taken *to remove* an alien must be reviewed *only* by the courts of appeals. 8 U.S.C.

10   § 1252(b)(9). The Supreme Court has described Section 1252(b)(9) as an "unmistakable 'zipper'

11   clause" because it consolidates and channels all judicial review in a single place: the courts of

12   appeals. *AADC*, 525 U.S. at 483; *Aguilar v. ICE*, 510 F.3d 1, 9-10 (1st Cir. 2007) (explaining

13   that the statutory scheme was designed to "put an end to the scattershot and piecemeal nature of

14   the review process," requiring that all claims arising from removal proceedings be raised in

15   immigration court and channeled through the petition for review process); *J.E.F.M. v. Lynch*,

16   837 F.3d 1026, 1031 (9th Cir. 2016), *petition for reh'g en banc filed* (Dec. 6, 2016) (explaining

17   that 1252(b)(9) does not foreclose review, but rather channels review to the courts of appeals).

18   The "zipper clause" dovetails with the INA's exhaustion requirement, which requires an alien to

19   "exhaust[] all administrative remedies available to the alien as of right," 8 U.S.C. § 1252(d)(1),

20   before presenting claims to a court of appeals. Together, the "zipper clause" and the exhaustion

21   requirement map out the exclusive path for all challenges to actions taken to remove an alien:

22   these channeling provisions preclude review in district court of "any" claim "arising from any

23   action" taken to remove an alien. *See J.E.F.M.*, 837 F.3d at 1031 ("Taken together, § 1252(a)(5)

24   and § 1252(b)(9) mean that *any* issue-whether legal or factual-arising from *any* removal-related

25

26

27

28

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD
                                        14

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

activity can be reviewed *only* through the PFR process"); *Aguilar*, 510 F.3d at 9 (rejecting as "wishful thinking" petitioners' claim that § 1252(b)(9) "narrowly . . . strip[s] district courts of jurisdiction over challenges to ongoing removal proceedings – nothing more.").

The Ninth Circuit has recognized that although Section 1252(b)(9) "swallows up virtually all claims that are tied to removal proceedings," the section excludes claims that are independent of, or collateral to, the removal process. *J.E.F.M.*, 837 F.3d at 1031-32. In *J.E.F.M.*, the Ninth Circuit found that plaintiffs' right-to-counsel claims "arise from" removal proceedings because, in part, those claims "are routinely raised in petitions for review filed with a federal court of appeals." *Id.* at 1033. The Ninth Circuit recognized that Congress's intent behind Section 1252(b)(9) was clear: the INA precludes separate district court review of a claim if the claim is one that can be raised in removal proceedings, and ultimately in a petition for review. *See id.* at 1033-34 (citing H.R. Rep. No. 109-72, at 172-73) (showing that the amendments to the INA were intended to preclude all district court review of any issue raised in a removal proceeding).

The claims that Plaintiff pursues here are not wholly independent of or collateral to his removal proceedings. His challenge to his arrest, questioning, and placement in removal proceedings, all "arise from" an action to remove him. Additionally, the reasonableness of his arrest and placement into proceedings (as well as his due process and equal protection claims emanating therefrom) and any challenges to the evidence used to prove removability are not "completely irrelevant to the mine-run of issues that will be litigated in removal proceedings." *Aguilar,* 510 F.3d at 19. Indeed, through petitions for review, the Ninth Circuit has considered allegations of violations of the Fourth and Fifth Amendments. *E.g.*, *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1017-19 (9th Cir. 2008) (evaluating on a petition for review alleged unlawful seizure); *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449 (9th Cir. 1994) (considering on a petition

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

15

for review alleged unlawful stop based on ethnicity); *Aguilar-Linares v. Holder*, 577 F. App'x 687 (9th Cir. June 2, 2014) (remanding to the Board of Immigration Appeals to consider Fourth Amendment challenges).

Recognizing that the plaintiffs' constitutional claims could have been raised in their removal proceedings, the court in *Arias* held that Section 1252(b)(9) barred all *Bivens* claims brought by plaintiffs placed in removal proceedings. *Arias v. ICE*, No. 07-1959, 2008 WL 1827604 (D. Minn. Apr. 23, 2008). In that case, plaintiffs alleged that ICE agents "forcibly entered" their homes, "conducted warrantless, non-consensual searches," and interrogated non-Caucasian residents, but not Caucasian residents. *Id.* at *3. Plaintiffs brought *Bivens* claims for unlawful seizure, due process, and equal protection violations under the Fourth and Fifth Amendments. *Id.* at *4. In concluding that the court had no jurisdiction over plaintiffs' claims, the district court explained that such claims are common in removal proceedings and "allowing aliens to ignore the channeling provisions of section 1252(b)(9) and bring these claims directly in the district court would result in precisely the type of fragmented litigation that Congress sought to forbid." *Id.* at *6 (quoting *Aguilar*, 510 F.3d at 13-14). Because, like in *Arias*, the plain language of Section 1252(b)(9) reaches each of Plaintiff's claims here, Congress has precluded him from bringing his constitutional claims in this particular court. All claims against the individual defendants (Counts Three through Six) should be dismissed pursuant to Rule 12(b)(1).

## II. This Court Should Not Recognize the Implied Constitutional Tort Remedies That Plaintiff Seeks to Assert in this Case.

Even were Plaintiff's claims not expressly foreclosed by the INA, this court cannot properly imply a constitutional tort remedy here because a host of factors counsel against doing so in this novel context. Invoking *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), Plaintiff seeks damages directly under the Constitution from

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

16

ICE officers who allegedly violated his rights under the Fourth and Fifth Amendments when they arrested him, placed him into removal proceedings, and detained him. Dkt. #78 ¶¶ 106-135. In *Bivens*, the Supreme Court for the first time created a private cause of action for damages directly under the Constitution for an unlawful seizure, absent statutory authority, but only after finding that there were "no special factors counseling hesitation" against implying such a remedy. 403 U.S. at 396. The Supreme Court has extended *Bivens* only twice since *Bivens* itself was decided – in both instances specifically determining that there were no such special factors. *See Davis v. Passman,* 442 U.S. 228 (1979) (implying a damages remedy under the Fifth Amendment for congressional aide alleging sex discrimination in the workplace); *Carlson v. Green,* 446 U.S. 14 (1980) (implying a damages remedy for a prisoner under the Eighth Amendment against federal prison officials for deliberate indifference to medical needs).

As the Supreme Court recently explained, during the "*ancien regime*" when *Bivens* was decided in 1971, the Court "followed a different approach to recognizing implied causes of action than it follows now." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (internal quotation marks and citation omitted). Over time, "the arguments for recognizing implied causes of action for damages began to lose their force." *Id*. With respect to providing a damages remedy directly under the Constitution in particular, "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id*. at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001) (observing that the Court has since "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one.").

It is so disfavored, in fact, that while the *Abbasi* Court stopped short of overruling *Bivens* and its two subsequent progeny, it observed that "in light of the changes to the Court's general

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

17

approach to recognizing implied damages remedies, it is possible that the analysis in the Court's

three *Bivens* cases might have been different if they were decided today." *Id*. at 1856. The

Court's reticence, made explicit in *Abbasi*, was foreshadowed by the fact that over the past

thirty-five years since *Carlson,* the Court "consistently refused to extend *Bivens* liability."

*Malesko*, 534 U.S. at 68; *Minneci v. Pollard*, 565 U.S. 118, 124-25 (2012) (collecting cases).

Indeed, the Supreme Court has "in most instances . . . found a *Bivens* remedy unjustified." *Wilkie*

*v. Robbins*, 551 U.S. 537, 550 (2007). The *Abbasi* Court warned that "it is a *significant* step

under separation-of-powers principles for a court to determine that it has the authority, under the

judicial power, to create and enforce a cause of action for damages against federal officials in

order to remedy a constitutional violation." *Abbasi,* 137 S. Ct. at 1856 (emphasis added).

