UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DANIEL RAMIREZ MEDINA,<br><br>    Petitioner,<br><br>    v.<br><br>U.S. DEPARTMENT OD HOMELAND SECURITY, *et al.*,<br><br>    Respondents. | Case No. C17-0218RSM<br><br>ORDER DENYING DEFENDANTS' MOTION TO DISMISS |

## I.    INTRODUCTION

This matter comes before the Court on Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. #90. For the reasons discussed herein, the Court DENIES the motion.

## II.    BACKGROUND

**A. Plaintiff Daniel Ramirez Medina**

Plaintiff, Daniel Ramirez Medina, is 24 years old, and the father of an American-born son. Dkt. #78 at ¶ 5. According to his Second Amended Complaint, Mr. Ramirez was brought to this country from Mexico in or around 2003, when he was approximately 10 years old. *Id.*

ORDER
PAGE - 1

Mr. Ramirez alleges that he recently moved from California to Washington to obtain more lucrative employment to better support his son.[1]  *Id.*

In late 2013, Mr. Ramirez first applied for deferred action and work authorization pursuant to the government's "Deferred Action for Childhood Arrivals" ("DACA") policy. Dkt. #78 at ¶ 41.  As part of this process, Mr. Ramirez provided the government with his birth certificate, school records, and information about where he lived, and was required to attend a biometrics appointment so that United States Citizenship and Immigration Services ("USCIS") could take his fingerprints and photographs. Dkt. #78 at ¶ 41.  Mr. Ramirez was granted deferred action and work authorization in 2014.  *Id.*

In 2016, Mr. Ramirez reapplied for DACA status, and again was granted deferred action and work authorization.  *Id.* at ¶ 42.  As part of this process, Mr. Ramirez received an approval notice (the "2016 DACA Approval Notice") informing him that his request for deferred action had been granted.  *Id.*  The 2016 DACA Approval Notice provided that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years" and is valid until May 4, 2018.  *Id.*, Ex. G.  The 2016 DACA Approval Notice also informed Mr. Ramirez that his deferred action could be terminated if he engaged in "[s]ubsequent criminal activity."  *Id.*

On February 10, 2017, at approximately 9:00 a.m., a team of Immigration and Customs Enforcement ("ICE") agents arrested Mr. Ramirez's father outside of the apartment where Mr. Ramirez, his father, and his brother were then living.  *Id.* at ¶ 44.  ICE agents entered the apartment.[2]  *Id.*  The agents found Mr. Ramirez asleep, woke him up, and began to question him.

---

[1] Because this comes to the Court on a Motion to Dismiss, the Court views the alleged facts as true.

[2] Consent to enter the apartment appears to be in dispute.  Mr. Ramirez asserts that he is unaware of any consent provided by his father. Dkt. #78 at ¶ 44.  The Record of Deportable/Inadmissible Alien form filled out by Officer Hicks states that consent was provided. Dkt. #78, Ex. H at 3.

*Id.* at ¶ 45.  Mr. Ramirez provided the agents with his name and birthdate, and told them that he was born in Mexico.  Mr. Ramirez was then placed in handcuffs.  *Id.*

According to Mr. Ramirez, he told the ICE agents repeatedly that he had a legal work permit, but the ICE agents refused to release him.  *Id.* at ¶ 46.  Mr. Ramirez's father also repeatedly informed the ICE agents that Mr. Ramirez had a legal work permit, and questioned why he was being detained.  *Id.*

Mr. Ramirez was then transported to an ICE holding facility in Tukwila, Washington.  *Id.* at ¶ 47.  At the holding facility, the ICE agents confiscated Mr. Ramirez's work permit.  *Id.* at ¶ 48.  That permit was marked with a "C33" designation, which identified Mr. Ramirez as a DACA recipient with work authorization.  Dkt. #78, Ex. F at 112.  The ICE agents also fingerprinted Mr. Ramirez and used this information to access his records, which revealed that Mr. Ramirez has no criminal history, had twice been granted DACA status, and possessed valid employment authorization through May 4, 2018.  *Id.* at ¶ 49.  Defendants refused to release Mr. Ramirez even after they confirmed his DACA status.  *Id.* at ¶ 50.  Defendants subsequently cited Mr. Ramirez's receipt of DACA as evidence of his "illegal" status in this country.  *Id.*, Ex. H at 3.

