1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Honorable Ricardo S. Martinez
Chief United States District Judge

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

Daniel Ramirez Medina,

             Plaintiff,

       v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; and U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES,

           Defendants.

CASE NO. 2:17-CV-00218-RSM-JPD

**PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

ORAL ARGUMENT REQUESTED

Noted for Consideration:  March 2, 2018

Attorneys for Plaintiff:
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
  jlondon@publiccounsel.org
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089


GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
  kmarquart@gibsondunn.com
NATHANIEL L. BACH (CA SBN 246518), *pro hac vice*
  nbach@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*
  jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520


ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
  echemerinsky@law.berkeley.edu
University of California, Berkeley, School of Law
*Affiliation for identification purposes only*
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

1   LEAH M. LITMAN (DC SBN 1016310), *pro hac vice*
        llitman@law.uci.edu
2   University of California, Irvine School of Law
    *\*Affiliation for identification purposes only*
3   401 East Peltason Drive, Educ 1095
    Irvine, CA 92697
4   Telephone: (949) 824-7722

5

6   LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
        larry@tribelaw.com
    Harvard Law School
7   *\*Affiliation for identification purposes only*
    1575 Massachusetts Avenue
8   Cambridge, MA 02138
    Telephone: (617) 495-1767

9

10  ELIZABETH HAWKINS (SBN 43187)
        ehawkins@hawkinsimmigration.com
11  Hawkins Law Group
    17544 Midvale Avenue, Suite 301
12  Shoreline, WA 98133
    Telephone: (206) 728-4220
13  Facsimile: (206) 973-5326

14

15  BARRERA LEGAL GROUP, PLLC
    LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
        lcortes@barreralegal.com
16  JOHN C. BARRERA (SBN 47658), *pro hac vice*
        jbarrera@barreralegal.com
17  JOSE GARCIA (SBN 46518), *pro hac vice*
        jgarcia@barreralegal.com
18  19309 68th Avenue South, Suite R102
    Kent, WA 98032
19  Telephone: (253) 872-4730
    Facsimile: (253) 237-1591

20

21  NORTHWEST IMMIGRANT RIGHTS PROJECT
    MATT ADAMS (SBN 28287)
22      matt@nwirp.org
    615 Second Ave., Suite 400
23  Seattle, WA 98104
    Telephone:  (206) 957-8611

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND ........................................................................................................ 2

    A.    The establishment of DACA ............................................................................. 2

        1.    The DACA application process ........................................................... 3

        2.    Limitations on revoking an individual's DACA status.................................. 3

    B.    Mr. Ramirez benefitted from his DACA status ................................................. 4

        1.    Mr. Ramirez was twice granted DACA status ................................................ 4

        2.    Mr. Ramirez received many benefits from DACA ........................................ 5

    C.    The government's unlawful and arbitrary conduct ......................................... 5

        1.    Mr. Ramirez's unlawful arrest and detention............................................ 5

        2.    The unlawful and arbitrary revocation of Mr. Ramirez's DACA status............ 7

III. LEGAL STANDARD ................................................................................................ 9

IV. ARGUMENT ............................................................................................................. 9

    A.    Mr. Ramirez is likely to succeed on the merits. ............................................. 9

        1.    The revocation of Mr. Ramirez's DACA status was arbitrary and capricious. ..................................................................................... 9

            a.    Defendants' reliance on unlawful presence was arbitrary and capricious. ................................................................. 11

            b.    Defendants' claim that Mr. Ramirez poses an egregious public safety concern is contradicted by the administrative record................................................................. 11

        2.    Defendants violated the APA by failing to follow their own internal procedures ................................................................................. 15

        3.    Defendants violated the APA by disregarding Mr. Ramirez's Due Process rights ...................................................................... 17

    B.    Mr. Ramirez has suffered and continues to suffer irreparable harm.......................... 21

    C.    The balance of equities and public interest weigh heavily in favor of provisional relief ...................................................................................... 23

V. CONCLUSION ......................................................................................................... 24

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abdur-Rahman v. Napolitano*,
814 F. Supp. 2d 1087 (W.D. Wash. 2010) .................................................................20

*Abdur-Rahman v. Napolitano*,
814 F. Supp. 2d 1098 (W.D. Wash. 2011) .................................................................15

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ...............................................................................................15, 16

*Alcaraz v. INS*,
384 F.3d 1150 (9th Cir. 2004) .................................................................................16

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................................9

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ..............................................................................18

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014), *permanent injunction aff'd*, 855 F.3d 957 (9th Cir.
2017) .....................................................................................................................22, 24

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008) .................................................................................12

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ................................................................................................17

*Bell v. Burson*,
402 U.S. 535 (1971) ................................................................................................20

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*,
620 F.3d 936 (9th Cir. 2010) ................................................................................9, 10

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
840 F.2d 701 (9th Cir. 1988) ....................................................................................23

*Church of Scientology of Cal. v. United States*,
920 F.2d 1481 (9th Cir. 1990) .................................................................................15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .........................................................................................9, 11, 16

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ................................................................................................18

1

**TABLE OF AUTHORITIES** *(continued)*

2

Page

3

*Coyotl v. Kelly*,
   261 F. Supp. 3d 1328 (N.D. Ga. June 12, 2017)...................................2, 8, 16, 19, 21, 23

4

5

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
   833 F.3d 1136 (9th Cir. 2016)................................................................................12, 14

6

*Delgadillo v. Carmichael*,
   332 U.S. 388 (1947)......................................................................................................13

7

8

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
   630 F.3d 1153 (9th Cir. 2011)......................................................................................22

9

10

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)......................................................................................................10

11

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)........................................................................................................9

12

13

*Gallo v. U.S. Dist. Court for Dist. of Ariz.*,
   349 F.3d 1169 (9th Cir. 2003).......................................................................................20

14

15

*Gonzalez Torres v. U.S. Dep't of Homeland Sec.*,
   2017 WL 4340385 (S.D. Cal. Sept. 29, 2017) ......................2, 11, 16, 17, 19, 21, 22, 23

16

*Griffeth v. Detrich*,
   603 F.2d 118 (9th Cir. 1979).........................................................................................19

17

18

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017).........................................................................................22

19

20

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017).....................................................................................21, 22

21

22

*Indep. Mining Co. v. Babbitt*,
   105 F.3d 502 (9th Cir. 1997).........................................................................................11

23

*Inland Empire-Immigrant Youth Collective v. Duke*,
   2017 WL 5900061 (C.D. Cal. Nov. 20, 2017)...................................2, 11, 16, 21, 22, 23

24

25

*INS v. Yang*,
   519 U.S. 26 (1996).........................................................................................................16

26

27

*Judulang v. Holder*,
   565 U.S. 42 (2011)....................................................................................................10, 13

28

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014).........................................................................................23

1

**TABLE OF AUTHORITIES** *(continued)*

2

Page

3

*Lopez-Valenzuela v. Arpaio*,
    770 F.3d 772 (9th Cir. 2014) (en banc).........................................................................17

4

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ..........................................................................................................17

5

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................................................................21

6

7

*McDonald v. Gonzales*,
    400 F.3d 684 (9th Cir. 2005)...........................................................................................16

8

9

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)......................................................................................21, 24

10

*Montes Bojorquez v. CBP*,
    No. 3:17-cv-00780-GPC-NLS, Dkt. 29-1 .........................................................................8

11

12

*Morrissey v. Brewer*,
    408 U.S. 471 (1972).........................................................................................................20

13

14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................................................10

15

16

*Munoz v. Rowland*,
    104 F.3d 1096 (9th Cir. 1997).........................................................................................14

17

*Newman v. Sathyavaglswaran*,
    287 F.3d 786 (9th Cir. 2002)...........................................................................................18

18

19

*NLRB v. Welcome-Am. Fertilizer Co.*,
    443 F.2d 19 (9th Cir. 1971).............................................................................................16

20

21

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015) ............................................................................23

22

*Nozzi v. Hous. Auth. of City of L.A.*,
    806 F.3d 1178 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 52 (2016) ...........................17, 19

23

24

*Perry v. Sindermann*,
    408 U.S. 593 (1972).....................................................................................................17, 18

25

*Ramirez Medina v. U.S. Dep't of Homeland Sec.*,
    2017 WL 5176720 (W.D. Wash. Nov. 8, 2017) ..........................................................10, 20

26

27

28

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES** *(continued)*

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
  499 F.3d 1108 (9th Cir. 2007)...................................................................................10, 12

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
  Case No. 3:17-CV-05211-WHA (N.D. Cal. Jan. 9, 2018)..........................................1, 8

*Republic of the Philippines v. Marcos*,
  862 F.2d 1355 (9th Cir. 1988)..............................................................................................9

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013)............................................................................................24

*Sameena Inc. v. U.S. Air Force*,
  147 F.3d 1148 (9th Cir. 1998)............................................................................................16

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014)..............................................................................................16

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
  836 F.3d 42 (D.C. Cir. 2016) ............................................................................................18

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ..............................................................................................................11

*Shirrod v. Dir., Office of Workers' Comp. Programs*,
  809 F.3d 1082 (9th Cir. 2015)............................................................................................12

*Singh v. Bardini*,
  2010 WL 308807 (N.D. Cal. Jan. 19, 2010) ....................................................................20

*Singh v. Vasquez*,
  2009 WL 3219266 (D. Ariz. Sept. 30, 2009), *aff'd*, 448 F. App'x 776 (9th Cir.
  2011) .....................................................................................................................................21

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015)..............................................................................................16

*Toor v. Lynch*,
  789 F.3d 1055 (9th Cir. 2015)............................................................................................11

*United States v. Garcia*,
  151 F.3d 1243 (9th Cir. 1998)............................................................................................14

*Valle del Sol, Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013)............................................................................................24

**TABLE OF AUTHORITIES** *(continued)*

Page

*Vitarelli v. Seaton*,
  359 U.S. 535 (1959)....................................................................................16

*Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*,
  24 F.3d 56 (9th Cir. 1994).....................................................................19, 20

*Winter v. Nat'l Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................9

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................9, 10

8 U.S.C. § 1182(a)(9)(B)–(C) ...........................................................................22

**Regulations**

8 C.F.R. § 236.1(c)(8) (2017) .........................................................................5, 7

**Other Authorities**

The Associated Press, *Excerpts from AP Interview with President Donald Trump*, U.S.
  News & World Report (Apr. 21, 2017), https://goo.gl/xsqHj3....................................20

Jonathan Blitzer, *A Case That Could Determine the Future for Dreamers*, The New
  Yorker (Mar. 15, 2017), https://goo.gl/SWDUhs ...................................................7, 13

Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on
  Immigration*, Politico (Mar. 29, 2017), https://goo.gl/TqyWrn ...................................20

1

### I.  INTRODUCTION

2        Plaintiff Daniel Ramirez Medina was wrongly stripped of his DACA status and work

3   authorization by the government, and faces the prospect of removal and separation from his family

4   due to Defendants' unlawful actions.  And now, Defendants' wrongs prevent Mr. Ramirez from

5   taking advantage of a recently issued nationwide injunction, applicable to all DACA recipients, that

6   would allow him to extend his DACA status and work authorization for another two-year period.

7        Mr. Ramirez accepted the quid pro quo the government offered him in applying for and

8   renewing DACA status, and he played by the rules of the program.  He stepped forward, provided the

9   government sensitive personal information, passed multiple DHS background checks, paid

10  substantial fees, and stayed out of trouble.  Through DACA, Mr. Ramirez was able to provide for his

11  family and rest easy knowing that he would not be arrested or detained based solely on his

12  immigration status.  But on February 10, 2017, the government broke its deal with Mr. Ramirez by

13  unlawfully arresting him and revoking his DACA status, detaining him for weeks without cause, and

14  trying to justify its wrongdoing with false and unsubstantiated claims that he was a gang member.

15  The government has not made amends for—or even admitted—its wrongdoing, and Mr. Ramirez

16  continues to suffer from this arbitrary and unlawful conduct.

17       Compounding Mr. Ramirez's ongoing harm and heightening the need for immediate

18  injunctive relief is the fact that on January 9, 2018, a court in the Northern District of California

19  issued a preliminary injunction requiring the government to maintain the DACA program on a

20  nationwide basis and to allow DACA recipients to renew their DACA status.  *Regents of the Univ. of*

21  *Cal. v. U.S. Dep't of Homeland Sec.*, Case No. 3:17-CV-05211-WHA, Dkt. 234, Order, at 43 (N.D.

22  Cal. Jan. 9, 2018) (the "Injunction").  The court recognized that, "[b]efore DACA, [DACA holders],

23  brought to America as children, faced a tough set of life and career choices turning on the

24  comparative probabilities of being deported versus remaining here.  DACA gave them a more

25  tolerable set of choices, including joining the mainstream workforce.  Now, absent an injunction, they

26  will slide back to the pre-DACA era and associated hardship." *Id*.

27       Mr. Ramirez is in this precise predicament—the Defendants' wrongful conduct has forced

28  him "back to the pre-DACA era and associated hardship" of not being able to work and support his

family, and of being threatened with exile, despite the deal he made with the government.  Without immediate relief from this Court, Mr. Ramirez cannot benefit from the Injunction, as Defendants wrongfully stripped him of his DACA status, and thus he cannot seek renewal of that status pursuant to the Injunction, or otherwise receive the benefits of DACA status.

Mr. Ramirez respectfully requests that this Court order the government to reinstate Mr. Ramirez's DACA status and his work permit.  Other district courts throughout the country—including two in the Ninth Circuit—have granted similar injunctions in recent months, recognizing the serious harm that wrongfully terminating DACA causes to those who meet the program's criteria.[1]  The case before this Court is no different and presents similar, if not more compelling circumstances, warranting immediate relief.

## II.  BACKGROUND

### A.      The establishment of DACA

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum").  Dkt. 78-3, at 1.  Under DACA, individuals who were brought to the United States as young children and meet certain specific criteria may request deferred action for a period of two years, subject to renewal.  In exchange, applicants are required to provide the government with highly sensitive personal information, submit to a rigorous background check, and pay a considerable fee.  The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."  *Id.* at 1–2.

Like other forms of deferred action, DACA serves the government's interests by allowing the government to prioritize its resources and exercise discretion for its own convenience and to advance sound policies.  As the government has recognized, our nation "continue[s] to benefit . . . from the

---

[1]      *See Inland Empire-Immigrant Youth Collective v. Duke*, 2017 WL 5900061, at *10 (C.D. Cal. Nov. 20, 2017) (enjoining "USCIS's decision to terminate Plaintiff's status under [DACA]"); *Gonzalez Torres v. U.S. Dep't of Homeland Sec.*, 2017 WL 4340385, at *7 (S.D. Cal. Sept. 29, 2017) (same); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1344–45 (N.D. Ga. June 12, 2017) (same).

contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."  Dkt. 78-2, at 2 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

### 1.     The DACA application process

To apply for DACA, applicants must submit extensive documentation establishing that they meet the criteria.  Dkt. 78-1, at 9–15 (USCIS DACA FAQs, Q28–41).  They must also undergo a thorough background check, in which DHS reviews the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies."  *Id.* at 7 (USCIS DACA FAQs, Q23).  If any information "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant is ineligible for DACA absent "exceptional circumstances."  *Id.* at 23 (USCIS DACA FAQs, Q65).

Indicators that an individual poses a safety threat include "gang membership."  *Id.* Accordingly, "[a]ll DACA requests presenting information that the requestor is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU)."  Dkt. 78-5, at 1 (Letter from USCIS Director León Rodríguez to Senate Judiciary Committee Chairman Charles E. Grassley (Apr. 17, 2015)) ("USCIS Letter").  If gang membership is confirmed, the DACA application is denied absent a determination by USCIS that an exception should be made given the totality of the circumstances.  *Id.* at 2.  In 2015, USCIS conducted an additional screening of all individuals granted deferred action under DACA—including Mr. Ramirez—"to identify records that contained information indicating known or suspected gang association."  *Id.* at 4.

### 2.     Limitations on revoking an individual's DACA status

DHS's "National Standard Operating Procedures" set forth strict guidelines for revoking DACA status.  *See* Dkt. 78-6 ("DACA SOP").  Most relevant, before revoking DACA, the government must provide a "Notice of Intent to Terminate" ("NIT") which "thoroughly explain[s]" the grounds for the proposed DACA termination.  *Id.* at 132 and Appendix I.  The DACA SOP then directs that individuals served with an NIT are to be afforded "33 days to file a brief or statement contesting the grounds cited in the [NIT]" before their DACA status is terminated.  *Id.* at 132.

The exception to the requirements of notice and an opportunity to respond is where there are

"criminal, national security, or public safety concerns" that "are deemed to be EPS." *Id.* at 132–33. The DACA SOP defines EPS—which stands for "Egregious Public Safety Concern"—as "[a]ny case where routine systems and background checks indicate that an individual is under investigation for, has been arrested for (without disposition), or has been convicted of, a specified crime, including but not limited to, murder, rape, sexual abuse of a minor, trafficking in firearms or explosives, or other crimes listed in the November 7, 2011 [USCIS policy memorandum regarding the issuance of NTAs ("USCIS NTA Memorandum")]." *Id.* at 8.

Additionally, when ICE encounters an individual who may be eligible for DACA, the agency uses a prosecutorial discretion checklist.  Dkt. 93, at 5 ("ICE AR").  This checklist provides that if the "only basis for ineligibility is an alleged . . . threat to national security or public safety," the agents should "consult with the [ICE Office of Chief Counsel]." *Id.* (emphasis omitted).

**B.    Mr. Ramirez benefitted from his DACA status**

**1.    Mr. Ramirez was twice granted DACA status**

In late 2013, Mr. Ramirez first applied for deferred action and work authorization pursuant to DACA.  Dkt. 78-15 ¶ 3 (Declaration of Daniel Ramirez Medina ("Ramirez Decl.")).  As part of this process, Mr. Ramirez provided the government with his birth certificate, school records, and information about where he lived, and was required to attend a biometrics appointment so that USCIS could take his fingerprints and photographs. *Id.*  Mr. Ramirez was granted deferred action and work authorization in 2014. *Id.* ¶ 6.  In 2016, Mr. Ramirez reapplied for DACA, and was again granted deferred action and work authorization after being once again subject to rigorous vetting. *Id.* ¶ 9.

The government sent Mr. Ramirez an approval notice (the "2016 Approval Notice"), providing that, "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years" and is valid to May 4, 2018.  Dkt. 78-7.  The 2016 Approval Notice advised Mr. Ramirez that his deferred action could be terminated if he engaged in "[s]ubsequent criminal activity." *Id.*  DHS has therefore confirmed on three separate occasions that Mr. Ramirez does not pose a threat to national security or public safety—first in 2014, when he applied for DACA; then again in 2015, when USCIS conducted an additional screening of all DACA beneficiaries; and finally in 2016, when he reapplied for DACA.  This finding was again confirmed by the government's lawyer on March 28,

2017, when he stated in immigration court that the government had no evidence that Mr. Ramirez was a threat to public safety.  And two different immigration judges made findings that Mr. Ramirez 1) was not a threat to public safety, and 2) was not a gang member.[2]  Declaration of Nathaniel L. Bach ("Bach Decl.") ¶ 2; Dkt. 78-22, at 1 (Notice to EOIR); *see also* 8 C.F.R. § 236.1(c)(8) (2017).

### 2. Mr. Ramirez received many benefits from DACA

DACA confers many benefits beyond deferred action, many of which Mr. Ramirez received and took advantage of.  Ramirez Decl. ¶¶ 5-7.  These benefits include work authorization, eligibility for public benefits such as Social Security, retirement, and disability and, under Washington law, unemployment insurance, financial aid, and food assistance.  SAC ¶¶ 28-29, 32.  DACA also allows beneficiaries access to other important benefits, enabling recipients to open bank accounts, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable to them.  *See* SAC ¶¶ 30–31.  Accordingly, revocation of DACA implicates a broad range of valuable benefits that include, but extend well beyond, the immigration context.

### C. The government's unlawful and arbitrary conduct

### 1. Mr. Ramirez's unlawful arrest and detention

On February 10, 2017, a team of ICE agents arrested Mr. Ramirez's father outside of the apartment where Mr. Ramirez, his father, and his brother were then living.  Ramirez Decl. ¶ 14.  The ICE agents then entered the apartment and began to question Mr. Ramirez.  He told the agents his name and birthdate, and that he was born in Mexico.  *Id.* ¶ 15.  At this point, one of the agents handcuffed Mr. Ramirez.  *Id.*  Mr. Ramirez told the ICE agents repeatedly that he had a valid work permit, but the ICE agents refused to release him.  *Id.*  Mr. Ramirez's father also repeatedly told the ICE agents that Mr. Ramirez had a valid work permit, and questioned why he was being detained. Dkt. 78-16 ¶ 11 (Declaration of Josue L. ("Josue L. Decl.")).  The ICE agents did not ask any questions at the apartment regarding whether Mr. Ramirez was involved with a gang, nor did they ask him about his tattoo.  Ramirez Decl. ¶ 16.  Despite being told repeatedly that Mr. Ramirez was authorized to be in the United States, the agents took him into custody and brought him to a holding

---

[2]    Relevant portion of January 17 ,2018 Immigration Court hearing transcript will be submitted to the Court once it becomes available to counsel.

facility in Tukwila, Washington. *Id.* ¶¶ 16–17; *see also* Dkt. 78-8, at 3 ("Form I-213").

At the holding facility, the ICE agents confiscated Mr. Ramirez's work permit. Ramirez Decl. ¶ 17. This permit was marked with a "C33" designation, which identified Mr. Ramirez as a DACA recipient with work authorization. *See* Dkt. 78-6, at 112. The ICE agents also fingerprinted Mr. Ramirez and used this information to access his records, which revealed that Mr. Ramirez had no criminal history, had twice been granted DACA status, and possessed valid employment authorization through May 4, 2018. *See* Ramirez Decl. ¶ 17. When Mr. Ramirez again protested that he had a work permit, he was told by Defendants' agents that it did not matter because he "was not from the United States." *Id.* Defendants subsequently cited Mr. Ramirez's receipt of DACA as evidence of his "illegal" status in the Form I-213. Form I-213 at 3.

The ICE agents further interrogated Mr. Ramirez, asking him at least five times whether he was in a gang, and each time he denied any gang affiliation. Ramirez Decl. ¶¶ 19–22. The ICE agents repeatedly pressed him as to whether he had ever known anyone who was a gang member. *Id.* Under pressure from the agents' aggressive interrogation, Mr. Ramirez told them that, when he was in high school, he used to "hang out with" some people who were in gangs, but that he himself was not gang affiliated and never had been. *Id.* ¶ 22.

The ICE agents also interrogated Mr. Ramirez about the tattoo on his forearm. *Id.* ¶ 23. He got this tattoo when he was 18 years old, before he first applied for DACA. *Id.* The tattoo consists of the words "La Paz – BCS"—his birthplace in Baja California Sur—and a nautical star. *Id.* ¶¶ 23–24. During the interrogation, one of the ICE agents said that if Mr. Ramirez was from Fresno, he was "definitely a gang member" because everyone in Fresno is a member of the "bulldogs" gang, and that Mr. Ramirez's tattoo was a "bulldogs" tattoo. *Id.* ¶¶ 21–25. Mr. Ramirez repeatedly told the ICE agents that the tattoo is not a gang tattoo, but they refused to believe him. *Id.* ¶ 25.

Mr. Ramirez was then transferred to Northwest Detention Center, where he remained in custody for the next 47 days. Pursuant to an order of this Court, Mr. Ramirez received a bond hearing in Immigration Court on March 28, 2017. *See* Dkt. 69, at 3. At the bond hearing, the government did not offer any evidence to show that Mr. Ramirez a gang member and instead conceded that Mr. Ramirez is not a danger to the community. Bach Decl. ¶ 2 ("I don't believe from

1    this record there is enough for us to argue that he's a danger to the community . . . .").  The

2    Immigration Judge concluded that Mr. Ramirez is neither a flight risk nor a danger to the community

3    and should be released on bond.  Dkt. 78-22, at 1 (Notice to EOIR); *see also* 8 C.F.R. § 236.1(c)(8)

4    (2017).  Mr. Ramirez was released on March 29, 2017.  Dkt. 78-22, at 1.

5         Defendants have not produced any evidence to support their false claim that Mr. Ramirez is

6    "gang affiliated."  Indeed, Mr. Ramirez's attorneys have repeatedly asked the government to produce

7    any evidence to establish that Mr. Ramirez is a gang member, but Defendants failed to do so time and

8    again.  Declaration of Mark D. Rosenbaum, ¶¶ 4-7.  And Mr. Ramirez has submitted extensive

9    evidence demonstrating that he is not, and never has been, a gang member.  In addition to evidence

10   demonstrating that he successfully passed three separate DHS background checks, Mr. Ramirez

11   submitted numerous sworn declarations attesting to the fact that he has never had any gang

12   affiliation.  *E.g.*, Ramirez Decl. ¶¶ 19–20; Josue L. Decl. ¶ 4; Dkt. 78-17 ¶¶ 8–9 (Declaration of Luz

13   L.); Dkt. 78-18 ¶ 8 (Declaration of Nancy L.).

14        Additionally, three independent experts rebutted Defendants' claims that Mr. Ramirez is gang

15   affiliated.  Martin Flores, who has served as a gang expert in more than 700 cases, stated that he has

16   "never seen a gang member with a similar tattoo nor would [he] attribute this tattoo to have any gang-

17   related meaning."  Dkt. 78-19 ¶ 11 (Declaration of Martin M. Flores ("Flores Decl.")).  Another gang

18   expert, Dr. Edwina Barvosa, similarly stated that there is "no apparent evidence that Mr. Ramirez

19   Medina has ever been a gang member himself."  Dkt. 78-20 ¶ 10 (Declaration of Edwina Barvosa,

20   PhD ("Barvosa Decl.")).  And Carlos García, a Mexican researcher who has written extensively on

21   gangs in California and Central America, noted that "'[a]ny argument about gang ties based on

22   [Mr. Ramirez's] tattoo is weak at best; this tattoo does not show any gang affiliation.'"  Dkt. 78-21, at

23   4 (Jonathan Blitzer, *A Case That Could Determine the Future for Dreamers*, The New Yorker (Mar.

24   15, 2017), https://goo.gl/SWDUhs).

