UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DANIEL RAMIREZ MEDINA,<br><br>        Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OD HOMELAND<br>SECURITY, *et al.*,<br><br>        Defendants. | Case No. C17-0218RSM<br><br>ORDER GRANTING PLAINTIFF'S<br>MOTION FOR PRELIMINARY<br>INJUNCTION |

## I.      INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction.  Dkt. #122.  The Court held oral argument on May 1, 2018, after which the Court directed the parties to submit additional briefing.  Dkt. #128.  The parties have since submitted that briefing.  Dkts. #130 and #131.  Plaintiff now seeks an Order enjoining Defendants from terminating his DACA status and work authorization pending adjudication on the merits of his case, and enjoining Defendant USCIS from continuing to accuse him of being a gang member in any further proceedings.  Dkt. #130.  Defendants oppose the motion, arguing that this Court lacks authority to hear and/or grant Plaintiff's request for new relief, and that Plaintiff's request goes too far beyond simply preserving the status quo.  Dkt. #131.    For the reasons discussed herein, the Court disagrees with Defendants and GRANTS Plaintiff's motion.

ORDER
PAGE - 1

## II.     BACKGROUND

### A. Plaintiff Daniel Ramirez Medina

Plaintiff, Daniel Ramirez Medina, is 25 years old, and the father of an American-born son. Dkt. #78, Ex. O at ¶¶ 2 and 8.  Mr. Ramirez was brought to this country from Mexico in or around 2003, when he was approximately 10 years old.  *Id.* at ¶ 2.  Mr. Ramirez alleges that he moved from California to Washington to obtain more lucrative employment to better support his son.[1]  *Id.* at ¶ 10.

In late 2013, Mr. Ramirez first applied for deferred action and work authorization pursuant to the government's "Deferred Action for Childhood Arrivals" ("DACA") policy.  *Id.* at 3.  As part of this process, Mr. Ramirez provided the government with his birth certificate, school records, and information about where he lived, and was required to attend a biometrics appointment so that United States Citizenship and Immigration Services ("USCIS") could take his fingerprints and photographs.  Dkt. #78, Ex. O at ¶ 3.  Mr. Ramirez was granted deferred action and work authorization in 2014.  *Id.* at ¶ 6.

In 2016, Mr. Ramirez reapplied for DACA status, and again was granted deferred action and work authorization.  *Id.* at ¶ 9.  As part of this process, Mr. Ramirez received an approval notice (the "2016 DACA Approval Notice") informing him that his request for deferred action had been granted.  *Id.*  The 2016 DACA Approval Notice provided that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years" and is valid until May 4, 2018.  Dkt. #78, Ex. G.  The 2016 DACA Approval Notice also informed Mr. Ramirez that his deferred action could be terminated if he engaged in "[s]ubsequent criminal activity."  *Id.*

---

[1]  The government asserts that he told agents he moved from California to get away from the gangs.  Dkt. #78, Ex. H at 3.

ORDER
PAGE - 2

On February 10, 2017, at approximately 9:00 a.m., a team of Immigration and Customs Enforcement ("ICE") agents arrested Mr. Ramirez's father outside of the apartment where Mr. Ramirez, his father, and his brother were then living. Dkt. #78, Ex. O at ¶ 14. ICE agents entered the apartment.[2] *Id.* The agents found Mr. Ramirez asleep, woke him up, and began to question him. *Id.* at ¶ 15. Mr. Ramirez provided the agents with his name and birthdate, and told them that he was born in Mexico. Mr. Ramirez was then placed in handcuffs. *Id.*

According to Mr. Ramirez, he told the ICE agents repeatedly that he had a legal work permit, but the ICE agents refused to release him. *Id.* at ¶ 17. Mr. Ramirez's father also repeatedly informed the ICE agents that Mr. Ramirez had a legal work permit, and questioned why he was being detained. Dkt. #78 at ¶ 46.

Mr. Ramirez was then transported to an ICE holding facility in Tukwila, Washington. *Id.* at ¶ 47. At the holding facility, the ICE agents confiscated Mr. Ramirez's work permit. *Id.* at ¶ 48. That permit was marked with a "C33" designation, which identified Mr. Ramirez as a DACA recipient with work authorization. Dkt. #78, Ex. F at 112. The ICE agents also fingerprinted Mr. Ramirez and used this information to access his records, which revealed that Mr. Ramirez has no criminal history, had twice been granted DACA status, and possessed valid employment authorization through May 4, 2018. Dkt. #78 at ¶ 49. Defendants refused to release Mr. Ramirez even after they confirmed his DACA status. *Id.* at ¶ 50. Defendants subsequently cited Mr. Ramirez's receipt of DACA as evidence of his "illegal" status in this country. *Id.*, Ex. H at 3.