Unlike 42 U.S.C. § 1983, Congress has never enacted an analogous statute providing for

money damages against federal officials for constitutional torts. *Id*. at 1854. The Supreme Court

therefore has made clear that, because the power to devise a new constitutional-tort cause of

action is "not expressly authorized by statute," it must be exercised with great caution, if it is to

be exercised at all. *Malesko*, 534 U.S. at 66-70; *Iqbal*, 556 U.S. at 675; *Schweiker v. Chilicky*,

487 U.S. 412, 421 (1988) ("Our more recent decisions have responded cautiously to suggestions

that *Bivens* remedies be extended into new contexts."); *accord Mirmehdi v. United States*, 689

F.3d 975, 980 (9th Cir. 2012) (noting that in the years since *Bivens*, the Supreme Court "has

repeatedly rejected *Bivens* claims outside the context discussed in that specific case").

The Supreme Court teaches, therefore, that in any *Bivens* action, the first step is to

determine "whether a case presents a new *Bivens* context." *Abbasi,* 137 S. Ct. at 1859, 1864.

**A.  Plaintiff Seeks to Extend *Bivens* Liability Into a New Context.**

In this case, Plaintiff asks this court to extend non-statutory *Bivens* liability into a new

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

18

context. While the Supreme Court has always urged courts to tread carefully in extending an implied damages remedy to a new context, in *Abbasi*, the Supreme Court defined, for the first time, what it meant in earlier decisions by the phrase "new context." *Id*. It declared that the "proper test" for determining whether a proposed implied right of action involves a new context is whether the case "is different in a meaningful way from previous *Bivens* cases *decided by this Court*." *Id*. (emphasis added).[16] The Court then gave several non-exclusive examples of how a given case "might differ in a meaningful way" including: the constitutional right at issue; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider. *Id*. at 1860. Such "meaningful" differences, the *Abbasi* Court noted, may be "small, at least in practical terms," but "even a modest extension is still an extension." *Id*. at 1864-65.

      The claims for which Plaintiff asks this court to create a damages remedy fall into several of the very categories that the *Abbasi* Court used to illustrate when a context is new. First, for two of his proposed individual causes of action, Plaintiff asks this court to craft a damages remedy for violations of constitutional rights for which the Supreme Court has never approved of an implied damages remedy, *i.e.*, the procedural and substantive due process components of the

---

[16] It bears repeating that the Supreme Court strictly limited the "new context" inquiry to the contexts presented in the three cases in which the Court itself has affirmatively approved of a *Bivens*-type remedy, *i.e.*, *Bivens*, *Davis*, and *Carlson*. *Id*. at 1855, 1859. In other words, the context analysis does not consider decisions of courts of appeals or district courts which may have chosen to create a damages remedy. *Contra id*. at 1878 (Breyer, J., dissenting) (citing courts of appeals' decisions in positing that the context in *Abbasi* was not new). This approach stands in contrast to, for example, the assessment of clearly established law in the qualified immunity arena, where courts consider Supreme Court and the applicable circuit's law existing at the time of the alleged act. *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (explaining that absent controlling authority, a robust consensus of cases of persuasive authority must exist to clearly establish the violation).

---

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

19

Fifth Amendment. *Id.* at 1857; *see also id.* at 1876 (Breyer, J., dissenting) (reporting that the Supreme Court has held that a *Bivens* remedy is *not* available "in the context of suits seeking to vindicate procedural, rather than substantive, constitutional protections" because such cases are "*fundamentally different* from anything recognized in *Bivens* or subsequent cases" (quoting *Malesko*, 534 U.S. at 70)).

Second, while Plaintiff asserts an unlawful arrest claim under the Fourth Amendment (the right at issue in *Bivens*) and a discrimination claim under the equal protection component of the Fifth Amendment (the right at issue in *Passman*), Plaintiff asks this court to create a remedy in a far different setting, *i.e.*, in the immigration enforcement context. Dovetailing therefrom is a third reason that the context of this case is new: the statutory scheme under which the individual defendants here were operating—the INA—is different than the ordinary criminal law enforcement context of *Bivens* itself. Indeed, the Supreme Court has *never* provided a damages remedy for plaintiffs challenging the conduct of immigration enforcement officers arresting, detaining or placing aliens into removal proceedings. Notably, following the issuance of *Abbasi*, the Supreme Court denied a plaintiff's petition for certiorari in a case in which the Fifth Circuit determined that a warrantless arrest in the civil immigration enforcement context presented a new context wholly distinct from the criminal law enforcement context in which *Bivens* was decided. *De La Paz v. Coy*, 786 F.3d 367 (5th Cir. 2015), *cert. denied*, No. 15-888 (U.S. June 26, 2017); *see also Mirmehdi*, 689 F.3d at 981 (recognizing that detention as part of deportation proceedings is a context "unique from other situations where an unlawful detention may arise"). And, as far as the undersigned is aware, no court—let alone the Supreme Court—has implied a damages remedy with regard to any aspect of DACA.

Finally, as explained below, Plaintiff had (and has) available to him potential alternate

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

20

means of protecting his rights that were not considered in any of the three previous Supreme

Court *Bivens* cases. All of the differences between this case, on the one hand, and *Bivens*, *Davis*,

and *Carlson*, on the other hand, are meaningful enough to make the context of this case an

unmistakably novel one.

**B.  Plaintiff's Claims Directly Implicate Numerous Special Factors That Counsel Against Recognizing a *Bivens* Remedy.**

When faced with an invitation to extend *Bivens* to a new context, *Abbasi* instructs that

courts *must* examine whether there are any special factors militating against implying a remedy

directly under the Constitution. *Abbasi,* 137 S. Ct. at 1860. As pleaded, this case is fraught with

the very concerns that have prompted the Supreme Court (as well as the Ninth Circuit) to refuse

to recognize a damages remedy. In this case, although each "special factor," standing alone,

counsels hesitation, in the aggregate they leave no room to doubt that any decision to create the

damages remedy that Plaintiff seeks lies with Congress, and not the courts. *See id.* at 1860-63

(cataloging several special factors implicated by the claims); *Chappell v. Wallace,* 462 U.S. 296,

304 (1983) (concluding that factors "[t]aken together" "constitute[d] 'special factors'"). As

shown below, the numerous special factors that this case presents (separately and collectively)

foreclose a damages remedy here.

**1.     Alternative, Existing Processes Preclude Plaintiff's Claims.**

When a court is asked to fashion a *Bivens* remedy, it must ask whether "any alternative,

existing process" or other indication of Congressional intent amounts to "a convincing reason for

the Judicial Branch to refrain from providing a new and freestanding remedy in damages."

*Wilkie*, 551 U.S. at 550. "So long as the plaintiff ha[s] an avenue for some redress, bedrock

principles of separation of powers foreclose judicial imposition of a new substantive liability."

*Malesko*, 534 U.S. at 69. Indeed, the *Abbasi* Court re-emphasized that "if there is an alternative

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

21

remedial structure present in a certain case, that *alone* may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi,* 137 S. Ct. at 1858 (emphasis added); *see also Bush v. Lucas*, 462 U.S. 367, 388 (1983) (explaining that the question is whether a "remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy [in damages]."). And, as the Ninth Circuit has instructed, "[i]f there is such an alternative remedy, our inquiry stops." *Mirmehdi*, 689 F.3d at 982 (refusing to recognize a *Bivens* remedy for detention pending deportation because the INA was an alternative remedial scheme). That is because "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi,* 137 S. Ct. at 1863.

Plaintiff's claims implicate three alternative existing processes that the Ninth Circuit has already determined require courts to refrain from creating a damages remedy: the INA; the APA; and habeas corpus.

**INA**. Chief among the alternative systems available to Plaintiff is the INA, which the Supreme Court has characterized as "the comprehensive federal statutory scheme for regulation of immigration and naturalization." *De Canas v. Bica*, 424 U.S. 351, 353 (1976). As described above, the INA includes detailed provisions governing removal proceedings, sets forth procedural safeguards for those proceedings, and includes specific procedures for detention and relief from detention. Congress has delineated the types of remedies available, taking into account aliens' status in the United States and the likelihood and imminence of their removal, and explicitly has prescribed and limited the manner of judicial review.