According to Mr. Ramirez, the ICE agents began to interrogate him, asking him numerous times whether he was in a gang, which he denied, and whether he had ever known anyone who was a gang member.  *Id.* at ¶ 51.  Mr. Ramirez told the agents that although he knew students who had attended middle school and high school with him who were in gangs, he was not gang affiliated and never had been.  *Id.*  The ICE agents also asked Mr. Ramirez about the tattoo on his forearm (which consisted of the words "La Paz-BCS" and a nautical star).  *Id.* at ¶ 52.  Mr. Ramirez got the tattoo when he was 18 years old.  La Paz is Mr. Ramirez's birthplace, and "BCS"

ORDER
PAGE - 3

stands for Baja California Sur, the region in which La Paz is located. *Id.* The agents apparently insisted to Mr. Ramirez that it was a gang tattoo, which he also denied. *Id.* at 53.

Prior to being transferred to the Northwest Detention Center, the ICE agents asked Mr. Ramirez if there were any gangs with which he would like to avoid being placed for his safety. *Id.* at ¶ 54. Mr. Ramirez again stated that he had no gang affiliation and would not have problems being placed with anyone. Dkt. #78 at ¶ 54. Upon continued questioning, Mr. Ramirez ultimately indicated that if he had to be placed with any group, he would prefer "the Paisas." *Id.* Mr. Ramirez understands the colloquial use of "Paisas" to mean Mexicans, and was attempting to communicate that if given the option, he would prefer to be placed with other Mexicans. *Id.*

Mr. Ramirez was then transferred to Northwest Detention Center, where he remained in custody for the next 47 days. *Id.* at ¶ 55. While at the Detention Center, Defendants classified Mr. Ramirez as a "medium-high" security risk. *Id.* at ¶ 59. Mr. Ramirez requested that he be reclassified because he was not, and never had been, gang affiliated. *Id.* The request was denied. *Id.* During his detention, Mr. Ramirez asserts that he feared for his safety because many of the other inmates believed he was affiliated with a gang due to the statements made after his arrest. *Id.*

Defendants issued a Notice to Appear ("NTA") on February 10, 2017. Dkt. #78, Ex. I. Defendants assert that Mr. Ramirez's DACA status terminated on the day the NTA was issued. Dkts. #78 at ¶¶ 60 and 61, Ex. J and #90 at 7.

USCIS then sent Mr. Ramirez a Notice of Action ("NOA") dated February 17, 2017. Dkt. #78, Ex. J. The NOA states that Mr. Ramirez's deferred action and employment authorization terminated on the date the NTA was issued, and provides that "[a]n appeal or motion to reopen/reconsider this notice of action may not be filed." *Id.*

ORDER
PAGE - 4

In the meantime, on February 13, 2017, Mr. Ramirez filed a Petition for Habeas Corpus in this Court. Dkt. #1. This Court ultimately declined to order the release of Mr. Ramirez and directed him to file a motion in Immigration Court. Dkt. #69. Pursuant to that Order, Mr. Ramirez filed such motion and received a bond hearing in Immigration Court on March 28, 2017. Dkt. #78 at ¶ 78. Mr. Ramirez was released on bond on March 29, 2017. *Id.*, Ex. V.

On April 25, 2017, Plaintiff filed a Second Amended Complaint in this matter. Dkt. #78. In that Complaint, Plaintiff drops his habeas claim, and alleges claims against several federal agencies, as well as individual officers. *Id.* The claims against the individual Defendant have since been dismissed. Dkt. #112. Against the remaining federal agencies, collectively, Plaintiff asserts the following claims: 1) violations of the Administrative Procedures Act ("APA") (Counts One and Two); and 2) violation of the Fifth Amendment (Count 8).[3] Dkt. #78 at ¶¶ 85-105 and 148-150.