25        **2.    The unlawful and arbitrary revocation of Mr. Ramirez's DACA status**

26        Defendants issued a Notice to Appear on February 10, 2017, alleging as the basis for removal

27   that Mr. Ramirez was unlawfully present in the United States.  Dkt. 78-9, at 1 ("NTA").  USCIS sent

28   Mr. Ramirez a Notice of Action dated February 17, 2017.  Dkt. 78-10, at 1 ("NOA").  The NOA

states that Mr. Ramirez's deferred action and employment authorization terminated "automatically" on the date the NTA was issued, and provides that "[a]n appeal or motion to reopen/reconsider this notice of action may not be filed." *Id.*

As explained above, DHS policy requires the government to provide an NIT and 33 days for a response prior to terminating DACA status, unless the case involves an EPS issue.  DACA SOP at 132 and Appendix I.  Mr. Ramirez was never provided with an NIT, nor was he given 33 days—or any time at all—to respond to such a notice or otherwise contest the revocation of his DACA status or work permit.  The government's own records demonstrated that Mr. Ramirez had "no criminal history" and the various database checks run at the time of his arrest did not reflect any flags or investigations, making any claim on the government's part that this was an EPS case highly unlikely. Form I-213 at 4.  Further, the ICE officers who arrested Mr. Ramirez failed to consult with the Office of Chief Counsel for further review, as is required where a purported "threat to . . . public safety" is the reason for DACA ineligibility.  ICE AR at 5 (emphasis omitted).[3]

Defendants' arbitrary decision and failure to follow their own procedures resulted in tremendous, and entirely avoidable, harm to Mr. Ramirez.  One of the primary purposes of such procedures is to prevent errors like those that occurred here, which can have life-altering consequences for DACA recipients and their families.  Here, Mr. Ramirez—a young father the government now admits is no threat to public safety—was kept behind bars for more than six weeks and is being deprived of the ability to earn a living and support his family, as well as the other benefits that DACA status provides, like protection from the removal now facing him because of the removal order issued on January 17, 2018.[4]  *See* Third Suppl. Decl. of Ramirez Medina ¶ 2.

---

[3]   The checklist provides that consultation with the Office of Chief Counsel is required when an alleged public safety concern is the "only basis for ineligibility."  ICE AR at 5.  Here, the ICE agents checked boxes for public safety concerns and lack of enrollment in school.  *Id.*  However, under USCIS policy, Mr. Ramirez was not required to be enrolled in school after his initial request for DACA was approved.  *See* USCIS DACA FAQs, Q54.

[4]   Other courts have held that the government is violating its own procedures in revoking DACA.  *See Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA, Dkt. 111, Mot. For Prelim. Inj. (N.D. Cal. Nov. 1, 2017) (and related cases); *Coyotl*, 261 F. Supp. 3d at 1343 (enjoining decision to terminate Plaintiff's DACA status and noting that government agencies "failed to present any evidence that they complied with their own administrative processes and procedures with regard to the termination of Plaintiff's DACA status"); *Montes Bojorquez v. CBP*, No. 3:17-cv-00780-GPC-NLS, Dkt. 29-1, Mot. for Prelim. Inj. at 22 (S.D. Cal. July 17, 2017) (alleging that DHS unlawfully expelled plaintiff from United States and then "use[d] their own wrongful conduct as a predicate" to revoke his DACA status).

### III.  LEGAL STANDARD

A preliminary injunction is warranted where the plaintiff establishes that (1) he is "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" tips in his favor, and (4) an "injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

In addition, under the Ninth Circuit's sliding scale approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as" the irreparable injury and public interest elements are satisfied. *All. for the Wild Rockies*, 632 F.3d at 1135 (internal quotation marks omitted).  In other words, "[i]f the balance of harm tips decidedly toward [Mr. Ramirez], then [he] need not show as robust a likelihood of success on the merits as when the balance tips less decidedly."  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (internal quotation marks omitted).

### IV.  ARGUMENT

**A.     Mr. Ramirez is likely to succeed on the merits.**

Mr. Ramirez is likely to establish that the government's revocation of his DACA status and work authorization violated the APA in several ways.  Specifically, the government violated the APA because its conduct was: (1) "arbitrary, capricious, [and] an abuse of discretion," SAC ¶¶ 85–89; (2) contrary to its own internal operating procedures and therefore in violation of the *Accardi* doctrine, *id.* ¶ 90; and (3) in violation of Mr. Ramirez's rights under the Due Process Clause, *id.* ¶¶ 92–105.

**1.     The revocation of Mr. Ramirez's DACA status was arbitrary and capricious.**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts,* 505 U.S. 788, 796 (1992).  To ensure that agency actions are reasonable and lawful, a court must conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971).  A court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Butte*

*Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010).

Agency action is "arbitrary and capricious" if the agency "[1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

While the government asserted "that it is allowed to withdraw DACA at any time for no reason at all," *Ramirez Medina v. U.S. Dep't of Homeland Sec.*, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017), the APA nevertheless requires the government to "exercise its discretion in a reasoned manner" and make discretionary decisions "based on non-arbitrary, 'relevant factors,'" *Judulang v. Holder*, 565 U.S. 42, 53, 55 (2011).  Indeed, the Supreme Court emphasized that, even where agencies retain substantial discretion, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."  *Id.* at 53.  In such circumstances, courts "must assess, among other matters, 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (citation and internal punctuation omitted).[5]  That task "involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Id.* (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting "the requirement that an agency provide reasoned explanation for its action")).  Here, the government's abrupt and unsupported decision to revoke Mr. Ramirez's DACA was arbitrary, capricious, and unlawful for multiple reasons.  5 U.S.C. § 706(2)(A).

---

[5]    The Supreme Court's decision in *Judulang* is especially instructive.  There, the Court considered a Board of Immigration Appeals ("BIA") rule governing eligibility for suspension of deportation.  565 U.S. at 46–47.  The Court made clear that, although the relief was ultimately within the agency's discretion, "the BIA's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Id.* at 55.  The Court emphasized that "[a] method for disfavoring deportable aliens . . . that neither focuses on nor relates to an alien's fitness to remain in the country—is arbitrary and capricious." *Id.*  Ultimately, the Court invalidated the BIA rule because it was based on "a matter irrelevant to the alien's fitness to reside in this country," and concluded that the BIA therefore "has failed to exercise its discretion in a reasoned manner." *Id.*

### a. Defendants' reliance on unlawful presence was arbitrary and capricious.

The government's one-page NOA states that Mr. Ramirez's DACA and employment authorization were "terminated automatically" based upon the issuance of a NTA. NOA at 1. The NTA, in turn, alleges only that Mr. Ramirez is subject to removal as "an alien present in the United States without being admitted or paroled." NTA at 1. But lack of lawful immigration status is a *predicate* to DACA eligibility and common among every DACA recipient. For this reason, "the issuance of an NTA charging presence without admission does not provide a reasoned basis for terminating DACA." *Inland Empire*, 2017 WL 5900061, at *6 (internal quotation marks omitted). On the contrary, the government's failure to provide any reasoning in the NTA or NOA for "automatically" terminating Mr. Ramirez's DACA demonstrates that its decision was arbitrary and irrational. *See id.* at *7 ("[G]iven that *all* DACA recipients are necessarily removable due to their unauthorized presence, '[t]he agency's reliance on an NTA citing [Plaintiff's] presence without admission simply fails to explain, much less justify, the agency's decision to reverse course and terminate his DACA." (citation omitted)): *cf. Gonzalez Torres*, 2017 WL 4340385, at *6. For this reason alone, Mr. Ramirez is likely to succeed on the merits of his APA claim.

### b. Defendants' claim that Mr. Ramirez poses an egregious public safety concern is contradicted by the administrative record.

The government's rationalizations for revoking Mr. Ramirez's DACA status—none of which appears on the face of the NTA or the NOA—are also insufficient, as they are contradicted by the administrative record. It is black letter law that courts review agency action according to the contemporaneous reasons given by the agency, and disregard any alternative rationales presented during litigation. *See Overton Park*, 401 U.S. at 419; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). The Ninth Circuit further explained that "[t]he rule barring consideration of *post hoc* agency rationalizations operates where an agency has provided a particular justification for a determination at the time the determination is made, but provides a different justification for that same determination when it is later reviewed by another body." *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997).[6] Moreover, agency action is arbitrary and capricious if the

---

[6]   *Accord Toor v. Lynch*, 789 F.3d 1055, 1064 (9th Cir. 2015) (agency action may only be affirmed based on the

Gibson, Dunn &
Crutcher LLP

contemporaneous reasons underlying the decision "run[] counter to the evidence before the agency." *Ranchers Cattlemen*, 499 F.3d at 1115 (internal quotation marks omitted).

The government asserts that ICE officers determined—based on information obtained during his arrest—that Mr. Ramirez was "affiliated with a gang" and that his DACA was therefore subject to immediate termination on EPS grounds.  *See, e.g.*, Dkt. 90, at 18 (Motion to Dismiss); *see also id.* at 6 ("ICE may issue an NTA if a disqualifying criminal offense or public safety concern, deemed to be an Egregious Public Safety ('EPS') issue, arises after removal has been deferred under DACA." (footnote omitted)).  But any such conclusion—which is fundamentally at odds with multiple prior analyses concluding that Mr. Ramirez did not present an EPS threat—plainly "runs counter to the evidence before the agency" and presents the sort of inconsistency that is the hallmark of arbitrary action.  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016) (internal quotation marks omitted).

***First***, the administrative record does not support the assertion that the information available to ICE—including information gained "through Plaintiff's arrest and detention process"—indicated Mr. Ramirez was a gang member or was "affiliated with a gang." Dkt. 90, at 18.  According to the Form I-213, an ICE field agent purportedly determined that Mr. Ramirez "does not qualify" for DACA "due to gang association." Form I-213 at 3; *see also* ICE AR at 25.  But the Form I-213 includes only the following conclusory paragraph regarding purported "gang activity":

> Subject was asked if he is or has been involved with any gang activity. Subject stated "No not no more".  Subject was questioned further regarding the gang tattoo on his forearm.  Subject then stated that he used to hang out with the Sureno's in California.  Subject stated that he fled California to escape from the gangs.  Subject stated that he still hangs out with the Paizas in Washington State.

Form I-213 at 3.[7]  These assertions—even if they were true—do not support the conclusion that Mr. Ramirez is gang-affiliated.  For example, although the Form I-213 asserts (without explanation) that

contemporaneous "explanations offered by the agency") (internal quotation marks omitted) (quoting *Arrington v. Daniels*, 516 F.3d 1106, 1112–13 (9th Cir. 2008)); *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1087 n.4 (9th Cir. 2015) (court must "review only what [the agency] did, not what [it] could have done").

[7]   All references herein are to the first-filed Form 1-213. As this Court has recognized, the government has submitted two different 1-213 forms, both of which purport to be signed on the same day, by the same person, but the second-filed of which omits language that is harmful to the government's defense. *See* Dkt 93, at ICE CAR 000023–29. This conduct is a prime example of the government's shifting narrative and lack of real evidence to support their contentions.

Mr. Ramirez had a "gang tattoo," the tattoo in question consists merely of the words "La Paz – BCS" and a nautical star.  "La Paz" is Mr. Ramirez's birthplace, "BCS" stands for Baja California Sur (the region in which La Paz is located), and the nautical star is a popular symbol.  Indeed, Martin Flores, who has served as a gang expert in more than 700 cases, indicated that he has "never seen a gang member with a similar tattoo nor would [he] attribute this tattoo to have any gang-related meaning." Flores Decl. ¶ 11.[8]  And despite being confronted with contrary evidence, the government has offered no explanation, let alone evidence (contemporaneous or otherwise) to support its assertion that the tattoo in question is a "gang tattoo."  Similarly, the claims that Mr. Ramirez "*used to hang out* with the Sureno's in California," "fled California to escape from the gangs," and "still *hangs out* with the Paizas in Washington State" do not support the conclusion he was affiliated with any gang, as opposed to just having known gang-affiliated individuals (which cannot be avoided for individuals living in certain neighborhoods).  Barvosa Decl. ¶ 9; *see also* Ramirez Decl. ¶ 22.

And none of these vague assertions was remotely sufficient to rebut or supersede the formal findings of three separate DHS background checks, spread over two years, including the additional screening of all DACA recipients that was *specifically* meant to uncover evidence of "known or suspected gang association."  USCIS Letter at 4.  The careful and thorough vetting and the ultimate findings of these three separate background checks cannot be overridden or ignored based upon "the fortuity of an individual official's decision" regarding gang activity.  *Judulang*, 565 U.S. at 58; *cf. id.* (reversing agency decision where "[a]n alien appearing before one official may suffer deportation[, while] an identically situated alien appearing before another may gain the right to stay in this country"); *cf. also Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947) (recognizing the "high and momentous" stakes for an immigrant who has long resided in this country, and reversing a decision that would "make his right to remain here dependent" on "fortuitous and capricious" circumstances).

Underscoring Defendants' bad faith efforts to fabricate this *post hoc* justification is the government's recent evidentiary submission made to the Immigration Court in connection with Mr.

---

[8]   Two other experts have also opined that Mr. Ramirez is not associated with a gang.  Barvosa Decl. ¶ 10 (stating that there is "no apparent evidence that Mr. Ramirez Medina has ever been a gang member himself"); Blitzer, *supra* (quoting expert Carlos García as explaining that "[a]ny argument about gang ties based on [Mr. Ramirez's] tattoo is weak at best; this tattoo does not show any gang affiliation").

1   Ramirez's January 17, 2018 hearing.  The so-called evidence proffered amounts to nothing more than

2   random articles regarding gang membership that bear no relation to Mr. Ramirez and stand for

3   nothing more than the abstract propositions that gang members often do not willingly admit gang

4   membership, and that some gangs discourage their members from obtaining tattoos.  Bach Decl. ¶ 5,

5   at 37, 42 (DHS's Second Submission of Evidence).  In any event, many of those articles relate to

6   Central American gangs (from El Salvador, Guatemala or Honduras), and Mr. Ramirez is from

7   Mexico.  *Id.* at  40–43.  Without evidence of gang affiliation, the government has apparently shifted

8   tactics to claiming that Mr. Ramirez's denials of gang affiliation and *absence* of gang tattoos should

9   be considered evidence of gang affiliation.  These attempts were rightly rejected by the Immigration

10  Judge, who made a specific finding that Mr. Ramirez is not a gang member.[9]

11          ***Second***, even if the evidence did suggest that Mr. Ramirez "was affiliated with a gang," Dkt.

12  90, at 18, which it does not, the further conclusion that Mr. Ramirez ***presented an EPS issue*** would

13  still "run[] counter to the evidence before the agency."  *Ctr. for Biological Diversity*, 833 F.3d at

14  1146 (internal quotation marks omitted).  Importantly, under the governing DACA SOP, an

15  individual presents an EPS issue only when "routine systems and background checks indicate that [he

16  or she] [1] is under investigation for, [2] has been arrested for (without disposition), or [3] has been

17  convicted of, ***a specified crime***, including but not limited to, murder, rape, sexual abuse of a minor,

18  trafficking in firearms or explosives, ***or other crimes*** listed in the November 7, 2011 [USCIS NTA

19  Memorandum]."  DACA SOP at 8 (emphases added).  Here, nothing in the administrative record

20  suggests that, at the time of his unlawful arrest—or at any other time—"routine systems and

21  background checks" indicated Mr. Ramirez was "under investigation for," "arrested for," or

22  "convicted of" any "specified crime."  *See* Form I-213 at 1–4.[10]  Indeed, the government does not

23  argue otherwise.  Rather, as stated above, the government maintains only that "information [obtained]

24  through Plaintiff's arrest and detention process, including interviews with Plaintiff," "suggested . . .

25

26      ───────────────
        [9]    *See* n.2, *supra*.

27      [10]    Neither gang membership nor gang affiliation is a "crime." *United States v. Garcia*, 151 F.3d 1243, 1244 (9th Cir.
        1998) ("[G]ang membership itself cannot establish guilt of a crime."); *Munoz v. Rowland*, 104 F.3d 1096, 1098 (9th Cir.
28      1997) ("Associating with gang members is not . . . a crime."); *cf.* USCIS NTA Mem. at 3 (statutory definitions for crimes
        qualifying as EPS).

1   that [Plaintiff] was **_affiliated_** with a gang." Dkt. 90, at 18 (emphasis added).  But gang affiliation

2   does not fall within the narrow exception for EPS cases under the DACA SOP.

3          The record shows that Mr. Ramirez had "no criminal history," and that checks run at the time

4   of his arrest did not reflect any flags or investigations.  *See* Form I-213 at 3.  Indeed, the

5   government's more recent admission that Mr. Ramirez presents no "danger to the community," *see*

6   Bach Decl. ¶ 2 ("I don't believe from this record there is enough for us to argue that he's a danger to

7   the community . . . ."), fatally undermines its claim that Mr. Ramirez presents an "Egregious Public

8   Safety" issue, especially where its own guidelines reserve that classification for extreme cases

9   involving *actual* crimes, like murder, rape, or trafficking in explosives.  Any conclusion to the

10  contrary runs counter to the evidence before the government at the time it terminated Mr. Ramirez's

11  DACA, and should be disregarded.[11]  At worst, Mr. Ramirez is guilty of having a tattoo.

12         For all these reasons, DHS's decision to terminate Mr. Ramirez's DACA was arbitrary and

13  capricious and in violation of the APA.  *See, e.g.*, *Abdur-Rahman v. Napolitano*, 814 F. Supp. 2d

14  1098, 1110 (W.D. Wash. 2011) (revocation of approved petition to support noncitizen's permanent

15  resident status was "arbitrary and capricious" where "agency failed to articulate a rational explanation

16  for its decision").

17         **2.      Defendants violated the APA by failing to follow their own internal procedures**

18         Defendants also acted unlawfully and violated the *Accardi* doctrine as they failed to adhere to

19  their own internal operating procedures by summarily revoking Mr. Ramirez's DACA status and

20  work authorization.  *See Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th

21  Cir. 1990) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).

22  "Pursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal

23  operating procedures." *Id.*  And in the Ninth Circuit, the *Accardi* doctrine "extends beyond formal

24  regulations," to include "internal operating procedures," "[h]andbook[s]," "policy statement[s],"

---

[11]    At times in this litigation, *e.g.*, Dkt. 90, at 17, the government has improperly relied upon a prior, now-superseded definition of EPS that includes those who are (1) "under investigation for" being (2) "**_known or suspected street gang members_**," *id.* (internal quotation marks omitted; emphasis added).  This earlier definition, which is drawn from the 2011 USCIS NTA Memorandum (issued before DACA was established), is inapplicable here, because the subsequently issued DACA SOP excludes gang membership from the definition of EPS.  *See* DACA SOP at 8 (incorporating only certain enumerated "*crimes*" into the definition of EPS) (emphasis added).

"Order[s]," "Standards," "Directive[s]," "Weekly Bulletin[s]," and unpromulgated rules documenting "usual practice." *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004) (internal quotation marks omitted; citing cases).[12]  As discussed above, DACA operates under strict guidelines, and the determinations at issue here are nondiscretionary.  *Texas v. United States*, 809 F.3d 134, 172–73 (5th Cir. 2015); *Coyotl*, 261 F. Supp. 3d at 1340.

Here, it is undisputed that Defendants failed to provide Mr. Ramirez with either an NIT or any opportunity—let alone 33 days—to contest the allegations against him prior to revoking his DACA status.  In addition, the ICE officers who arrested Mr. Ramirez also failed to comply with the requirements of the ICE prosecutorial discretion checklist.  In particular, the officers did not consult with the Office of Chief Counsel for further review, as required where a purported "threat to . . . public safety" is the reason for DACA ineligibility.  ICE AR at 5 (emphasis omitted).  These failures violated DHS's internal guidelines, and, therefore, the *Accardi* doctrine.  *See* DACA SOP at 132–33; *see also Inland Empire*, 2017 WL 5900061, at *6–8; *Gonzalez Torres*, 2017 WL 4340385, at *5–6.

The government's undisputed failure to follow the "usual" DACA procedures, *Coyotl*, 261 F. Supp. 3d at 1337, cannot be justified by its "post hoc" reliance on inapplicable EPS guidelines.  *See Overton Park*, 401 U.S. at 419; *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014).  And indeed, as other district courts have recognized, the government cannot bypass the comprehensive requirements of the DACA SOP by overturning USCIS's reasoned decision on an individual officer's whim.  *See Inland Empire*, 2017 WL 5900061, at *7–8 ("[N]othing in the Napolitano Memo supports the notion that, once USCIS implemented the DACA adjudication process and made a considered judgment to grant an individual DACA, the decision could be unilaterally undone by any ICE or CBP officer—indeed, if such were the case, then the SOPs' careful

---

[12]   Indeed, *Accardi* itself was about the exercise of discretion in immigration removal proceedings.  *Accardi*, 347 U.S. at 261.  And courts have applied *Accardi* and its principles in a wide variety of administrative and civil enforcement contexts.  *See, e.g., INS v. Yang*, 519 U.S. 26, 32 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows-by rule or by settled course of adjudication-a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the [APA] . . . ."); *McDonald v. Gonzales*, 400 F.3d 684, 686 & n.5 (9th Cir. 2005) (noting that "INS is obligated to follow its own policy" when investigating potential immigration violations); *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (decision to debar government contractors); *NLRB v. Welcome-Am. Fertilizer Co.*, 443 F.2d 19, 20 (9th Cir. 1971) (NLRB enforcement action); *see also Vitarelli v. Seaton*, 359 U.S. 535, 539–40 (1959) (termination of employment for security reasons); *cf. Coyotl*, 261 F. Supp. 3d at 1340.

1  and detailed procedures governing DACA terminations would be negated." (internal quotation marks

2  omitted)); *see also Gonzalez Torres*, 2017 WL 4340485, at *6.  Because the government failed to

3  adhere to its own internal operating procedures in summarily revoking his DACA status, Mr.

4  Ramirez is likely to succeed on the merits of this claim.

5      **3.**     **Defendants violated the APA by disregarding Mr. Ramirez's Due Process rights**

6      Even assuming that Defendants complied with their own established procedures, they still

7  violated the APA by depriving Mr. Ramirez of constitutionally protected liberty and property

8  interests—including important public benefits and the ability to legally work in the United States—

9  without due process of law.  The Due Process Clause of the Fifth Amendment "protect[s] every

10  person within the nation's borders from deprivation of life, liberty or property without due process of

11  law.  Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that

12  constitutional protection."  *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc)

13  (quoting *Mathews v. Diaz*, 426 U.S. 67, 77 (1976)) (internal quotation marks omitted).

14      "[T]he first question in any case in which a violation of procedural due process is alleged is

15  whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of

16  that interest."  *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1190–91 (9th Cir. 2015), *cert.*

17  *denied*, 137 S. Ct. 52 (2016).  The property interests protected by the Due Process Clause "extend

18  beyond tangible property and include anything to which a plaintiff has a 'legitimate claim of

19  entitlement.'"  *Id*. at 1191 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77

20  (1972)).  "A legitimate claim of entitlement is created 'and [its] dimensions are defined by existing

21  rules or understandings that stem from an independent source such as state law—rules or

22  understandings that secure certain benefits and that support claims of entitlement to those benefits.'"

23  *Id.* (quoting *Roth*, 408 U.S. at 577).  This independent source may be a statute, a regulation,

24  "[e]xplicit contractual provisions," "implied" agreements, or "rules or mutually explicit

25  understandings."  *Perry v. Sindermann*, 408 U.S. 593, 601–02 (1972).  The Ninth Circuit has further

26  explained that an individual has a protected property interest in government benefits where

27  regulations "greatly restrict the discretion of the people who administer those benefits."  *Nozzi*, 806

28  F.3d at 1191 (internal quotation marks omitted).

1    Here, there is no question that Mr. Ramirez has a legitimate claim of entitlement to his DACA

2  status and the benefits that status conferred for numerous reasons.  Specifically, DHS rules and the

3  government's operation of the program, the government's communications with Mr. Ramirez

4  regarding DACA, and many government officials' public promises, collectively created an

5  understanding that Mr. Ramirez was entitled to DACA and its related benefits as long as he played by

6  the rules.  *See Perry*, 408 U.S. at 601 ("A person's interest in a benefit is a 'property' interest for due

7  process purposes if there are such rules or mutually explicit understandings that support his claim of

8  entitlement to the benefit . . . .").

9    ***First***, the rules and guidelines governing DACA, and the government's operation of the

10  program, evidence Mr. Ramirez's legitimate claim of entitlement to his DACA status and related

11  benefits.  For example, the 2012 DACA Memorandum set forth five specific criteria that defined

12  eligibility for the program, and explicitly instructed DHS agents to prevent individuals who met those

13  criteria from being apprehended or placed into removal proceedings.  Dkt. 78-3, at 1–3; *see also* Dkt.

14  78-1, at 5 (USCIS DACA FAQs, Q9) ("[I]f an individual meets the guidelines for DACA, CBP or

15  ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from

16  being apprehended, placed into removal proceedings, or removed.").  The government also operated a

17  special hotline—"staffed 24 hours a day, 7 days a week"—to assist individuals who met the DACA

18  criteria but were apprehended or placed into removal proceedings.  Dkt. 78-1, at 5 (USCIS DACA

19  FAQs, Q9).  As a result, the overwhelming majority of applicants who met the basic criteria and

20  properly submitted their application were granted DACA status.[13]  *See, e.g.*, USCIS, Number of Form

21  I-821D, Consideration of Deferred Action for Childhood Arrivals (Sept. 30, 2017), goo.gl/8AeEcR.

22  ────────────────

[13]  Boilerplate language in the 2012 DACA Memorandum suggesting that it "confers no substantive right" does not

23  disturb Mr. Ramirez's legitimate claim of entitlement.  As the Ninth Circuit has explained, the "identification of property
interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the

24  state." *Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002) (finding a protected property interest despite the
state's "labeling of the interests" otherwise); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)

25  (allowing the state to unilaterally limit property interests by providing limited procedures would "reduce[]" the Due
Process Clause "to a mere tautology").  And such boilerplate language is routinely rejected or ignored.  *See, e.g.*,

26  *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding agency action to be "final" despite
"boilerplate" disclaimer that action "[did] not represent final Agency action, and cannot be relied upon to create any rights

27  enforceable by any party" (internal quotation marks omitted)); *see also Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836
F.3d 42, 56 (D.C. Cir. 2016) (finding agency action to be "final" despite "boilerplate" disclaimer that agency "may

28  provide further guidance in the future as a result of additional information" (internal quotation marks omitted)).