According to Mr. Ramirez, the ICE agents began to interrogate him, asking him numerous times whether he was in a gang, which he denied, and whether he had ever known anyone who

---

[2] Consent to enter the apartment appears to be in dispute. Mr. Ramirez asserts that he is unaware of any consent provided by his father. Dkt. #78 at ¶ 44. The Record of Deportable/Inadmissible Alien form filled out by Officer Hicks states that consent was provided. Dkt. #78, Ex. H at 3.

was a gang member.  Dkt. #78 at ¶ 51.  Mr. Ramirez told the agents that although that he knew students who had attended middle school and high school with him who were in gangs, he was not gang affiliated and never had been.  *Id.*  The ICE agents also asked Mr. Ramirez about the tattoo on his forearm (which consisted of the words "La Paz-BCS" and a nautical star).  *Id.* at ¶ 52.  Mr. Ramirez got the tattoo when he was 18 years old.  La Paz is Mr. Ramirez's birthplace, and "BCS" stands for Baja California Sur, the region in which La Paz is located.  *Id.*  The agents apparently insisted to Mr. Ramirez that it was a gang tattoo, which he also denied.  *Id.* at 53.

Prior to being transferred to the Northwest Detention Center, the ICE agents asked Mr. Ramirez if there were any gangs with which he would like to avoid being placed for his safety.  *Id.* at ¶ 54.  Mr. Ramirez again stated that he had no gang affiliation and would not have problems being placed with anyone.  Dkt. #78 at ¶ 54.  Upon continued questioning, Mr. Ramirez ultimately indicated that if he had to be placed with any group, he would prefer "the Paisas."  *Id.*  Mr. Ramirez understands the colloquial use of "Paisas" to mean Mexicans, and was attempting to communicate that if given the option, he would prefer to be placed with other Mexicans.  *Id.*

Mr. Ramirez was then transferred to Northwest Detention Center, where he remained in custody for the next 47 days.  *Id.* at ¶ 55.  While at the Detention Center, Defendants classified Mr. Ramirez as a "medium-high" security risk.  *Id.* at ¶ 59.  Mr. Ramirez requested that he be reclassified because he was not, and never had been, gang affiliated.  *Id.*  The request was denied.  *Id.*  During his detention, Mr. Ramirez asserts that he feared for his safety because many of the other inmates believed he was affiliated with a gang due to the statements made after his arrest.  *Id.*

ORDER
PAGE - 4

Defendants issued a Notice to Appear ("NTA") on February 10, 2017.  Dkt. #78, Ex. I. Defendants assert that Mr. Ramirez's DACA status terminated on the day the NTA was issued. Dkts. #78 at ¶¶ 60 and 61, Ex. J and #90 at 7.

USCIS then sent Mr. Ramirez a Notice of Action ("NOA") dated February 17, 2017.  Dkt. #78, Ex. J.  The NOA states that Mr. Ramirez's deferred action and employment authorization terminated on the date the NTA was issued, and provides that "[a]n appeal or motion to reopen/reconsider this notice of action may not be filed." *Id.*

In the meantime, on February 13, 2017, Mr. Ramirez filed a Petition for Habeas Corpus in this Court.  Dkt. #1.  This Court ultimately declined to order the release of Mr. Ramirez and directed him to file a motion in Immigration Court.  Dkt. #69.  Pursuant to that Order, Mr. Ramirez filed such motion and received a bond hearing in Immigration Court on March 28, 2017. Dkt. #78 at ¶ 78.  Mr. Ramirez was released on bond on March 29, 2017.  *Id.*, Ex. V.

On April 25, 2017, Plaintiff filed a Second Amended Complaint in this matter.  Dkt. #78. In that Complaint, Plaintiff dropped his habeas claim, and alleged claims against several federal agencies, as well as individual officers.  *Id.*  The claims against the individual Defendants have since been dismissed.  Dkt. #112.  Against the remaining federal agencies, collectively, Plaintiff asserted the following claims: 1) violations of the Administrative Procedures Act ("APA") (Counts One and Two); and 2) violation of the Fifth Amendment (Count 8).[3]  Dkt. #78 at ¶¶ 85-105 and 148-150.

---

[3] Counts Three through Seven were *Bivens* claims brought against the individually-named Defendants.  Dkt. #78 at ¶¶ 92-147.  As noted above, those claims have since been dismissed. Dkt. #112.

ORDER
PAGE - 5

The federal agency Defendants then filed a second motion to dismiss, which this Court denied on November 8, 2017.  Dkt. #116.  Defendants filed their Answer to the Second Amended Complaint on December 6, 2017.  Dkt. #119.

On January 17, 2018, an Immigration Judge issued an Order of Removal directing Plaintiff's return to Mexico.  *See* Dkt. #122-1, Ex. B at ¶ 2.