Even prior to the Supreme Court's additional guidance in *Abbasi*, at least three separate federal courts of appeals had already considered and rejected the attempts of plaintiffs to raise their immigration and related arrest and detention challenges by way of a *Bivens* action. Most

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

22

importantly, in 2012, the Ninth Circuit held that the INA is an alternative existing process,
concluding that alien-plaintiffs had no *Bivens* remedy for constitutional claims challenging
wrongful detention pending deportation. *Mirmehdi v. United States*, 689 F.3d 975, 982-83 (9th
Cir. 2012). The Ninth Circuit recognized that the complexity and comprehensiveness of the INA
weighed against allowing a *Bivens* remedy. *Id.* at 982. Quoting the *en banc* Second Circuit, the
Ninth Circuit observed, "Congress has established a substantial, comprehensive, and intricate
remedial scheme in the context of immigration." *Id.* at 982 (quoting *Arar v. Ashcroft*, 585 F.3d
559, 572 (2d Cir. 2009) (en banc)). Given the extensive procedures available and because the
plaintiffs had the opportunity under the INA (and via habeas) to protect their constitutional
interests, the *Mirmehdi* Court concluded that they could not also pursue a damages remedy under
*Bivens*. *Id.*; *see also Alvarez v. ICE*, 818 F.3d 1194, 1196 (11th Cir. 2016) (refusing to craft a
*Bivens* remedy in the immigration context for claims of unreasonable seizure and violation of
due process rights because "the Immigration and Nationality Act sets out sufficient meaningful
remedies for Alvarez and similarly situated aliens").

　　　When faced with claims stemming from a warrantless arrest by immigration enforcement
agents, the Fifth Circuit similarly refused to infer a *Bivens* remedy under the Fourth Amendment,
concluding that the INA served as an alternative existing process. *De La Paz v. Coy*, 786 F.3d
367, 375 (5th Cir. 2015), *cert. denied*, No. 15-888 (U.S. June 26, 2017). The Fifth Circuit
observed that the INA is a "comprehensive regulation of all immigration related issues," which
"intricately prescribes removal procedures," includes provisions designed to protect the rights of
illegal aliens, and provides for multiples levels of review. *Id.* at 375-377. The Fifth Circuit
explained that "[o]nce the legislature has chosen a remedial scheme, federal courts are not free to
supplement it." *Id.* at 378. It therefore concluded that "the implicit but emphatic message from

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

23

Congress requires this court to abstain from subjecting immigration officers to *Bivens* liability

for civil immigration detention and removal proceedings," including the Fourth Amendment

warrantless arrest claims asserted by the plaintiffs there. *Id.*; *see also Dukureh v. Hullet*, No.

C11-1866, 2012 WL 3154966, at *4-5 (W.D. Wash. Aug. 2, 2012) (dismissing plaintiff's *Bivens*

claims against CBP agents alleging unlawful warrantless arrest under the Fourth Amendment and

due process claims under Fifth Amendment because the INA was an alternative scheme). The

existence of the INA alone warrants refraining from crafting an implied damages remedy for

Plaintiff here.

    **APA.** Another avenue for relief for Plaintiff is an injunctive claim under the APA.[17] In

*Abbasi,* the Supreme Court explained that the potential for injunctive relief weighs heavily

against permitting a judicially-created damages remedy. *Abbasi,* 137 S. Ct. at 1862. Plainly, the

existence of the APA, which allows for such relief, militates against fashioning an additional

remedy in damages. Even prior to *Abbasi,* the Ninth Circuit recognized the APA as an alternative

existing process precluding it from recognizing a separate damages remedy. *Western Radio*

*Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) (quoting *Wilkie*, 551 U.S. at

550) (concluding that the "design of the APA raises the inference that Congress 'expected the

Judiciary to stay its *Bivens* hand' and provides 'a convincing reason for the Judicial Branch to

refrain from providing a new and freestanding remedy in damages'"); *see also Wilkie*, 551 U.S.

at 552 (noting that plaintiff had an adequate remedy for his "unfavorable agency action" claims

because administrative and judicial review under the APA was available). In *Western Radio*, the

---

[17] The agency defendants have shown in their motion to dismiss that the INA divests the district court of jurisdiction over the types of APA claims that Plaintiff has asserted in the Second Amended Complaint. Dkt. #90. The individual defendants similarly have shown that the court lacks jurisdiction over Plaintiff's *Bivens* claims. It is only if the court concludes that it has jurisdiction over the APA claims that it need reach this particular special factor.

Individual Defendants' Motion                 U.S. Department of Justice, Civil Division
To Dismiss Second Amended Complaint           P.O. Box 7146, Ben Franklin Station
Case No. 2:17-cv-00218-RSM-JPD               Washington, D.C. 20044
24                             (202) 616-0089

Ninth Circuit observed that the APA "expressly declares itself to be a comprehensive remedial scheme," and described the APA as broader in scope than the Social Security System, which the Supreme Court previously had found to preclude a *Bivens* remedy. *Id.* at 1122. The Ninth Circuit reasoned that because the APA's procedures are available when no other adequate alternative remedy exists, it "further indicates Congress's intent that courts should not devise additional, judicially crafted default remedies." *Id.* at 1123; *see also Miller v. USDA*, 143 F.3d 1413, 1416 (11th Cir. 1998) (APA precludes *Bivens* action); *Carpenter's Produce v. Arnold*, 189 F.3d 686, 688 (8th Cir. 1999) (APA is one factor weighing against permitting a *Bivens* claim). As a result, the Ninth Circuit concluded that the "APA leaves no room for *Bivens* claims" based on agency action or challenging individual officers' alleged illegitimate desire to retaliate against plaintiff for exercising its First Amendment rights. *Western Radio,* 578 F.3d. at 1123, 1125. And, it leaves no room for Plaintiff's claims here. Just as in *Western Radio*, in this very suit, Plaintiff has taken advantage of this scheme to pursue injunctive relief.[18] This court should not augment the APA by creating an implied damages remedy.

   **Habeas**. The availability of habeas is a third process that has convinced courts to refrain from crafting a damages remedy. *Abbasi* itself recognized that a habeas remedy may be a "more direct route to relief" than a suit for money damages and considered habeas to provide an alternative form of judicial relief. *Abbasi,* 137 S. Ct. at 1863.[19] The Ninth Circuit came to the same conclusion in *Mirmehdi*, where it found habeas to be a remedial system that, in conjunction

---

[18] The viability of those claims will rise or fall on their own basis, or lack thereof. Nevertheless, it is the potential availability of the avenue, and not the ultimate success of those claims, that forecloses the implication of a *Bivens* remedy. *Wilkie*, 551 U.S. at 552.

[19] The Supreme Court noted that it has left open the question of whether confinement conditions may be challenged through a writ of habeas corpus, but it nonetheless suggested that the availability of habeas was an alternative method of relief which would weigh against implying a damages cause of action. *Abbasi*, 137 S. Ct. at 1863.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

25

with the INA, precluded aliens' damages claims for wrongful detention pending deportation. *Mirmehdi*, 689 F.3d at 982-83. Other courts have agreed, joining *Mirmehdi* in refusing to supplement habeas in the immigration context with a damages remedy. *See, e.g., Alvarez*, 818 F.3d at 1208-09 (explaining that habeas, when paired with a detailed regulatory scheme like the INA, weighed against recognizing a *Bivens* remedy); *Khorrami v. Rolince*, No. 03-6579, 2016 WL 4011224, at *5 (N.D. Ill. July 27, 2016), *appeal docketed*, No. 16-3520 (7th Cir. Sept. 26, 2016) (holding that habeas coupled with the INA provided adequate alternative remedies for due process violations because the INA contains procedural safeguards including the right to object to evidence, cross-examine witnesses, and present evidence); *Dukureh*, 2012 WL 3154966, at *5 (concluding that plaintiff could have raised his Fourth and Fifth Amendment challenges through habeas and thus habeas weighed against permitting a *Bivens* remedy). Represented by counsel, Plaintiff pursued a habeas action, but ultimately was released from detention once he asked for, and promptly received, a bond hearing under the procedures set forth in the INA. This court should not devise a supplemental cause of action for damages for Plaintiff.