**B. The DACA Program**

On June 15, 2012, former Secretary of Homeland Security Janet Napolitano announced the creation of the DACA program. Dkt. #78, Ex. C ("Napolitano Memo"). In her memorandum, Ms. Napolitano provided DHS with guidelines regarding the exercise of its prosecutorial discretion to focus enforcement efforts away from low priority cases, including individuals who came to the United States as children. *Id.* The Napolitano Memo listed the following five criteria that must be satisfied before an individual can be considered for an exercise of prosecutorial discretion under DACA:

- came to the United States under the age of sixteen;

---

[3] Counts Three through Seven were *Bivens* claims brought against the individually-named Defendants. Dkt. #78 at ¶¶ 92-147. As noted above, those claims have since been dismissed. Dkt. #112.

ORDER
PAGE - 5

- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.

Dkt. #78, Ex. C. Individuals must also pass a criminal background check to be eligible for DACA. *Id.* at 2.

Under the DACA program, deferred action is provided for a renewable period of two years, and DACA recipients are eligible to apply for work authorization during the period of deferred action. *Id.* at 3; *see also* 8 C.F.R. § 274a.12(c)(14) (permitting USCIS to establish a specific period for employment authorization for aliens who have been granted deferred action).

The National Standard Operating Procedures ("SOP") issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status. *See* Dkts. #78, Ex. F ("DACA National Standard Operating Procedures ("SOP")", dated April 4, 2013) and #109-1, Ex. A (excerpts of DACA SOP, dated August 28, 2013). The SOP states that it is applicable to all personnel performing adjudicative functions and the procedures to be followed are not discretionary. Dkt. #78, Ex. F at 16.

ORDER
PAGE - 6

Pertinent to the instant matter, are the procedures applying to criminal offenses or public safety concerns that have been deemed to be Egregious Public Safety Concerns ("EPS"). The SOP defines EPS as:

> Any case where routine systems and background checks indicate that an individual is under investigation for, has been arrested for (without disposition), or has been convicted of, a specified crime, including but not limited to, murder, rape, sexual abuse of a minor, trafficking in firearms or explosives, or other crimes listed in the November 7, 2011, memorandum entitled <u>Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens</u>.

Dkt. #109-1, Ex. A (underline in original). The November 7, 2011, memorandum lists "known or suspected street gang members" as one of many EPS cases. Dkt. #78, Ex. F, Appendix B at 4.

Chapter 14 of the SOP, entitled "DACA Termination," provides as follows:

> If disqualifying criminal offenses or public safety concerns, which are deemed to be EPS, arise after removal has been deferred under DACA, the officer should forward the case to the BCU DACA Team who, in turn, will refer the case to ICE and follow the handling procedures outlined in the November 7, 2011 NTA memorandum for EPS cases. If ICE accepts the case, the issuance of the NTA will result in the termination of DACA. Upon the filing of the NTA with EOIR, the individual's employment authorization terminates automatically.
>
> If ICE does not accept the case or if the disqualifying criminal offense is non-EPS per the November 7, 2011 NTA memorandum, the BCU DACA Team should reopen the case on Service motion and issue a Notice of Intent to Terminate. The individual should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate. The Notice of Intent to Terminate should include a statement that if deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of deferred action will be terminated for cause.
>
> If the adverse grounds are not overcome, or no response is received to the Notice of Intent to Terminate, the officer should prepare a Termination Notice and seek supervisory review of the draft Termination Notice prior to issuance. The Termination Notice should indicate that the individual's employment authorization is terminated for cause as of the date of the notice.

> Consequently, the Class of Admission (COA) code in CIS should be changed to DAT (Deferred Action Terminated) for employment verification purposes. Additionally, the BCU DACA Team should forward the individual's name to ERO.
>
> If national security concerns arise after removal has been deferred under DACA, the case should go through the CARRP process, per established CARRP protocols.

Dkt. #78, Ex. F at 133.[4]

Mr. Ramirez alleges that the revocation of his DACA status and employment authorization violated the Administrative Procedures Act ("APA") because the revocation did not comport with established procedures, and was therefore arbitrary and capricious. *See* Dkt. #78 at ¶ ¶ 85-91.  Mr. Ramirez also alleges that the revocation of his DACA status and employment authorization violated the APA because those actions violated his rights under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution. Dkt. #78 at ¶ ¶ 94-105 and ¶ ¶ 148-150.