***Second***, DACA is operated under a well-defined framework and governed by highly specific criteria that "greatly restrict the discretion of the people who administer," which further underscores Mr. Ramirez's legitimate claim of entitlement to his DACA status and related benefits.  *Nozzi*, 806 F.3d at 1191 (finding protected property interest where "regulations closely circumscribe[d] [the agency's] discretion" (internal quotation marks omitted)).[14]  For example, to ensure compliance with the criteria set forth in the 2012 DACA Memorandum, ICE agents were required to use a checklist to determine whether an individual qualified for DACA.[15]  ICE AR at 5.  This checklist did not provide ICE agents with discretion.  *Id.*  DHS also greatly limited the discretion of those who administer DACA by issuing the DACA SOP, which provides nearly 150 pages of specific instructions for managing the program.  *See* Dkt. 78-6.  These exacting guidelines are "applicable to all personnel performing adjudicative functions and the procedures to be followed are not discretionary."  *Coyotl*, 261 F. Supp. 3d at 1334; *see also Gonzalez Torres*, 2017 WL 4340385, at \*4 (noting that the DACA SOP is "non-discretionary").  Indeed, the decision to deny or terminate DACA status is subject to written limitations and, absent special circumstances, requires supervisory review, thereby further evidencing Mr. Ramirez's legitimate claim of entitlement.[16]  Dkt. 78-6, at 132–34; *see, e.g.*, *Wedges/Ledges*, 24 F.3d at 64 ("substantive limitation on the discretion" of government officials to revoke licenses created a "protectible property interest").

***Third***, public statements and actions from government officials of both political parties reinforced the understanding that eligible individuals would be granted DACA and that the government would honor its promises under the program.  In December 2016, then-Secretary of Homeland Security Jeh Johnson publicly stated that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."  Dkt. 78-2, at 1.

---

[14]   *See also Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 63 (9th Cir. 1994) ("narrow . . . criterion at the heart of the [city's] licensing statute" created a protected property interest); *Griffeth v. Detrich*, 603 F.2d 118, 121 (9th Cir. 1979) (finding protected property interest where "detailed" regulations "greatly restrict[ed] the discretion of" decisionmaker).

[15]   The use of mandatory language in the 2012 DACA Memorandum further underscores the existence of a protected property interest.  *See, e.g.*, *Wedges/Ledges*, 24 F.3d at 63; *Griffeth*, 603 F.2d at 121.

[16]   The requirement in the DACA SOP that individuals be provided with notice and an opportunity to respond prior to revocation of their DACA status further underscores that DACA confers interests that are entitled to protection under the Due Process Clause.  *See Nozzi*, 806 F.3d at 1191.

1    Public statements and actions affirming this understanding continued following the change in

2    Administrations.  In February 2017, the new Administration specifically exempted DACA from a

3    DHS memorandum "immediately rescind[ing]" all prior immigration directives that conflicted with

4    President Trump's January 25, 2017 Executive Order on immigration enforcement.  Dkt. 78-4, at 2.

5    In March 2017, then-Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the

6    government towards the DACA person, or the so-called Dreamer."  Ted Hesson & Seung Min Kim,

7    *Wary Democrats Look to Kelly for Answers on Immigration*, Politico (Mar. 29, 2017),

8    https://goo.gl/TqyWrn (internal quotation marks omitted).  Shortly thereafter, President Trump

9    emphasized that "dreamers should rest easy" and confirmed that the "policy of [his] administration

10   [is] to allow the dreamers to stay."  The Associated Press, *Excerpts from AP Interview with President*

11   *Donald Trump*, U.S. News & World Report (Apr. 21, 2017), https://goo.gl/xsqHj3.

12       ***Fourth***, the government reiterated these promises in its official correspondence to

13   Mr. Ramirez, vowing that he would not lose DACA's benefits absent specified misconduct.  For

14   example, the DACA approval notice sent to Mr. Ramirez lists only "fraud or misrepresentation" in

15   the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA.  Dkt. 78-

16   7.  In so doing, the government further confirmed that Mr. Ramirez was entitled to retain his DACA

17   status as long as he played by the rules.  *See, e.g.*, *Wedges/Ledges*, 24 F.3d at 64.

18       Ultimately, as this Court has already found, "the representations made to [Mr. Ramirez and

19   other] applicants for DACA cannot and do not suggest that no process is due to them, particularly in

20   [Mr. Ramirez's] case where benefits have already been conferred."[17]  *Ramirez Medina*, 2017 WL

21   5176720, at *9; *Singh v. Bardini*, 2010 WL 308807, at *7 (N.D. Cal. Jan. 19, 2010) ("Even if there is

22   no constitutional right to be granted asylum, that does not mean that, once granted, asylum status can

---

[17]    Indeed, once certain benefits are conferred, beneficiaries, including non-citizens, have interests entitled to protection under the Due Process Clause.  *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that "[o]nce [driver's] licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood," such that they cannot "be taken away without" due process); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (holding parole revocation requires due process, and noting that parolees—who, through release, gained the ability to "be gainfully employed"—had "relied on at least an implicit promise that parole [would] be revoked only if [they] fail[ed] to live up to the parole conditions"); *Gallo v. U.S. Dist. Court for Dist. of Ariz.*, 349 F.3d 1169, 1179 (9th Cir. 2003) ("Our case law holds that a professional license, once conferred, constitutes an entitlement subject to constitutional protection."); *see also Singh v. Bardini*, 2010 WL 308807, at *7 (N.D. Cal. Jan. 19, 2010); *Abdur-Rahman v. Napolitano*, 814 F. Supp. 2d 1087, 1096 (W.D. Wash. 2010) (finding a "strong likelihood of succeeding on the merits of the constitutional claim of denial of due process in the revocation of [plaintiff's Application for Reentry Permit]").

be taken away without any due process protections." (internal citation omitted)).  Mr. Ramirez should have been afforded at least the pre-termination process that DHS normally provides—*i.e.*, adequate notice and an opportunity to respond—and not merely an NOA informing him that his DACA had been "terminated automatically."  Dkt. 78-10, at 1; *see Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *cf. Singh v. Vasquez*, 2009 WL 3219266, at *5 (D. Ariz. Sept. 30, 2009) (Murguia, J.) (noting "there is a substantial risk of erroneous deprivation through the procedures utilized by INS in rescinding asylum via a mailed letter" because "[t]his manner of termination does not account for anything other than post hoc notice . . . that he or she is no longer entitled to protection"), *aff'd*, 448 F. App'x 776 (9th Cir. 2011); *see also id.* at *6 ("[A]ll of the *Mathews* factors weigh in favor of a finding that due process requires more than sending an after the fact letter of rescission when the government terminates a grant of asylum.").

In sum, Mr. Ramirez is likely to succeed on his claims that the government impermissibly deprived him of liberty and property interests entitled to protection under the Due Process Clause, and thereby violated the APA by wrongfully depriving him of his DACA status.

### B.    Mr. Ramirez has suffered and continues to suffer irreparable harm

Mr. Ramirez has experienced, and continues to experience, ongoing irreparable harm, weighing heavily in favor of provisional relief.  Indeed, all three courts to consider this issue have recognized that the harm caused by the unwarranted revocation of an individual's DACA status justifies preliminary injunctive relief.  *Inland Empire*, 2017 WL 5900061, at *9–10; *Gonzalez Torres*, 2017 WL 4340385, at *6–7; *Coyotl*, 261 F. Supp. 3d at 1343–44.  And on January 9, 2018, in enjoining the government to continue to maintain the DACA program on a nationwide basis, the Northern District of California found that individual plaintiffs who would be deprived of DACA benefits after program's rescission "have clearly demonstrated that they are likely to suffer serious irreparable harm" absent an injunction.  Injunction at 43.  The same reasoning applies here.

*First*, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).  Mr. Ramirez has demonstrated that the government's arbitrary revocation of his DACA status violated his Fifth Amendment due process

rights.  As with the unlawfully detained immigrants in *Hernandez* and *Melendres*, "it follows inexorably from [the] conclusion that the government's [action is] likely unconstitutional" that Mr. Ramirez "ha[s] also carried [his] burden as to irreparable harm."  *Hernandez*, 872 F.3d at 995.

**Second**, the revocation of his DACA status has injured and continues to injure Mr. Ramirez in several other ways, each of which is irreparable and sufficient to warrant an injunction here.[18]  For example, and as discussed more thoroughly below, he is not able to apply for renewal of his DACA status, and thus take advantage of the opportunity that currently exists under the Injunction.  Further, because his DACA status was unlawfully revoked, Mr. Ramirez is currently accruing time for unlawful presence, which may affect his ability to pursue legal presence or status in the United States through other avenues in the future.  *See* Dkt. 78-1, at 3 (USCIS DACA FAQs, at Q5); 8 U.S.C. § 1182(a)(9)(B)–(C).  Mr. Ramirez is also being denied access to DACA's many public benefits, such as paying into Social Security, retirement, and disability accounts, and the ability to take advantage of unemployment insurance, financial aid, and food assistance.  *See* SAC ¶¶ 28–29, 32.

After spending more than six weeks in detention and more than six months staying with family, dependent on them for everything, Mr. Ramirez is still unable to earn an income due to his lack of work authorization, leaving his family in a debilitating state of financial insecurity.  Third Suppl. Decl. of Ramirez Medina ¶ 3.  And should he not recover the benefits that DACA status affords, he will again suffer additional harm by separation from family, as he did when he was wrongfully detained.  *See Hawaii v. Trump*, 878 F.3d 662, 669 (9th Cir. 2017) ("prolonged separation from family members" is a harm not compensable with money damages and therefore weighs in favor of finding irreparable harm (internal quotation marks omitted)).  These practical injuries are continuing irreparable harms that justify injunctive relief.  *See Ariz. Dream Act Coal.*, 757 F.3d at 1068; *Inland Empire*, 2017 WL 5900061, at *9–10; *Gonzalez Torres*, 2017 WL 4340385, at *6.

**Third**, the emotional harm Mr. Ramirez is enduring is seriously affecting his well-being.  Third Suppl. Decl. of Ramirez Medina ¶¶ 3–4.  DACA provides recipients with a sense of security,

---

[18]  *See, e.g.*, *Hernandez*, 872 F.3d at 995 (recognizing "the economic burdens imposed on detainees and their families" as supporting injunctive relief); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014), *permanent injunction aff'd*, 855 F.3d 957 (9th Cir. 2017); *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011).

which the government has wrongfully taken away from Mr. Ramirez. *See Gonzalez Torres*, 2017 WL 4340385, at *6 ("The loss of DACA status also undermines one's sense of well-being and subjects Plaintiff to a constant threat of apprehension and possible removal from the only country he has called home."); *Coyotl*, 261 F. Supp. 3d at 1343–44. Also, until his DACA status is restored and he can re-establish himself as a productive member of society, Mr. Ramirez will continue to be viewed as an alleged gang member and "'Daniel from the news.'" Dkt. 50 ¶ 6 (Second Suppl. Decl. of Ramirez Medina). These emotional and psychological injuries constitute irreparable harm warranting provisional relief. *See, e.g.*, *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015).

*Finally*, while he is deprived of his DACA status, Mr. Ramirez cannot take advantage of any benefits that might be conferred to DACA holders by federal legislation or by the courts. As already described, just weeks ago the Injunction required the government "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments." Injunction at 46. Within days, USCIS began processing renewal applications. Bach Decl. ¶ 4. However, Mr. Ramirez is not able to take advantage of this opportunity to extend his DACA benefits for two more years. *Cf. Gonzalez Torres*, 2017 WL 4340385, at *6 (loss of the "ability to apply for renewal" of DACA status found to be irreparable harm); *Coyotl*, 261 F. Supp. 3d at 1343–44. While this litigation is pending, Mr. Ramirez should not be required to forgo the benefits that the government *twice* conferred on him, particularly should the legal or political landscape shift again so as to foreclose DACA holders' opportunity to renew their status.

## C.    The balance of equities and public interest weigh heavily in favor of provisional relief

The final two elements of the preliminary injunction test—the balance of the equities and the public interest—merge when the government is a party. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Here, these factors weigh overwhelmingly in favor of provisional relief. *See Inland Empire*, 2017 WL 5900061, at *10. The government will face no harm if a preliminary injunction is granted. First, the government has no interest in enforcing unlawful rules or failing to follow its own non-discretionary

procedures.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[Government] cannot suffer harm from an injunction that merely ends an unlawful practice."); *Ariz. Dream Act Coal.*, 855 F.3d at 978 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." (quoting *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).  Moreover, as described in detail above, the government has twice granted DACA status to Mr. Ramirez, and his qualifications upon which those decisions were based have not changed.  As such, restoring the status quo while this litigation is pending cannot and will not harm the government.

In any event, a violation of constitutional rights *per se* weighs in favor of granting a preliminary injunction.  "[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction."  *Ariz. Dream Act Coal.*, 757 F.3d at 1069; *see also Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)).  Here, this Court has already held that Mr. Ramirez was owed due process.  Dkt. 116, at 18 (Order Denying Mot. to Dismiss) (noting it "cannot be that "no process is due" to DACA recipients, "particularly . . . where benefits have already been conferred").  And as explained above, the arbitrary revocation of his DACA status violated these due process rights—and his rights under the APA.  Accordingly, both the balance of the equities and the public interest favor provisional relief.

## V.  CONCLUSION

For the reasons set forth above, Mr. Ramirez respectfully requests that the Court award provisional relief directing the government to restore his DACA status and work authorization pending a decision on the merits of his claims.

DATED:      February 6, 2018
            Seattle, Washington

                  Respectfully submitted,


                  /s/ Theodore J. Boutrous, Jr.
                  GIBSON, DUNN & CRUTCHER LLP
                  THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
                  ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
                  KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
                  NATHANIEL L. BACH (CA SBN 246518), *pro hac vice*
                  JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*


                  /s/ Mark D. Rosenbaum
                  PUBLIC COUNSEL
                  MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
                  JUDY LONDON (CA SBN 149431), *pro hac vice*
                  KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
                  ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
                  ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*


                  Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document should automatically be served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

_/s/ Theodore J. Boutrous, Jr._

The Honorable Ricardo S. Martinez
Chief United States District Judge

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

Daniel Ramirez Medina,

        Plaintiff,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; and U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES,

        Defendants.

CASE NO. 2:17-CV-00218-RSM-JPD

**DECLARATION OF NATHANIEL L. BACH
IN SUPPORT OF PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

DECLARATION OF N. BACH
Case No. 2:17-cv-00218-RSM-JPD

Counsel Listed on Pages I–II

Attorneys for Plaintiff:
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
  jlondon@publiccounsel.org
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089


GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
  kmarquart@gibsondunn.com
NATHANIEL L. BACH (CA SBN 246518), *pro hac vice*
  nbach@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*
  jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
  echemerinsky@law.berkeley.edu
University of California, Berkeley, School of Law
*Affiliation for identification purposes only
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN (DC SBN 1016310), *pro hac vice*
  llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only*
401 East Peltason Drive, Educ 1095
Irvine, CA 92697
Telephone: (949) 824-7722


LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
  larry@tribelaw.com
Harvard Law School
*Affiliation for identification purposes only*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767


ELIZABETH HAWKINS (SBN 43187)
  ehawkins@hawkinsimmigration.com
Hawkins Law Group
17544 Midvale Avenue, Suite 301
Shoreline, WA 98133
Telephone: (206) 728-4220
Facsimile: (206) 973-5326


BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
  lcortes@barreralegal.com
JOHN C. BARRERA (SBN 47658), *pro hac vice*
  jbarrera@barreralegal.com
JOSE GARCIA (SBN 46518), *pro hac vice*
  jgarcia@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591


NORTHWEST IMMIGRANT RIGHTS PROJECT
MATT ADAMS (SBN 28287)
  matt@nwirp.org
615 Second Ave., Suite 400
Seattle, WA 98104
Telephone:  (206) 957-8611

I, Nathaniel L. Bach, declare as follows:

1. I am an attorney admitted to practice law *pro hac vice* before this Court.  I am an associate at the law firm of Gibson, Dunn & Crutcher LLP, and I am one of the attorneys responsible for the representation of Daniel Ramirez Medina ("Mr. Ramirez") in the above-captioned action. I submit this declaration in support of Mr. Ramirez's Motion for Preliminary Injunction.  The following facts are within my personal knowledge and, if called and sworn as a witness, I would testify competently to these facts.

2. Attached hereto as <u>Exhibit A</u> is a true and correct copy of the transcript of custody proceedings held in *In the matter of Daniel Ramirez-Medina*, No. A 207-028-995, in Immigration Court in Tacoma, Washington, before Immigration Judge John C. Odell, on March 28, 2017.

3. Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Third Supplemental Declaration of Daniel Ramirez Medina, dated February 1, 2018.

4. Attached hereto as <u>Exhibit C</u> is a true and correct copy of the U.S. Citizenship & Immigration Services statement, "Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction," dated January 13, 2018, and available at https://www.uscis.gov/ humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction, which I accessed and printed on January 30, 2018.

5. Attached hereto as <u>Exhibit D</u> is a true and correct copy of the Department of Homeland Security's Second Submission of Evidence, submitted in *In the Matter of Daniel Ramirez-Medina*, File No. A 207-028-995 of the Immigration Court in Seattle, Washington, on or about December 20, 2017.

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct, and that I executed this Declaration on February 6, 2018, in Los Angeles, California.

/s/        *Nathaniel L. Bach*

Nathaniel L. Bach

EXHIBIT A



**[00:00:10] Speaker 1**: Today's date is March 28, 2017. These are custody proceedings in the case of Mr. Daniel Ramirez Medina, 207028995. The respondent is present and appearing with counsel. Counsel make your appearance.

**[00:00:25] Speaker 2**: This is counsel for the respondent.

**[00:00:27] Speaker 1**: Who's with you?

**[00:00:29] Speaker 2**: Jesse Gabriel and Mark Rosenbaum.

**[00:00:32] Speaker 1**: Mr. Rosenbaum, Mr. Gabriel, thank you. For the department?

**[00:00:34] Neil Floyd**: Good afternoon, Neil Floyd on behalf of the United States and Kathleen Patrick is with me.

**[00:00:53] Speaker 1**: To the respondent here, what is your best language?

**[00:00:59] Daniel Ramirez**: Spanish.

**[00:01:01] Speaker 1**: Okay, so we'll use the Spanish language interpreter, please put the headphones on. You've previously been sworn. The case number is 207028995. How many days of custody, Mr. Floyd?

**[00:01:24] Neil Floyd**: Your honor, I have not calculated the days, but **[unintelligible 00:01:27]**.

**[00:01:32] Speaker 1**: Alright, do the courts have evidence?

**[00:01:47] Neil Floyd**: Judge, the government submission is the same packet that was submitted in the merit proceeding, with the addition of a few most recent orders from the district judge.

**[00:02:00] Speaker 1**: I'll tell you what, I'll mark the evidence here. The state's evidence will be B one and the respondent's evidence will be B two. The department has filed 157 pages. Is this the same information that was filed in the proceedings?

**[00:02:35] Neil Floyd**: Yes.



**[00:02:37] Speaker 1**: Then the respondent's filed 90 to 100 pages. I don't know how much of this is repetitive with the government's file, this is the first I've seen it. I accepted the case rather quickly in compliance with Judge, I think it's Martinez, the district court judge who sent it over for a bond hearing and directed that the bond hearing be conducted within seven days of the respondent's request. It was a short set. If I'm going to look at this before we conclude the case, then I probably will need to take a break, otherwise you can look at the top of my head while I read it. I'm going to go off the record and I'll take it back to the office to review it. It will probably take me about 15 minutes. Back on the record I'll take a break and review it, and I was asking the government how long the respondent had been detained. It looks like the **[unintelligible 00:03:47]** was February, 10th 2017. As I said the respondent's evidence is in, the government's evidence is B one. Go ahead, Mr. Cortez.

**[00:04:08] Mr. Cortez**: Thank you, Your Honor. **[unintelligible 00:04:14]**. He, I believe, was approximately 10 years old.

**[00:04:41] Speaker 1**: Right now he's **[unintelligible 00:04:41]**.

**[00:04:47] Mr. Cortez**: **[unintelligible 00:04:47]** apprehension. He was not the subject of the arrest, they were there for his father and he was collateral to that arrest. The respondent has minimal criminal history, really what amounts to traffic violations like having no insurance and stuff like that. There is one violation in Oregon for possession of marijuana. I want to note for the court that it was cited as a violation, which is less than a misdemeanor. That's the extent of his criminal history **[unintelligible 00:05:46]**. The government has alleged that the respondent is a gang member based upon what seems to be **[unintelligible 00:06:08]**. We have submitted declarations from two experts indicating that he is not a gang member. Another gang expert evaluated Mr. Ramirez and indicated that the knowledge about him being a gang member was weak at best. There's no other evidence of gang membership other than the tattoo and what was allegedly said **[unintelligible 00:06:37]** part of a gang. The respondent has extensive ties to the US, essentially his entire life. He has one US citizen child and he shares custody with the child's mother.

**[00:07:05] Speaker 1**: When was the last time you lived with the child?

**[00:07:11] Mr. Cortez**: He left California in late December, early January.



**[00:07:15] Speaker 1**: He lived in the same house?

**[00:07:18] Mr. Cortez**: Before that, in December, in Lindsay, California he lived with the child. I believe that he shares equal custody with the child. He has **[unintelligible 00:07:33]** immigration court. He is eligible for cancellation.

**[00:07:39] Speaker 1**: Is he eligible for cancellation with the violation in Oregon?

**[00:07:45] Mr. Cortez**: Yes.

**[00:07:49] Speaker 1**: It's still an offense.

**[00:07:52] Mr. Cortez**: It doesn't bar him from cancellation, because it wasn't a condition at the time by the INA. An Oregon violation does not amount to a conviction, because the evidence is less than beyond a reasonable doubt.

**[00:08:10] Speaker 1**: Do you have that case file?

**[00:08:12] Mr. Cortez**: I do.

**[00:08:19] Speaker 1**: Is it a recorded case?

**[00:08:21] Mr. Cortez**: I believe it is. ESLAMIZAR.

**[00:08:30] Speaker 1**: What's the site?

**[00:08:33] Mr. Cortez**: Two, three, INN. Decision 684, EIA, 2004. That was specifically about the Oregon violation.

**[00:08:52] Speaker 1**: Does it address this particular Oregon violation statute?

**[00:08:57] Mr. Cortez**: It does not address this particular one, it addresses if it was a citation under Oregon law, then because it's a senior violation, the violation has a less **[unintelligible 00:09:0908]**. We submitted that the violation requires a preponderance of evidence. The decision under Eslamizar wasn't in response to that particular violation, it was more the fact that a violation has a less of a burden of proof.

3



**[00:09:48] Speaker 1**: Alright, I'll have to look at this.

**[00:09:53] Mr. Cortez**: He should still be eligible for cancellation.

**[00:09:56] Speaker 1**: Is the child healthy?

**[00:10:01] Mr. Cortez**: There's nothing we see right now in terms of medical issues, but we don't know.

**[00:10:10] Speaker 1**: If the child's healthy, are there any indications of any developmental issues?

**[00:10:15] Mr. Cortez**: Nothing that we have found at the moment, Your Honor.

**[00:10:17] Speaker 1**: Is that his only qualifying relative?

**[00:10:19] Mr. Cortez**: It is his only qualifying relative. He'll also be applying for asylum.

**[00:10:30] Speaker 1**: But the child lives now with his mother?

**[00:10:34] Mr. Cortez**: Living with the mother now and the respondent's mother is taking care of the child when it's not the child's mother's turn for custody time. He left in December, in January he was living in **[unintelligible 00:10:57]** where he tried to get a job.

**[00:11:03] Speaker 1**: Does he likely have a one year issue on the asylum claim?

**[00:11:11] Mr. Cortez**: Under the assumption of circumstances because of a recent increase of danger that he feels he would have.

**[00:11:22] Speaker 1**: I won't talk about the substance of his claim today, but that would be an issue, he did not apply within a year of turning 18.

**[00:11:30] Mr. Cortez**: You're right, and it is something that he is wanting to **[unintelligible 00:11:38]**.

**[00:11:39] Speaker 1**: Anything else, Mr. Cortez?

**[00:11:41] Mr. Cortez**: Just one quick note, Your Honor. The respondent has also a **[unintelligible 00:12:00]** if he doesn't show up, obviously he would be ordered **[unintelligible 00:12:08]**. If he

4

doesn't show up to his probation court, that will make that also significantly more difficult. He knows the importance of that case as well. He has counsel at the moment and he will be moving forward with counsel.

**[00:12:26] Speaker 1**: Is he married?

**[00:12:28] Mr. Cortez**: He's not married, Your Honor.

**[00:12:32] Speaker 1**: Do his parents have immigration status in the United States?

**[00:12:34] Mr. Cortez**: His mom does not, his dad does not either. His brother is a document recipient. Other than that, there are no filed immigration applications.

**[00:12:46] Speaker 1**: Sister status? I got a letter from the sister.

**[00:12:56] Mr. Cortez**: His sister is documented as well.

**[00:12:58] Speaker 1**: Does he have any, other than his child, does he have any family in the United States with status?

**[00:13:06] Mr. Cortez**: Distant family, cousins and like that. One other point, Your Honor, his documented status was revoked because of his alleged gang ties, so he is looking to contest that.

**[00:13:21] Speaker 1**: Is there a process for that?

**[00:13:22] Mr. Cortez**: He applied.

**[00:13:24] Speaker 1**: The denial of discretionary –

**[00:13:29] Mr. Cortez**: He's not going to contest the denial, but to reapply. I believe that this provides a circumstance where he might not have participated in an issue like this, so assuming he can even try.

**[00:13:57] Speaker 1**: Okay. It seems like the department has spoken. I think they filed a notice of determination of the doc application, or benefit or what have you. The decision to withhold deportation. Where does he work?

5



**[00:14:22] Mr. Cortez**: He was not working here in Washington. He was working in the fields when he was in Lindsay.

**[00:14:28] Speaker 1**: When's the last time he worked?

**[00:14:30] Mr. Cortez**: Right before he came to Washington.

**[00:14:32] Speaker 1**: In Lindsay, California?

**[00:14:34] Mr. Cortez**: Yes, about January, December.

**[00:14:36] Speaker 1**: Has he been filing tax returns?

**[00:14:40] Mr. Cortez**: I believe he has.

**[00:14:42] Speaker 1**: They're not in the record.

**[00:14:49] Mr. Cortez**: I need to get a chance to gather that as well, and certainly that would be part of his cancellation of removal.