On February 6, 2018, Plaintiff filed the instant motion.  On the day the government's opposition to the motion was due, February 26, 2018, the United States District Court for the Central District of California certified a class that includes all DACA recipients "who, after January 19, 2017, have had or will have their DACA grant and employment authorization revoked without notice or an opportunity to respond, even though they have not been convicted of a disqualifying criminal offense."  *Inland Empire–Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *22 (C.D. Cal. Feb. 26, 2018) ("*Inland Empire II*").  In the same order, the court preliminarily enjoined "Defendants' decisions after January 19, 2017 to terminate the DACA grants and EADs of class members, without notice, a reasoned explanation, or an opportunity to respond prior to termination," and ordered that "Defendants immediately will restore those individuals' DACA and EADs, subject to their original date of expiration."  *Inland Empire*, 2018 WL 1061408 at *22.  Mr. Ramirez is part of that class.

On or about April 3, 2018, Defendants issued a Notice to Mr. Ramirez confirming the restoration of his DACA status and work authorization, and stating that his DACA status and work authorization had been extended from May 5, 2016, to May 5, 2018.  Dkt. #126-1, Ex. B. On the same date, Defendant USCIS issued a Notice of Intent to Terminate ("NOIT") Mr. Ramirez's DACA status, stating:

USCIS has reviewed your deferred action pursuant to procedures outlined in the USCIS DACA Standard Operating Procedures (SOP) regarding DACA termination.  Specifically, page 138 of the DACA SOP states:

> If after consulting with ICE [U.S. Immigration and Customs Enforcement], USCIS determines that exercising prosecutorial discretion after removal has been deferred under DACA is not consistent with the Department of Homeland Security's enforcement priorities, and ICE does not plan to issue an NTA, the officer should refer the case to HQSCOPS [Headquarters Service Center Operations Directorate], through the normal chain of command, to determine whether or not a NOIT [Notice of Intent to Terminate] is appropriate.  If it is determined that the case warrants final termination, the officer will issue DACA 603 - Termination Notice [Enforcement Priority, Not Automatically Terminated] from the Appendix I.

USCIS has consulted with U.S. Immigration and Customs Enforcement (ICE) and has determined that exercising prosecutorial discretion to defer removal action in your case is not consistent with DHS's enforcement priorities.  As you were already issued an NTA by ICE on February 14, 2017, subsequent to your grant of DACA, further referral to ICE for consideration of NTA issuance is unnecessary.  DHS records show that on January 17, 2018, an immigration judge ordered you removed to Mexico.

Additionally, a review of Form 1-213, Record of Deportable Alien, reveals that during an encounter with ICE on February 10, 2017, you admitted to previously associating with the "Sureno's" criminal street gang in the state of California, and to currently associating with the "Paizas" criminal street gang in the state of Washington.  While DHS email records indicate that you disputed in immigration court that you are a gang member and that the immigration judge accepted this claim, you nonetheless admitted in immigration court that gangs may identify you as a rival gang member because of your tattoo and you admitted that you withdrew your appeal from placement in a Level 2 gang population at the Norwest Detention Center because you wanted to remain with the gang population.  Gang association poses a significant public safety risk.  Therefore, it appears that you do not warrant favorable consideration for DACA.

In light of your statements relating to gang association, DHS' determination that you are an enforcement priority, and the fact that ICE has informed USCIS that it is actively pursuing your removal and you were recently ordered removed, USCIS will not contemporaneously conclude that removal action should continue to be deferred in your case.  Accordingly, USCIS has determined, in its unreviewable discretion, that you do not warrant a favorable exercise of prosecutorial discretion.

ORDER
PAGE - 7

Dkt. #126-1, Ex. C.

**B.  The DACA Program**

On June 15, 2012, former Secretary of Homeland Security Janet Napolitano announced the creation of the DACA program.  Dkt. #78, Ex. C ("Napolitano Memo").  In her memorandum, Ms. Napolitano provided DHS with guidelines regarding the exercise of its prosecutorial discretion to focus enforcement efforts away from low priority cases, including individuals who came to the United States as children.  *Id.*  The Napolitano Memo listed the following five criteria that must be satisfied before an individual can be considered for an exercise of prosecutorial discretion under DACA:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.

Dkt. #78, Ex. C.  Individuals must also pass a criminal background check to be eligible for DACA.  *Id.* at 2.

Under the DACA program, deferred action is provided for a renewable period of two years, and DACA recipients are eligible to apply for work authorization during the period of deferred action.  *Id.* at 3; *see also* 8 C.F.R. § 274a.12(c)(14) (permitting USCIS to establish a specific period for employment authorization for aliens who have been granted deferred action).

The National Standard Operating Procedures ("SOP") issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status.  *See* Dkts. #78, Ex. F ("DACA National Standard Operating Procedures ("SOP")", dated April 4, 2013) and #109-1, Ex. A (excerpts of DACA SOP, dated August 28, 2013).  The SOP states that it is applicable to all personnel performing adjudicative functions and the procedures to be followed are not discretionary.  Dkt. #78, Ex. F at 16.