**2.   Other Special Factors Counsel Against Creating a *Bivens* Remedy.**

Although the availability of alternative, Congressionally created processes for relief is dispositive in this case, the Supreme Court has made clear that, even in the absence of any alternative, existing process, "before authorizing a new kind of federal litigation," courts should assess whether there are "any special factors counselling hesitation." *Wilkie*, 551 U.S. at 550 (internal quotation marks omitted) ("[E]ven in the absence of an alternative, a *Bivens* remedy is a subject of judgment: the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation."). A wide range of "special factors" may make it inappropriate to provide

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

26

1    a *Bivens* remedy in a particular context, even when the plaintiff has no alternative remedy at all.

2    *Abbasi*, 137 S. Ct. at 1860-63 (cataloguing several special factors implicated by that case).

3    Plaintiff's claims before this court implicate no less than **four** separate special factors that should

4    cause this court to hesitate before fashioning a damages remedy in this distinct context.

5            **First**, and most prominently, as the Supreme Court has observed, when a party seeks to

6    assert an implied a cause of action, "separation-of-powers principles are or should be central to

7    the analysis." *Abbasi*, 137 S. Ct. at 1857. As a result, when Congress has plenary power over the

8    subject matter for which an implied damages remedy is sought, courts have found that to be a

9    factor weighing heavily against providing a remedy. *E.g., Chappell*, 462 U.S. at 300-1

10   (explaining that Congress's plenary power over military matters counseled against implying a

11   *Bivens* remedy); *cf. Reno v. Flores*, 507 U.S. 292, 305 (1993) (internal quotation marks omitted)

12   (noting that the government's relationship with alien visitors has been committed to Congress

13   and "[o]ver no conceivable subject is the legislative power of Congress more complete"). Courts

14   recognize that immigration issues "'have the natural tendency to affect diplomacy, foreign

15   policy, and the security of the nation.'" *Mirmehdi*, 689 F.3d at 982 (quoting *Arar*, 585 F.3d at

16   574). This concern is highlighted in this very case by the fact that the Governors of Mexico

17   submitted a letter to the court. *See* Dkt. #56. Accordingly, courts have concluded that these

18   concerns "'counsel[] hesitation' in extending *Bivens*." *Mirmehdi*, 689 F.3d at 982 (quoting *Arar*,

19   585 F.3d at 574); *De La Paz*, 786 F.3d at 379 (explaining that immigration policy and

20   enforcement "implicate serious separation of powers concerns" and that the political branches'

21   power over the subject of immigration "demand[s] hesitation by the judiciary in fostering

22   litigation" in the immigration enforcement context). Because these concerns pervade claims

23   asserted in the immigration context, including the claims here, this court should refrain from

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

27

crafting a non-statutory damages remedy.

**Second**, distinctly, but relatedly, the Supreme Court has declined to create a damages remedy when doing so would be inconsistent with Congress' authority in the field. *Abbasi,* 137 S. Ct. at 1861; *Chilicky*, 487 U.S. at 423 (internal quotation marks omitted) ("[T]he concept of special factors … has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent."); *Western Radio*, 578 F.3d at 1123 (stating that Congress, through the APA, has considered the universe of harms that could be committed in a program's administration and has provided what Congress believes to be adequate remedies).

With regard to the immigration context, as the Ninth Circuit recognized in *Mirmehdi*, "Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the Immigration and Nationality Act, Congress never created such a remedy." *Mirmehdi*, 689 F.3d at 982; *Alvarez*, 818 F.3d at 1209 (noting that an analysis of the INA's statutory scheme "confirms the conclusion that the congressional decision not to provide a private action for damages was deliberate" and stating that it was "satisfied that Congress has weighed the policy considerations in favor of and against providing damages"); *De La Paz*, 786 F.3d at 377 (concluding that "legislative developments pertaining to immigration leads ineluctably to the conclusion that Congress's failure to provide an individual damages remedy 'has not been inadvertent'" and noting that Congress has frequently amended the INA "demonstrating that 'the Judiciary should stay its *Bivens* hand.'" (quoting *Wilkie*, 551 U.S. at 554)). And, to the extent Congress acted with respect to how and whether individuals such as Plaintiff could challenge immigration-related actions, it did so through the highly particularized preclusion and channeling processes of the jurisdictional provisions described above.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

28

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

In *Abbasi*, the Supreme Court also recognized that when Congress's interest in a topic has been "frequent and intense" and when high-level policies attract the attention of Congress, Congressional silence is all the more "telling" and "notable." *Abbasi*, 137 S. Ct. at 1862. As the Fifth Circuit observed, "Despite its repeated and careful attention to immigration matters, Congress has declined to authorize damage remedies against individual agents involved in civil immigration enforcement. The institutional silence speaks volumes and counsels strongly against judicial usurpation of the legislative function." *De La Paz*, 786 F.3d at 377.

With respect to DACA, in particular, and despite its high-profile nature, Congress has not spoken at all. While the Executive issued its DACA memorandum in 2012, and certain attributes of the DACA memorandum have been debated and introduced in various forms of bills in both Chambers of Congress over the past sixteen years, the features of DACA have never been enacted into law. *E.g.*, H.R. 1582, 107th Cong. (2001); S. 1291, 107th Cong. (2001); S. 2205, 110th Cong. (2007); S. 3827, 111th Cong. (2010); S. 952, 112th Cong. (2011); *see also, e.g.*, *Abbasi*, 137 S. Ct. at 1862 (noting that at Congress's behest, OIG compiled a report documenting the confinement conditions at issue in the suit, demonstrating Congressional interest, but Congress never chose to extend a damages remedy to individuals like respondents). Certainly, it is undisputed that "at no point did Congress choose to extend to any person the kind of [damages] remedies that [Plaintiff] seek[s] in this lawsuit." *Abbasi*, 137 S. Ct. at 1862 (quoting *Chilicky*, 487 U.S. at 426). Congress's near-constant attention to immigration, its numerous revisions to the INA, its awareness and consideration of DACA, and its careful delineation of judicial review—all without including a damages remedy—shows it would be inappropriate for a court to supplement the scheme with an implied damages remedy.

**Third**, this court should refrain from providing a damages remedy against the individual

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

29

defendants in their personal capacities because, fundamentally, this case involves a challenge to Executive and agency policy. The Supreme Court has declared, however, that a *Bivens* action is not "a proper vehicle for altering an entity's policy." *Abbasi*, 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 74). Consequently, courts regularly look behind the asserted *Bivens* claims to determine whether the claims are simply a thinly-veiled attempt to challenge policy. *See Lebron v. Rumsfeld*, 670 F.3d 540, 552 (4th Cir. 2012) ("One may agree or not agree with those policies … But the forum for such debates is not the [*Bivens*] action pressed in the case at bar. The fact that [plaintiff] disagrees with policies allegedly formulated or actions allegedly taken does not entitle him to demand the blunt deterrent of money damages under *Bivens* to promote a different outcome.").