///

///

---

[4] "BCU" is defined as "Background Check Unit." Dkt. #78, Ex. F at 6. "BCU DACA Team" is defined as:

> A specialized team within the BCU that specifically reviews and adjudicates issues of criminality arising from DACA requests. The team may consist of Immigration Services Officers, as well as officers assigned to CARRP, NTA issuance, and Triage duties, and the analysts who support them.

*Id.* "CARRP" is defined as:

> Controlled Application Review and Resolution Program. This program outlines the process to identify, record, and adjudicate applications/petitions/requests where a National Security concern is identified.

*Id.* at 8.

ORDER
PAGE - 8

### III.   DISCUSSION

**A. Standards of Review**

*1. Motions to Dismiss for Lack of Jurisdiction Under 12(b)(1)*

A motion to dismiss un Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction is either facial or factual. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Where the moving party "convert[s] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits "or other evidence necessary to satisfy its burden of establishing subject[-]matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) (citing *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)). The party asserting its claims in federal court bears the burden of establishing subject-matter jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).

*2. Motions to Dismiss for Failure to State a Claim Under 12(b)(6)*

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, the court is not required to accept as true a "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. This requirement is met when the plaintiff "pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Absent facial plausibility, Plaintiffs' claims must be dismissed. *Twombly*, 550 U.S. at 570.

Though the Court limits its Rule 12(b)(6) review to allegations of material fact set forth in the Complaint, the Court may consider documents of which it has taken judicial notice. *See* FRE 201; *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Here, the Court has taken judicial notice of and considers herein the documents attached to and incorporated by reference in the Second Amended Complaint (Dkt. #78, Exs. A-W), and attached to Plaintiff's Request for Judicial Notice (Dkt. #109-1, Ex. A). FRE 201; *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). The Court has also taken judicial notice of the documents attached to Defendants' motion to dismiss (Dkt. #90, Exs. A-E). *Id.*

**B. Plaintiff's Second Amended Complaint**

*1. Subject Matter Jurisdiction*

Central to the resolution of this motion is the proper characterization of Plaintiff's Second Amended Complaint. Defendants characterize Plaintiff's action as challenging the Department of Homeland Security's decision to issue him a Notice to Appear ("NTA") and the resulting termination of his DACA status. Dkt. #90 at 1. Plaintiff asserts this is a mischaracterization of his Complaint, and notes that his claims are independent of the removal process and challenge only nondiscretionary actions that resulted in the revocation of his DACA status and work authorization. Dkt. #109 at 1.

Plaintiff alleges that the Court has jurisdiction pursuant to: (1) 28 U.S.C. § 1331; (2) 28 U.S.C. § 2201 (Declaratory Judgment Act); and 3) 5 U.S.C. § 701, *et seq.* (Administrative Procedure Act). Dkt. #78 at ¶ 1. Defendants argue the Immigration and Nationality Act ("INA") explicitly precludes review of (1) the discretionary decision to terminate Plaintiff's DACA status.

Dkt. #90 at 10-16. Specifically, Defendants argue that 8 U.S.C. §§ 1252(g), 1252(a)(5) and 1252(b)(9) strip this Court of subject matter jurisdiction to hear Plaintiff's case. *Id.* Defendants also argue that the APA does not permit judicial review of cases where agency action is committed to agency discretion by law. Dkt. #90 at 16.

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." Defendants argue that Plaintiff's claims are precluded by this section of the INA because the decision about whether to grant DACA status is discretionary. Dkt. #90 at 11. Defendants further assert that the statute precludes review of the decision to issue an NTA, which is the predicate step to commencing removal proceedings and which was what terminated Plaintiff's DACA status. *Id.* at 12-13.

Section 1252(a)(5), entitled "Exclusive means of review," states that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal . . . ." 8 U.S.C. § 1252(a)(5). Similarly, section 1252(b)(9) provides "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). Defendants argue that these statutes (known as the REAL ID Act) preclude Plaintiff's claims because they preclude review in the District Court of any challenge arising from an action taken to remove an alien. Dkt. #90 at 14. Defendants characterize Plaintiff's action as one challenging the discretionary

ORDER
PAGE - 11

decision to issue an NTA and thereby terminate his DACA status, and concludes that such an action cannot proceed in this Court. Dkt. #90 at 15-16.