**[00:14:53] Speaker 1**: Have you seen the tax returns?

**[00:14:55] Mr. Cortez**: I have not, but I remember talking to him about them. Certainly having those and proving that will incentivize him to move forward in court.

**[00:15:14] Speaker 1**: Anything else, Mr. Cortez?

**[00:15:16] Mr. Cortez**: Nothing, Your Honor.

**[00:15:19] Speaker 1**: Does the department want to be heard?

**[00:15:21] Neil Floyd**: Yes, Your Honor. I do have some questions for the respondent. I don't know if he's able to answer questions today?

**[00:15:32] Speaker 1**: It's his burden to take the stand and we can ask him questions. Take response to testimony.

**[00:15:44] Mr. Cortez**: We object to taking response to testimony.

6



**[00:15:48] Speaker 1**: On what grounds?

**[00:15:50] Mr. Cortez**: Relevance. We don't know what the government is going to ask him in terms of moving forward his probation proceedings. We believe that the evidence speaks for itself, and if the government has any other questions besides that, then we will be happy to answer them as his counsel.

**[00:16:08] Speaker 1**: It's his burden, so he's not in danger. You don't want them to ask questions about the material that you've submitted in the case?

**[00:16:20] Mr. Cortez**: We're worried that his nervousness may end up not answering –

**[00:16:25] Speaker 1**: I'm happy to take our time, if he feels nervous, we'll take a break. I mean, it's his burden. If he's refusing to testify, I understand that, but I'll just have to take that into account. It is his burden here, and you've raised a lot of issues and a lot of evidence for the record. I may have questions for him myself. If you want to ask, if you want to do a direct exam, you can do that.

**[00:16:52] Mr. Cortez**: Yes, we will proceed for him to continue with testimony.

**[00:16:55] Speaker 1**: Then you're going to have him testify?

**[00:16:57] Mr. Cortez**: Yes, Your Honor.

**[00:16:59] Speaker 1**: Do you want to do a direct exam, or let the government start? I tell you what, I'll allow you to ask whatever follow up questions you want at the end.

**[00:17:08] Mr. Cortez**: That would be great.

**[00:17:11] Speaker 1**: Mr. Ramirez, will you come forward please and have a seat. Mr. Brown, will you bring us a chair, please? I think we have a lot more people at the counsel table than we normally do. Thank you, Officer Brown. Just take your headset with you, sir. Come on up and have a seat. Please have a seat by the interpreter. I think a different judge had the case for the removal proceedings. Can you hear the interpreter? Raise your right hand. Do you swear and affirm that the testimony you give today will be the truth?

**[00:18:20] Daniel Ramirez**: Yes.



**[00:18:24] Speaker 1**: If you're going to use a Spanish interpreter, I ask that you answer in Spanish. Go ahead, Mr. Floyd.

**[00:18:33] Neil Floyd**: Thank you, Your Honor. Good afternoon, Mr. Ramirez and thank you for answering our questions today. First I want to ask you about your doc application. As I understand it, you stopped attending high school in 2009, is that correct?

**[00:19:07] Interpreter**: I don't remember.

**[00:19:09] Neil Floyd**: Let me just ask you, how far did you make it in high school?

**[00:19:19] Interpreter**: Eleventh.

**[00:19:21] Neil Floyd**: And you stopped attending high school before you graduated, correct?

**[00:19:34] Interpreter**: Can you repeat the question, please?

**[00:19:37] Neil Floyd**: You dropped out of high school before you graduated?

**[00:19:45] Interpreter**: Yes.

**[00:19:47] Neil Floyd**: At some point in 2012, you started attending a GED program?

**[00:19:55] Interpreter**: Yes.

**[00:19:57] Neil Floyd**: How long did you go to the GED program?

**[00:20:05] Interpreter**: I attended several times.

**[00:20:11] Neil Floyd**: Our records indicate that you stopped attending the GED program in August of 2013.

**[00:20:17] Speaker 3**: I'd like to object on relevance. A lot of this seems to be going to the merits of his DACA application. I fail to see how this would be relevant to whether or not he's a danger to persons or property or a flight risk.

**[00:20:31] Speaker 1**: Mr. Cortez is going to be addressing the court.



**[00:20:33] Speaker 3**: I'm sorry, Your Honor.

**[00:20:35] Speaker 1**: One attorney per witness. If you're going to be handling this witness, I hear the objection.

**[00:20:47] Neil Floyd**: Judge, if there are misrepresentations in his DACA application, I believe that goes to his flight risk potential and credibility.

**[00:20:55] Speaker 1**: Is that what you're alleging here, Mr. Floyd? I read your materials.

**[00:20:58] Neil Floyd**: Yes, Judge.

**[00:21:01] Speaker 1**: I'm going to rule the objection on relevancy grounds, go ahead, Mr. Floyd, but if we could move through this fairly quickly. This is a bond hearing, this is not a removal proceeding.

**[00:21:16] Neil Floyd**: Yes, Judge. So, the question was you stopped attending in August of 2013.

**[00:21:29] Interpreter**: Yes.

**[00:21:30] Neil Floyd**: And then you filed your application for DACA in October of 2013?

**[00:21:41] Interpreter**: Can you repeat the question?

**[00:21:45] Neil Floyd**: And you filed for DACA, for deferred action, in October of 2013.

**[00:21:56] Interpreter**: Yes.

**[00:21:58] Neil Floyd**: At that time, you weren't attending the GED program anymore. Right?

**[00:22:07] Interpreter**: I don't remember.

**[00:22:10] Neil Floyd**: We have a notice in here in January of 2014, I'm looking at page 62, Judge, we have a letter from the school.

**[00:22:25] Judge**: This is exhibit B one, the government's evidence?



**[00:22:26] Neil Floyd**: Yes. So, we have a letter from the school saying that you stopped attending in August. That letter is dated January of 2014.

**[00:22:46] Mr. Cortez**: Objection, Your Honor. He asked and answered the question already.

**[00:22:53] Speaker 1**: He did say that he stopped attending in August of 2013. I'll sustain that.

**[00:23:02] Neil Floyd**: In your DACA application, you indicated that you were still in school, the GED program, but you weren't, were you?

**[00:23:16] Interpreter**: I was attending when I wrote it down.

**[00:23:31] Neil Floyd**: I'm confused. You stated that you stopped attending in August of 2013, and our letter from the school says you stopped attending in August of '13. You filed for DACA in October of 2013. Do you understand the issue?

**[00:24:00] Interpreter**: Yes.

**[00:24:01] Neil Floyd**: So, what's your explanation?

**[00:24:12] Interpreter**: I don't remember the last day I attended school.

**[00:24:17] Neil Floyd**: So, really you were applying for DACA because you wanted to get work authorization.

**[00:24:24] Mr. Cortez**: Objection, Your Honor, argumentative.

**[00:24:34] Speaker 1**: I don't understand how that gets to his statements or false statements on an application. I'll sustain that objection.

**[00:24:47] Neil Floyd**: So later in 2015, you renewed your application for DACA? Is that correct?

**[00:24:49] Interpreter**: Yes.

**[00:25:02] Neil Floyd**: At that time, were you still attending school?

**[00:25:07] Mr. Cortez**: Objection, Your Honor, relevant.

10



**[00:25:17] Speaker 1**: Mr. Floyd, do you want to be heard on the objection?

**[00:25:24] Mr. Cortez**: You don't have to be in school the second time you apply for DACA.

**[00:25:31] Neil Floyd**: He did submit a request for renewed work authorization saying that he was still attending school.

**[00:25:26] Speaker 1**: I'm going to rule the objection. If you can answer the question, please do it. Or tell him he'll re-ask the question, I'll have him do that. Can you ask the question again, Mr. Floyd?

**[00:25:53] Neil Floyd**: When you applied for work authorization and renewal of the DACA application, you again stated you were attending school. Is that correct?

**[00:26:09] Mr. Cortez**: Objection, Your Honor, it misstates the record.

**[00:26:12] Speaker 1**: Alright, let's look at the record. What are you referring to, Mr. Floyd?

**[00:26:23] Neil Floyd**: I believe it's page 42.

**[00:26:31] Mr. Cortez**: It's exhibit A, page 42, Your Honor, and I think what he is referring to is that it's stated that he wanted to continue his studies at some point. He did not say that he was in school.

**[00:26:46] Speaker 1**: If you want to rephrase the question?

**[00:26:48] Neil Floyd**: I can just withdraw that. Have you attended a GED program or school any time after August, 2013?

**[00:27:12] Interpreter**: I did.

**[00:27:17] Neil Floyd**: Do you have any evidence of that?

**[00:27:21] Mr. Cortez**: Objection, Your Honor, relevance.



**[00:27:26] Speaker 1**: This is the same line of objection. I'll not your continuing objection, but it seems to me that this is the same line of questioning that I already found to be relevant, so I'll allow the question. Go ahead, Mr. Floyd.

**[00:27:46] Neil Floyd**: Do you have any evidence, or did you attend school someplace else?

**[00:27:56] Interpreter**: No, I don't believe so.

**[00:27:58] Neil Floyd:** Sir, I want to ask you about the day that you were arrested for immigration custody. You remember the officers coming to your house where you were living, correct?

**[00:28:16] Interpreter**: Yes.

**[00:28:18] Neil Floyd**: You and your father and your brother were present in the apartment, correct?

**[00:28:28] Interpreter**: Yes.

**[00:28:30] Neil Floyd**: You were living with your father at the time in that apartment, right?

**[00:28:38] Interpreter**: Yes.

**[00:28:43] Neil Floyd**: Did you know that your father had been previously ordered removed from the United States?

**[00:28:47] Mr. Cortez**: Objection, Your Honor, relevance.

**[00:28:49] Speaker 1**: What is the relevance of that, Mr. Floyd?

**[00:28:54] Neil Floyd**: At some point, if he has knowledge that this person has been deported, then he's essentially harboring someone that's illegal.

**[00:29:08] Speaker 1**: I have the I2-13. I just don't see that, that's particularly relevant that he's a danger or a flight risk. You can get into that, but his father's status is not very relevant. I'll sustain the objection.



**[00:29:28] Neil Floyd**: When the officer came and talked to you in the apartment, he asked you whether or not you were here legally. Do you remember that?

**[00:29:42] Interpreter**: The officer?

**[00:29:44] Neil Floyd**: Yes.

**[00:29:45] Interpreter**: Yes.

**[00:29:48] Neil Floyd**: You told him you were here illegally, correct?

**[00:29:55] Interpreter**: No, I told him that I was legal.

**[00:29:59] Neil Floyd**: Do you recall telling him that you had been arrested before?

**[00:30:07] Interpreter**: No.

**[00:30:12] Neil Floyd**: Did you tell him that, or did you not?

**[00:30:15] Mr. Cortez**: Objection, it's been answered.

**[00:30:19] Speaker 1**: I think he's looking to clarify. I'll rule the objection. If you want to try to clarify, Mr. Floyd, go ahead. I wasn't sure what the answer was.

**[00:30:24] Neil Floyd**: Did you tell the officer that you had been arrested?

**[00:30:38] Interpreter**: No, I don't believe so.

**[00:30:41] Neil Floyd**: Had you been arrested before?

**[00:30:50] Mr. Cortez**: I want to define what arrest means.

**[00:31:01] Speaker 1**: You can ask him what he understands an arrest to be. You're asking for what he remembers and knows, it's his belief or understanding what the term arrest means. Go ahead, Mr. Floyd.

**[00:31:18] Neil Floyd**: Had you been arrested before that time the officers came to your house?

13



**[00:31:26] Interpreter**: No.

**[00:31:33] Neil Floyd**: Do you remember telling the officers that you had work authorization?

**[00:31:50] Interpreter**: If I told them that I had a work permit?

**[00:31:53] Neil Floyd**: Yes, that's what I'm asking.

**[00:31:56] Interpreter**: Yes, I told them like three or four times.

**[00:32:02] Neil Floyd**: That's what you told them, that you have a work permit?

**[00:21:12] Interpreter**: Yes, and also to remain here in the United States.

**[00:32:16] Neil Floyd**: At the house, you never mentioned deferred action or DACA did you?

**[00:32:26] Mr. Cortez**: Objection, Your Honor, relevance.

**[00:32:28] Speaker 1**: What's the relevance of him informing? We're talking about whether he's a danger or a flight risk, I'm trying to understand how the answer to that question informs the court about danger or flight risk.

**[00:32:44] Neil Floyd**: The entire arrest was improper, and I'm trying to find out what he told the officers and when, because if it was proper –

**[00:32:54] Speaker 1**: I understand that's being litigated in federal district court. I'm here today to decide whether or not the respondent should get a bond, and if he should get a bond, how much. The issue is whether or not he's a danger or a flight risk. He's got some claim against the officers, and I think that's probably something he's going to have to bring up in another venue. If we could focus on the danger and the flight risk issue, unless you can tell me how it's relevant to that.

**[00:33:20] Neil Floyd**: I'll move on. Sir, do you remember when the officers took you to the station in Tukwila?

**[00:33:36] Interpreter**: Yes, more or less, yes, I do remember.

14



**[00:33:38] Neil Floyd**: They took you and your father there, and you were processed and booked in. Remember that?

**[00:33:49] Interpreter**: Yes.

**[00:33:51] Neil Floyd**: They took your fingerprints and they sat you down and asked you some questions about –

**[00:33:56] Mr. Cortez**: Objection, Your Honor, relevance.

**[00:34:00] Speaker 1**: Mr. Floyd?

**[00:34:02] Neil Floyd**: I'm building a foundation, Judge. The questions that they asked him next were –

**[00:34:05] Speaker 1**: Is this leading up to the statements he told them about his involvement in or non-involvement or whatever? I'm going to rule the objection. I understand that there were statements that were made that the government wants to inquire into, and I'll let them do that. Overruled, go ahead.

**[00:34:21] Neil Floyd**: Okay, at some point they sat you down at a desk across from a computer and officer, correct? Remember that?

**[00:34:33] Interpreter**: Yes.

**[00:34:37] Neil Floyd**: Next to you, at another computer terminal was your father and another officer, correct?

**[00:34:58] Interpreter**: Yes, but he was put inside **[unintelligible 00:35:00]**.

**[00:35:02] Neil Floyd**: Okay, but this is an open room. There's a lot of people in the room.

**[00:35:19] Interpreter**: Yes, I was talking with the officer at the computer.

**[00:35:22] Neil Floyd**: At some point, he noticed the tattoo that you had on your arm, right?

**[00:35:31] Interpreter**: Yes.



**[00:35:33] Neil Floyd**: And you had a conversation with him and another officer about the tattoo, correct?

**[00:35:41] Interpreter**: Yes.

**[00:35:43] Neil Floyd**: The officers raised with you the question that the star on the tattoo looks like it may be an Norteno gang sign, correct?

**[00:36:06] Interpreter**: Yes, that's what the officer wrote down, but I told him that I was no gang member at all.

**[00:36:15] Neil Floyd**: When you told him that you were not a gang member, he asked you what the significance of the tattoo was.

**[00:36:24] Interpreter**: Yes.

**[00:36:27] Neil Floyd**: He also told you that if you were detained at the Northwest Detention Center, they needed to know whether or not you were housed with Soreno or Norteno gang members, correct?

**[00:36:56] Interpreter**: Can you repeat the question please?

**[00:37:01] Neil Floyd**: They asked you a question. They wanted to know if you were sent to the Northwest Detention Center, if you had any connection to either Soreno or Norteno, because they were concerned about where they would house you.

**[00:37:16] Mr. Cortez**: Objection, Your Honor, he didn't know that day when they asked him whether he was going to have problems or not.

**[00:37:33] Speaker 1**: That's why Mr. Floyd is asking him. He's asking him if that was the question that he was asked. He's taking his testimony, we're trying to find out what he remembers about the incident. What is your objection?

**[00:37:52] Mr. Gabriel**: To me, it seems like the government are trying **[unintelligible 00:37:56]** issues in federal court. As you pointed out, we're here today to talk about whether this man is a danger or a flight risk. If they have evidence they would like to present, they can do that, but they're



doing it in an extraordinarily roundabout way **[unintelligible 00:38:17]**. If they want to ask him if he's ever been a member of a gang, or ask him if he has gang ties, I think all those would be appropriate **[unintelligible 00:38:35]** step by step. Every question he's been asked doesn't seem to address those issues.

**[00:38:37] Speaker 1**: Thank you, Mr. Gabriel. I am here, I'm trying to get to the bottom of what happened, and I'm trying to determine whether or not there's any reason to believe the respondent's a danger or flight risk. My sense is that Mr. Floyd's inquiring about what he may have told the officers about any potential gang affiliation. That's something that I believe I should know about in order to make an informed decision about whether or not a bond is appropriate in this case. I understand what you're saying. I wish we could be more prompt and get to the heart of things, but I'll certainly give your team an opportunity to follow up with the respondent, but I'm going to allow the question. I believe this line of inquiry is helpful to the court to make a determination about danger or flight risk, and that's the issue here. So, go ahead, Mr. Floyd. If we could just get to it.

**[00:39:31] Neil Floyd**: Sir, do you remember the question?

**[00:39:34] Interpreter**: No.

**[00:39:36] Neil Floyd**: Do you remember having a conversation with the officer about going to Northwest Detention Center, where they would put you?

**[00:39:48] Interpreter**: I didn't know.

**[00:39:50] Neil Floyd**: Do you remember them asking whether or not you had any connection with Soreno or Norteno gangs, because that would make a difference in where they would put you?

**[00:40:16] Interpreter**: Can you repeat the question again please?

**[00:40:20] Neil Floyd**: Do you remember telling the officer that if you're sent to the Northwest Detention Center, you would rather be with the Sorenos than the Nortenos?

**[00:40:38] Interpreter**: Yes, they asked me that.



**[00:40:41] Neil Floyd**: And you said yes, I used to hang out with Sorenos in California.

**[00:40:59] Interpreter**: No, I told him that previously I did that, but I told him that I just knew them, I didn't hang out with them.

**[00:41:21] Neil Floyd**: Help me out. What did you tell them about knowing Sorenos in California?

**[00:41:33] Interpreter**: What was what they asked me?

**[00:41:37] Neil Floyd**: No, I'm asking what you told them.

**[00:41:51] Interpreter**: What I told them was that I knew those guys, but I was not hanging out with them.

**[00:42:00] Neil Floyd**: You told them that in reference to you knew Sorenos better than you knew Nortenos?

**[00:42:11] Mr. Cortez**: Objection, Your Honor, it mis-characterizes the testimony, I don't think anywhere it says that.

**[00:42:20] Speaker 1**: The question is did you tell the officers that you knew Sorenos better than you knew Nortenos, is that correct? And what is the objection?

**[00:42:34] Mr. Cortez**: It mis-characterizes what he was saying. There's nothing in the record that says he said that, and that's what he's asking. He's asking to confirm that.

**[00:42:44] Speaker 1**: Sir, if that's not what you told them, you can say no. I'm going to allow the question. Sir, answer the question as best you can. If you're not able to answer the question, just say you can't answer the question, you don't remember or you don't know, but if you know the answer to a question, I expect that you will tell us. Do you need Mr. Floyd to ask the question again?

**[00:43:17] Interpreter**: Yes.

18



**[00:43:19] Neil Floyd**: When you said that you knew the Sorenos down in California, that was in response to the officers asking essentially who would you rather be housed with, Soreno or Norteno.

**[00:43:43] Interpreter**: I don't remember.

**[00:43:47] Neil Floyd**: When you were actually housed at the Northwest Detention Facility initially, you were there in a pod where there were Soreno gang members, correct?

**[00:44:08] Interpreter**: In which?

**[00:44:12] Neil Floyd**: When you first got here, the first pod you were in.

**[00:44:20] Mr. Cortez**: Objection, Your Honor, relevance.

**[00:44:25] Speaker 1**: I'm going to overrule it this time. Go ahead.

**[00:44:37] Neil Floyd**: Do you remember the question?

**[00:44:42] Interpreter**: Can you repeat it?

**[00:44:44] Neil Floyd**: The first pod that you were in when you got to the Northwest Detention Center, I think it was G2, was a pod where they housed Soreno gang members along with you, correct?

**[00:45:06] Interpreter**: No, I don't believe so.

**[00:45:10] Neil Floyd**: At some point you filed a request to reclassify and appeal of your classification determination.

**[00:45:19] Mr. Cortez**: Objection, Your Honor, relevance.

**[00:45:24] Speaker 1**: This is in the record somewhere?

**[00:45:27] Neil Floyd**: Yes, Judge.

**[00:45:32] Speaker 1**: The government file or the respondent?



**[00:45:39] Neil Floyd**: It's in ours, page seven and eight, Judge.

**[00:46:26] Speaker 1**: I'm going to rule objection. It refers to the same line of questioning about whether or not he may have gang affiliations.

**[00:46:41] Neil Floyd**: You filed that with your OIS here asking to be moved, correct?

**[00:46:59] Interpreter**: To a lower level.

**[00:47:01] Neil Floyd**: Then that was denied.

**[00:47:03] Interpreter**: Yes.

**[00:47:05] Neil Floyd**: Do you read English?

**[00:47:08] Interpreter**: Yes.

**[00:47:10] Neil Floyd**: Okay, the reason it was denied was because you had previously said that you hung out with Sorenos in California and you hang out with Paisas, whatever, here in Washington.

**[00:47:24] Mr. Cortez**: Objection, I don't know if that's a question.

**[00:47:30] Speaker 1**: I'm looking at the document you're referring to, Mr. Floyd. It says, "I came in and the officer said I have gang affiliations with the gangs. I wear an orange uniform, I do not have a criminal history, and I'm not affiliated with any gangs".

**[00:47:43] Neil Floyd**: Yes, Judge. Then the typewritten section under the denial.

**[00:47:54] Speaker 1**: It refers to the I2-13, which is already in the record.

**[00:47:59] Neil Floyd**: Then my next question, Judge, is you had an opportunity to appeal that decision and chose not to. Correct?

**[00:48:09] Interpreter**: Yes, because I looked around and I saw no gang members there, so I thought I could be okay, but I thought also if I was moved to another section there could be a possibility that I would be with gang members.



**[00:48:45] Neil Floyd**: In fact you told the ICE officer that you didn't want to appeal it, because you had made friends in that pod.

**[00:49:01] Interpreter**: Not friends, but I met them.

**[00:49:12] Speaker 1**: How much more do you have, Mr. Floyd?

**[00:49:16] Neil Floyd**: I think that I was about to say that I am done, let me check. Were you ever involved in any incidents in California that were gang related and the police showed up?

**[00:49:56] Interpreter**: No.

**[00:49:59] Neil Floyd**: So, this fight that you were a witness to that you were encountered by the police, that was between two gang members, right?

**[00:50:15] Interpreter**: No.

**[00:50:28] Neil Floyd**: If you are released from custody, who are you going to live with?

**[00:50:54] Interpreter**: I will live with my brother or with my mom and my child.

**[00:51:06] Neil Floyd**: That's all the questions I have, Judge.

**[00:51:08] Speaker 1**: In California, Sir?

**[00:51:10] Interpreter**: Yes.

**[00:51:13] Speaker 1**: Mr. Cortez, go ahead.

**[00:51:18] Mr. Cortez**: Your Honor, would it be possible for Mr. Gabriel to question Mr. Ramirez?

**[00:51:21] Speaker 1**: That's fine, go ahead, Mr. Gabriel. Back on the record, Mr. Gabriel are you going to question the respondent?

**[00:51:41] Mr. Gabriel**: I do not have questions for the respondent, but I would like to make a few arguments, if that would be acceptable.



**[00:51:53] Speaker 1**: By the way, Sir, if you're not going to be questioned, I'm going to have you come back and sit with your attorneys. Okay, is there any other evidence from either party or other testimony? Go ahead, Mr. Gabriel.

**[00:52:30] Mr. Gabriel**: Thank you, Your Honor. If you don't mind, I just wanted to respond to a few of the points that were raised on the examination and then also perhaps walk Your Honor through a few additional arguments about danger and flight risk. I just want to note on the education argument that the government was trying to make –

**[00:52:59] Speaker 1**: I'm going to stop you. I heard from Mr. Cortez, he went through – has he not already addressed the issues? Or are you just going to address the issues from the examination?

**[00:53:12] Mr. Gabriel**: I simply wanted to note –

**[00:53:15] Speaker 1**: I just don't want to rehash the stuff that Mr. Cortez already said.

**[00:53:21] Mr. Gabriel**: Understood, Your Honor. Just to simply make the point that the DACA requires the individual to be enrolled in a qualifying educational program, so whether or not he was attending or when he was attending, I don't think are issues that are germane to whether or not he's a flight risk or a danger.

**[00:53:33] Speaker 1**: Didn't he renew his DACA about two years after he had already been disenrolled from the GED program?

**[00:53:38] Mr. Gabriel**: He did, Your Honor, but being enrolled in an educational program is not a requirement to renew DACA. If you'd like I can direct Your Honor to some of the USCIS questions that point to that.

**[00:53:51] Speaker 1**: So, you can be enrolled, not attend for a month and a half, lie and say that your enrollment is current and never go back and attend any GED classes, and then have your DACA expire two years after you've been disenrolled from a GED program, you can renew your DACA, even though the whole DACA program was built on people improving themselves and getting an education here in the United States?



**[00:54:22] Mr. Gabriel**: That's correct, Your Honor, I would note that he was enrolled for several months before submitting his DACA application. Getting an education and being enrolled is one of the ways in which you can get DACA status.

**[00:54:30] Speaker 1**: I thought it was a prerequisite.

**[00:54:33] Mr. Gabriel**: You can serve in the military or be a veteran or other ways.

**[00:54:37] Speaker 1**: Did he do that?

**[00:54:39] Mr. Gabriel**: He did not.

**[00:54:43] Speaker 1**: I hear what you're saying, but it doesn't look like he ever – he testified that the last time he went to a GED class was August, 2013, about a month and a half before he applied for DACA. He never went back and he renewed his application in 2016.