Pertinent to the instant matter, are the procedures applying to criminal offenses or public safety concerns that have been deemed to be Egregious Public Safety Concerns ("EPS").  The SOP defines EPS as:

> Any case where routine systems and background checks indicate that an individual is under investigation for, has been arrested for (without disposition), or has been convicted of, a specified crime, including but not limited to, murder, rape, sexual abuse of a minor, trafficking in firearms or explosives, or other crimes listed in the November 7, 2011, memorandum entitled <u>Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens</u>.

Dkt. #109-1, Ex. A.  The November 7, 2011, memorandum lists "known or suspected street gang members" as one of many EPS cases.  Dkt. #78, Ex. F, Appendix B at 4.

Chapter 14 of the SOP, entitled "DACA Termination," provides as follows:

> If disqualifying criminal offenses or public safety concerns, which are deemed to be EPS, arise after removal has been deferred under DACA, the officer should forward the case to the BCU DACA Team who, in turn, will refer the case to ICE and follow the handling procedures outlined in the November 7, 2011 NTA memorandum for EPS cases.  If ICE accepts the case, the issuance of the NTA will result in the termination of DACA.  Upon the filing of the NTA with EOIR, the individual's employment authorization terminates automatically.

> If ICE does not accept the case or if the disqualifying criminal offense is non-EPS per the November 7, 2011 NTA memorandum, the BCU DACA Team should reopen the case on Service motion and issue a Notice of Intent to Terminate.  The individual should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate.

The Notice of Intent to Terminate should include a statement that if deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of deferred action will be terminated for cause.

If the adverse grounds are not overcome, or no response is received to the Notice of Intent to Terminate, the officer should prepare a Termination Notice and seek supervisory review of the draft Termination Notice prior to issuance. The Termination Notice should indicate that the individual's employment authorization is terminated for cause as of the date of the notice. Consequently, the Class of Admission (COA) code in CIS should be changed to DAT (Deferred Action Terminated) for employment verification purposes. Additionally, the BCU DACA Team should forward the individual's name to ERO.

If national security concerns arise after removal has been deferred under DACA, the case should go through the CARRP process, per established CARRP protocols.

Dkt. #78, Ex. F at 133.[4]

Mr. Ramirez alleges that the revocation of his DACA status and employment authorization violated the Administrative Procedures Act ("APA") because the revocation did not comport with established procedures, and was therefore arbitrary. *See* Dkt. #78 at ¶ ¶ 85-91. Mr. Ramirez also alleges that the revocation of his DACA status and employment authorization

---

[4] "BCU" is defined as "Background Check Unit." Dkt. #78, Ex. F at 6. "BCU DACA Team" is defined as:

A specialized team within the BCU that specifically reviews and adjudicates issues of criminality arising from DACA requests. The team may consist of Immigration Services Officers, as well as officers assigned to CARRP, NTA issuance, and Triage duties, and the analysts who support them.

*Id.* "CARRP" is defined as:

Controlled Application Review and Resolution Program. This program outlines the process to identify, record, and adjudicate applications/petitions/requests where a National Security concern is identified.

*Id.* at 8.

ORDER
PAGE - 10

violated the APA because those actions violated his rights under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution. Dkt. #78 at ¶¶ 94-105 and ¶¶ 148-150.

### C. DACA Decisions In the Ninth Circuit

Legal challenges involving DACA have been filed in federal district courts throughout the country. One such case is a set of challenges to the DACA program's rescission that was filed in September 2017 in federal district court in California. *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1026 (N.D. Cal. 2018). Following challenges before the Ninth Circuit Court of Appeals and the U.S. Supreme Court regarding the scope of the administrative record in that case, the District Court issued a preliminary injunction. 279 F. Supp.3d at 1036–37. The injunction directed DHS to resume accepting applications for the renewal of DACA benefits, although it did not require the agency to accept new DACA applications or to afford current DACA beneficiaries advance parole. *See id.* at 1048–49.

In addition, District Courts in the Ninth Circuit have addressed challenges to the rescission of DACA status for various individuals. In *Inland Empire-Immigrant Youth Collective, et al. v. Duke, et al.*, 2017 U.S. Dist. LEXIS 203307 (C.D. Cal. Nov. 20, 2017), the District Court addressed a motion for preliminary injunction stemming from the Plaintiff Jesus Alonso Arreola Robles' termination of DACA status. Like the instant Plaintiff, Mr. Robles had been granted DACA status and was working with a valid work permit. At the time Mr. Robles was stopped by ICE agents, he informed the agents of his status, but he was arrested anyway. *Inland Empire*, 2017 U.S. Dist. LEXIS 203307, *4. Mr. Robles was then issued a Notice to Appear, initiating removal proceedings and charging him as removable due to his presence in the United States without admission under the INA. Mr. Robles was not charged with any crime.