Coursing through each claim against the individual defendants in the Complaint is Plaintiff's contention that because he was provided deferred action under DACA, he should never have been placed in removal proceedings or detained. In other words, he wants to transform DHS's discretionary DACA policy, which "confers no substantive right, immigration status or pathway to citizenship" and can be terminated at any time, into a requirement not only that the government must refrain from taking any enforcement action against him, but even more remarkably that the decision to do so should support an implied, non-statutory cause of action in damages against the line individuals who allegedly arrested him and placed him into removal proceedings. However, "because *Bivens* has never been approved as a *Monell*-like vehicle for challenging government policies," *Arar*, 585 F.3d at 579, courts should not permit plaintiffs to resort to individual-capacity damages claims to leverage policy change. As the Supreme Court has explained, if a plaintiff seeks to challenge policy, the proper means for doing so is to seek injunctive relief. *Malesko*, 534 U.S. at 74; *Abbasi*, 137 S. Ct. at 1862 ("Respondents … challenge

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

30

large-scale policy decisions … imposed on hundreds of prisoners. To address those kinds of decisions, detainees may seek injunctive relief."). Plaintiff already is pursuing injunctive relief in this case. This court should not countenance Plaintiff's attempt to utilize *Bivens* for policy change here.

**Fourth**, adjudication of this case is rife with practical concerns, which also warrant hesitation in implying a new damages remedy. *Abbasi*, 137 S. Ct. at 1856. Even before *Abbasi*, courts refrained from creating a *Bivens* remedy when a case presented claims replete with "administrability concerns." *See Meshal v. Higgenbotham*, 804 F.3d 417, 427 (D.C. Cir. 2015), *cert. denied*, No. 15-1461 (U.S. June 27, 2017) (detailing practical factors counseling hesitation); *Lebron*, 670 F.3d 540, 552-53 (cataloging a series of administrability problems that justified hesitation in implying a remedy and recognizing that this special factor "overlaps to some extent with the dangers of intrusion into the constitutional responsibilities of others").

Here, in order to evaluate Plaintiff's claims, this court would have to assess what the reach of DACA is, how Plaintiff fits into DHS's enforcement plans and priorities, whether a recipient of deferred action under DACA ever may be placed in removal proceedings, and under what circumstances. In other words, Plaintiff asks this court to re-weigh the equities and command the government to exercise its discretion in a highly particularized way – all in the context of a *personal* damages suit. The Eleventh Circuit refused to recognize a *Bivens* remedy under analogous circumstances, explaining, plaintiff "asks us to examine ICE's motivations for continuing not only his own detention, but that of every other alien who may be detained past the statutory 90-day period. The agency's discretion to abandon removal proceedings for humanitarian or efficiency reasons, *see AADC*, 525 U.S. at 483-84 [], would make it particularly difficult for us to undertake this kind of inquiry." *Alvarez*, 818 F.3d at 1210-11. The Eleventh

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

31

Circuit highlighted the difficult questions the court would need to consider in order to evaluate plaintiff's claims, including enforcement priorities and the case's relationship to the government's overall enforcement plans. *Id.*; *cf. Mirmehdi,* 689 F.3d at 983 (quoting *AADC,* 525 U.S. at 490) (recognizing that "concerns that always mitigate against 'subjecting the prosecutor's motives and decisionmaking to outside inquiry' have particular force in the immigration context" and are different than domestic law enforcement); *Khorrami v. Rolince*, No. 03-6597, 2016 WL 4011224, at *7 (N.D. Ill. July 27, 2016) (noting that allowing a *Bivens* claim in the context of immigration "would force a court to determine the contours of an inadmissible alien's due process rights in connection with the INA District Director's absolute discretion to grant parole").

The *Abbasi* Court cautioned further that when a court is asked to fashion a damages remedy, it also must consider various economic and governmental concerns. *Abbasi*, 137 S. Ct. at 1856. The Fifth Circuit evaluated those very concerns in a case involving warrantless immigration arrest claims and concluded that "extending *Bivens* suits to the immigration context could yield a tidal wave of litigation" because it is "an easy exercise" to allege "that there was no reasonable suspicion for [the] stops, arrests, or detentions." *De La Paz*, 786 F.3d at 379-80. It therefore held that "[t]he special factors unique to the immigration context far outweigh any benefits that might accrue from authorizing *Bivens* suits." *Id*. at 378. Plaintiff's Complaint implicates similar concerns, speaking in terms of not only his rights, but broadly about those of 750,000 other Dreamers, *e.g*., Dkt. #78 at 2. *Abbasi* warned, however, that "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation." *Abbasi*, 137 S. Ct. at 1858; *Bush v. Lucas*, 462 U.S. 367, 389 (1983) (stating, "Congress is in a far better position than a

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

32

court to evaluate the impact of a new species of litigation"). Instead, *Abbasi* teaches that when a case involves "a host of considerations that must be weighed and appraised, it should be committed to those who write the laws, rather than those who interpret them." *Abbasi*, 137 S. Ct. at 1857 (internal quotation marks and citation omitted). These concerns justify hesitation here.

In the end, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Abbasi*, 137 S. Ct. at 1858. Here, multiple special factors provide ample justification for concluding that the decision to impose a damages remedy in the immigration enforcement and removal context rests with Congress, not the courts. And, when special factors demonstrate that the court should refrain from crafting a *Bivens* remedy, the individual-capacity constitutional claims should be dismissed outright. *See id.* at 1863; *cf. Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam) (remanding for assessment of whether special factors preclude inferring a remedy and noting that it "would be imprudent" for the Court to resolve a Fourth Amendment claim when "doing so may be unnecessary to resolve" the case in light of special factors). Accordingly, all claims against the individual defendants should be dismissed.

### III.    Qualified Immunity Bars Plaintiff's Individual-Capacity Claims.

Given the aforementioned threshold barriers to suit and the many special factors implicated here, this court may and should abstain from resolving the constitutional claims based on mere allegations, and instead dismiss the individual-capacity claims on jurisdictional or special factors grounds. *See Camreta v. Greene*, 563 U.S. 692, 705 (2011) (internal quotation marks omitted) (describing Court's longstanding principle of judicial restraint which requires

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). The principle of constitutional avoidance similarly suggests that even if this court chooses to address the constitutional claims, it "can enter judgment without ever ruling" on Plaintiff's claim "that a particular right exists" or whether the facts alleged show a violation of a constitutional right – as long as prior case law has not "clearly settled" the right. *Id.* at 705-06; *accord Pearson v. Callahan*, 555 U.S. 223, 232, 237-241 (2009) (describing instances in which it is preferable simply to assess whether the right was clearly established rather than determine whether the facts "make out a violation of a constitutional right," especially when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right"). As described below, because Plaintiff has not alleged that any of the individual defendants violated a right so clearly established that no reasonable officer could have believed his actions were proper, Plaintiff cannot overcome the individuals' entitlement to qualified immunity. Consequently, all claims against the individual defendants should be dismissed.

### A.  The Framework for the Qualified Immunity Defense.

The doctrine of qualified immunity ensures that only conduct that unquestionably violates the Constitution will subject officials to personal liability. *Harlow v. Fitzgerald,* 457 U.S. 800, 814-19 (1982). Qualified immunity shields public officials from the necessity of defending against tort liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *See id.* at 818. Thus, when properly applied, the doctrine provides "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

Because qualified immunity is "an immunity from suit rather than a mere defense to

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

34

liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court "repeatedly ha[s] stressed" that courts should resolve the issue "at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227. Accordingly, if a plaintiff fails to state a claim sufficient to overcome immunity, the court should dismiss the action at the outset without allowing discovery. *Mitchell,* 472 U.S. at 526; *Iqbal,* 556 U.S. at 686.

Qualified immunity shields federal officials from money damages unless a plaintiff "pleads facts showing:" (1) that the official violated a constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A court may decide which of the two prongs to address first. *Id.*; *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010).