As an initial matter, the Court agrees with Defendants that, if Plaintiff were asking for review of the government's ultimate discretionary decision to terminate his DACA status, section 1252(g) would strip this Court of jurisdiction to review that determination. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999) ("Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed."); *see also Rodriguez v. Sessions*, 2017 U.S. App. LEXIS 3216, 2017 WL 695192, at *1 (9th Cir. Feb. 22, 2017) ("We lack jurisdiction to consider [the plaintiff's] eligibility for Deferred Action for Childhood Arrivals."); *Vasquez v. Aviles,* 639 F. App'x 898, 901 (3rd Cir. 2016) ("[Section 1252(g)] deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action.") (citing *Reno*, 525 U.S. at 485); *Fabian-Lopez v. Holder*, 540 F. App'x 760, 761 n.2 (9th Cir. 2013) (determining that Section 1252(g) deprived the court of jurisdiction to consider the plaintiff's DACA eligibility). However, the Court ultimately finds that none of the statutes relied upon by Defendants applies to the narrower issues presented in this case; specifically, whether Defendants complied with their own non-discretionary procedures when taking Plaintiff into custody and questioning him at the Tukwila facility, which then led to the issuance of an NTA, rescission of his work authorization and, ultimately, termination of his DACA status.

Several District Courts have recently made this same determination. For example, in the case of *Coyotl v. Kelly*, 2017 U.S. Dist. LEXIS 108953 (N.D. Ga. June 12, 2017), the United States District Court for the Northern District of Georgia rejected the same arguments made by Defendants in this case.[5] In *Coyotl* the court noted that section 1252(b)(9) relates to the review of orders of removal, and that although Plaintiff was involved in an on-going removal proceeding that ultimately may result in an order regarding her removal from this country, there had been no such order issued. Thus, the Court concluded that 1252(b)(9) was not applicable. *Coyotl*, 2017 U.S. Dist. LEXIS 108953, *25.

Similarly, the court determined that it was not deprived of jurisdiction by § 1252(g) to consider whether Defendants followed their own procedures in terminating Plaintiff's DACA status:

> Section 1252(g) only strips district courts of jurisdiction to hear cases involving a "decision or action ... to commence proceedings, adjudicate cases, or execute removal orders." As the Supreme Court explained in Reno,
>
> > § 1252(g) does not apply to the entire universe of deportation-related claims, but instead applies only to three discrete actions that the Attorney General may take: her "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders." There are of course many other decisions or actions that may be part of the deportation process – such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order.
>
> Reno, 525 U.S. at 482 (emphasis in original); *see also* Alvarez v. U.S. Immigration & Customs Enforcement, 818 F.3d 1194, 1202 (11th Cir. 2016) (stating that Reno "instructs us to narrowly interpret § 1252(g) – a command that our sister circuits have applied in subsequent cases."). In this case, a removal proceeding was commenced against Plaintiff in May 2010, but that decision to commence the proceedings is not presently before the Court. Likewise, there has been no adjudication in Plaintiff's removal proceeding

---

[5] The Court recognizes that the *Coyotl* case arose in a different procedural posture than the instant matter, but that does not change the persuasiveness of the jurisdictional analysis.

ORDER
PAGE - 13

nor is there any order to be executed.  Accordingly, the Court finds that neither of these statutes divests this Court of jurisdiction to hear Plaintiff's challenge to the *non-discretionary* process by which her DACA status was terminated.

*Coyotl*, 2017 U.S. Dist. LEXIS 108953, *25-26.

Likewise, in *Torres v. United States Dep't of Homeland Sec., et al.*, 2017 U.S. Dist. LEXIS 161406 (S.D. Cal. Sept. 29, 2017), the United States District Court for the Southern District of California also rejected Defendants' arguments.  In that case, the court explained:

> Section 1252(g) must be construed narrowly and "applies only to three discrete actions. . . 'to commence proceedings, adjudicate cases, or execute removal orders.'" *Wong v. United States*, 373 F.3d 952, 963-64 (9th Cir. 2004); *Coyotl v. Kelly*, 2017 U.S. Dist. LEXIS 108953, 2017 WL 2889681 (N.D. GA. June 12, 2017) (jurisdictional stripping provision does not bar the exercise of jurisdiction over claim that termination of DACA status occurred without following the non-discretionary termination provisions of the DACA SOP); (*United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (district court may consider "a purely legal conclusion that does not challenge the Attorney General's discretionary authority, even if the answer . . . forms the backdrop against which the Attorney General later will exercise discretionary authority"); *Ramirez-Perez v. Ashcroft*, 336 F.3d 1001, 1004 (9th Cir. 2003) (courts "retain jurisdiction to review constitutional claims, even when those claim address [agency] discretion").  Accordingly, this provision does not deprive the court of jurisdiction to entertain Plaintiff's claim that the termination of his DACA status did not comply with the non-discretionary DACA SOP.
>
> Similarly, the provision related to the review of orders of removal, 8 U.S.C. §1252(b)(9), does not prevent the court from entertaining Plaintiff's claims.  Here, there is no final order of removal entered against Plaintiff and no proceedings have been commenced against Plaintiff.  As noted in *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007), §1252(b)(9) "appl[ies] only to those claims seeking judicial review of orders of removal."  Here, Plaintiff brings a procedural challenge to termination of his DACA status, an issue independent from any removal proceedings.  Accordingly, this provision does not deprive the court of jurisdiction to entertain Plaintiff's claim.

*Torres*, 2017 U.S. Dist. 131406, *12-14.

In the instant case, a review of the Complaint makes clear that Mr. Ramirez is challenging the non-discretionary actions taken at the time of his arrest and his subsequent questioning at the

ORDER
PAGE - 14

Tukwila detention office and detention at the Northwest Detention Center, which led to the termination of his work authorization and DACA status.  Dkt. #109 at 18.  Plaintiff alleges that Defendants did not follow their own internal policies and procedures in taking such actions.  For the same reasons discussed in the cases above, this Court determines that the INA does not strip it of jurisdiction to review those claims.

Likewise, the Court rejects Defendants' argument that § 701(a) of the APA bars this Court from reviewing an agency's non-discretionary review process.  Again, this argument was analyzed in *Coyotl, supra.*  The *Coyotl* court noted the Eleventh Circuit's decision in *Perez v. U.S. Bureau of Citizenship & Immigration Servs. (USCIS)*, 774 F.3d 960 (11th Cir. 2014), which illustrates the important distinction between challenges to an agency's ultimate discretionary decision and challenges to non-discretionary administrative determinations:

> In *Perez*, the plaintiff challenged a determination regarding his eligibility to apply to adjust his immigration status. *Id.* at 963.  The court recognized that while the "ultimate decision whether to grant adjustment of status under the [Cuban Adjustment Act] is discretionary[,] . . . USCIS initial statutory eligibility decisions, which are made before the discretionary decision whether to grant adjustment of status, are purely legal questions that do not implicate agency discretion." *Id.* at 965 (citing *Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137, 1143-44 (11th Cir. 2009) (citation omitted).  Put another way, "simply because the Secretary has the ultimate discretionary authority to grant an immigration benefit does not mean that every determination made by USCIS regarding an alien's application for that benefit is discretionary, and hence not subject to review." *Mejia Rodriguez*, 562 F.3d at 1143.

*Coyotl*, 2017 U.S. Dist. LEXIS 108953, *26-27.  The Ninth Circuit has similarly held that the asserted jurisdictional provisions do not apply to claims which "are collateral to, or independent of, the removal process."  *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016).

In this case, Defendants' alleged failure to follow the procedures detailed in the DACA SOP does not implicate agency discretion.  Therefore, the jurisdiction-stripping provisions of 8

ORDER
PAGE - 15

U.S.C. §§ 1252(g), 1252(a)(5), 1252(b)(9) and 5 U.S.C. § 701(a) are not applicable to prevent this Court from determining whether Defendants complied with their non-discretionary procedures.

   *2. Failure to State a Claim*

   In the alternative, Defendants have argued that Plaintiff's claims must be dismissed under Rule 12(b)(6) for his failure to state a claim because: 1) there is no requirement that ICE provide notice to a recipient of DACA before issuing an NTA that terminates DACA; and 2) Plaintiff lacks as a matter of law a constitutionally protected interest in DACA or employment authorization. Dkt. #90 at 17-22. Plaintiff responds that these arguments must fail because the government effectively concedes that it violated the APA, Defendants violated the APA by failing to follow their own internal procedures, and Defendants violated the APA by ignoring the Due Process Clause. Dkt. #109 at 16-24.