**[00:55:05] Mr. Gabriel**: Again, Your Honor, the application when you renew does not require you – it specifically says that in their frequently asked questions. Do I have to be continuing my education to renew my DACA, and the answer is no. The broader point here is I think this is going to be an issue that we're going to want to contest with USCIS when Mr. Ramirez goes back to renew his DACA application, but I don't think it has any bearing on the issue we're here to discuss today, which is whether he's a danger to the community or a flight risk. I think just to address the most important question, which is does he pose a danger to persons or property. I think that we're in a fairly unique situation where there's a lot of affirmative evidence that he does not pose a threat to persons or property, and that's because the government itself, the department of homeland security on three separate occasions has subjected him to an extensive criminal background check. It involved biometrics, it involved searching numerous gang databases. He underwent that search in 2004 when he was initially granted DACA. In 2015, the department of homeland security rescreened all DACA applicants for gang issues, and in 2016 when he reapplied for DACA, they again performed that background check. So, three times this individual passed a check by the department of homeland security, and they specifically affirmed that he was not a danger to public safety or national security. I would point out that this is an individual who voluntarily submitted to biometrics and a criminal background check. It's also uncontested here that he has no serious criminal history, and despite searching high and low the government has not pointed to any

23



evidence of any violent conduct, of any serious criminal history. What they've got at most is a few minor traffic citations, and a citation, not even a misdemeanor, for possession of a small amount of marijuana. None of this suggests any future propensity for violence or danger. Again to remind the court, this man was not the target of an ICE raid. He happened to be there in the wrong place at the wrong time when they sought out somebody else, and I think as you pointed out, the guilt by association should not be allowed to –

**[00:57:27] Speaker 1**: Did I point that out?

**[00:57:29] Mr. Gabriel**: As you pointed out his father's status and his father's background is irrelevant to his own circumstance.

**[00:57:37] Speaker 1**: You put words in my mouth.

**[00:57:39] Mr. Gabriel**: Understood, Your Honor, my apologies. I think what is telling here is the evidence that they have offered of his gang affiliation really rests on this purported gang tattoo. We have in the record, Your Honor, three independent gang experts who rejected that. The first to be the declaration of Martin Florez.

**[00:58:03] Speaker 1**: Again, I didn't want to go back through what Mr. Cortez ably pointed to the court. He told me about this already. I thought we were going to address the testimony. I heard, I took careful notes, I paid attention.

**[00:58:15] Mr. Gabriel**: I would like to point out they were questioning him on whether or not he confessed to gang affiliation when he was brought into the ICE holding facility, and whether or not he said he wanted to be places with certain gang members over others. One of what Mr. Floyd pointed to on the reclassification form is that he supposedly suggested that he wanted to be detained with the Paisas gang. I think what happened here, Your Honor, is there's a little bit of confusion over the meaning of the term Paisas. Paisas as our client understands it is a colloquial term for Mexican.

**[00:59:00] Speaker 1**: Is that in his declaration?



**[00:59:02] Mr. Gabriel**: It's in his declaration and also in Mr. Florez's declaration, the gang expert. Those are pages 91 F and 101. So, we have both his explanation that there was this misunderstanding about that term and Mr. Florez, who has testified in hundreds of cases.

**[00:59:26] Speaker 1**: Okay, I see that. Thank you.

**[00:59:37] Mr. Gabriel**: The other thing I just want to note, they made this point whether he hung out with gang members, whether he knew gang members. We have two declarations from gang experts that address this issue, Mr. Florez and Miss Barbosa. Both of them explain that in communities like the one that Mr. Ramirez Medina grew up in, it's effectively impossible for young people to avoid interacting with gang members. If you go to the public schools in those communities, if you grew up in those communities, you are going to interact with gang members, and that interaction by itself does not constitute or indicate gang affiliation. That's at page 101, paragraph 15 and pages 104 to 105, paragraphs nine to 10. They also asked him about this reported gang fight, they presented a police report from Lindsay. I just want to point out there that the only suggestion that was a gang fight, this is exhibit H, DHS 25, the person that called the police said they thought it was a gang fight, but if you read the narrative, this was a schoolyard fight between two former friends. There were no charges, there were no serious injuries, there were no weapons, there was no evidence of gang affiliation and everybody was released at the scene. To describe this as some kind of gang fight – again, Mr. Rosenbaum reminds me they've submitted three different exhibits from the Lindsay police department, but none of them refer to Mr. Ramirez Medina as a gang member. This is a small community of approximately 13,000 persons and there is no evidence in the record from that police department where he grew up that he's a gang member, nor is there from any other law enforcement agency anywhere in the country. I think what is most important here is what the government's not saying, there just isn't any credible that this is someone who is a gang member, that this is someone who is violent, that this is someone who has a violent past, nothing to suggest that he's going to be a threat to persons or property. We think that having a single tattoo of your hometown and being witness to a schoolyard fight, that's not enough to suggest that someone is a danger to persons or property.

**[01:02:06] Speaker 1**: Thank you, Mr. Gabriel.



**[01:02:10] Neil Floyd**: Just briefly, Judge, I would note that the only other police involvement was an investigation for having sex with a minor, apparently the mother of his child. He was 19 years old, the father of his 17 year old girlfriend essentially contacted the police when they found out that she was pregnant.

**[01:02:30] Speaker 1**: I thought it was social services? She was 17 and he was 19 when the relationship began?

**[01:02:39] Neil Floyd**: I'm not making more of it than what it was, Judge, it's just that is the only other police involvement that we have. Obviously, you're aware of it. I don't believe from this record there is enough for us to argue that he's a danger to the community, we do have some association, indicated from him that he had association with gangs in the past. We were more concerned with him being a potential flight risk, because of his lack of candor in filing applications, and because he has no stable place to live with someone that has status here in the United States, and because he has limited forms of relief in the form of cancellation removal, there is a strong argument here for hardship. He may have some problems with statutory eligibility based on his admitted drug use and moral character issues.

**[01:03:43] Speaker 1**: That moral character thing I don't think is an exception for people who use less than 30 grams **[unintelligible 01:03:51]**.

**[01:03:53] Neil Floyd**: That's correct, Judge, but there's a lot more that goes into moral character than just the drug use.

**[01:03:56] Speaker 1**: I will say I did look at the police report and when they pulled him over and the officer asked him if there was marijuana in the car, he said, "No". Later the cops found 26 grams of it, and he admitted to the judge when he sent in his nolo contendere plea that he kept it with him all the time, I think is what he said, and it was his marijuana. Anything else, Mr. Floyd? Anything else from the client's counsel table?

**[01:04:33] Mr. Gabriel**: May I very briefly address these things?

**[01:04:35] Speaker 1**: Briefly.



**[01:04:36] Mr. Gabriel**: Just on the police report on unlawful sex, as you pointed out, there was consent of a parent, no charges were filed, the case was closed. I don't think there's any reason to second guess the local prosecutor.

**[01:04:50] Speaker 1**: Yes, I don't – the initial review of what the police report says at the top, but then when you look at the facts of the case, this is the mother of the child. I don't know if they still have a relationship. How old is she now?

**[01:05:12] Mr. Gabriel**: Twenty-two I believe.

**[01:05:17] Speaker 1**: Roger that. What else do you have, Mr. Gabriel?

**[01:05:22] Mr. Gabriel**: Just a note, I think the government is suggesting **[inaudible 01:05:28]** immigration proceedings, and what we would say is first of all, he has very strong ties to the US. He has a young son here, his entire family's here. This is the only home he's ever known since he was 10 years old. He's also afraid to return to Mexico at this point, because he has been labeled by the government in a very public way as a gang member. This is something that has been on the front pages of newspapers in Mexico, this is something that's made the international media. The government, through it's conduct and through issuing several press releases, describe him as a gang member, a charge that they have since backed off of, it has really placed him in a difficult situation. As we mentioned before, he has an important case pending in federal court, he's heavily invested in his federal case, which is going to impact his brother and his sister, who are DACA recipients and other DACA recipients, and he understands that failure to appear for future immigration proceedings would be highly detrimental to that case that he's invested in. He's never missed a hearing in immigration court.

**[01:06:29] Speaker 1**: Has he ever had a hearing in immigration court?

**[01:06:34] Mr. Gabriel**: No. He's voluntarily subjected himself to a criminal background check. I don't think that there's any evidence in the record to suggest that he would. I'll agree with Mr. Floyd here, there's going to be back and forth over his potential avenues for relief, we think that he has several strong potential avenues for relief. We have confidence in his case, he has confidence in his case, and he's committed to stay and fight that case, whether or not the government's going to be successful, something we'll figure out down the road, but he's here to stay and fight that case.



**[01:07:07] Speaker 1**: Last word, Mr. Floyd?

**[01:07:11] Neil Floyd**: Nothing other than the fact that I can't accept the fact that the government has publicized the respondent's detention. If it wasn't for the fact that they've made this a federal case, literally, he probably would have been out on bond a long time ago. That's the reality of the situation. When they accuse us of altering documents in the media and then advertise all over the media and we don't get to respond, eventually we do have to respond. A lot of this case has been a result of them making accusations.

**[01:07:50] Speaker 1**: A lot of this is not meant for me. I'm just going to stick to the record. I'm going to set a bond, it's going to be $15,000. Does your party wish to appeal?

**[01:08:01] Interpreter**: No.

**[01:08:10] Speaker 1**: If you pay your bond, you'll be released. Upon release, you need to give the court a good address where you can be reached by mail. If you fail to appear at any future hearings **[unintelligible 01:08:27]** and if you get in trouble again, if you do get arrested and the bring you back in here, it's going to be hard to get a bond. Anything else before we adjourn? For the record, I am denying **[unintelligible 01:08:47]**. I'll give the parties a copy of the order. Good luck.

**[silence 01:09:03 - 01:10:40]**

**[01:10:40] [END OF AUDIO]**

EXHIBIT B

## THIRD SUPPLEMENTAL DECLARATION OF DANIEL RAMIREZ MEDINA

1.  I, Daniel Ramirez Medina, make this declaration based on my own personal knowledge, and if called as a witness, I could and would testify to the following matters:

2.  I am the plaintiff in this case, and was released from the Northwest Detention Center in Tacoma, Washington on March 28, 2017, after spending six weeks in detention.  I have continued to be in removal proceedings since my release from detention.  I had a hearing for my immigration case on January 17, 2018, at which the Immigration Judge issued an order of removal to Mexico against me.  Without my DACA status, I live in fear that I will be removed from the United States and taken away from my relatives and my son.  DACA status allowed me to live my life without this fear.

3.  Since my release from detention, I have been spending as much time as I can with my family. I split my time between Washington and California to spend time with my brother and my son. I am feeling tremendous daily stress and anxiety due to my uncertain future as a result of the loss of my DACA status and work permit, and now the entry of the removal order against me. I would like to financially support my son but without my work authorization, which was taken from me after I was arrested, I am unable to gain lawful employment.  It is an impossible situation for me and my son, and I am trying to be the best father I can be, and trying to provide for him both financially and emotionally.  If I am deported I won't be able to do either of these things. .

4.  I am aware that on January 9, 2018, a federal court issued an order that requires the government to continue maintaining the DACA program and to allow for renewals for current DACA recipients.  Unfortunately, I am unable to take advantage of this and seek renewal of my DACA status and its benefits following that court order because the government stripped me of my DACA status.  Knowing that there may be a limited window in which I could apply for renewal of DACA status if it had not been taken from me only worsens my anxiety and distress.

1   I declare under penalty of perjury under the laws of the United States of America that the foregoing

2   is true and correct.  Executed on February 1st, 2018, in Lindsay, California.

3

4

5                                          Daniel Ramirez medina

6                                          Daniel Ramirez Medina

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT C



**U.S. Citizenship and
Immigration Services**

# Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction

Versión en español

**Jan. 13, 2018, Update:**  Due to a federal court order, USCIS has resumed accepting requests to renew a grant of deferred action under DACA.  Until further notice, and unless otherwise provided in this guidance, the DACA policy will be operated on the terms in place before it was rescinded on Sept. 5, 2017.

Individuals who were previously granted deferred action under DACA may request renewal by filing Form I-821D (PDF), Form I-765 (PDF), and Form I-765 Worksheet (PDF), with the appropriate fee or approved fee exemption request, at the USCIS designated filing location, and in accordance with the instructions to the Form I-821D (PDF) and Form I-765 (PDF).  USCIS is not accepting requests from individuals who have never before been granted deferred action under DACA.  USCIS will not accept or approve advance parole requests from DACA recipients.

If you previously received DACA and your DACA expired on or after Sept. 5, 2016, you may still file your DACA request as a renewal request.  Please list the date your prior DACA ended in the appropriate box on Part 1 of the Form I-821D.

If you previously received DACA and your DACA expired before Sept. 5, 2016, or your DACA was previously terminated at any time, you cannot request DACA as a renewal (because renewal requests typically must be submitted within one year of the expiration date of your last period of deferred action approved under DACA), but may nonetheless file a new initial DACA request in accordance with the Form I-821D and Form I-765 instructions. To assist USCIS with reviewing your DACA request for acceptance, if you are filing a new initial DACA request because your DACA expired before Sept. 5, 2016, or because it was terminated at any time, please list the date your prior DACA expired or was terminated on Part 1 of the Form I-821D, if available.

Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion.  Further, deferred action under DACA does not confer legal status upon an individual and may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.  DACA requests will be adjudicated under the guidelines set forth in the June 15, 2012 DACA memo (PDF).

Additional information will be forthcoming.

Last Reviewed/Updated: 01/13/2018

EXHIBIT D

RAPHAEL A. SÁNCHEZ
Chief Counsel
GREGORY E. FEHLINGS
Deputy Chief Counsel
JORDAN L. JONES
Assistant Chief Counsel
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
1000 Second Avenue, Suite 2900
Seattle, WA 98104

NON-DETAINED



# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
### Seattle, Washington

| | |
|---|---|
| In the Matter of:<br><br>RAMIREZ-MEDINA, Daniel<br><br>Respondent<br><br>In Removal Proceedings | File No.:  A 207-028-995 |

Immigration Judge Brett M. Parchert

Next Hearing: January 17, 2018 at 8:30 AM

## DEPARTMENT OF HOMELAND SECURITY
## SECOND SUBMISSION OF EVIDENCE

1

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**Seattle, Washington**

|  |  |
|---|---|
| In the Matter of: | December 20, 2017 |
| RAMIREZ-MEDINA, Daniel | File No.:  A 207-028-995 |
| Respondent |  |
| In Removal Proceedings |  |

## DEPARTMENT OF HOMELAND SECURITY
## SECOND SUBMISSION OF EVIDENCE

The U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ("Department" or "DHS") submits the following additional evidence:

1.  DHS Certification, p. 5.

2.  Letter of Support from Governor Graco Ramirez Garrido Abreu, Governor of the State of Morelos, Chair of the National Conference of Governors of Mexico on behalf of all Governors of Mexico, February 25, 2017; p. 6.

    - "Mexico and its states have the obligation to guarantee, promote and respect and protect human rights in accordance with the spirit of the Consular Convention between the United Mexican States and the United States of America as well as the Convention of Vienna on Consular Relations . . . . By reviewing Mr. Ramirez's case, and guaranteeing equal protection before the law, we are sure that we can encourage more young people to envisage a better future . . . ."

3.  "If Dreamers are Deported, 'It Will be America's Loss and Mexico's Gain,' Mexican Foreign Minister Says," September 12, 2017, The Sacramento Bee, http://www.sacbee.com/news/local/article172765891.html; pp. 7 – 8.

    - "Speaking at the Mexican Consulate in North Natomas, Videgaray called the recipients, also known as 'Dreamers,' 'a blessing.' He said if they are deported, the Mexican government is ready to help them continue their college educations, find jobs that fit their skills and provide them with medical insurance . . . . The government [of Mexico] is working with all 32 Mexican states to ensure any dreamers who are sent back can find jobs in their areas of study . . . ."

2

4. "Detained Dreamer's Lawyers Say Government Doctored Document to Justify False Gang Affiliation," February 16, 2017, The Stranger; pp. 9 – 13. https://www.thestranger.com/slog/2017/02/16/24878118/detained-dreamers-lawyers-say-government-doctored-legal-document-to-try-and-prove-false-gang-affiliation

5. Ramirez-Medina v. U.S. DHS, No. C17-218-RSM-JPD, 2017 WL 2954719 (W.D. Wash. March 14, 2017) (MJ Donohue), Report & Recommendation Adopted, 2017 WL 1101370 (W.D. Wash. March 24, 2017) (CJ Martinez); p. 14.

   - "The Court observes that the copy of the Classification Appeal form provided by the Government is readable in its entirety and contains no obvious alterations."

6. Declaration of Classification Officer Michael Heye, GEO Corrections & Detention, February 27, 2017, Ramirez-Medina v. U.S. DHS, No. C17-218-RSM-JPD (W.D. Wash.); pp. 15 – 20. (pp. 19 -20 contains "Classification Appeal" form).

   - ". . . . The Petitioner was assessed as a medium high due to his association with a gang . . . . After the determination was made to not change the classification, I met with the Petitioner to inform him of the decision to keep his classification level at medium high. I sat with the Petitioner at his pod to discuss the classification appeal. I provided him a copy of the Classification Appeal with my recommendation and the Associate Warden's decision. The Petitioner informed me that he did not want to appeal his classification level and go down a level because he has friends in this unit and does not want to move out of the pod. The Petitioner asked to get rid of the Classification Appeal form as he no longer wanted to change his level. I then informed the Petitioner that I could not get rid of the form. I then wrote 'Detainee dose [sic] not want to appeal classification level.' On the back side of the form, and the petitioner signed it."

7. DHS E-mail Communication Regarding Respondent's Classification Appeal; pp. 21 – 22.

8. Declaration of Detention Officer Kayla Martindale, GEO Corrections & Detention, February 27, 2017, Ramirez-Medina v. U.S. DHS, No. C17-218-RSM-JPD (W.D. Wash.); pp. 23 – 24.

   - ". . . . I asked him [i.e., the respondent] his criminal background, and he stated he did not have one. I then reviewed the classification determination page of the book-in process, and I informed him that he was classified as medium high. I asked the Petitioner if he wanted to appeal his classification determination, one electronically, or two, with a paper form. I told him that after the book in process, if there was time, I would get him the paper form and help him fill it out. I provided him the Classification Appeal form and gave him a pen. I filled out the Petitioner's name, A-number, and the current classification level on the form. As the Petitioner began filling out the form, the pen that I gave him did not seem to write very well and the words were faint, so I got him a new pen so he could finish filling out the form . . . ."

9. Declaration of Captain Leroy Portillo, GEO Corrections & Detention, February 27, 2017, <u>Ramirez-Medina v. U.S. DHS</u>, No. C17-218-RSM-JPD (W.D. Wash.); pp. 25 – 26.

   - "Petitioner has been classified as a medium high. Upon his arrival at the NWDC, he was placed in pod G-2. Pod G-2 was a medium high level pod, and only medium high level detainees were housed in Pod G-2. "

10. "Declaration of Daniel Ramirez Medina," February 16, 2017, <u>Ramirez-Medina v. U.S. DHS</u>, No. C17-218-RSM-JPD (W.D. Wash.); pp. 27 – 33.

11. "Father of Detained Dreamer Pleads Guilty to Immigration Crime," March 14, 2017, The Seattle Times, <u>https://www.seattletimes.com/seattle-news/crime/father-of-detained-dreamer-pleads-guilty-to-immigration-crime/</u>; pp. 34 – 36.

12. "Identifying and Documenting Gang Members," (excerpt) September 23, 2010, Police Magazine, <u>http://www.policemag.com/channel/gangs/articles/2010/09/identifying-and-documenting-gang-members.aspx</u>; pp. 37 – 39.

13. "Destiny's Children, Gang Identity and Tattoos," <u>http://www.destinyschildren.org/en/context/gang-identity-and-tattoos/</u>; pp. 40 – 49.

14. DHS Memorandum titled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." June 15, 2012; pp. 50 – 52.

15. Letter from Attorney General Jefferson B. Sessions III advising DHS to rescind the June 15, 2012 Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." P. 53.

16. DHS "Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)"; September 5, 2017; pp. 54 – 60.

17. DHS "Statement from Acting Secretary Duke on the Rescission of Deferred Action for Childhood Arrivals (DACA)." September 5, 2017; pp. 61 – 63.

18. DHS "Fact Sheet: Rescission of Deferred Action for Childhood Arrivals (DACA)." September 5, 2017; pp. 64 – 67.

19. "Santa Cruz County Gangs," Santa Cruz County BASTA: Broad-Based Apprehension, Suppression, Treatment & Alternatives – Gang Overview;" p. 68. <u>http://www.basta.santacruz.k12.ca.us/gang_overview.html</u>

20. "Gang Recognition Guide," Everett Police; pp. 69 – 70.

21. Photographs of Respondent's Tattoos; pp. 71 – 72.

_____

Jordan L. Jones, ACC (ICE/DHS)

4



# DEPARTMENT OF HOMELAND SECURITY
## CERTIFICATION

I HEREBY CERTIFY AND ATTEST in my official capacity that the annexed documents are true and correct copies of the original records of the Department of Homeland Security, or its predecessor the Immigration and Naturalization Service, of which the Secretary of the Department of Homeland Security is the legal custodian under Sections 103 and 290 of the Immigration and Nationality Act, kept or recorded in the regular course of business or activity, relating to the person whose name appears as the subject of the documents and whose A-number appears therein, and that, in executing my official duties under Section 252(c) of Title 6 of the United States Code, and Sections 1240.2 and 1240.32(c) of Title 8 of the Code of Federal Regulations, I have lawful physical custody of the original records of which the annexed documents are true and correct copies produced in the regular course of business or activity by an accurate process of reproduction.

Assistant Chief Counsel
Immigration and Customs Enforcement
Seattle, WA

5



Conferencia Nacional
de Gobernadores

February 25, 2017

The Honorable James P. Donohue
Chief United States Magistrate Judge
United States District Court
Western District of Columbia
United States Courthouse
700 Stewart Street, Suite 12232
Seattle, WA 98101 – 9906

Dear Judge Donohue,

On behalf of the Mexican nationals brought to the United States as young children by their parents, the Governors of Mexico would like to express our support and admiration for the daily struggle they endure in their effort to succeed, attain an education and shape their future and their communities' future through hard work.

Regarding the case of the arrest and detention of Daniel Ramirez Medina (case # 2:17-cv-00218-RSM-JPD), a young Mexican national and who was a beneficiary of the Deferred Action for Childhood Arrivals program (DACA), we would expedited decision to review Ramirez's case in which we are confident that his right to liberty will be fully observed and considered.

Mexico and its states have the obligation to guarantee, promote, respect and protect human rights in accordance with the spirit of the Consular Convention between the United Mexican States and the United States of America as well the Convention of Vienna on Consular Relations. We convey our respect for the U.S. judicial system as well as our support for the Consular efforts of the Government of Mexico related to the protection of human rights and due process when addressing Mexican citizens.

In addition, DACA has demonstrated to be a successful program that has been carefully crafted to rigorously vet its recipients. DACA allows for its recipients to continue to live their lives without fear of arrest or arbitrary immigration prosecution. That is why we share our strongest conviction that Mr. Ramirez, and other DACA recipients will benefit from an immediate decision from this court.

By reviewing Mr. Ramirez's case, and guaranteeing equal protection before the law, we are sure that we can encourage more young people to envisage a better future.

I thank you in advance for your consideration of this letter.

Sincerely,
Governor Graco Ramirez Garrido Abreu,
Governor of the State of Morelos
Chair of the National Conference of Governors of Mexico

56

🔖 BOOKMARK FOR LATER

MY BOOKMARKS 



**LOCAL**

# If dreamers are deported, 'it will be America's loss and Mexico's gain,' Mexican foreign minister says

**BY STEPHEN MAGAGNINI**
*smagagnini@sacbee.com*

SEPTEMBER 12, 2017 4:00 AM

If the 600,000 Mexican-born recipients of the Deferred Action for Childhood Arrivals program – or DACA – are deported by the Trump administration, "America's loss will be Mexico's gain," Mexican Secretary of Foreign Affairs Dr. Luis Videgaray Caso said Monday at a press conference in Sacramento.

Speaking at the Mexican Consulate in North Natomas, Videgaray called the recipients, also known as "Dreamers," "a blessing." He said if they are deported, the Mexican government is ready to help them continue their college educations, find jobs that fit their skills and provide them with medical insurance.

"We will receive them with open arms," Videgaray said, adding that both the Mexican Ministry of Education and the Department of Labor have changed regulations to accommodate the Dreamers if they are deported.

"Hopefully that doesn't happen," said Videgaray, whose office has been vigorously lobbying both houses of Congress to pass legislation on the issue.

**Today's top news by email**

The local news you need to start your day

Enter Email Address

SIGN UP

"We fully acknowledge that America's immigration policies must be defined by America," he said, "but we strongly hope U.S. Congress will act promptly. These young people want to stay in America – they were raised here."

The DACA program was established by President Barack Obama in 2012. It allowed minors brought to the U.S. by their parents to qualify for renewable work permits, driver's licenses, college educations and scholarships if they successfully met certain requirements, including having no criminal record. The Trump administration recently announced it would end the program, and has given Congress six months to pass legislation to address the Dreamers and their legal status.

Videgaray spent part of Monday at the Capitol meeting with Gov. Jerry Brown and state legislators on a variety of hot-button issues including climate change, NAFTA, renewable energy and immigration.

The Mexican government already is providing legal assistance to undocumented Mexican immigrants seeking to adjust their legal status, said Videgaray, who met with about 20 DACA recipients privately. Videgaray, who holds a doctorate in economics from MIT, said the government is working wiith all 32 Mexican states to ensure any dreamers who are sent back can find jobs in their areas of study.

"If it's one or 100,000 or 600,000, this will be a big gift to Mexico," he said. "They are college-educated, law-abiding, talented young people full of energy and creativity."

Videgaray on Monday also spoke of the recent 8.1-magnitude earthquake in Mexico that claimed 95 lives and destroyed thousands of homes and buildings.

*Stephen Magagnini: 916-321-1072, @SteveMagagnini*

**Never miss a local story.**

Case 2:17-cv-00218-RSM    Document 122-1    Filed 02/06/18    Page 48 of 112

# the Stranger

MENU

# SLOG

NEWS

# Detained Dreamer's Lawyers Say Government Doctored Document to Justify False Gang Affiliation

by <u>Sydney Brownstone</u> · Feb 16, 2017 at 7:10 pm

Tweet



**Daniel Ramirez Medina's lawyers say the government doctored his request to be removed from the Northwest Detention Center's gang unit.**

Lawyers for Daniel Ramirez Medina, the **23-year-old, twice-authorized Deferred Action for Childhood Arrivals program (DACA) recipient** who was scooped up by immigration enforcement near Seattle last week, say that government officials doctored a legal document at the Northwest Detention Center in an attempt to prove that Ramirez Medina belonged to a gang.

The allegation of government misconduct is outlined in a brief filed by Ramirez Medina's lawyers in US District Court in Seattle. The lawyers say that when Ramirez Medina—who has been detained inside the Tacoma's Northwest Detention Center's gang unit for a week—tried to petition to be removed from the gang unit, part of his written petition was erased.

ADVERTISEMENT

The brief states Ramirez Medina originally wrote: "I came in and the officers said I have gang affiliation with gangs so I wear an orange uniform. I do not have a criminal history and I'm not affiliated with any gangs."

But according to an additional declaration filed to the court, the statement returned to Medina by Immigration and Customs Enforcement (ICE) officials five days later says: "I have gang affiliation with gangs so I wear an orange uniform. I do not have a criminal history and I'm not affiliated with any gangs."

The document filed to the court bears clear signs of erased words. (See the image above.)

ADVERTISEMENT

"What began, I thought, as a mistake in bringing Daniel in has turned into a bogus operation that is attempting to railroad him and violate the sacred program that the DACA represents," lawyer Mark Rosenbaum told reporters on a conference call this evening. "It is one of the most serious examples of governmental misconduct that I have come across in my 40 years of practice."

ICE did not immediately respond to a request for comment.

After Ramirez Medina's arrest during an immigration raid targeting a family member last week, ICE put out a statement claiming that Ramirez Medina was a "self-admitted gang member." Ramirez Medina's lawyers denied that their client ever said he was affiliated with a gang; they added that he had been pressured to say he was (but resisted) while in detention.

ADVERTISEMENT

On Wednesday, the *Seattle Times* reported that the accusation of gang affiliation may have stemmed from **a tattoo on Ramirez Medina's forearm** with a nautical star and the name of his hometown.

According to e-mails obtained by *The Stranger* from a source at the city, ICE has declined to meet with Seattle Mayor Ed Murray to discuss the situation and share more information about Ramirez Medina's arrest. Tomorrow morning, a federal judge in Seattle will hear Ramirez Medina's lawyers and the government argue over ICE officials' justification in detaining Ramirez Medina in the first place.

**Update:** "I'm not familiar with the lawyer's allegation," ICE public information officer Rose Richeson said. "We stand by all statements previously released related to this case."

**See also: Daniel Ramirez Medina will remain detained for now, judge rules.**

To get this delivered to your inbox, subscribe to *The Stranger*'s Daily Slog newsletter.

| email address | Subscribe |
|---|---|



14

## You might also be interested in these:

SPONSORED: 25% OFF The Nutcracker at Pacific Northwest Ballet!

**The Morning News:** Seattle Now Among Five Most Expensive Cities for Renters, Women Sue Harvey Weinstein
by Heidi Groover

Marya Sea Kaminski Leaves Seattle Repertory Theatre for a Post at Pittsburgh Public Theater
by Rich Smith

ADVERTISEMENT

## MOST POPULAR IN SLOG

Savage Love Letter of the Day: Help! My Boyfriend's Son Saw My Sexy Vacation Pics! by Dan Savage

Protesters Disrupt Landlord Convention, State Rep Calls for Rent Control by Heidi Groover

New Beacon Hill Bar/Restaurant/Music Venue the Clock-Out Lounge Slated to Open in February by Dave Segal

GOP Wants to End the Student Loan Forgiveness Program by Katie Herzog

The Republican "Win" on Taxes Is Already Helping Democrats by Eli Sanders

Popular Leftist YouTuber ContraPoints Gets Caught Up in University of British Columbia Free Speech Debate by Katie Herzog

Two Students Wounded in Shooting Outside Pierce County High School by Sydney Brownstone

# theStranger

All contents © Index Newspapers LLC
1535 11th Ave (Third Floor), Seattle, WA 98122

Contact | Privacy Policy | Terms of Use | Takedown Policy

1        Once Petitioner arrived at the detention center, he was told to wear orange, signifying a

2    higher security level due to being a gang member. *Id.* at ¶ 27. Petitioner attempted to appeal

3    this classification, but later withdrew the appeal.[12]

4        The Government's account of the events of February 10, 2017 is based on the summary

5    set forth in the Form I-213[13] prepared by Deportation Officer ("DO") Matthew Hicks

6    following Petitioner's arrest. Dkt. 52-9. According to the Form I-213, after Petitioner's father

7    was arrested and taken into custody at approximately 9:02 a.m., the father, upon questioning by

8    the arresting officers, advised officers that his sons were inside the apartment and that they

9    were in this country illegally. *Id.* at 4. The father then indicated that he wanted to talk to his

10   kids and officers told him he could do that, but that officers would need to accompany him. *Id.*

11       The Form I-213 indicates that at approximately 9:10 a.m., officers requested, and were

12   granted, permission by Petitioner's father to enter the apartment. *Id.* Upon entering the

13   apartment, officers observed Petitioner sleeping on the living room floor. *Id.* DO Hicks

---

14   [12] Petitioner asserts that when he filled out his "Classification Appeal" form on

15   February 10, 2017, he wrote "I came in and the officer said I have gang affiliation with gangs
     so I wear orange uniform. I do not have a criminal history and I'm not affiliated with any

16   gangs." *Id.* When Petitioner saw the form again on February 16, 2017, he asserted that it
     appeared that someone had attempted to erase the words, "I came in and the officer said," to

17   make it look like Petitioner made the statement, "I have gang affiliation." *Id.* Petitioner does
     not know who would have erased his words on the form. The Government's materials suggest

18   that no alterations were made to Petitioner's appeal form, but that Petitioner was simply
     provided a faulty pen. The detention officer who provided Petitioner with the Classification

19   Appeal form states that after filling out Petitioner's name, A-number, and current classification
     level, she gave the form to Petitioner along with a pen. Dkt. 52-14 at 2. As Petitioner began

20   filling out the form, the pen provided by the officer was not writing well and the words were
     faint, so the officer got Petitioner a new pen to finish filling out the form. *Id.* at 2-3. The

21   Court observes that the copy of the Classification Appeal form provided by the Government is
     readable in its entirety and contains no obvious alterations. *See* Dkt. 52-13. The parties'

22   differing accounts of what took place with respect to Petitioner's classification appeal are
     immaterial to the Court's resolution of the jurisdictional questions at issue.

23
     [13] The Form I-213, titled "Record of Deportable/Inadmissible Alien" provides details
24   regarding Petitioner's identity, criminal history, immigration history, and basis for removal and
     immigration detention. Dkt. 52-9 at 2-5.

REPORT AND RECOMMENDATION - 12

14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIEL RAMIREZ MEDINA

Petitioner,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

Respondents.

Case No. C17-218-RSM-JPD

DECLARATION OF
MICHAEL HEYE

I, Michael Heye, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am employed by the GEO Group, Inc. at the Northwest Detention Center ("NWDC") in Tacoma, Washington.  I am a classification officer at GEO.  I have been the classification officer at GEO for the last six years.  I have been employed at GEO since 2004. My primary duty is to classify incoming detainees to the appropriate detention levels at intake.  I also adjudicate all classification appeals.  After 60 days of detention, I review the classification level for possible reclassification.  I then review the classification level of each detainee every 90 days.

2.      I make this declaration based on my personal knowledge, review of the Petitioner's detention file.

3.      When the Daniel Ramirez Medina ("Petitioner") was booked into the NWDC on February 10, 2017, another GEO Classification Officer conducted the initial classification assessment, which I reviewed and approved.  The Petitioner was assessed as a medium high due to his association with a gang.

4.      On the day the Petitioner booked into the NWDC, he filled out a Classification Appeal form.  The Classification Appeal form was given to the intake officer, who routed the Classification Appeal form to me.  When I arrived to work on February 13, 2017, the

Classification Appeal form was on my desk for adjudication. I stamped the Classification
Appeal form as received on February 13, 2017.

     5.      On February 15, 2017, I adjudicated the Classification Appeal. After reviewing
the Form I-213, I recommended that the classification level should not be changed. I then hand
delivered the Classification Appeal to the GEO Assistant Warden. The Assistant Warden
concurred with my recommendation and determined that the classification will not be changed.

     6.      After the determination was made to not change the classification, I met with the
Petitioner to inform him of the decision to keep his classification level at medium high. I sat
with the Petitioner at his pod to discuss the classification appeal. I provided him a copy of the
Classification Appeal with my recommendation and the Associate Warden's decision. The
Petitioner informed me that he did not want to appeal his classification level and go down a level
because he has friends in this unit and does not want to move out of the pod. The Petitioner
asked to get rid of the Classification Appeal form as he no longer wanted to change his level. I
then informed the Petitioner that I could not get rid of the form. I then wrote "Detainee dose
[sic] not want to appeal classification level." on the back side of the form, and the Petitioner
signed it.

     7.      After speaking with the Petitioner, I placed the original Classification Appeal into
the Petitioner's detention file. Attached as Exhibit 1 to my declaration is a true, accurate, and
complete copy of the Classification Appeal as it appears in Petitioner's detention file.

     8.      I have a specific recollection of the original Classification Appeal form. The form
was filled out in blue ink. The first seven words appear to be a little lighter that the rest of the
text. I have no idea why it is lighter. However, there are no smudge marks, or any other
indications that would suggest that someone tried to tamper with it.

     9.      I did not tamper with this document in any way.

     10.     If I would have seen any evidence of tampering, I would have immediately
reported it to the Assistant Warden.

//

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed in Tacoma, Washington, on this ___27___ day of February, 2017

Michael Heye
Classification Officer
GEO Corrections & Detention

17

# EXHIBIT 1

# Classification Appeal

| Name: RAMIREZ. MEDINA | A#: 207 028 995 |
|---|---|

Current Classification Level: X LEVEL TWO    ⌐ LEVEL THREE

In the space provided explain why you disagree with your classification level assignment. Your appeal will be forwarded to the Classification Review Officer. The Classification Review Officer will review your appeal and forward it to the Associate Warden. The Associate Warden will make a determination regarding your appeal within five business days. You will receive notification of that decision within ten business days.

I came in and the officer said I have gang affiliation with gangs so I wear a orange uniform I do not have a criminal history and im not affiliated with any gangs.

Danlo Ramirez          2-10-2017
_Detainee Signature_          _Date_

## Recommendation of the Classification Review Officer

I recommend that the classification level of this detainee: ⌐ Should be changed to _____   X Should not be changed

I have based my recommendation on the following:
Detainee came into custody on 2/10/17. Detainee has no criminal convictions. The I-213 that ICE provided states that the detainee used to hang out with the Sereno's in California and still hangs out with the Paizas in Washington.   Because of gang affiliation ICE standards do not allow a lower custody level.  A classification reduction is not recommended.

_____          2/15/17
_Staff Signature_          _Date_

## Decision of the Associate Warden

I have determined that the classification level of this detainee: ⌐ Will be changed as recommended
⌐ Will be changed to _____
X Will not be changed

I have based my decision on the following:
As stated above

_____          2-15-17
_Signature_          _Date_

RECEIVED
FEB 13 2017

Detainee acknowledgement of decision and notice of appeal rights on reverse.

Detainee acknowledgement of decision and notice of appeal rights on reverse.

## Detainee Acknowledgment of Decision

If you disagree with the decision of the Associate Warden, you may appeal the decision to the Warden. The Warden will make a determination regarding your appeal within five business days. You will receive notification of that decision within ten business days.

I have received the decision of the Associate Warden and: ☐ Wish to appeal the decision to the Warden
☐ Accept the decision and waive further appeals

DETAINEE DOSE NOT WANT TO APPEAL CLASSIFICATION LEVEL.

_____          _____
Detainee Signature                       Date

## Appeal to the Warden

X Daniel  2/15/17

I disagree with the decision of the Associate Warden for the following reason(s):

_____
_____
_____
_____

_____          _____
Detainee Signature                       Date

## Decision of the Warden

I have determined that the classification level of this detainee: ☐ Will be changed to
☐ Will not be changed

I have based my decision on the following:

_____
_____
_____

### *THIS DECISION IS FINAL AND CANNOT BE APPEALED*

_____          _____
Signature                                  Date

## Detainee Acknowledgement of Final Classification Decision

I have received the decision of the Warden.

_____          _____
Detainee Signature                       Date

Classification Appeal                    CL 003                          12-24-14

20

**Fehlings, Gregory E**

| | |
|---|---|
| **From:** | Bill McHatton ~~████████████████~~> |
| **Sent:** | Friday, February 17, 2017 6:43 AM |
| **To:** | Melendez, Michael A; Wilcox, Bryan S |
| **Subject:** | Fwd: Detainee Ramirez-Medina A#207-028-995 |

FYI

---------- Forwarded message ----------
From: "Michael Heye" <~~████████████~~>
Date: Feb 17, 2017 06:40
Subject: Fwd: Detainee Ramirez-Medina A#207-028-995
To: "Bill McHatton" ~~████████~~>
Cc:

Ramirez-Medina 207028995 appeal
---------- Forwarded message ----------
From: **Michael Heye** <~~████████████~~>
Date: Wed, Feb 15, 2017 at 9:42 AM
Subject: Detainee Ramirez-Medina A#207-028-995
To: Leroy Portillo <~~████████████~~>

Detainee Ramirez put in a classification appeal form to go down in level because he says that he has no criminal history and he is not affiliated with any gangs.  I wrote up the appeal form and took it to him today on 2/15/17 at about 0900.  I talked to the detainee in G2 pod and he told me that he did not want to appeal his classification level and go down because he has friends in this unit and dose not want to move.  So I wrote on the back of the appeal form "Detainee dose not want to appeal classification level" and had him sign it.

Thanks (HI)

--
**Michael Heye (HI)**
Classification

**The GEO Group, Inc.®**
Northwest Detention Center
1623 East J Street
Tacoma, Washington 98421

Tel: ~~████████~~
~~██████████████~~
www.geogroup.com

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

1

Z1-

--

**Michael Heye (HI)**
Classification

**The GEO Group, Inc.®**
Northwest Detention Center
1623 East J Street
Tacoma, Washington 98421

Tel: 

www.geogroup.com

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DANIEL RAMIREZ MEDINA | Case No. C17-218-RSM-JPD |
| Petitioner, | |
| v. | DECLARATION OF Kayla Martindale |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | |
| Respondents. | |

I, Kayla Martindale, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am employed by the GEO Group, Inc. at the Northwest Detention Center ("NWDC") in Tacoma, Washington. I am a detention officer for the GEO Group. I have been a detention officer for the last six years. My duties include booking in new detainees at the NWDC.

2.     I make this declaration based on my personal knowledge.

3.     On February 10, 2017, I was working at intake. I completed the Petitioner's book-in process and I explained every document that he signed to him. The Petitioner complained and asked my why he was dressed in orange. I told him I did not know why. I asked him his criminal background, and he stated he did not have one. I then reviewed the classification determination page of the book-in process, and I informed him that he was classified as a medium high. I asked the Petitioner if he wanted to appeal his classification determination, and he stated yes. I told him there are two ways to appeal the classification determination, one electronically, or two, with a paper form. I told him that after the book in process, if there was time, I would get him the paper form and help him fill it out.

4.     I provided him the Classification Appeal form and gave him a pen. I filled out the Petitioner's name, A-number, and the current classification level on the form. As the Petitioner began filling out the form, the pen that I gave him did not seem to write very well and the words

23

were faint, so I got him a new pen so he could finish filling out the form.  The Petitioner signed the form and gave the form back to me.  I dropped the form off to the Classification Officer.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed in Tacoma, Washington, on this ___27___ day of February, 2017

_____
Kayla Martindale
Detention Officer
GEO Corrections & Detention

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIEL RAMIREZ MEDINA

    Petitioner,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

    Respondents.

Case No. C17-218-RSM-JPD

DECLARATION OF
LEROY PORTILLO

I, Leroy Portillo, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am employed by the GEO Group, Inc. at the Northwest Detention Center ("NWDC") in Tacoma, Washington. My rank for GEO is Captain. I have been the Captain for the last three years. I have been employed by GEO since 2003. My primary duty is to oversee the operations of the facility. This would include making decisions on the appropriate housing for detainees.

2.    I make this declaration based on my personal knowledge.

3.    I am familiar with the detainee classification process. At the NWDC, there are four classifications for detainees, the low level is dressed in blue. The medium low level is dressed in green. The medium high level is dressed in orange. The high level is dressed in red. The low (blue) and medium low (green) can be housed together. The low (blue) and medium low (green) level detainees cannot be housed with any detainee classified at medium high (orange) or high (red). Medium high (orange) level detainees can be housed with high (red) level detainees.

4.    The NWDC is currently near its maximum capacity, and every residential pod is in use. The NWDC is also dealing with a potential Varicela outbreak, which requires some pods to be under quarantine.

5.      Petitioner has been classified as a medium high.  Upon his arrival at the NWDC, he was placed in pod G-2.  Pod G-2 was a medium high level pod, and only medium high level detainees were housed in Pod G-2.

6.      On February 22, 2017, I was notified by my Lieutenant that the facility was out of available low and medium low bed space for males.  I then met with the Assistant Warden and the ICE AFOD to discuss this issue.  We determined that the best course of action was to rehouse the detainees in G-2 to other medium high and high pods.  I then instructed my subordinates to start the process of rehousing the detainees at G-2 to other pods within the facility.

8.      None of the detainees in G-2 who were rehoused had their classifications readjusted, including the Petitioner.  The Petitioner remains at the medium high level.

7.      The Petitioner was assigned to Pod C-1.  Pod C-1 is a medium high custody level pod.  Pod C-1 houses only medium high custody level detainees.  There are no high level detainees in Pod C-1.

8.      Pod G-2 is now housing low and medium low detainees.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed in Tacoma, Washington, on this __27__ day of February, 2017

Leroy Portillo
Captain
GEO Group, Inc.

# DECLARATION OF DANIEL RAMIREZ MEDINA

1.  I, Daniel Ramirez Medina, make this declaration based on my own personal knowledge, and if called as a witness, I could and would testify to the following matters:

2.  My name is Daniel Ramirez Medina. I was born near La Paz, Baja California Sur, Mexico, on March 9, 1993. When I was about 10 years old, my parents brought me to the United States so that my family could have a better life. I have never left the United States since then. I grew up in California living with my mom and my brother and sister. Now, I am a father of a three-year-old United States citizen son, and until my current detention, I had Deferred Action for Childhood Arrivals ("DACA") and employment authorization.

3.  I first applied for DACA in late 2013. When I applied, I paid an application fee, and I gave the government all of my personal information, including my birth certificate, my school records, and information about where I lived. I marked on the application that I had no criminal record or gang affiliation. I also had to go to a United States Citizenship and Immigration Services (USCIS) biometrics appointment, where USCIS took my fingerprints and photograph so they could complete a background check on me.

4.  I still remember the biometrics appointment because I was so nervous. I was afraid to go to the office because I did not know whether I could trust the government, and I thought that they might deport me. But everything went okay. When I got out of the appointment, I felt relieved, and my family and I went out to eat to celebrate.

5.  It was a huge risk to apply for DACA because of all the personal information I had to share. But the government made me believe that it was worth it because DACA would protect me from detention and deportation so long as I qualified for the program, and because the employment authorization would let me

1    find a better job and make a better future for my family. I would not have applied if I
2    had thought that the government would not keep up its side of the promise.

3         6.    The government reviewed my application for multiple months. In 2014,
4    my DACA application was approved, and I received an employment authorization
5    card. I felt so happy. My understanding was that DACA and employment
6    authorization meant that I could work in the country, and I would not be detained or
7    deported while my DACA was valid.

8         7.    With my employment authorization, I was able to work. My first job was
9    picking oranges in the fields. It is hard work because you have to climb a ladder into a
10   tree to pick the fruit and put them in a bag. In the summer it is very hot, and even the
11   shade of the trees that we climb is not enough. The fruit also becomes very heavy in
12   the bags. Sometimes I got bad chest pains from the weight of the oranges. But it
13   helped me provide for my family.

14        8.    In late 2013, my son Daniel was born. He is my world. I was at the
15   hospital with his mom when he was born, and I could feel then how even more
16   important it was to be able to provide for him and support my family.

17        9.    On February 28, 2016, I submitted an application to renew my DACA
18   and employment authorization. As part of the process, I re-submitted personal
19   information, promised that I had no criminal record or gang affiliation, and I was
20   required again to go to a USCIS biometrics appointment. USCIS took my fingerprints
21   and photograph so that they could complete another background check. On May 5,
22   2016, USCIS approved my DACA renewal application. I received a notice from
23   USCIS indicating that my renewed DACA is valid from May 5, 2016 to May 4, 2018.
24   USCIS mailed me a new employment authorization card valid for the same time
25   period.

26        10.   About a month and a half ago, I left California and came to Washington
27   to find work with my brother and father, so that I can provide better for my son. I have
28   been looking for work ever since I got here. My hope is to work and finish my

28

1  education so that I can have a good career, maybe in auto repair or painting cars,
2  which I really enjoy.

3      11.    Looking back on things, I realize that I could have done better in middle
4  and high school, but some subjects in school, like math and science, were challenging
5  for me. But after I left school, I realized how important it is get the better jobs, so I
6  started going to adult school. I am hopeful that in Washington I can go back to adult
7  school so that I can finish my degree, which I need so that I can support my family
8  better. My mother, my little sister who is in school, and my son are all counting on
9  me.

10      12.    In school, I behaved well. I do not remember ever being suspended or
11  expelled.

12      13.    Even though I am in Washington to find work to provide for my son, it is
13  still very difficult to be away from him. I went back to California to see him on New
14  Year's, and we played with his toys, shared meals, and spent time together. I cry when
15  I think that New Year's was the last time I saw my son, and I do not know when I will
16  get to see him again.

17      14.    On Friday February 10, 2017, my world broke apart. At about 9:00 a.m.,
18  ICE agents arrested my father outside our apartment right after he had taken my little
19  stepbrother to school. I was sleeping on the couch when I woke up to a lot of noise
20  and saw ICE agents in the room with me. I could see inside the bedroom where my
21  brother had been asleep, and I could hear my brother and two other ICE agents. I was
22  so scared. I sat up and turned my head around in disbelief.

23      15.    One ICE agent with short hair asked me my name, my birthdate, and
24  where I was born. I said my name, my birthdate, and that I am from Mexico. At that
25  point, the agent told me to stand up and turn around. Then, with my arms behind my
26  back, he placed handcuffs around my wrists, which hurt and left me with marks. I said
27  at least five times, "I have a work permit. You cannot take me." I kept saying it, but
28  the agent did not care. I also asked for the warrant, but they would not show me.

16.    He continued to ask me questions. And he never asked about my tattoo or about any gang involvement. The ICE agents arrested me and took me along with my father to a processing center.

17.    At the processing center, they took my fingerprints, ran them, and confirmed that I had no criminal history and that my DACA was active. Then, the same officer with short hair who questioned me at the apartment continued to interrogate me. He searched me, removed my wallet from my shorts, and took out my identification and my employment authorization card, which shows that I have DACA. I told the agent again that I have employment authorization, but the agent said that it did not matter because I was not from the United States.

18.    I was surprised and did not know what to say. I was thinking, "What does my employment authorization mean if not that I can live and work in this country without being deported?" It felt shocking because they were basically saying that my authorization and DACA meant nothing.

19.    The officer then started asking me if I was in a gang. I think he asked me five to seven times. Each time I said, "No. I am not in a gang." I never said that I was involved with a gang or that I was "not no more" involved. I said that because I am not in a gang, and I have never been in a gang or gang-affiliate. In middle and high school, there were some kids involved in gangs at my school that I knew, but I was not one of them.

20.    I was not and am not interested in gangs because that life ends badly, either in jail or in death. I do not and have not ever wanted that kind of life. I am a person who wants to build a career and who spends time with family. We go out shopping or share meals together at home.

21.    Another agent who had a lot of tattoos on him came over. After I had said "no, I am not involved in a gang" so many times to the agent with short hair, the other one chimed in. The agents kept insisting that I was in a gang, naming different gangs. At one point, he said that I was a "bulldog" from Fresno because I had said that I was

1   from the Fresno area. I laughed because it was such a ridiculous idea, but the agent
2   with tattoos said, "You see, that's why he's laughing. He's a gang member."

3       22.   They would not stop. It felt like forever. I felt an intense amount of
4   pressure, like if I did not give them something, they would not stop. So, I told them
5   that I did nothing more than hang out with a few people who may have been Sureños,
6   but that since I became an adult I have not spoken with any of those people. I never
7   said that I was involved in that gang or any gang, or that I was a gang member. The
8   opposite—I kept say "No." I just said that about "hanging out" because they would
9   not stop. Really, when I was in high school, I knew people that were in gangs, which
10  is impossible not to if you come from my community and go to the public school. I
11  never said that I hang out with gang members in Washington.

12      23.   The agents started asking me about my tattoo. I have only one tattoo, which
13  is located on my left forearm and says "La Paz - BCS" and has a nautical star. The ink
14  is bluish. When I was about 18, I really liked the way tattoos look—like a lot of
15  people do. In California, I saw people with tattoos in public and at stores, like Wal-
16  Mart. I talked about it with my friend and he did it for me.

17      24.   "La Paz" is where I am from. "BCS" stands for Baja California Sur,
18  which is where La Paz is located. I decided to go with my hometown because I have
19  seen a lot of people do that. As for the star, my friend who did the tattoo for me
20  designed it. We were at my aunt's house. I was trying to decide between a whale tail
21  and the nautical star. In the end, I liked the way the star looked, so he had a notebook,
22  and he drew various options of the design. I picked one that I liked.

23      25.   When the agents asked me about my tattoo, I said, "It is where I am
24  from." One of the agents asked me where I lived before Washington, and I said the
25  "Fresno area." The agent said that if I was from Fresno, then I was definitely a gang
26  member. He repeated it, saying that everyone from Fresno is in that gang. The agent
27  then said the star was a tattoo from the Fresno area. I continued to tell them that I am
28  not in a gang. The agents asked me to sign some papers, but I did not sign anything

1  saying that I was a gang member. I think that the papers I signed had to do with
2  processing issues, like consular access.

3      26.    After I received a call from my brother, the agents got upset because I
4  would not say who I was speaking with, and they assumed I was speaking with a gang
5  member. Right after that, they said that they were going to take me to the detention
6  center. Then, they asked me if I would have any problems in the detention center with
7  any gang members if they put me in a particular housing unit. I told the officers that I
8  would not have any problems with any gang members. I said that if they were going to
9  put me in a particular housing unit at the detention center, I did not want to be with the
10 Sureños or Norteños. I would want to be with other *"paisas."* *"Paisa"* is short for
11 "paisano" which is a colloquial term for other Mexican people at the detention center.
12 It basically means Mexican people who are not in a gang.

13     27.    The agents then transferred me to the detention center. They told me I
14 had to wear orange because I was classified as a gang member. Orange means I am a
15 higher security level. I asked to change the color because I am not a gang member and
16 did not want to be classified at the higher security level. They told me to fill out a
17 "Classification Appeal" form. On that form, I had to explain why I disagreed with my
18 classification level. I wrote "I came in and the officer said I have gang affiliation with
19 gangs so I wear orange uniform. I do not have a criminal history and I'm not affiliated
20 with any gangs." I signed the form on February 10, 2017. I saw the form again today,
21 but the part of my sentence that states "I came in and the officer said" is erased. This
22 document is attached as Exhibit A. Now it looks like *I* said "I have gang affiliation,"
23 but that is not what I said. You can still see my original words on the paper. I did not
24 erase it and I do not know who did.

25     28.    I am currently and have been held in detention at an ICE Detention
26 Center since Friday morning (February 10, 2017).

27     29.    This detention has been very difficult on me, as well as my family. I have
28 not seen my son. I am not able to work to provide for him while detained. I want to

---

6

1   stay in this country and provide a life for my son and family. I, too, want a better
2   future. I just do not understand why I am being detained.

4       I declare under penalty of perjury under the laws of the United States of
5   America that the foregoing is true and correct.  Executed on February 16, 2017, in
6   Tacoma, Washington.

_Daniel Ramirez_
Daniel Ramirez Medina

DECLARATION OF DANIEL RAMIREZ MEDINA
33

Search

Crime

# Father of detained Dreamer pleads guilty to immigration crime

Originally published March 14, 2017 at 1:59 pm *Updated March 14, 2017 at 5:25 pm*

**Antonio Ramirez-Poledo could face up to 20 years in prison when he is sentenced for entering the country illegally. However, federal prosecutors are recommending that he be released for time served.**

 By Mike Carter

*Seattle Times staff reporter*

The father of a so-called Dreamer — the young man whose arrest in Des Moines by immigration officials sparked fears of an immigration roundup and drew a national outcry — pleaded guilty Tuesday in U.S. District Court to entering the country illegally.

Court documents indicate that Antonio Ramirez-Poledo, 43, could face up to 20 years in prison because he has a prior drug felony in King County. However, federal prosecutors are recommending in a plea agreement filed with the court that he be released for time served when he is sentenced by U.S. District Judge Ricardo Martinez.

Martinez is not bound by the prosecutor's recommendation.

Ramirez-Poledo will likely face immediate deportation back to Mexico after the sentence is served.

## More on immigration

34

ICE tracks down immigrant who spoke to media in SW Washington: 'You are the one from the newspaper'

With chances of immigration deal fading, Dreamer supporters mount big push

WATCH: A look at the crackdown on undocumented immigrants on the Washington coast

Federal appeals court allows Trump's third travel ban to partially take effect

A Washington county that went for Trump is shaken as immigrant neighbors start disappearing

Seattle lawsuit challenges bar on entry of refugee's family

He was deported from the U.S. at Paso del Norte, Texas, in 2004, after he was convicted in King County for possessing heroin and cocaine for distribution. He then returned to King County.

According to the criminal complaint, Ramirez-Poledo spent a year and a day in jail after his drug arrest and was then ordered deported. The complaint states that, in addition to the deportation, Ramirez-Poledo had been granted seven "voluntary departures," including five in 2000, one in 2001 and another in 2006.

Ramirez-Poledo was arrested Feb. 10 outside a home in Des Moines after he was located by an agent from the Immigration and Customs Enforcement (ICE) Criminal Alien Program. Agents also took his 23-year-old son, Daniel Ramirez Medina, into custody.

The younger man had been brought to the country as a child and had been legally allowed to stay under the Obama administration's 2012 "Deferred Action for Childhood Arrivals" (DACA) program, which deferred deportation or other adverse immigration actions against individuals who entered the U.S. illegally as children.

35

Case 2:17-cv-00218-RSM   Document 112   Filed 02/06/18   Page 75 of 112

Proponents call its participants Dreamers, alluding to their desire to become U.S. citizens.

The arrest was the first involving a DACA-eligible immigrant under the Trump administration, and immigration and civil-rights officials reacted by suing ICE over his detention.

However, ICE insisted that the son was a gang member, and he remains in custody. His lawyers have disputed that claim and alleged government misconduct.

*Mike Carter: mcarter@seattletimes.com. Information from Seattle Times archives is included in this story.*

**Contact**

**About the company**

**Advertise**

**Subscriber Services**

**Today's Front Page**

    **Facebook**

    **Twitter**

Copyright © 2017 The Seattle Times Company  |  Privacy statement  |  Terms of service

36

FRE
Im
Ge



**GANGS**

Our Advertisers | Digital Edition | Magaz

HOME    VIDEO    GANGS    SWAT    WEAPONS    CAREERS & TRAINING    PATROL    TECHNOLOGY    VEHICLES    WO

Featured Articles    Products    News    Blog    Photo Galleries

## Features

# Identifying and Documenting Gang Members

**Extract as much information as you can from contact with gang members.**

September 23, 2010  |  by Matthew O' Deane and William Patrick Murphy

**LINKS**

National Allian
Assn.  Californi
California Gan
Florida Gang I
York Gang Inve
Investigators As

In California it is not a crime to be a gang member. It is, however, a crime to be in a street gang while committing crimes for the benefit of or at the direction of the street gang.

While in and of themselves these crimes may carry a strict sentence, when the gang crime allegation is added the punishment can be greatly enhanced. As such, many gang members are oftentimes hesitant to admit gang membership. The same may be true in your state.

As a prosecutor and a San Diego police sergeant, respectively, we have both sat through and testified at many gang trials where the defense attempted to discount our expertise and undermine the reasons a particular individual was documented as a gang member. Gang members also sit through their own trials or the trials of other gang members and typically learn firsthand the true nature and repercussions of being convicted of a gang crime.

While legislation has shown aggressiveness in enforcing against gang violence, it may also be working to our detriment. This is why gang documentation and gang field interviews are critical to fighting the war against gangs.

Uniformed patrol or gang unit officers are constantly challenged with the identification and determination of a possible gang member's affiliation. Many of the younger gang associates do not bear tattoos indicating gang affiliation, nor do they wear the clothing and colors easily identifiable with a particular gang.

37

Matthew O'Deane has been a District Attorney Investigator in San Diego since March of 2002 and has been assigned to the Gang Prosecution Unit. Prior to working for the District Attorney, he worked for the National City Police Department for almost 10 years, spending several years working street gangs and narcotics. He has testified numerous times as an expert in street gangs.

Sgt. William "Patrick" Murphy has been a San Diego PD police officer since 1990. He has over nine years experience as a gang investigator and taught street gang courses at the regional academy for five years. He has also worked in the Vice Unit and Patrol and has testified numerous times as an expert in street gangs.

**Matthew O'Deane, Ph.D.**

**Commander, San Diego County District Attorney's Office**

Matthew O'Deane has been with the San Diego County District Attorney's Office Bureau of Investigation since 2002, currently serving as Commander of the Gang Prosecution Unit, Narcotics Unit and Cold Case Homicide Unit. Over the past 13 years has worked with various units, including nearly 8 years with the Gang Prosecution Unit. Prior to joining the DA's office, Matthew worked with the National City Police Department as a Patrol Sergeant, Narcotics Detective at the Operation Alliance Task Force, and Patrol Officer.

Matthew holds a Ph.D. in Public Policy and Administration, a Master's in Public Administration, and a Bachelor's in Criminal Justice. He is a Subject Matter Expert (SME) for the Peace Officers Standards of Training and has taught in the Witness Protection Course and Extraditions course since 2005. Matthew has written three books on the topic of gangs, including *Gang Injunctions and Abatement: Using Civil Remedies to Curb Gang Related Crime* (December 2011 – CRC Press), *Gangs: Theory, Practice and Research* (January 2010 – LawTech Custom Publishing), and *The Gang Investigators Handbook, A Law Enforcement Guide to Identifying and Combating Violent Street Gangs* (June 2007 – Paladin Press). Matthew has also written chapters in additional books, and contributed dozens of articles in magazines such as *FBI Law Enforcement Bulletin, Police Magazine,* and *Law Officer Magazine.* Matthew has presented on the topic of gangs at academic and law enforcement conferences across the nation, and is an adjunct professor at several local institutions in the area of criminal justice.

39

# Destiny's Children
Hijos del Destino

## Gang identity and tattoos

A gang is any group of three or more people who form an organized assemblage and share a common identity. Since publication of Frederic Thrasher's pioneering study of Chicago gangs in 1927 sociologists have defined the process through which unsupervised youth — especially marginalized youth in urban centers — form street organizations and identities through conflict with authorities and other groups. This classic definition of the street gang includes those groups, which engage in behavior termed delinquent or in conflict with the law.



*In Guatemala City youngsters who belong to the 18th Street gang "sign" the "E" for Eighteenth Street with their hands. They learned the codes and styles of gang life from deported Eighteenth Street gang members from Los Angeles, California. Copyright © Donna DeCesare, 2001.*

For contemporary sociologists like John Hagedorn, an expert on the history of Chicago gangs, global economic forces and the retreat or absence of the State from many communities are factors that promote the institutionalization of groups such as gangs. Hagedorn argues that the failure of neo-liberalism has lead to an intensification of resistance identities among socially excluded youth. But for many developing world youth these contested resistance identities are "supervised" by a variety of criminal groups or religious or nationalist militias.

These insights are relevant to understanding the context and forces shaping the development of so-called transnational gangs like the 18th Street and Mara Salvatrucha. Media portrayals create the impression of organized crime syndicates spreading mafia franchises throughout the US and Central America. The reality is much less formally "organized" or "corporate " if equally tragic and intolerable.

Case 2:17-cv-00218-RSM  Document 222-1  Filed 02/06/18


*Deportees from the US with new gang recruits from marginal barrios of San Salvador.*

As the stories of the young people profiled in DESTINY'S CHILDREN make clear, the emotional, social, and economic factors, which attract youth to both these gangs, are localized in conditions in the communities from which they come. Gangs provide a sense of something larger to belong to, a sense of shared suffering, identity and resistance to exclusion. Gangs can be ruthless and cruel, but they also provide comfort to fellow gang members– homeboys and homegirls who if they have nothing else at least have each other.

**Tattoos and Rituals**

Facial and body gang tattoos are simultaneously a defiant assertion of identity confronting exclusion and a source of further exclusion. In the early 1990s most of the gang tattoos I saw—the three dots for La Vida Loca or Crazy Gang Life, or the gang's name spelled out in letters, numbers or symbols were icons of belonging. And like sailors and soldiers gang members often tattooed the names of mothers or girlfriends and boyfriends as a sign of love and commitment. The tattoos were also a public memorial display for lost homeboys and family members killed in the civil wars of Central America or the gang wars, which followed. In the story titled Jessica: Prisoner of Memories, there is an image of her brother Victor Diaz's tattoos. There is an aura of a trauma narrative bleeding out his anguished memories onto the surface of his skin.


*A gang member with his children. With tattoos it is difficult to find work.*

In the US where tattoos are a socially accepted form of body art, gang tattoos can still be a source of exclusion and barrier to employment. Tattoo removal is one of the ways US gang members transition toward other forms of identity.

In culturally conservative Central America all tattoos are stigmatized and criminalized. Gang tattoos are not only provocation for conflict among rival groups; they are also a pretext for arbitrary arrest or extrajudicial killing by social cleansing squads. In the first phase of the Mano Duro repressive response, gang identity intensified deepening conflicts with enemy gangs and provoking an increase in both the visibility and violence of tattoo imagery. This is the phase that produced full body or head and face tattoos seen in the most sensationalist media accounts.

At the height of the repression under Super Mano Duro policing policies, the Central American gang response to tattoo removal became a mirror image of society's intolerant view of tattoos. Removal without permission is considered an act of disrespect and betrayal, a sign that the former gang member may have become an informer. It can carry a death sentence from one's former homeboys.



*New Mara Salvatrucha members are initiated in a ritual beating in San Salvador, El Salvador.*

Gangs rely on rituals and meetings to enforce codes. Most recently the gangs in Central America have been discouraging tattoos and punishing homeboys who disregard the new rules. Tattoos are now seen as an impediment to the flexibility one needs to move undetected in the informal drug economy. Gangs have always had other identity rituals, gang hand signs, colors or clothing and grooming styles. As gang identities continue to evolve gangs establish new ways of consolidating and expressing identity.

Links:

· OJJDP Overview of Youth Gangs
· USAID Central America and Mexico Gang Assessment

Content originally from *Destiny's Children: A Legacy of War and Gangs.*
Visual histories of war's aftermath to unsettle, inspire and challenge fate, by connecting minds and hearts with activism.

Permanent link: http://www.destinyschildren.org/en/context/gang-identity-and-tattoos/

# Destiny's Children

Hijos del Destino

## About

*"And when man faces destiny, destiny ends and man comes into his own."*

– André Malraux, The Voices of Silence

Destiny's Children: A Legacy of War and Gangs by Donna DeCesare follows the lives of four young people marked by an experience of war and its aftermath.  As each struggles with circumstance, the lure of gangs and the challenge of limited opportunity, the question of fate looms.

Told in images with bilingual text, the site adds layers to the narrative structure. One can scroll progressively through a story or disrupt the linear sequence. Hyperlinks make it possible to move from the narrative to the issues or an historical timeline. One story includes the voice of protagonist Carlos Perez that can be activated or silenced by cursor placement as one navigates.

The primary purpose of the site is to educate and inspire action. To that end, "How to Help" directs site users to organizations in need of resources and volunteers, or those that promote activism. "Need Help" guides young people seeking assistance to appropriate programs in their geographical area. The resource pages are formatted to appear on a cell phone connection, or may be downloaded and printed for use as handouts in barrio classrooms and community centers without web access.

In the second phase of this project there will be a wiki to enable users to build out information on service providers not currently included. A blog will provide a space for news and information as well as a location for image and text stories created by young people.

The majority of the many hundreds of people and organizations that contributed to my thinking and my well being as I worked on this project over many years are too numerous to thank by name here. However I wish to recognize a few who were absolutely critical to the project.

First, I want to thank those who opened their lives to my camera and presence. Edgar's mother Ana Bolaños, and Carlos Ingles' brother Rogelio generously shared many insights as well as their sorrows. Early on Jessica Diaz, her mother Carmen and sister Sonia helped me recognize the role of childhood trauma in the lives of Salvadoran gang members. And my thanks to Carlos Perez for his courage, openness and inspiring tenacity.

Many grants and fellowships helped support this work over years but in particular I want to thank the Open Society Institute for a very generous Independent Project fellowship in 2001 which supported fieldwork as well as time for selection and scanning from among thousands of negatives.

My deep appreciation and thanks go to Fred Ritchin at Pixelpress for friendship for challenging my thinking, and for assistance with the final image edit. I am indebted also to Zohar Nir Amitin for her graphic design concept and original web architecture first done in 2003–2004.

After a hiatus in which I focused on teaching and other projects I was ready to resume work in 2008 but much had changed in both the gang world and digital landscape. I am thankful for the assistance of a Mellon Faculty Research grant in summer 2009 which enabled me to update the site with new reporting and images from El Salvador, Honduras and Guatemala. My final thanks go to my former student Jose Castillo who adapted the graphic design and foundational html architecture to Flash and Wordpress and to a current student Eduardo Gonzalez who translated many pages of the support sections into Spanish.

To contact Donna DeCesare, email her at donna.decesare@austin.utexas.edu

43

**DONNA DECESARE**
Email: donna.decesare@austin.utexas.edu

## EDUCATION

| | |
|---|---|
| 1979 | M.Phil. Comparative Studies, Essex University, Colchester, England |
| 1976 | B.A. Literature, State University College at Buffalo, Buffalo, NY |

## ACADEMIC EXPERIENCE

| | |
|---|---|
| 2002-2007 | Assistant Professor, School of Journalism, University of Texas at Austin |
| 2008-present | Associate Professor, School of Journalism, University of Texas at Austin |

## PROFESSIONAL EXPERIENCE: PHOTOGRAPHY AND REPORTAGE

| | |
|---|---|
| 2001-present | Independent photographer and writer, represents self. |
| 1999-2001 | Saba Corbis agency, New York, NY. |
| 1984-1999 | Impact Visuals photo agency, New York, NY. |

## GRANTS & AWARDS

| | |
|---|---|
| 2011 | Audience Engagement Grant, The Documentary Photography Initiative, Open Society Institute, New York (*Theatre, exhibition, workshop project: El Salvador*) |
| 2010 | Faculty Research Leave—competitive peer reviewed semester sabbatical Mellon Foundation, Lozano Long Institute of Latin American Studies. |
| 2005 | Fulbright Fellowship, Bogota Colombia (9 months) |
| 2003 | Dart Society, Ochberg Fellowship |
| 2002 | National Press Photographers Association Annual Best of Photojournalism, First Prize, Best Web Essay Independent, Second Place, Issue Reporting, Honorable Mentions Issue Reporting, Portrait Single. |
| 2001 | Soros Independent Project Fellow, Open Society Institute |
| 2000 | Pictures of the Year, Judges Special Recognition, Canon photo essay |
| 2000 | Alfred Eisenstadt Magazine Photography Award, Journalistic Impact |
| 1999 | Mother Jones International Photo fund Award for Social Documentary |
| 1997 | Alicia Patterson Fellowship for Social Documentary |
| 1996 | New York State Foundation for the Arts, Photography Fellowship |
| 1996 | Golden Light Award, Maine Photographic Workshops |
| 1995 | First Prize, Gordon Parks Award |
| 1993 | Dorothea Lange Paul Taylor Prize, Center for Documentary Studies at Duke University |

## EXHIBITIONS (SOLO/VENUES)

### *UNSETTLED / DESASOSIEGO*

| | |
|---|---|
| **2013** | The Nettie Lee Benson Gallery, Lozano Long Institute for Latin American Studies, University of Texas, Austin |

### *DESARRAIGOS: MEMORIA, HISTORIA Y REFELXIONES,*

2011            Museo Tecleño, Santa Tecla, El Salvador June-July, 2011
                Permanent exhibition at Central American University Jose Simeon Cañas
                (UCA) San Salvador beginning in spring 2013

### INDIGENOUS MAYA
2010            Visual Arts Center, University of Texas Austin, Gala Opening

### SHARING SECRETS
2010-2013       Open Society Institute Office of Public Health, NY
2008            Columbia University School of Social Work, NY
2007            Washington Office on Latin America, Washington DC

### DESTINY'S CHILDREN/HIJOS DEL DESTINO
2010            FLACSO gallery of art, Quito, Ecuador (installation)
2010            59E59 Theatre Complex Off Broadway, New York, NY (installation)
2009            Biennale of Photography, Museum of Contemporary Art Guangzhou,
                China Exhibition and Website installation
2006            The Nichols Gallery, Pitzer College, CA
2005            The Frontline Club, London UK
2005            The Atrium, London School of Economics, UK
2004            John Jay College of criminal justice, NY
2003            Fotofiesta Medellin, Colombia

### BEHIND THE WALL: Inside El Buen Pastor
2008            Paul Bardwell Gallery of Contemporary Art, Colombo Americano, El
                Buen Pastor Women's Prison Medellin Colombia September –October

### EL SALVADOR INSIDE OUT
2008            The Harry Ransom Center, Austin TX, April –August, Permanent
                Collection

### DISPLACED: Dislocation in Latin America
2007            Paul Bardwell Gallery of Contemporary Art, Colombo Americano,
                Medellin, Colombia
2007            Foto Cali, Cali Colombia

### MI ODISEA EN LATINOAMERICA (My Latin American Odyssey)
2005            Centro de la Imagen, Multimedia Sala del Deseo, Mexico DF, June-July

### FROM CIVIL WAR TO GANG WAR:
2001            Visa Pour L'image, Perpignan, France
2000            The Salt Institute Gallery, Portland ME
1998            John Jay College of criminal justice, NY
1996            The Guadelupe Community Arts Center, San Antonio, TX
1996            Intercambios Culturales, San Salvador, El Salvador
1995            NAFOTO, Sao Paulo Cultural Center, Sao Paulo, Brazil
1995            Walter Reade Theatre at Lincoln Center, Human Rights Watch Film
                Festival, NY

**SELECTED   MULTI-ARTIST EXHIBITIONS** (INITIAL OPENINGS/
                ADDITIONAL VENUES)

DeCesare, Donna                    Resume                              2

45

| | |
|---|---|
| 2013 | **Crossing Borders: Gender and Migration**, Radcliffe Institute for Advanced Studies, Harvard University, Boston MA April 15 -May 3 |
| 2012-14 | **War Photography: Photographs of Armed Conflict and its Aftermath** Curated by Anne Tucker, Houston Museum of Fine Arts. November 11, 2012 to February 3, 2013; Travels to:  Annenberg Space for Photography Los Angeles, CA, March 3, 20130 May 27, 2013; Corcoran Gallery of Art, Washington DC, June 29, 2013 to September 29, 2013; Brooklyn Museum of Art November 8, 2013 to February 2, 2014. |
| 2012 | **The Birth of Photography – Highlights of the Gernsheim Collection** The Forum Internationale Photographie" (FIP) at the Reiss-Engelhorn-Museums, Mannheim, Germany. Exhibition opens September 9, 2012 through January 6, 2013. |
| 2011 | **Women's Work, Women's Lives,** Salon Miro II UNESCO (United Nations Educational Scientific and Cultural Organization) Paris France Opening March 8, 2011 International Women's Day; Travelling |
| 2011- | **Migraciones/Migrations**- The Museum of the Word and Image, San Salvador, El Salvador, March 1, 2011 Travelling |
| 2010-2011 | **Gang Life: Between Belonging and Exclusion,** Small Arms Survey and United Nations Office on Drugs and Crime, Vienna, Austria |
| 2008-2009 | GUNS N' US, The Darkroom, New Orleans, LA, December –February |
| 2008-2009 | **Children of War: Broken Childhood?**  United Nations, NY, Nov.-Jan. |
| 2007 | **Perilous Lens: Guns in the Urban Landscape,** sponsored by Small Arms Survey Geneva, Mexico DF, Dar Es Salaam |
| 2007 | **Counterpoint: International Artists Confront Global Complexity, Coreana** Cultural Arts Complex Seoul, Korea, tour to Shanghai, China, Poznan, Poland |
| 2006-2007 | **Moving Walls—Sharing Secrets,** Open Society Institute NY, Open Society Institute Washington DC |
| 2005-2006 | **Hand and Eye: Mara Salvatrucha,** Center for Documentary Studies, Duke University |
| 2006- | **Women on War,** Theatre for the New City, NY, 2004, 3 Fish Gallery, Portland, Maine |
| 2004-2009 | **The Human Condition: After Effects** touring:  Nathan Cummings Foundation, NY, Lehigh University Gallery of Art, Bethlehem PA, International Festival of Photography, Pinyao China, The Flint Institute of Fine Arts, Flint, MI, Festival of Photography, Graz, Austria (2009) |
| 2003-2004 | **Fokus Mensch,** Reiss-Engelhorn Museum, Manheim, Germany |
| 2000-2004 | **Echoes Across the Himalayas: Tibetan Refugee Children,** Martin Luther King Library, DC, Gellman Library, George Washington University, DC, The University of New Hampshire, NH, Ball State University, IN, Westminster College, UT, Maine Humanities Council, Portland, ME, Harvard University School of Education, MA, Hudson Museum, ME, Art Gallery University of Southern Maine, ME, Laconia Library, NH |
| 2000 | **The Art of Documentary Photography,** Portland Museum of Art, ME |

DeCesare, Donna                    Resume                              3

46

| 2000 | **Selected award winners 10 Year of the Mother Jones Award**, Fotofest, Houston, TX |
| 1999 | **Mother Jones Award Winners Exhibition**, Gallery 16, San Francisco, CA |
| 1995-1998 | **Points of Entry: A Nation of Strangers**, The Museum of Tolerance, CA, The Ellis Island Immigration Museum, NY, The High Museum of Art, GA, The Jewish Museum, NY, The Center for Fine Arts, Miami, FL, International Museum of Photographer at George Eastman House, NY, The Smithsonian Institution, DC, The Center for Creative Photography, AZ, The Museum of Photographic Arts, CA |
| 1996-1997 | **What We've Discovered: Images of Our Cultural Identity** Louisiana Arts and Sciences Center, LA, Nash Gallery, MN, The Artists Alliance, LA |
| 1996 | **Photoworks**, Top Prize, The Duchess County Art Association Barrett House, NY |
| 1994 | **Northern Ireland: A Terrible Beauty**, Artists Space, NY |

## PUBLICATIONS

**One Woman Exhibition catalogues, artist monographs:**

| 2012 | *UNSETTLED/DESASOCEIGO* by Donna De Cesare with a Foreword by Fred Ritchin, 30,000 words Bi-lingual English-Spanish text by the author with 105 duotone photographs. University of Texas Press, 184 pages. |
| 2005 | *HIJOS DEL DESTINO*: Youth Violence in the Americas, LSE Arts, London School of Economics, and UK |

**Contributions: Books and Catalogs**

| 2012 | *War Photography: Photographs of Armed Conflict and its Aftermath,* Exhibition catalog by Anne Tucker, Houston Museum of Fine Art. |
| 2012 | *The Birth of Photography – Highlights of the Gernsheim Collection* Exhibition catalogue by Claude Sui, Reiss-Engelhorn Museen |
| 2010 | *A History of Women Photographers*, by Naomi Rosenblum, 3rd Edition Abbeville Press, May 2010 |
| 2009 | *Sightings: Searching for the Truth:* Guangdong Museum of Contemporary Art, Guangzhou, China, May 2009 Exhibition catalog |
| 2008 | *Child Soldiers*, edited by Leora Kahn, Powerhouse Books, NY |
| 2008 | "Agents of Change: Images of Youth Responding to Violence and Exclusion" Book chapter text and images in *Globalizing the Streets* edited by David Brotherton and Michael Flynn, Columbia University Press. |
| 2005 | *Hand and Eye: Fifteen Years of the Dorothea Lange Paul Taylor Prize*, Center for Documentary Studies at Duke, Chapel Hill NC |
| 2005 | *Colombia Images and Realities*, Villegas Publishers, Bogota Colombia |
| 2003 | *Helmut Gernsheim: Pioneer of Photo History*, Reiss Engelhorn Museen, Mannheim, Germany |
| 2003 | "From Civil War to Gang War: The Tragedy of Edgar Bolaños," Book chapter text and image essay in *Gangs and Society* edited by Lou Kontos and David Brotherton, Columbia University Press |

47

| 2002 | *The Best of Photojournalism*, National Press Photographers Association |
| 2000 | *The Best of Photojournalism*, National Press Photographers Association |
| 2000 | *American Photography Annual 17,* Amilus, NY |
| 2000 | *Photojournalism: The Professional's Approach* 4th edition, by Ken Kobre, Focal Point Press |
| 1996 | *Fotoseptiembre*, Centro de la Imagen, Mexico DF |
| 1995 | *Points of Entry,* Museum of Photographic Arts, San Diego, CA |
| 1994 | *A Terrible Beauty,* Artists Space, New York |
| 1991 | *Nicaragua: A Decade of Revolution*, Norton Publishers, NY |

**Select magazine & Web publication, Media interviews**

| 2012 | "El Salvador: El Violento Paisaje de las Maras," by Alma Guillermoprieto, Photographic Essay by Donna De Cesare, *Letras Libres*, April 2012, Madrid, Mexico City pp. 60-67 |
| 2011 | "Desarraigos" BBC Mundo July 2011 |
| 2011 | Santa Tecla Una Historia—Multimedia project directed and produced on MemoriArte site as part of OSI grant project |
| 2011 | "Ser Testigo," director/producer multimedia video--ethical coverage of violence and those effected, version in Spanish Dart Media, June 2011 |
| 2010 | "Pushing Past Technology to Reach Enduring Issues," and "Destiny's Children: A Legacy of War and Gangs," Nieman Reports, Spring 2010, Volume 64, No. 1, Harvard University, Cambridge, MA pps. 34-35. |
| 2010 | "Out of the Guatemalan Gang Culture, An Artist," THE INDELIBLE IMAGE, Smithsonian magazine, February 2010. 10-12. |
| 2009 | "Forming Connection, Finding Comfort: An Essay in Words and Photographs," Nieman Reports, Winter 2009-10, Volume 63, No. 4, Cambridge, MA; pps. 34-39 |
| 2009 | Witnessing and Picturing Violence," director/producer multimedia video ethical coverage of violence and those effected, Dart Media, December |
| 2009 | "Salvadoran Gangs: Brutal Legacies and a Desperate Hope" text and photo essay NACLA, Nov/Dec |
| 2008 | All Things Considered, NPR, Guatemalan Death Squads Target Gangs December 22, Click on photo gallery |
| 2008 | ReVista," Documenting Violence", Images and text, Harvard Review of Latin American Studies, Cambridge, MA, winter |
| 2008 | de l'Air, The Best of Visa Pour L'Image, No. 36 Paris, France, August |
| 2008 | Grit TV, Interview with Laura Flanders, Image Gallery July |
| 2007 | The Texas Observer, "Habitat for Inanity," Austin, TX September cover |
| 2007 | Anaconda 8 Arte y Cultura, "Las Expresiones culturales en las Pandillas," Quito, Ecuador |
| 2007 | Episode 24 Nueva York, CUNY TV, November |
| 2006 | Nieman Reports, "Globalizing Gangs: Documenting Migration's Revolving Door," Nieman Foundation, Harvard University, Fall |
| 2006 | Enjeaux Internationaux, "Crime Sans Frontieres," Brussels, January |
| 2005 | Images, Photographie & Humanitaire 60th anniversaire de l'UNICEF, |

48

| 2005 | The Herald, "Heartbreak and Hope, Everett WA May 29 |
| 2005 | Color Lines, "Living in the Battle Zone," Spring |
| 2003 | Children in Organized Armed Conflict, COAV website Images gallery |
| 2003 | Courrier International, "Colombia's Child Combatants," Paris, France, |
| 2003 | Newsweek, El Salvador: A Country's Rebirth, International Edition |
| 2003 | The Guardian, "Poor Neighborhoods Fall Prey to US Gang Culture," UK, |
| 2003 | Newsweek, "Made in USA," June 9 |
| 2002 | Numero34, "Children of Colombia's Armed Conflict" Bogota, Colombia |
| 2002 | The Digital Journalist, Profile, May |
| 2001 | Aperture 164, "Deadly Traffic," NY, Summer 2001 |
| 2001 | Blast, "LA Gangs," Paris, France, 2001 |
| 1999 | Bomb, "Exiles," NY, Summer |
| 1999 | Culture Front, "El Norte," NY, Summer |
| 1995 | Grand Street, "The Endless Dream Game of Death," NY Spring |
| 1994 | Aperture 134, "A Terrible Beauty: Northern Ireland," NY Winter |

## PERMANENT COLLECTIONS

The Reiss-Engelhorn Museum, Manheim, Germany, The Museum of Fine Art, Houston, TX; The Harry Ransom Center, TX, The Center for Documentary Studies at Duke University, NC, and numerous private collections.

49



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

June 15, 2012

MEMORANDUM FOR:   David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM:   Janet Napolitano
Secretary of Homeland Security

SUBJECT:   Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the
Department of Homeland Security (DHS) should enforce the Nation's immigration laws against
certain young people who were brought to this country as children and know only this country as
home. As a general matter, these individuals lacked the intent to violate the law and our ongoing
review of pending removal cases is already offering administrative closure to many of them.
However, additional measures are necessary to ensure that our enforcement resources are not
expended on these low priority cases but are instead appropriately focused on people who meet
our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of
prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of
this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education
development certificate, or is an honorably discharged veteran of the Coast Guard or
Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple
misdemeanor offenses, or otherwise poses a threat to national security or public safety;
and
- is not above the age of thirty.

50

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

5)

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

52



**Office of the Attorney General**
**Washington, D. C. 20530**

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

53


Official website of the Department of Homeland Security


U.S. Department of
Homeland Security

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

54

**FROM:**

Elaine C. Duke
Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

# Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (#_ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization

55

from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] (#_ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (#_ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

56

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4). [5] (#_ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] (#_ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA. [7] (#_ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous

Memorandum on Rescission Of DACA | Homeland Security

administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

58

- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by

59

any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (#_ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (#_ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (#_ftnref4) *Id.*

[5] (#_ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (#_ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (#_ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

Memorandum on Rescission Of DACA | Homeland Security


Official website of the Department of Homeland Security


U.S. Department of
Homeland Security

# Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

WASHINGTON - This Administration's decision to terminate DACA was not taken lightly.  The Department of Justice has carefully evaluated the program's Constitutionality and determined it conflicts with our existing immigration laws.  Given the Supreme Court's decision on DAPA, they do not believe DACA is legally viable, and thus the program should be ended.

As a result of recent litigation, we were faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately.  The Administration chose the least disruptive option.

*61*

Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood ...

I am very aware of the consequences of this action, and I sympathize with the DACA recipients whose futures may now be less certain. But I am also frustrated on their behalf. DACA was never more than deferred action—a bureaucratic delay—that never promised the rights of citizenship or legal status in this country. The program did not grant recipients a future, it was instead only a temporary delay until a day of likely expiration. And for that reason, DACA was fundamentally a lie.

I believe President Obama had genuine intentions for DACA, and was clearly frustrated by his inability to maneuver through the legislative process. But a Secretarial memo – even if intended to be temporary - is not a substitute for a law passed by Congress and signed by the President.

For several years before becoming the Acting Secretary, I taught civics to people who were going through the naturalization process. I taught them the principles of American democracy, like the three branches of government, the separation of powers, and how our system of checks and balances works.

I taught them that the Constitution was the supreme law of the land.

And I taught them the rule of law: How everyone in our country must follow the law, no matter who they are.

The DACA program violates those basic civics lessons that are fundamental to our country and our citizens.

It is a dangerous precedent to systematically ignore the law, regardless of one's intent or purpose. It is also dangerous to encourage and reward illegal immigration.

We must find a better way. And we must do so within the Constitution of the United States.

If our current laws do not reflect our country's values, then I urge Congress to use its Constitutional authority to write and pass legislation that does. I believe the President shares my confidence in the Congress.

Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood ...

DHS would be glad to provide Congress with data and information to help them consider the situation, and find a legislative solution.  There is much wrong with our current immigration system—not just DACA—and this is an opportunity to make it better, fairer, and more beneficial for the nation.

What this decision makes clear is that we are overdue for real answers.  No more stopgap measures, no more temporary options, and no more kicking the tough decisions down the road in the hope they become too painful to ignore for someone else.

We need to do this the right way. And we need to do this now.

Topics: Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)
Keywords: Acting Secretary Duke (/keywords/acting-secretary-duke) , DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood ...

 Official website of the Department of Homeland Security

 **U.S. Department of Homeland Security**

# Fact Sheet: Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," creating a non-congressionally authorized administrative program that permitted certain individuals who came to the United States as juveniles and meet several criteria—including lacking any current lawful immigration status—to request consideration of deferred action for a period of two years, subject to renewal, and eligibility for work authorization.  This program became known as Deferred Action for Childhood Arrivals (DACA).

The Obama administration chose to deploy DACA by Executive Branch memorandum—despite the fact that Congress affirmatively rejected such a program in the normal legislative process on multiple occasions. The constitutionality of this action has been widely questioned since its inception.

DACA's criteria were overly broad, and not intended to apply only to children. Under the categorical criteria established in the June 15, 2012 memorandum, individuals could apply for deferred action if they had come to the U.S. before their 16th birthday; were under age 31; had continuously resided in the United States since June 15, 2007; and were in school, graduated or had obtained a

64

certificate of completion from high school, obtained a General Educational Development (GED) certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States. Significantly, individuals were ineligible if they had been convicted of a felony or a significant misdemeanor, but were considered eligible even if they had been convicted of up to two other misdemeanors.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

Based on this analysis, the President was faced with a stark choice: do nothing and allow for the probability that the entire DACA program could be immediately enjoined by a court in a disruptive manner, or instead phase out the program in an orderly fashion. Today, Acting Secretary of Homeland Security Duke issued a memorandum (1) rescinding the June 2012 memo that established DACA, and (2) setting forward a plan for phasing out DACA. The result of this phased approach is that the Department of Homeland Security will provide a limited window in which it will adjudicate certain requests for DACA and associated applications for Employment Authorization Documents meeting parameters specified below.

Effective immediately, DHS:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted as of the date of this memorandum.

Fact Sheet: Rescission Of Deferred Action For Childhood Arrivals (DACA) | Homeland Secur

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, U.S. Customs and Border Protection will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, U.S. Citizenship and Immigration Services will—of course—retain the authority to revoke or terminate an advance parole document at any time.

- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

- Will not approve                                  at DACA

*66*

Fact Sheet: Rescission Of Deferred Action For Childhood Arrivals (DACA) | Homeland Secur...

- • Will continue to exercise its discretionary authority to terminate or deny deferred action for any reason, at any time, with or without notice.

It should be noted that DACA was not intended to be available to persons who entered illegally after 2007.  Thus, persons entering the country illegally today, tomorrow or in the future will not be eligible for the wind down of DACA.

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

67





| Home | About Us | Santa Cruz County Gangs | What to Look For | Why Youth Join Gangs | Resources | Youth Zone |



# Santa Cruz County Gangs



## What is a Gang?

The California Penal Code 186.22 defines a criminal street gang as:

"Any organization, association, or group of 3 or more persons, whether formal or informal, that commits one or more criminal acts listed in 186.22 PC as one of its primary activities; and uses a common name or common identifying sign or symbol; and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

## Sureños: an Overview




In North County (Santa Cruz) Sureños out-number the Norteños. In South County (Watsonville) it is the opposite- the Norteño gang members out-number the Sureños.




## Signs, Symbols and Terms



## Norteños: an Overview




In South County (Watsonville) the Norteño gang members out-number the Sureños. In North County (Santa Cruz) it is the reverse—Sureños out-number the Norteños.




## Signs, Symbols and Terms

- Norte
- Northsider
- Catorce
- ENE
- 14
- XIV
- X4
- XIVer
- N =The fourteenth letter of the alphabet
- Four dots or one and four dots = 14
- The color red
- The Mayan symbol for 14 =
- The logo NORCAL
- The Huelga Bird – symbol for United Farm Workers
- The Strawberry (in Watsonville)
- The logo WS (in Westside Santa Cruz)
- The Northern Star
- The California Flag

68

# GANG RECOGNITION GUIDE





As gangs become an increasing issue in our society, education is the key to recognizing their activity and understanding what they are about. However, when discussing gangs, a working definition must be developed. Gangs are three or more individuals, using the same name, sign or symbol who commit criminal acts individually or as a group to further their agenda.

*The following information is not exhaustive in describing gangs and their background, but is a basic framework to educate concerned community members.*

## CRIPS:



This street gang originally started in South Central Los Angeles in the 1960's. Stanley "Tookie" Williams met with Raymond Lee Washington to unite local gang members to battle neighboring street gangs. Today, the Crips are one of the largest and most violent gangs, involved in murders, robberies, drug dealing and many other criminal pursuits. Crips identify with the color blue. Their biggest rivals are the Bloods and disrespect in many ways - calling them "slobs". Crips call themselves "Blood Killas" and cross the letter "b" out or leave it off altogether. Crips do not use the letters "ck" as it denotes "Crip Killer" and substitute it for "cc" (as in "kicc" for "kick"). While traditionally African-American, today's Crip membership are multi-ethnic.

## BLOODS:



The Bloods were formed to compete against the Crips. Their origins stem from a Piru street gang (initially a Crip set) who broke away during an internal gang war and allied with other smaller street gangs to form the present day Bloods. Since the Bloods were originally outnumbered 3 to 1 by the Crips, they had to be more violent. With the rise of crack cocaine, the Bloods focused on drug dealing to make money which resulted in even more bloodshed. As their name suggests, Bloods identify with the color red and consider themselves "Crip Killas". Bloods disrespect Crips by crossing out the letter "c" and calling Crip members "Crabs".

## SUREÑO:



Sureños (Spanish for "Southerners") are a group of Mexican-American street gangs with origins in southern California (south of Bakersfield). The gang has allegiance to the CA prison gang, Mexican Mafia, aka "La Eme". Sureños identify with "13", "XIII", "X3", the letter "M" - 13th letter in the alphabet - as homage to the Mexican Mafia. They typically use the color blue but may use other colors as well such as black or brown, dependant on the set. The "cholo" type of dress was adopted but nowadays is far less observed as anonymity of gang affiliation has become more commonplace. Their biggest rivals are Norteños but it is not uncommon for Sureños sets to fight each other.

## NORTEÑO:



Norteños (Spanish for "Northerner") are a group of Latino street gangs with origins in northern California (north of Bakersfield). Members were initially part of the CA prison gang, Mexican Mafia, but later formed their own group when they were not protected or treated fairly in prison. Separation can be attributed to a "shoe incident" which created Nuestra Familia (Our Family). Outside of prison members are called Norteños who associate with the sombrero, the machete and the "Huelga" bird (symbol of the United Farm Workers). They use the color red and the number "14", "XIV", "X4" and the letter "N" - 14th letter of the alphabet. Their biggest rival are the Sureños but they also fight against Crip sets.

69

## MARA SALVATRUCHA (MS13):

The Mara Salvatrucha (MS) are a transnational street gang that originated in Los Angeles and are widely spread throughout the US, Canada, Mexico and Central America. In the 1980s, Salvadorian immigrants banded together to protect themselves from already established gangs in the Pico-Union neighborhoods. They later aligned with the Mexican Mafia who protected MS members in prison and adopted the "13" as a tribute. MS associates with "MS", "MS13" and "Mara". MS typically represents themselves with blue and white (El Salvadorian flag colors) but also includes other colors depending on the sub-set or faction. While aligned with Sureños, MS13 sets do have conflicts with Sureños but more often fight with Norteños.



## ASIAN GANGS:

Contrary to popular belief, Asian street gangs are not usually synonymous with the organized crime syndicates such as the "Yakuza". However the smaller street gangs often work for and with the syndicates. During the 1980's, Asians in Los Angeles and San Francisco banded together for protection from the larger Black  and Hispanic street gangs. In modern times, Asian gangs often align with Blood or Crip sets depending on mutual enemies or criminal activities but many remain independent due to the member's ethnic rigidity. Group colors and symbols vary and are not uniform or traditional. Many new Asian gangs begin as dance troupes or road racing groups that eventually morph into criminal street gangs.

## INSANE CLOWN POSSE:

Newest to the world of street gangs, the Insane Clown Posse (ICP) originated as fans of the Detroit born horrorcore band the Insane Clown Posse (Psychopathic Records Label). Band members, Violent J (Joseph Bruce) and Shaggy 2 Dope (Joseph Utsler), attest they do not promote the gang persona. In a live performance, Bruce addressed the audience as "Juggalos" which stuck as a name for male members. Females are called "Juggaletts". ICP is known for their outlandish clown make-up and associate with the "Hatchet man" symbol. ICP members do not believe they are a gang but rather a "family" which is ideal to attract migratory and homeless youth. They favor the colors red, orange and black. Crimes include robberies and assaults where members are armed with edged weapons.



## FOLK NATION:

The Folk Nation is a Chicago based alliance of many gangs which spread throughout the US and Canada. Each set has its own unique colors, hand signs and organizations but have signed a charter to join together. The Folk Nation began in 1978 within the Illinois Department of Corrections. Generally, gangs within the Folk Nation use the six-point star, wear identifiers on the right side (hats, bandanas, etc) and embody the pitch fork. Folk nation rivals the People Nation. Gang sets include Black Gangsters Disciple and Gangster Disciples.



## PEOPLE NATION:



The People Nation is another Chicago based alliance of many street gangs which have spread throughout the US and Canada. Similar to the Folk Nation, the People Nation formed in 1978 when the gangs El Rukns, Vice Lords and Latin Kings banded together. Gangs within the People Nation wear identifiers to the left side (gang signs, hats, left pant leg rolled up, folded arms with the left on top). People Nation uses a five pointed star, a 3D pyramid, 5-pointed crown, a crescent moon and playboy bunny symbol. They use an upside down pitch fork as disrespect for Folk Nation gangs with whom they are rivals.

FOR EMERGENCIES, CALL 911                    Gang Awareness Guide    P. 2

425-257-7497
crimeprevention@everettwa.gov
www.EverettPolice.org                                        EVERETT WASHINGTON USA

70



DHS - 6

71

R 21



## CERTIFICATE OF SERVICE

I hereby certify and declare under penalty of perjury that, on December 20, 2017, I caused to be served the attached documents:

## DEPARTMENT OF HOMELAND SECURITY
## SECOND SUBMISSION OF EVIDENCE

☒ by placing a true copy thereof in a sealed envelope, with postage thereon to be fully prepaid by normal government process and causing the same to be mailed by first class mail to the person at the address set forth below;

☐ by causing to be personally delivered a true copy thereof to the person set forth below;

☐ by electronic filing, in accordance with applicable regulations, to the person at the address set forth below;

☐ by FEDERAL EXPRESS to the person at the address set forth below;

☐ by telefaxing with acknowledgment of receipt to the person at the address set forth below:

Luis Alberto Cortes Romero, Esq.
Barrera Legal Group, PLLC
19309 68th Ave. S., Ste. R102
Kent, WA 98032


Jordan L. Jones, ACC (ICE/DHS)

73

The Honorable Ricardo S. Martinez
Chief United States District Judge

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

|  |  |
|---|---|
| Daniel Ramirez Medina, | CASE NO. 2:17-CV-00218-RSM-JPD |
| Plaintiff, | **DECLARATION OF MARK D. ROSENBAUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | |
| Defendants. | |

Attorneys for Plaintiff:
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
  mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
  jlondon@publiccounsel.org
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
  keidmann@publiccounsel.org
ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
  aprice@publiccounsel.org
ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*
  ehadaway@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089


GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
  tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
  kmarquart@gibsondunn.com
NATHANIEL L. BACH (CA SBN 246518), *pro hac vice*
  nbach@gibsondunn.com
JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*
  jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
  edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306


ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
  echemerinsky@law.berkeley.edu
University of California, Berkeley, School of Law
*Affiliation for identification purposes only
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN (DC SBN 1016310), *pro hac vice*
  llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only
401 East Peltason Drive, Educ 1095
Irvine, CA 92697
Telephone: (949) 824-7722


LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
  larry@tribelaw.com
Harvard Law School
*Affiliation for identification purposes only
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767


ELIZABETH HAWKINS (SBN 43187)
  ehawkins@hawkinsimmigration.com
Hawkins Law Group
17544 Midvale Avenue, Suite 301
Shoreline, WA 98133
Telephone: (206) 728-4220
Facsimile: (206) 973-5326


BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
  lcortes@barreralegal.com
JOHN C. BARRERA (SBN 47658), *pro hac vice*
  jbarrera@barreralegal.com
JOSE GARCIA (SBN 46518), *pro hac vice*
  jgarcia@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591


NORTHWEST IMMIGRANT RIGHTS PROJECT
MATT ADAMS (SBN 28287)
  matt@nwirp.org
615 Second Ave., Suite 400
Seattle, WA 98104
Telephone:  (206) 957-8611

I, Mark D. Rosenbaum, declare as follows:

1. I am an attorney admitted to practice law *pro hac vice* before this Court.  I am an attorney with Public Counsel, and I am one of the attorneys responsible for the representation of Daniel Ramirez Medina ("Mr. Ramirez") in the above-captioned action.  I submit this declaration in support of Mr. Ramirez's Motion for Preliminary Injunction.  The following facts are within my personal knowledge and, if called and sworn as a witness, I would testify competently to these facts.

2. I have represented Mr. Ramirez since shortly after his arrest and detention by Immigrations and Customs Enforcement ("ICE").

3. One of the earliest assertions by the Department of Homeland Security ("DHS") and ICE was that Mr. Ramirez was a gang member.  From the outset, Mr. Ramirez has vigorously denied that he has ever been a member of any gang and denies that he had ever admitted to gang affiliation when interviewed by ICE agents.

4. Because Mr. Ramirez was the first DACA recipient in the nation to be arrested and detained notwithstanding his status, his case received considerable media attention.  At an early point following Mr. Ramirez's arrest, news media reported that DHS officials had stated that they possessed evidence that Mr. Ramirez is a gang member, justifying his arrest and detention.  Statements to this effect were specifically attributed to DHS officials in Washington, D.C.

5. From the beginning then, Mr. Cortes, Ethan Dettmer (another attorney for Mr. Ramirez of the law firm Gibson, Dunn & Crutcher LLP), and I sought from DHS and ICE any bases for this assertion that Mr. Ramirez was in a gang.

6. For example, on or about February 14, 2017, Mr. Dettmer and I had an introductory telephone conversation with Jeffrey Robins, Assistant Director of the Office of Immigration Litigation and chief counsel for DHS in this case.  We asked Mr. Robins for any documentation of the gang allegation regarding Mr. Ramirez.  Mr. Robins responded that he did not know of any such evidence, but would make inquiry and get back to us.  Over the next several months, I

1  continued to seek this information from Mr. Robins, both in court and outside of court.  To

2  date, no evidence substantiating the claim made by DHS in February 2017 was ever disclosed.

3  7.  I was one of Mr. Ramirez's counsel present Mr. Ramirez's bail hearing in immigration court.

4  At that hearing, the government, represented by two counsel from Washington, D.C., offered

5  no evidence that Mr. Ramirez was or had ever been a gang member, and conceded that he was

6  not a danger to public safety.

7  8.  To my knowledge, at no point did representatives of DHS or ICE ever act as if either entity

8  truly believed that Mr. Ramirez had ever been affiliated with any gang.  To my knowledge,

9  his residence in Washington was never searched for evidence of gang involvement, local

10  authorities were never brought into the investigation or informed that Mr. Ramirez had

11  involvement with gangs, and Mr. Ramirez was never charged with concealing or falsifying

12  information from DHS during any of the occasions when he was vetted for DACA status.

13  I declare under penalty of perjury under the laws of the United States and the State of Washington

14  that the foregoing is true and correct, and that I executed this Declaration on February 6, 2018, in Los

15  Angeles, California.

16  /s/          *Mark D. Rosenbaum*          _

17  Mark D. Rosenbaum

18
19
20
21
22
23
24
25
26
27
28

The Honorable Ricardo S. Martinez
Chief United States District Judge

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

|  |  |
|---|---|
| Daniel Ramirez Medina, | CASE NO. 2:17-CV-00218-RSM-JPD |
| Plaintiff, | **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | |
| Defendants. | |

Gibson, Dunn &
Crutcher LLP

1    This matter comes before the Court on Plaintiff's February 6, 2018 Motion for Preliminary

2  Injunction.  Upon consideration of Plaintiff's motion and the record, IT IS ORDERED that:

3    1.  Plaintiff's motion for preliminary injunction is GRANTED; and

4    2.  Defendants are ordered to RESTORE Plaintiff Daniel Ramirez Medina's DACA status and

5      work authorization pending a decision on the merits of his claims.

6

7  Dated this ___ day of _____, 2018.

8                                                  _____

9                                                  THE HONORABLE RICARDO S. MARTINEZ
                                                   CHIEF UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:17-cv-00218-RSM-JPD

1  PRESENTED BY:

2     /s/ *Theodore J. Boutrous, Jr.*
       GIBSON, DUNN & CRUTCHER LLP
3      THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
       ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
4      KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
       NATHANIEL L. BACH (CA SBN 246518), *pro hac vice*
5      JESSE S. GABRIEL (CA SBN 263137), *pro hac vice*

6     /s/ *Mark D. Rosenbaum*
       PUBLIC COUNSEL
7      MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
       JUDY LONDON (CA SBN 149431), *pro hac vice*
8      KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
       ANNE M. HUDSON-PRICE (CA SBN 295930), *pro hac vice*
9      ELIZABETH HADAWAY (CA SBN 308800), *pro hac vice*

10    ***Attorneys for Plaintiff***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:17-cv-00218-RSM-JPD