He received a bond hearing and was released from immigration detention.  Shortly thereafter, Plaintiff received a Notice of Action from USCIS notifying him that his DACA and EAD were "terminated automatically as of the date [his] NTA was issued."  *Inland Empire*, 2017 U.S. Dist. LEXIS 203307, *5.

After determining that it had jurisdiction to hear the challenge, the District Court examined the merits of Plaintiff's claims.  The Court agreed with Plaintiff that his case was analogous to that which the Supreme Court considered in *Judulang v. Holder*, 565 U.S. 42, 55, 132 S. Ct. 476, 181 L. Ed. 2d 449 (2011).  *Inland Empire*, 2017 U.S. Dist. LEXIS 203307, *16. The Court explained:

> In *Judulang*, the Supreme Court considered a Board of Immigration Appeals ("BIA") rule governing eligibility for a form of relief – suspension of deportation – which, like DACA, was not provided for in the INA and was therefore discretionary.  *See Judulang*, 565 U.S. at 46-47.  Despite this discretionary quality, the Supreme Court nonetheless determined that the rules applied by the agency must reflect reasoned decisionmaking, admonishing that "[a] method for disfavoring deportable aliens that bears no relation to these matters – that neither focuses on nor relates to an alien's fitness to remain in the country – is arbitrary and capricious."  *Id.* at 55.  The BIA's rule was invalidated because it was based on "a matter irrelevant to the alien's fitness to reside in this country," which indicated that "the BIA ha[d] failed to exercise its discretion in a reasoned manner."  *Id.* at 53.

*Inland Empire*, 2017 U.S. Dist. LEXIS 203307, *16-17.  The District Court found that Mr. Robles had put forth a compelling argument that, like the BIA's invalidated rule in *Judulang*, the decision to automatically terminate his DACA and EAD based on the issuance of an NTA failed the requirements of the APA.

The District Court further held that while agencies are free to change course and depart from a prior decision, they are "obligated to supply a reasoned analysis for the change."  *Id.* at *20 (citation omitted).  The Court agreed "USCIS's one-sentence explanation" fails to "provide 'good reasons' for the agency's change in position, as required by the APA."  *Id.* at *21.  "As

Plaintiff accurately concludes, given that *all* DACA recipients are necessarily removable due to their unauthorized presence, '[t]he agency's reliance on an NTA citing [Plaintiff's] presence without admission simply fails to explain, much less justify, the agency's decision to reverse course and terminate his DACA.'"   *Inland Empire*, 2017 U.S. Dist. LEXIS 203307, *21-22 (citations omitted; emphasis in original).

The District Court then found that the deprivation of Plaintiff's earnings and job opportunities caused by the loss of his DACA and EAD constitutes irreparable harm, that the harms that would be experienced by Plaintiff and his family if this motion were denied outweigh any potential injury to Defendants, and that the public has a strong interest in ensuring that the nation's immigration laws are robustly *and fairly* enforced.   *Inland Empire*, 2017 U.S. Dist. LEXIS 203307, *29-32.  As a result the District Court issued a preliminary injunction, enjoining USCIS's decision to terminate the plaintiff's status under the Deferred Action for Childhood Arrivals program, and enjoining the termination of the plaintiff's employment authorization.  *Id.* at *32.

As noted above, on February 26, 2018, the United States District Court for the Central District of California then certified a class that includes all DACA recipients "who, after January 19, 2017, have had or will have their DACA grant and employment authorization revoked without notice or an opportunity to respond, even though they have not been convicted of a disqualifying criminal offense."  *Inland Empire–Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *22 (C.D. Cal. Feb. 26, 2018) ("*Inland Empire II*").  In the same order, the court preliminarily enjoined "Defendants' decisions after January 19, 2017 to terminate the DACA grants and EADs of class members, without notice, a reasoned explanation, or an opportunity to respond prior to termination," and ordered that "Defendants immediately will restore those

ORDER
PAGE - 13

individuals' DACA and EADs, subject to their original date of expiration." *Inland Empire*, 2018 WL 1061408 at *22.  Mr. Ramirez is part of that class.

### III.    DISCUSSION

**A. Jurisdiction**

As an initial matter, the Court examines its jurisdiction to hear this matter.  Defendants argue that this Court lacks jurisdiction to review the NOIT issued to Mr. Ramirez because it does not constitute a final agency action.  Dkt. #131 at 3-9.  Plaintiff responds that Defendants' arguments are misplaced because: 1) he does not seek review of a final agency action; 2) even if he was seeking such review there is an exception allowing his challenge; and 3) he is entitled to proceed on his Due Process claims separate and apart from his APA claims.  Dkt. #130 at 9-12. The Court agrees with Plaintiff.

First, the Court agrees that this motion does not raise an issue of finality because Plaintiff does not seek to challenge the issuance of the NOIT itself.  Rather, he seeks to enjoin Defendants from relying on the allegations that he is a gang member, or is gang affiliated, in any proceedings. Dkt. #130 at 9. Indeed, this Court is not making any evaluation as to whether USCIS is justified in terminating Mr. Ramirez's DACA status.

Further, even if finality was an issue, the Court agrees with Plaintiff that this Court has jurisdiction to review Plaintiff's Due Process claim.  *Hata v. United States*, 23 F.3d 230, 233 (9th Cir. 1994) (recognizing that even where administrative claims are not typically reviewable, "review of constitutional claims may still be available upon a sufficiently pleaded allegation of a serious constitutional violation 'going to the heart of the administrative determination.'") (citations omitted)).  As further discussed below, the Court finds that Plaintiff has pled a colorable Due Process claim.

ORDER
PAGE - 14

Defendants also object to the Court's authority to issue relief that was not requested in the operative Complaint. Dkt. #131 at 3-5. The Ninth Circuit Court of Appeals has explicitly held that, in order to grant injunctive relief:

> there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself. The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant "relief of the same character as that which may be granted finally." *De Beers Consol. Mines*, 325 U.S. at 220. Absent that relationship or nexus, the district court lacks authority to grant the relief requested.

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). Here the Court finds that nexus exists. In Plaintiff's Second Amended Complaint, Plaintiff sets forth a number of factual allegations related to the government's assertions that he is gang-affiliated. *See* Dkt. #78 at ¶¶ 24, 25, 46, 51, 53, 54, 63-77, 80, 82 and 84. In Count One, Plaintiff asserts that Defendants have violated the APA by asserting that he is gang-affiliated. Dkt. #78 at ¶ 89. In Count Two, Plaintiff alleges that Defendants' continued assertions that he is gang-affiliated are unconstitutional. *Id.* at ¶ 98.

Defendants also assert that Plaintiff's challenges to the NOIT process are improper because they attempt to gain an advisory opinion and influence Defendants' non-final action. Dkt. #131 at 5. However, this misconstrues Plaintiff's request for relief in this action. As noted above, this Court is not making any evaluation as to whether USCIS is justified in terminating Mr. Ramirez's DACA status. Thus, given the Court's "broad powers and wide discretion to frame the scope of appropriate equitable relief" when issuing a preliminary injunction to preserve the status quo", *Sec. & Exch. Comm'n v. United Fin. Grp., Inc.*, 474 F.2d 354, 358-59 (9th Cir.

ORDER
PAGE - 15

1973), the Court finds it has the authority to issue a preliminary injunction in this matter, as further discussed below.

**B.   Standard of Review for Preliminary Injunctions**

In determining whether to grant a preliminary injunction, this Court considers: (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to that party if an injunction is not issued; (3) the extent to which the balance of hardships favors the moving party; and (4) whether the public interest will be advanced by the injunction.  *See Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).  The Ninth Circuit has often compressed this analysis into a single continuum where the required showing of merit varies inversely with the showing of irreparable harm.  *See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000).  Thus, Plaintiff will be entitled to preliminary relief if it is able to show either: (1) probable success on the merits and the possibility of irreparable harm; or (2) the existence of serious questions going to the merits and a fair chance of success thereon, with the balance of hardships tipping sharply in favor of an injunction.  *Miller*, 19 F.3d at 456.

**C.   Likelihood of Success on the Merits**

*1.   APA Claim – Arbitrary and Capricious*

Plaintiff argues that he is likely to succeed on the merits of his APA claim because the government's reliance on unfounded allegations of gang-affiliation is arbitrary, capricious and an abuse of discretion.[5]  Dkts. #122 at 20-24 and #130.  The Administrative Procedures Act

---

[5]  Because the Court agrees that Defendants' determination is arbitrary and capricious, it does not address Plaintiff's alternative argument that Defendants failed to follow their own procedures in violation of the APA.  Dkt. #122 at 24-26.  The Court does, however, address Plaintiff's alternate due process argument.  Dkt. #122 at 26-30.

ORDER
PAGE - 16

("APA") provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125, 195 L. Ed. 2d 382 (2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)). "[I]f an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable." *Syracuse Peace Council v. FCC*, 867 F.2d 654, 657, 276 U.S. App. D.C. 38 (D.C. Cir. 1989). However, because "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," *post hoc* explanations that the agency did not articulate when it acted are insufficient. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947).

Plaintiff argues that the government's determination that Mr. Ramirez is gang-affiliated is contrary to the administrative record. Dkt. #122 at 20-24. Defendants assert that ICE officers determined, based on information obtained during his arrest, Mr. Ramirez was "affiliated with a gang" and that his DACA was therefore subject to immediate termination on EPS grounds. *See*, *e.g.*, Dkt. #90 at 18. However, the administrative record does not support that assertion. According to the Form I-213, an ICE field agent purportedly determined that Mr. Ramirez "does not qualify" for DACA "due to gang association." Dkt. #78, Ex. H at 3. That form states:

> Subject was asked if he is or has been involved with any gang activity. Subject stated "No not no more". Subject was questioned further regarding the gang tattoo on his forearm. Subject then stated that he used to hang out with the Sureno's in California. Subject stated that he fled California to

escape from the gangs.  Subject stated that he still hangs out with the Paizas in Washington State.[6]

*Id.*

These conclusory findings have since been contradicted by experts and other evidence. For example, the arresting officer states that Mr. Ramirez was questioned about his "gang tattoo." That tattoo consists of the words "La Paz – BCS" and a nautical star.  However, as Mr. Ramirez has explained, "La Paz" is his birthplace, "BCS" stands for Baja California Sur (the region in which La Paz is located), and the nautical star is a popular symbol.  Dkt. #35-1 at ¶¶ 23-25.  Mr. Martin Flores, who has served as a gang expert in more than 700 cases, indicated that he has "never seen a gang member with a similar tattoo nor would [he] attribute this tattoo to have any gang-related meaning."  Dkt. #35-7 at ¶¶ 2 and 11.  Defendants have produced no evidence to the contrary.

Likewise, the conclusions that Mr. Ramirez "used to hang out with the Sureno's in California," "fled California to escape from the gangs," and "still hangs out with the Paizas in Washington State" equally suggest that he had known gang-affiliated individuals.  Dkts. #35-8 at ¶ 9 and #35-1 at ¶ 22.  More importantly, the term "paisa" is simply the shortened form of "paisano" meaning one from the country.  Dkt. #35-7 at ¶ 9.  In addition, the ICE officer's conclusion is completely contradictory to the government's own previous findings after extensive background checks that were meant to uncover evidence of "known or suspected gang association."  *See* Dkt. #78, Ex. E.

---

[6] As this Court has previously recognized, Defendants have submitted two different 1-213 forms, both of which purport to be signed on the same day, by the same person, but the second-filed form omits certain language. *See* Dkt. #62 at 13:19-14:25.  Defendants have acknowledged that there is at least one "visible discrepancy" between the two forms.  However, the Court examines the first-filed form and the gang-affiliation findings on which Defendants continue to rely.

ORDER
PAGE - 18

Most troubling to the Court, is the continued assertion that Mr. Ramirez is gang-affiliated, despite providing no evidence specific to Mr. Ramirez to the Immigration Court in connection with his administrative proceedings, and offering no evidence to this Court to support its assertions four months later.    Dkts. #122-1, Ex. D and #129 at 20:20-21:7.    Indeed, the Immigration Judge, after reviewing all evidence submitted by respondent, that Mr. Ramirez was credible, and that he was not in a gang or associated with one.    Dkt. #124-1.

For these reasons, the Court finds that Defendants' continued assertion that Plaintiff is a gang member or gang-affiliated is arbitrary and capricious and in violation of the APA. *See, e.g.*, *Abdur-Rahman v. Napolitano*, 814 F. Supp. 2d 1098, 1110 (W.D. Wash. 2011) (revocation of approved petition to support noncitizen's permanent resident status was "arbitrary and capricious" where "agency failed to articulate a rational explanation for its decision").    Thus Plaintiff has demonstrated a likelihood of success on the merits.    As a result, the first factor in the preliminary injunction inquiry tips in Plaintiff's favor.

   2.  *APA Claim – Due Process*

Alternatively, Plaintiff argues that Defendants violated the APA by depriving Plaintiff of his constitutionally protected liberty and property interests without due process of law.  Dkt. #122 at 26-30.  Defendants' only opposition to Plaintiff's argument is that he has failed to demonstrate the necessary prejudice to support the claim.  Dkt. #123 at 11.  The Court disagrees.

To assert a due process claim, a plaintiff must first show that he or she has an interest in liberty or property protected by the Constitution.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 569, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).  As the court noted in *Torres v. DHS*, 2018 U.S. Dist. LEXIS 62366, *25-26 (S.D. Cal. Apr. 12, 2018):

> The bedrock principle underlying procedural due process is clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they

ORDER
PAGE - 19

may enjoy that right they must be notified." *Baldwin v. Hale*, 68 U.S. 223, 1 Wall 223, 233, 17 L. Ed. 531 (1863).  Equally fundamental to the right to notice is the opportunity to be heard at a meaningful time in a meaningful manner.  *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965); *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).  When protected liberty or property interests are implicated, the individual is entitled to "some kind of prior hearing" before the termination of such interests.  *Board of Regent of State Colleges v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548, (1972).

2018 U.S. Dist. LEXIS 62366, at *25-26.

In this case, the Court is unpersuaded by Defendants' argument that Plaintiff's claim fails due to the failure to demonstrate prejudice.  The Napolitano Memo provides five criteria that must be satisfied before an illegal immigrant qualifies to obtain DACA status – 1) entered the United States before their 16th birthday and prior to June 2007; 2) lived continuously in the United States during the previous five years; 3) was currently in school, a high school graduate or was honorably discharged from the military; 4) was under the age of 31 as of June 15, 2012; and 5) have not been convicted of a felony, significant misdemeanor, three or more misdemeanors, nor posed a threat to national or public safety.  As the *Torres* court found, "[o]nce these objective and non-discretionary criteria are satisfied, the DACA recipient enjoys significant liberty and property interests, including the right to obtain lawful employment authorization and the right to be considered lawfully present in the United States."  2018 U.S. Dist. LEXIS 62366, *25-26.  Here, Defendants' determination that Plaintiff is in a gang or gang-affiliated, without supporting evidence, and their admission that Plaintiff's DACA status will be terminated for that reason, implicates Plaintiff's right to an opportunity to be heard in a "meaningful manner."  *See* Dkt. #129 at 20:7-12 ("THE COURT: Let me ask you this: Is the plaintiff correct that by filing the notice to terminate, that you intend to once again rely on the allegations that Mr. Ramirez is a gang member, has associated with gang members, and therefore needs to have that DACA

ORDER
PAGE - 20

status terminated?   MR. ROBINS: Essentially, yes, Your Honor.").   Thus Plaintiff has demonstrated a likelihood of success on the merits on this claim as well.   As a result, the first factor in the preliminary injunction inquiry tips in Plaintiff's favor.

### D. Irreparable Harm

Turning to the issue of irreparable harm, the Court rejects Defendants' arguments that Plaintiff cannot demonstrate this element of the preliminary injunction test.  Dkt. #123 at 4-7. The Ninth Circuit has held that "loss of opportunity to pursue [one's] chosen profession" constitutes irreparable harm.  *Enyart v. National Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) ("We have frequently recognized the severity of depriving a person of the means of livelihood.").   Moreover, the Ninth Circuit has specifically found irreparable harm in a similar case involving DACA recipients.  *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (finding irreparable harm where professional opportunities are limited).  Furthermore, Mr. Ramirez has demonstrated that his earnings are used to support his family, Dkt. #35-1 at ¶ ¶ 8, 10 and 29, which also suggests irreparable harm.  *See Torres v. DHS*, 2017 U.S. Dist. LEXIS 161406 at *19 (S.D. Cal. Sept. 29, 2017) ("The potential harm caused by Defendants' conduct includes the loss of employment, a core benefit under DACA. The deprivation of employment impacts Plaintiff's ability to financially provide for himself and his family.").

Defendants also argue undue delay in seeking an injunction.  Dkt. #123 at 4-5.  Plaintiff demonstrates ongoing efforts to challenge Defendants' actions, and his litigation strategy has evolved as his situation has unfolded, and there is no indication that the timing of his motion is in bad faith.

Accordingly, the Court finds that Plaintiff has demonstrated irreparable harm, and that factor weighs in favor of an injunction.

### E.  Balance of Hardships and Public Interest

The remaining two factors – balance of hardships and the public interest – merge when, as here, the government is the opposing party.  *See Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009).

The Court acknowledges that there is a strong interest to be found in the effective and efficient enforcement of the nation's immigration laws, as Defendants assert in this case.  Dkt. #123 at 12.  However, the Court should not conclude that this interest outweighs the ongoing harm that Plaintiff is experiencing as a result of losing his DACA and EAD, especially when he has received DACA benefits twice, there is no demonstrable evidence that he is of particular risk, and there are several nationwide injunctions preventing the wind down of DACA.

Furthermore, public interest exists in ensuring that the government complies with its obligations under the law and follows its own procedures.  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

### IV.  CONCLUSION

Having reviewed Plaintiff's Motion for Preliminary Injunction, the opposition thereto and reply in support thereof, along with the Declarations and exhibits, supplemental briefing, and the remainder of the record, the Court hereby finds and ORDERS:

1.  Plaintiff's Motion for Preliminary Injunction (Dkt. #122) is GRANTED.

ORDER
PAGE - 22

2. Defendants shall not terminate Plaintiff's DACA status and work authorization pending a final decision by this Court on the merits of his claims.[7]

3. Defendant USCIS is ENJOINED from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety.

DATED this 15 day of May, 2018.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

---

[7] Defendants rely on an Order from the United States District Court for the Southern District of California for their assertion that enjoining the termination of Plaintiff's DACA status and work authorization pending a decision on the merits of his claims is improper. *See* Dkt. #131-1. However, the procedural posture of that case was much different. In that case, the District Court determined that such an injunction was unnecessary because of the timing of the request to modify the injunction. *Id.* In the instant matter, Plaintiff's DACA status expires today, May 15, 2018.

ORDER
PAGE - 23