In order to overcome the first prong of qualified immunity, a plaintiff must allege specific acts by which a particular individual defendant personally violated a plaintiff's constitutional rights. *See Iqbal*, 556 U.S. at 676. In order to survive a motion to dismiss in a *Bivens* case, therefore, a plaintiff "must plead that *each* Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Id.* (emphasis added). That is because a government official is only personally liable for "his or her own misconduct." *Id.* at 677. As a result, courts have dismissed personal capacity claims when a plaintiff lumps together multiple defendants without attributing specific conduct to each particular defendant. *E.g.*, *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596-97 (6th Cir. 2012) (categorical references to "defendants" insufficient to state a *Bivens* claim); *Arar*, 585 F.3d at 569 (rejecting allegation that all "defendants—undifferentiated" violated plaintiff's rights because it failed to link a constitutional violation to any defendant); *accord Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004) (dismissing detention-related *Bivens* claims that failed "to identify what role, if any, each

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

35

individual defendant had in placing her in detention"). Similarly, "*Bivens* is not designed to hold officers responsible for acts of their subordinates." *Abbasi,* 137 S. Ct. at 1860; *Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").

To overcome the second prong of qualified immunity, a plaintiff must show that the right allegedly violated by a particular defendant was clearly established at the time of the conduct. The Supreme Court has repeatedly admonished courts that have defined the right at issue at a high level of generality. *al-Kidd,* 563 U.S. at 742. Rather, "[t]he contours of a right [must be] sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right." *Id.* at 741 (internal quotation marks omitted); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (explaining that the contours of the right must be "sufficiently definite"). In other words, qualified immunity applies unless existing precedent shows that the unlawfulness of a defendant's conduct is "beyond debate." *al-Kidd,* 563 U.S. at 741. Plaintiff bears the burden of proving that the rights defendants allegedly violated were clearly established. *See Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 665 (9th Cir. 2007); *Holmberg v. Gregoire*, No. 08-5775, 2009 WL 1812391, at *7 (W.D. Wash. June 24, 2009).

### B. Plaintiff Fails to Allege a Violation of Any Clearly Established Fourth Amendment Right (Count Three).

Plaintiff fails to plead facts showing that, by arresting and detaining him, any of the individual defendants violated a clearly established Fourth Amendment right. A warrantless arrest is reasonable, and therefore constitutional under the Fourth Amendment, if supported by probable cause. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Probable cause is a practical and common sense standard that is based on the "totality of the circumstances." *Florida v. Harris*, 568 U.S. 237, 244 (2013). "Whether probable cause exists depends upon the

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

36

reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Removal, moreover, is a civil matter. *Arizona v. United States*, 567 U.S. 387, 396 (2012). Thus, in the immigration context, an agent must point to objective facts supporting a reasonable suspicion that the individual to be seized is an alien illegally in the United States. *Orhorhaghe v. INS*, 38 F.3d 488, 497 (9th Cir. 1994).

To defeat qualified immunity with respect to clearly established law, a plaintiff claiming an unlawful arrest must show not only the absence of probable cause, but that there was not even *arguable* probable cause for the arrest. *See Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (per curiam) (explaining that the question for qualified immunity purposes is "whether it is *reasonably arguable* that there was probable cause for arrest"). Stated differently, if reasonable officers could have believed there was probable cause, even if a court later finds that probable cause was absent, the defendant is entitled to qualified immunity. *Id*.; *Gillis v. City & Cnty. of San Francisco*, 560 F. App'x 665, 667–68 (9th Cir. 2014) (same).

Under the totality of the circumstances, Plaintiff cannot contend that there was no arguable probable cause to arrest him. Agents[20] had just arrested Plaintiff's father pursuant to a warrant for an immigration violation. Dkt. #78 ¶ 44; Compl. Ex. H. Plaintiff's father reported that his sons were "here illegally." *Id*. He stated that his sons were in the apartment and he wanted to speak to them. An ICE agent encountered Plaintiff in the residence and, upon

---

[20] Plaintiff's Complaint contains a fundamental flaw for a personal capacity lawsuit such as this one: asserting that "defendants" collectively took all actions against him. At a minimum, Plaintiff's error is fatal to his claims against Defendant Lawrence with respect to the initial arrest. Plaintiff's lone allegation against Lawrence is that she "supervised the processing of Mr. Ramirez at the ICE holding facility." Dkt. #78 ¶ 47. There is no allegation that she was present for or had any role in his arrest. Similarly, in his Declaration, Plaintiff only states that he was questioned and arrested by one agent. *Id*., Compl. Ex. O, ¶¶ 15, 17. Yet, he sues all four individuals personally for his arrest and detention.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

37

questioning, Plaintiff provided his name, date of birth, and reported that he had been born in Mexico. *Id.* ¶ 45. Plaintiff was then handcuffed and taken to the ICE facility.[21] These facts provided the agents arguable probable cause to arrest him.[22] *See, e.g., Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980); *cf. Scales v. INS*, 232 F.3d 1159, 1163 (9th Cir. 2000) (noting that in immigration proceedings evidence of foreign birth gives rise to a rebuttable presumption of alienage).[23]

Nor does the information gathered at the Tukwila facility undermine arguable probable cause that Plaintiff was removable; to the contrary, the information gathered during records checks substantiated the arguable probable cause for his removability. Aliens are removable if, *inter alia*, "they were inadmissible at the time of entry… or meet other criteria set by federal law." *Arizona*, 567 U.S. at 396. It is undisputed that Plaintiff entered the United States without being admitted or paroled, in violation of 8 U.S.C. § 1182. He is therefore removable. Although

---

[21] In contrast, Plaintiff's brother, who was also present, reported that he was legally in the country and was *not* arrested. Dkt. #78, Compl. Ex. P.

[22] In Count Three, Plaintiff contends that the "Individual Defendants" arrested him at his home knowing that he had received deferred action under DACA. Dkt. #78 ¶ 109. No facts in the Complaint support that conclusory assertion.

[23] Even assuming as true the allegation that Plaintiff told the agents that he had a work permit, such an allegation does not negate arguable probable cause: the Secretary has permitted certain aliens who lack lawful immigration status to apply for work authorization. *E.g.*, 8 U.S.C. § 1226(a)(3) (permitting the Secretary in certain instances to grant work authorization to an otherwise work-eligible alien who has been arrested pending a decision on whether to remove the alien); *id.* § 1231(a)(7) (permitting the Secretary under narrow circumstances to grant work authorization to aliens who have received final orders of removal); *Guevara v. Holder*, 649 F.3d 1086, 1092 (9th Cir. 2011) (observing that certain aliens who receive an employment authorization document may not "necessarily [be] admitted" or have "obtained lawful status"); *cf. United States v. Flores*, 404 F.3d 320, 327 (5th Cir. 2005) (explaining that an alien could be permitted to work during a stay of removal, but still be considered "illegally or unlawfully in the United States" for purposes of 18 U.S.C. § 922).

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD
38
U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

an agent[24] learned at the facility that Plaintiff had received deferred action under the DACA policy, that discretionary deferral of removal confers no substantive right, immigration status or pathway to citizenship, Dkt. #78, Ex. C, and can be terminated at any time. Plaintiff alleges that he told an ICE agent at the facility that he knew people who were in gangs and two agents questioned him about his tattoo, which they concluded was gang-related. It certainly was not (and is not) clearly established that when an alien is removable that the alien may never be placed into removal proceedings after that alien has received discretionary deferral under the DACA policy. *E.g.*, *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1059 (9th Cir. 2014) (observing that DACA recipients "enjoy no formal immigration status," but DHS does not consider them to be "unlawfully present"); *Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (explaining that unlawful presence and unlawful status are distinct concepts). Nor would every reasonable officer believe that it would be unconstitutional to place a DACA recipient into removal proceedings if additional information not known at the time of the initial decision is uncovered during questioning and appears to no longer justify the Executive's forbearance.[25] Even if the individual defendants were mistaken with respect to the bases upon which they relied to decline continued forbearance, qualified immunity gives officials breathing room to make

---

[24] Again, Plaintiff seeks to hold all four agents personally liable for his detention, but in his Declaration only reports that one agent questioned him at the Tukwila facility. Dkt. #78, Compl. Ex. O, ¶ 17. It is Plaintiff's obligation to plead facts showing that each individual defendant, through his own actions, violated the Constitution. *Iqbal*, 556 U.S. at 676.

[25] As noted, the 2012 DACA Memo expressly disclaims conferring any substantive right. In addition, the DACA policy has not been codified in a statute or in the Code of Federal Regulations. Even if the 2012 DACA Memo mandated continued forbearance (which it does not), the individual defendants would still be entitled to qualified immunity. Qualified immunity in a *Bivens* action is determined by federal constitutional standards. Officials do not lose their immunity "by violating the clear command of a statute or regulation …." *Davis v. Scherer*, 468 U.S. 183, 194-96 & n.12 (1984).

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

39

reasonable, but mistaken judgments. That is because courts recognize that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials ... should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012) (same).

Finally, to the extent Plaintiff's Fourth Amendment claim seeks to hold the individual defendants personally liable for his 47-day detention following the issuance of the Notice to Appear on February 10, 2017, the individual defendants are entitled to qualified immunity. Plaintiff cannot show that every reasonable officer would believe that it is unconstitutional to detain Plaintiff, an alien placed in removal proceedings, under the circumstances, especially when the Supreme Court has recognized its "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 526 (2003); *Reno v. Flores*, 507 U.S. 292, 306, 312 n.8 (1993) (observing that Congress "has given the Attorney General broad discretion" in detaining an alien during removal proceedings); *see also* 8 U.S.C. § 1226(a) (granting DHS discretionary authority to determine whether an alien should be detained pending completion of removal proceedings). Furthermore, Plaintiff's post-NTA detention claims fail for a more basic reason: Congress has established a system whereby an alien detained under Section 1226(a) can contest the initial bond determination via a hearing before an immigration judge. *See* 8 C.F.R. §§ 236.1, 1003.19, 1236.1 (providing for bond redetermination before an immigration judge and a subsequent administrative appeal to the BIA). Notwithstanding the availability of a bond redetermination hearing before an immigration judge (as well as Magistrate Judge Donohue directing that an expedited bond hearing be conducted before an immigration judge), Plaintiff

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

40

declined the expedited bond hearing and chose not to request a bond hearing until after this court ruled on his request for conditional release on March 24, 2017. Whatever Plaintiff's reasons for doing so, the individual defendants cannot be held personally liable for the actions of others.

### C.  Plaintiff Fails to Allege the Violation of a Clearly Established Procedural Due Process Right (Count Four).

The individual defendants are entitled to qualified immunity because Plaintiff has failed to allege the violation of a due process right, let alone a clearly established one. "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999) (citation omitted). Plaintiff's procedural due process claim fails because he has not shown that any one of the individual defendants has deprived him of a property or liberty interest protected by the Fifth Amendment. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). As the Supreme Court has explained, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

Although Plaintiff has not specified the interest, liberty or property, of which each individual personally deprived him, he has not shown that an alien has a protected interest in discretionary deferral of removal proceedings and/or continuation of DACA when that alien is otherwise removable.[26] The DACA policy is not codified in any statute or regulation. The

---

[26] In addition to the Complaint's repeated failure to distinguish among ICE "agents" across all of the *Bivens* claims, Plaintiff also often times refers to "Defendants," which is equally vague and inappropriate in a personal capacity case such as this one, as there are both numerous federal agency and individual defendants in the case. This is fatal to Plaintiff's procedural due process

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

41

1    description of the policy is set forth in a memorandum, which specifies that "[t]his memorandum

2    confers no substantive right, immigration status or pathway to citizenship. Only the Congress,

3    acting through its legislative authority, can confer these rights." Dkt. #78-3 at 3. Congress has

4    not conferred any rights to DACA recipients.[27] Further, the Ninth Circuit has determined that

5    aliens have no protected interest in discretionary relief. *E.g., Mendez-Garcia v. Lynch*, 840 F.3d

6    655, 665 (9th Cir. 2016) (holding that denial of discretionary relief does not deprive an alien of a

7    constitutionally protected liberty or property interest); *Tovar-Landin v. Ashcroft*, 361 F.3d 1164,

8    1167 (9th Cir. 2004) (concluding that aliens have no protected interest in "discretionary relief

9    from removal . . ."); *Garcia v. Holder*, 320 F. App'x 288, 290 (5th Cir. April 9, 2009) (stating

10   that an alien "must have a liberty or property interest before the due process clause is relevant,

11   and no such protected interests arise in the denial of totally discretionary relief"); *Romeiro de

12   Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (observing that internal instructions vested

13   INS with unfettered discretion to determine whether to grant deferred action to an otherwise

14   deportable alien, thus, "it creates no protectable liberty interest in deferred action ....). Nor does

15   Plaintiff articulate what process from the individuals he was due. Although Plaintiff bears the

16   burden, *Galen*, 477 F.3d at 665, he has offered no case that decides the constitutional issue, let

17   alone puts it "beyond debate." *al-Kidd,* 563 U.S. at 741. Accordingly, the individual defendants

18

19

20

21

22   ──────────────────

23   claim, which simply inserts the phrase "Individual Defendants" before citations to the seven
     paragraphs articulating agency action. Dkt. #78, ¶ 116. Plaintiff must allege a specified protected

24   interest of which a particular individual was personally responsible for depriving him; an
     individual cannot be held personally liable for agency actions, agency procedures, or the actions

25   of others. *Iqbal*, 556 U.S. at 676; *Abbasi*, 137 S. Ct. at 1860 (explaining that "a *Bivens* claim is
     brought against the individual official for his or her own acts, not the acts of others"). With

26   regard to the actions that Plaintiff attributes to the individuals (namely, that they arrested him and
     placed him into removal proceedings), Plaintiff has not specified what process, outside of the

27   proceedings set forth in the INA, he was due.

28   [27] Nor has it instructed the Executive to do so by regulation.

Individual Defendants' Motion                              U.S. Department of Justice, Civil Division
To Dismiss Second Amended Complaint                        P.O. Box 7146, Ben Franklin Station
Case No. 2:17-cv-00218-RSM-JPD                             Washington, D.C. 20044
                                                           (202) 616-0089

are entitled to qualified immunity on Plaintiff's procedural due process claim.

### D.  Plaintiff Fails to Allege the Violation of a Clearly Established Substantive Due Process Right (Count Five).

Plaintiff asserts a substantive due process claim based on his detention, contending that there was no reason for the individual defendants to have detained him. Dkt. #78 ¶ 122. This claim essentially rehashes the detention portion of his Fourth Amendment claim (*i.e.*, that Plaintiff was charged as a removable alien and detained pending removal notwithstanding having received deferred action under the DACA policy). Because his substantive due process claim is based on the same conduct as his Fourth Amendment claim, this court should analyze this claim under the contours of the Fourth Amendment rather than generalized notions of substantive due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998) (explaining that a substantive due process claim is inappropriate when the claim is covered by the Fourth Amendment); *Albright v. Oliver*, 510 U.S. 266, 273-75 (1994) (rejecting due process claim for "freedom from prosecution without probable cause" because it "is properly considered under the Fourth Amendment, the more specific constitutional right implicated by plaintiff's allegations").

But even if the court were to analyze Count Five under the rubric of substantive due process, Plaintiff still has failed to allege that any of the individual defendants violated a clearly established right. The Complaint is devoid of any factual allegations identifying "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849. Courts have rejected such detention-based claims for aliens who are temporarily detained pending removal. *Demore*, 538 U.S. at 523 (stating that detention during deportation proceedings is a "constitutionally valid aspect of the deportation process" and thus did not violate due process). Plaintiff has not shown that it would be clear to a reasonable officer that it would be unconstitutional to detain him pending his removal proceedings. While evidence of gang

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

43

association is not required to justify an initial no-bond determination, even if the individual

defendants were mistaken or overly cautious when assessing whether to release him on bond,

qualified immunity gives officials ample breathing room to make reasonable, but mistaken

judgments. *See Messerschmidt*, 565 U.S. at 553. And, as described above, the INA has built-in a

check on that discretionary decision by way of a bond redetermination hearing and opportunity

for appeal, one which Plaintiff delayed but eventually successfully utilized.

   Plaintiff also asserts that the "defendants" engaged in an unconstitutional "bait-and-

switch" by heavily promoting the "DACA program" and encouraging aliens to disclose sensitive

information only to use that information against Plaintiff, all in violation of his substantive due

process rights. Dkt. #78 ¶ 123. This aspect of Plaintiff's due process claim seeks to hold four

Seattle-based ICE officers personally responsible for the conduct of the "the government" and

for actions by agencies for whom they do not even work. *See id.* ¶ 124 ("the government

vigorously promoted…"). Plaintiff has failed to adequately allege that any one of the four

individuals personally participated in this alleged violation. As described above, an individual

may be held liable only for his own conduct, not the conduct of others and certainly not the

conduct of an entire agency or the government, *writ large. See Iqbal*, 556 U.S. at 676. In any

event, Plaintiff has identified no case law that would place it "beyond debate" that checking and

using information in government databases, even if those databases contained information that a

plaintiff voluntarily disclosed, would be unlawful under the circumstances. For all these reasons,

the individual defendants are entitled to qualified immunity on Count Five.

### E. Plaintiff Fails to Allege a Violation of a Clearly Established Equal Protection Right (Count Six).

   As with many of his contentions, Plaintiff cannot overcome the qualified immunity bar

for his equal protection claim because he has not alleged facts showing that each individual

Individual Defendants' Motion          U.S. Department of Justice, Civil Division
To Dismiss Second Amended Complaint      P.O. Box 7146, Ben Franklin Station
Case No. 2:17-cv-00218-RSM-JPD       Washington, D.C. 20044
44          (202) 616-0089

personally engaged in conduct that violated his Fifth Amendment rights. As the Supreme Court has explained, in order to state a Fifth Amendment Equal Protection claim, a plaintiff "must plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676, 682. As *Iqbal* instructs, "to state a [discrimination] claim based on a violation of a clearly established right, [plaintiff] must plead sufficient factual matter to show that [each defendant acted] . . . not for a neutral [] reason but for the purpose of discriminating [against him] on account of race … or national origin." *Id.* at 677. Where, as here, Plaintiff seeks to recover from the personal assets of federal employees, he must plead that "*they themselves* acted on account of a constitutionally protected characteristic." *Id.* at 683 (emphasis added). Plaintiff's attribution of discriminatory animus to "defendants," collectively and without individual distinction, is unquestionably inadequate in this personal capacity suit.[28]

Further, Plaintiff's equal protection claim should be dismissed because the Complaint's allegations of discrimination are conclusory and implausible. As *Iqbal* notes, conclusory assertions are not entitled to any presumption of truth. *Id*. at 678-79. *Iqbal* explains that once the court sets aside "the allegations in the complaint that are not entitled to the assumption of truth," including recitations of elements of a cause of action and legal conclusions, then it must evaluate the remaining factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 680-81. Plaintiff asserts that the individual defendants arrested and detained him because of his race or national origin and invidious stereotypes about men of Mexican heritage with tattoos.

---

[28] For example, Plaintiff only declares that one agent questioned him before arrest. Dkt. #78, Compl. Ex. O ¶ 15. Plaintiff reports that the same agent questioned him at the Tukwila facility and allegedly made the statement about Plaintiff's deferral of removal pursuant to DACA not mattering. *Id*. ¶ 17. Plaintiff alleges a second agent joined the conversation about Plaintiff's tattoo. *Id*. ¶¶ 21-25. Even if those allegations could evidence animus of some sort, which they do not, there is no basis to claim that four individuals are alleged to have acted with discriminatory purpose and are personally liable for discriminating against him.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

45

Dkt. #78 ¶¶ 132-33. Once the conclusory allegations are stripped from the Complaint, what is left are allegations that unspecified "defendants" (1) questioned Plaintiff about his place of birth before arresting him,[29] (2) placed Plaintiff in removal proceedings despite his receipt of deferred action under DACA, (3) stated that his "DACA status" did not matter because he was not from the United States, and (4) asserted that Plaintiff was a gang member based on his tattoo. *Id.*

Discriminatory animus based on race or national origin is not a plausible conclusion to draw from these facts. Plaintiff's assertions ascribing discriminatory intent to the individual defendants during the arrest are belied by the context in which Plaintiff was encountered. ICE agents had just arrested Plaintiff's father for being illegally present, he reported that his sons were here illegally and he wanted to go inside to see them. Asking a person, who is thereafter encountered in the arrestee's residence, his name, date of birth, and place of birth, ostensibly to try to verify what was just relayed by the arrestee, does not evidence bias. Rather, the more plausible explanation is that the individual defendants were merely investigating each person's status, as their jobs provided. Significantly, with respect to Plaintiff's Equal Protection claim, his brother, who told agents that he was "legally here," was *not* arrested. With regard to the decision to detain Plaintiff at the holding facility upon learning that he was a recipient of deferred action under DACA, the allegations do not evidence discriminatory intent either. Gang membership and gang association may be one of the innumerable factors that the Executive considers in assessing

---

[29] Plaintiff also claims in Count Six that he was arrested in spite of his deferral of removal pursuant to DACA and "their" statement to him that it did not matter because he was not from the United States. Dkt. #78 ¶ 132. The facts alleged in the Complaint do not support these contentions. During the initial arrest, no one is alleged to have told agents that Plaintiff had "DACA status," none of the individual defendants are alleged to have said that deferral of removal pursuant to DACA "didn't matter," and none of the individual defendants are alleged to have reported that Plaintiff's tattoo was observed by them prior to his arrest, let alone served as the basis for that arrest.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

46

whether to continue to forebear through deferred action. Inquiring about Plaintiff's tattoo and possible gang membership does not evidence race-based or national origin animus. Nor does stating that "it does not matter that [Plaintiff] had DACA status" evidence racial or national origin bias, as deferred action may be terminated at any time, Plaintiff was removable, and DHS had chosen no longer to forebear.

Even in *Twombly*, where the Court acknowledged that the allegation of parallel conduct was *consistent* with an unlawful agreement, the Court nonetheless refused to find that it plausibly suggested an illicit accord because it was not only compatible with, but *more likely explained by* lawful behavior. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-68 (2007); *Iqbal*, 556 U.S. at 677. Given the more plausible, "neutral [] reason" for the individual defendants' actions here—that prior to Plaintiff's arrest the individual defendants believed that he, unlike his brother, was illegally in the United States and, later, was removable—Plaintiff has not nudged his claims of purposeful discrimination "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 677, 680 (quoting *Twombly*, 550 U.S. at 570); *see also id*. at 682 (citation and internal quotation marks omitted) ("On the facts respondent alleges, the arrests … were likely lawful and justified by … nondiscriminatory intent …. As between that obvious alternative explanation for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion."). Plaintiff simply cannot establish that all reasonable officials under the circumstances would have understood that they were discriminating against Plaintiff based on his race or national origin.

*** 

Because Plaintiff cannot meet his burden of alleging that any of the individual defendants violated any clearly established constitutional right, they are entitled to qualified immunity.

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

47

## <u>CONCLUSION</u>

For the reasons stated above, the court should dismiss with prejudice all claims against

Matthew Hicks, Lance Hernandez, Taula Peter, and Kathlyn Lawrence.

Dated: August 10, 2017                                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel, Torts Branch

*/s/ Sarah E. Whitman*
SARAH E. WHITMAN
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0089
Facsimile: (202) 616-4314
Email: Sarah.Whitman@usdoj.gov

*Counsel for Defendants Matthew Hicks,*
*Taula Peter, Lance Hernandez, and Kathlyn*
*Lawrence, as sued in their individual*
*capacities*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 10, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document should automatically be served this day on all counsel of record *via* transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Sarah E. Whitman*
Sarah E. Whitman
Trial Attorney
U.S. Department of Justice

Individual Defendants' Motion
To Dismiss Second Amended Complaint
Case No. 2:17-cv-00218-RSM-JPD

U.S. Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
(202) 616-0089

49