   Defendants' arguments miss the mark. In his Second Amended Complaint, Plaintiff asserts two claims: 1) the government violated the APA because its conduct was arbitrary, capricious and an abuse of discretion, and contrary to its own operating procedures; and 2) the government violated the APA because it violated his rights under the Due Process Clause. Dkt. #78 at ¶ ¶ 85-90 and 92-105. With respect to Plaintiff's Claim 1, Defendants wholly fail to address that the revocation of Plaintiff's DACA was arbitrary and capricious. *See* Dkt. #90. Instead, they focus solely on the decision to issue an NTA and whether notice was required before revoking DACA. The Court agrees with Plaintiff that the failure to address that argument defeats Defendants' assertion that he failed to state a claim with respect to Claim I. *See* Dkt. #109 at 16. At this stage of the proceedings, and taking the facts alleged in the Second Amended Complaint as true, the Court finds that Plaintiff has alleged a plausible claim that the government violated

ORDER
PAGE - 16

the APA because its conduct was arbitrary, capricious and an abuse of discretion, and contrary to its own operating procedures, and that claim may proceed.

Likewise, the Court finds that Plaintiff has stated a plausible claim that the government violated the APA because it violated his rights under the Due Process Clause. During oral argument, the government emphasized that it is allowed to withdraw DACA at any time for no reason at all, and that the government has made no promise to DACA recipients with respect to any benefits of that policy/program. As a result, the government apparently asserts that there can be no violation of Plaintiff's Due Process rights because no process is actually due. That cannot be.

In creating the DACA policy/program, the federal government recognized that there were thousands of young people unlawfully present in our country, that lacked the intent to violate the law, and that had contributed to our country in significant ways, and that its immigration enforcement resources should not be spent on low priority cases such as those. *See* Dkt. #78, Ex. C. The policy then set forth criteria to be considered when determining whether to grant DACA to an applicant. *Id.* These criteria established a *quid pro quo* from the federal government to the potential applicants – *i.e.*, you (applicant) make yourself known to us (federal government) and pass rigorous background checks, etc., and in return you will be considered for DACA, which in turn will allow you the opportunity to remain in the country, work, and potentially receive other state benefits. *Id.*

When faced with concerns from numerous members of congress about how personal information about the applicants would be used, the former Secretary of the Department of Homeland Security, Jeh Johnson, recognized that the federal government had made

ORDER
PAGE - 17

representations "upon which DACA applicants most assuredly relied," and agreed that such representations "must continue to be honored." Dkt. #78, Ex. B. He went on to state:

> Since DACA began, thousands of Dreamers have been able to enroll in college and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers and entrepreneurs – all on the books. **We continue to benefit as a country from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future.**

Dkt. #78, Ex. B (emphasis added).

Likewise, the Frequently Asked Questions (FAQs") created and provided by USCIS state:

> **Q1: What is deferred action?**
>
> A1: . . . . An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect.

Dkt. #78, Ex. A at 2 (bold in original). The FAQs then go on to inform individuals that "in light of this policy" if they believe they have been apprehended in error, they should call the Law Enforcement Support Center's hotline. *Id.* at 5, Q9.

While the Court recognizes and acknowledges that DACA does not confer lawful status upon an individual, the Court also finds that the representations made to applicants for DACA cannot and do not suggest that no process is due to them, particularly in Plaintiff's case where benefits have already been conferred. What process is due, and whether Plaintiff received such process, are ultimately questions for another day. But at this stage of the proceedings the Court is satisfied that Plaintiff has raised a plausible due process claim that will not be dismissed.

///

///

ORDER
PAGE - 18

## IV.    CONCLUSION

Having reviewed Defendants' motion, the opposition thereto and reply in support thereof, along with the remainder of the record, the Court hereby ORDERS that Defendants' Motion to Dismiss (Dkt. #90) is DENIED.

DATED this 8th day of November, 2017.

_____
RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE