The Honorable Ricardo S. Martinez
Chief United States District Judge

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

DANIEL RAMIREZ MEDINA,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and U.S. CITIZENSHIP AND IMMIGRATION SERVICES,

Defendants.

CASE NO. 2:17-CV-00218-RSM-JPD

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Attorneys for Plaintiff
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
mrosenbaum@publiccounsel.org
JUDY LONDON (CA SBN 149431), *pro hac vice*
jlondon@publiccounsel.org
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*
keidmann@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice*
tboutrous@gibsondunn.com
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
kmarquart@gibsondunn.com
NATHANIEL L. BACH (CA SBN 246518), *pro hac vice*
nbach@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

ERWIN CHEMERINSKY (DC SBN 289330; IL SBN 3122596), *pro hac vice*
echemerinsky@law.berkeley.edu
University of California, Berkeley School of Law
**Affiliation for identification purposes only*
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN (DC SBN 1016310), *pro hac vice*
llitman@law.uci.edu
University of California, Irvine School of Law
**Affiliation for identification purposes only*
401 East Peltason Drive
Educ 1095
Irvine, CA 92697
Telephone: (949) 824-7722

LAURENCE H. TRIBE (MA SBN 126736; CA SBN 039441), *pro hac vice*
larry@tribelaw.com
Harvard Law School
**Affiliation for identification purposes only*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

ELIZABETH HAWKINS (SBN 43187)
ehawkins@hawkinsimmigration.com
Hawkins Law Group
17544 Midvale Avenue, Suite 301
Shoreline, WA 98133
Telephone: (206) 728-4220
Facsimile: (206) 973-5326

IMMIGRANT ADVOCACY & LITIGATION CENTER, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*
lcortes@ia-lc.com
19309 68th Avenue South, Suite R-102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

NORTHWEST IMMIGRANT RIGHTS PROJECT
MATT ADAMS (SBN 28287)
matt@nwirp.org
615 Second Ave., Suite 400
Seattle, WA 98104
Telephone: (206) 957-8611

## INTRODUCTION

In February 2017, Immigration and Customs Enforcement ("ICE") arrested Plaintiff Daniel Ramirez Medina ("Mr. Ramirez") without a warrant or probable cause, and detained him for more than six weeks without justification, in violation of his constitutional rights. Defendants targeted Mr. Ramirez despite their knowledge that he is a "Dreamer" who was twice granted deferred action and work authorization under the Deferred Action for Childhood Arrivals ("DACA") program after rigorous vetting of applications he submitted under the program. Defendants have twice been enjoined from revoking Mr. Ramirez's DACA status and work authorization—once by this Court and once by the United States District Court for the Central District of California in *Inland Empire-Immigrant Youth Collective v. Nielsen* ("*Inland Empire*"), No. 17-2048. Nevertheless, in what has become a personal vendetta against Mr. Ramirez, the father of a five-year-old U.S. citizen, Defendants remain determined to unlawfully strip Mr. Ramirez of his DACA status and work authorization.

After Mr. Ramirez first challenged the government's unlawful and unconstitutional actions, Defendants launched a campaign to smear his reputation, falsely accusing him of being a gang member to strip him of DACA by any means possible. Defendants continued this campaign despite repeatedly confirming and being forced to admit that they had no actual evidence that Mr. Ramirez had any gang affiliation. Even worse, Defendants had determined that Mr. Ramirez was neither a gang member nor an "EPS" (egregious public safety) concern but failed to inform Mr. Ramirez or the Court that they had done so. Specifically, in an internal U.S. Citizenship and Immigration Services ("USCIS") email dated March 20, 2018, the government admitted that "there is not sufficient evidence to conclude [Mr. Ramirez] is currently a known or suspected gang member," and "[t]here is NOT sufficient evidence to conclude [Mr. Ramirez] is an EPS concern."[1] Despite knowing its gang accusations were false, just two weeks later, on April 3, 2018, the government tried again to terminate Mr. Ramirez DACA's on the basis that he was a gang member and told this Court on May 1, 2018 that it was continuing to rely on that allegation as its basis to do so.

[1] Ex. A (Mar. 20, 2018 USCIS Email) (capitalization in original).

After this Court granted Mr. Ramirez's preliminary injunction motion on May 15, 2018 ("Preliminary Injunction Order"), enjoining Defendants from continuing their unlawful campaign and terminating his DACA, Mr. Ramirez believed he would be able to get back to peacefully living his life and working to support his son. But Defendants have now attempted a new unlawful gambit, arbitrarily and capriciously denying Mr. Ramirez's most recent request to renew his DACA status, in December 2018—requests that are otherwise approved 99% of the time—thereby violating both the letter and spirit of this Court's Preliminary Injunction Order.

Mr. Ramirez asks this Court to remedy the government's latest unconstitutional actions by restoring his DACA status and work authorization, and confirming that the benefits he was provided under DACA are protected by the Fifth Amendment's Due Process Clause.

* * * * *

The federal government established the DACA program with great fanfare in 2012. Under DACA, individuals brought to the United States as children who meet certain criteria, and who are found by the Department of Homeland Security ("DHS") to pose no threat to public safety or national security, are granted deferred action for a two-year period, subject to renewal. These young people are commonly referred to as "Dreamers" in recognition that they have played by the rules, cooperated with the government, and are working hard to be part of the American Dream. As the government has explained, Dreamers are "considered by DHS to be lawfully present during the period deferred action is in effect," and are eligible to receive employment authorization and other important benefits.[2] Indeed, on March 29, 2017, the Secretary of Homeland Security reaffirmed that "DACA status is a commitment . . . by the government towards the DACA person, or the so-called Dreamer."[3]

---

[2] Ex. B, at 2 (*Frequently Asked Questions*, U.S. Citizenship & Immigration Servs.: Consideration of Deferred Action for Childhood Arrivals Process, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions) (hereinafter "USCIS DACA FAQs"); *see also Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015) *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) ("Deferred action . . . is much more than nonenforcement: It . . . affirmatively confer[s] 'lawful presence' and associated benefits . . . ."); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015).

[3] Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico (Mar. 29, 2017), http://politi.co/2mR3gSN.

As a result of the government's representations and promises, hundreds of thousands of Dreamers have applied for, and been granted, deferred action under DACA. To apply for DACA, eligible young people are required to provide DHS with highly sensitive personal information, pay a substantial fee, and submit to a rigorous background check. Mr. Ramirez did all of that not once, but three times—once in 2013, again in 2016 when he successfully renewed his DACA status, and most recently in May of 2018. In so doing, Mr. Ramirez—like nearly 750,000 other Dreamers—"relied on the U.S. government's representations" that it would honor its commitments under the DACA program.[4] As a result of his reasonable expectations, Mr. Ramirez (and his fellow Dreamers) has constitutionally protected liberty and property interests in the benefits granted under DACA, which include, among other things, the ability to live and work in the United States without fear of arbitrary arrest or detention.

Notwithstanding these promises, Defendants arrested and detained Mr. Ramirez without a warrant or probable cause. They handcuffed him, forcibly removed him from a private residence, and transported him to an ICE detention facility where he was coercively interrogated. They summarily revoked his DACA status and work authorization without notice, justification, or due process, and detained him with dangerous criminals for more than six weeks.

Once Mr. Ramirez filed a petition for habeas corpus in this Court, the government doubled down, mounting a sustained campaign to publicly vilify him as a "gang member," despite having no credible evidence to support that allegation. Indeed, as the government later admitted to an Immigration Judge—and as it has since admitted in an internal USCIS email—there is insufficient evidence to even argue that Mr. Ramirez is a danger to the community. Despite these remarkable concessions, the government continued to falsely accuse Mr. Ramirez of gang affiliation.

Mr. Ramirez therefore sought a preliminary injunction to prohibit the government from terminating his DACA status and work authorization on these discredited allegations. While Mr. Ramirez's preliminary injunction motion was pending before this Court, a class-wide injunction was entered on February 26, 2018 in *Inland Empire* that required the government to restore to a class of former DACA recipients—including Mr. Ramirez—their DACA status and work authorization.

[4] Ex. C, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

On April 3, 2018, the same day that Defendants complied with the *Inland Empire* order by restoring Mr. Ramirez's benefits, they simultaneously initiated a new process to strip Mr. Ramirez of his just-restored DACA status and work authorization, issuing a Notice of Intent to Terminate ("NOIT") on the same false, discredited basis that Mr. Ramirez was a gang member. Remarkably, USCIS had determined at least two weeks prior to issuing the April 3, 2018 NOIT—as demonstrated in a March 20, 2018 internal USCIS email—that Mr. Ramirez posed no threat as there was insufficient evidence to sustain any allegation that he is a gang member:

> Description of Current Criminal History: No criminality on rap sheet. Gang information obtained from EARM, ICE interview of DACA recipient. HOWEVER, there is not sufficient evidence to conclude he is currently a known or suspected gang member. If this was a pending case, it would have been further vetted and likely referred to a field office for a gang interview. There is NOT sufficient evidence to conclude this person is an EPS concern.

Ex. A (underlining added). Moreover, the government only produced this document to Mr. Ramirez in September 2018, after being compelled to do so by this Court. USCIS therefore ignored its own determination that Mr. Ramirez was not a gang member and issued a NOIT just two weeks later on the same false basis that Mr. Ramirez was a gang member. There has rarely been a case in which the government's animus against a particular individual has so clearly driven an unlawful vendetta based on a fiction.

On May 1, 2018, this Court held a hearing on Mr. Ramirez's preliminary injunction motion, and after supplemental briefing from the parties, on May 15, 2018 it issued its Preliminary Injunction Order. The Court ordered that "Defendants shall not terminate Plaintiff's DACA status and work authorization pending a final decision by this Court on the merits of his claims," and enjoined Defendant USCIS from "asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety."[5] Thereafter, and although the government was subsequently enjoined from terminating Mr. Ramirez's DACA status pending trial on the merits, Mr. Ramirez filed a DACA renewal notice to ensure there would be no question about his entitlement to such benefits.

[5] Dkt. #133, at 23 (Preliminary Injunction Order).

However, Defendants blatantly violated the terms of the Preliminary Injunction Order when, in a "Decision" dated December 19, 2018, USCIS denied Mr. Ramirez's routine DACA renewal request on the grounds that he now again poses a risk to public safety, citing no new criminal charges but a supposed "offense history" that predates his initial grant of DACA and his 2016 renewal. It is abundantly clear that the government has determined to continue to target Mr. Ramirez for standing up for his rights and decided to willfully violate this Court's Preliminary Injunction Order to do so. There has never been any lawful basis for any of Defendants' targeted and retributive actions against Mr. Ramirez and this Court should put a stop, once and for all, to the government's unlawful campaign against him.

Mr. Ramirez therefore respectfully requests that this Court: (1) find the agency actions to deny Mr. Ramirez's DACA to be arbitrary and capricious and unlawful; (2) confirm the validity of his ongoing DACA status and work authorization and/or reinstate such status; (3) protect those benefits against future unlawful action by the government; and (4) issue declaratory relief confirming that Mr. Ramirez's benefits under the DACA program are liberty and property interests protected by the Due Process Clause.

## JURISDICTION AND VENUE

1. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331. This Court also has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

2. Venue properly lies within the Western District of Washington because a substantial part of the events or omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(e)(1).

3. This is an amended version of the Second Amended Complaint that was filed in this action on April 25, 2017.[6]

## PARTIES

4. Mr. Ramirez is the twenty-six-year-old father of a United States citizen. He was brought to the United States from Mexico in or around 2003, when he was approximately 10 years

[6] *See* Dkt. #78.

old. Mr. Ramirez was twice granted deferred action and work authorization under the DACA program. He moved from California to Washington in or around January 2017 in order to obtain more lucrative employment to better support his son. After being arrested without a warrant or probable cause, Mr. Ramirez was detained in the Northwest Detention Center for more than six weeks. He successfully obtained release from custody after the government conceded he was not a threat to public safety, and later, on May 15, 2018, obtained an order from this Court enjoining Defendants from terminating his DACA, Defendants have now unlawfully denied Mr. Ramirez's request to renew his DACA.

5. The Department of Homeland Security is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.

6. U.S. Immigration and Customs Enforcement is a law enforcement agency that is part of DHS. According to its website, "ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration."[7]

7. U.S. Citizenship and Immigration Services is a federal agency that is part of DHS. According to its website, USCIS "is the government agency that oversees lawful immigration to the United States."[8] USCIS administers the DACA program, including by processing applications and renewals, and issuing notices of termination.

## STATEMENT OF FACTS

### Establishment of the DACA Program

8. On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum").[9] Under the

---

[7] *See, e.g.*, *ICE Initiative to Increase Community Engagement*, U.S. Immigration & Customs Enforcement: News Releases (Mar. 10, 2016), https://www.ice.gov/news/releases/ice-initiative-increase-community-engagement.

[8] United States Citizenship & Immigration Servs., *About Us*, https://www.uscis.gov/aboutus.

[9] Ex. D, at 1 (Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012)) (hereinafter "2012 DACA Memorandum").

DACA framework, individuals who were brought to the United States as young children and meet certain specific criteria may request deferred action for a period of two years, subject to renewal. In exchange, DACA applicants are required to provide the government with highly sensitive personal information, submit to a rigorous background check, and pay a considerable fee.

9. Deferred action is a well-established form of prosecutorial discretion under which the government defers removal action against an individual for a specified period, subject to renewal. The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."[10]

10. The 2012 DACA Memorandum established criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."[11] They are that the applicant:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.[12]

11. In addition, the 2012 DACA Memorandum provided that "[n]o individual should receive deferred action . . . unless they first pass a background check."[13]

---

[10] *Id.* at 1–2.

[11] *Id.* at 1.

[12] *Id.*

[13] *Id.* at 2.

12. USCIS describes DACA as follows: "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."[14]

13. Like other forms of deferred action, DACA serves the government's interests by allowing the government to prioritize its resources and exercise discretion for its own convenience. As the government has recognized, our nation "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."[15]

14. On February 20, 2017, Secretary of Homeland Security John D. Kelly issued a memorandum that "immediately rescinded" all "conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," but specifically exempted the 2012 DACA Memorandum.[16]

15. On September 5, 2017, Acting Secretary of Homeland Security Elaine Duke issued a memorandum rescinding the DACA program (the "Rescission Memorandum"), announcing the government's intention to terminate the DACA program as of March 5, 2018.

16. On January 9, 2018 and February 13, 2018, United States District Courts in the Northern District of California and the Eastern District of New York, respectively, issued nationwide preliminary injunctions prohibiting the government from terminating DACA on the

[14] Ex. B, at 2 (USCIS DACA FAQs, Question 1).

[15] Ex. C, at 2 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[16] Ex. E, at 2 (Memorandum from Secretary John Kelly, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017)).

ground that the decision to rescind the program was arbitrary and capricious.[17] These injunctions require the government to maintain DACA on the same terms and conditions that existed prior to the Rescission Memorandum, except that the government need not accept new DACA applications from individuals who have never received DACA previously and need not continue granting advance parole to allow DACA recipients to travel internationally.

17. On August 17, 2018, the United States District Court for the District of Columbia vacated the Rescission Memorandum, again on the ground that the decision was arbitrary and capricious.[18] Similar to the earlier preliminary injunctions, the order of vacatur excluded first-time DACA applications and requests for advance parole, but otherwise required the government to maintain the DACA program and process renewal applications.

18. On November 8, 2018, the United States Court of Appeals for the Ninth Circuit upheld the nationwide preliminary injunction issued by the United States District Court for the Northern District of California.[19]

19. The DACA program remains in place at this time, and the government continues to accept and process DACA renewal applications.

**The DACA Application Process**

20. Before the issuance of the Rescission Memorandum, when the government was still processing new requests for deferred action under DACA, first-time DACA applicants were required to submit extensive documentation establishing that they meet the above-mentioned criteria.[20] Applicants were also required to submit a Form I-765 Application for Employment Authorization, and pay hundreds of dollars in fees.[21]

---

[17] *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018).

[18] *NAACP v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018).

[19] *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018).

[20] Ex. B, at 9–15 (USCIS DACA FAQs, Questions 28–41).

[21] *Id.* at 3 (USCIS DACA FAQs, Question 7); *see also* USCIS, I-821D, Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d (explaining that the filing fee for a DACA application is currently set at $495 and cannot be waived).

21. DACA applicants were also required to undergo biometric and biographic background checks. When conducting these checks, DHS reviewed the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies."[22] If any information "indicate[d] that [the applicant's] presence in the United States threatens public safety or national security," the applicant would be ineligible for DACA absent "exceptional circumstances."[23]

22. Indicators that an individual poses a national security threat include "gang membership."[24] Accordingly, "[a]ll DACA requests presenting information that the requestor is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU)."[25] If gang membership was confirmed, the DACA application was denied absent a determination by USCIS that an exception should be made given the totality of the circumstances.[26]

23. USCIS evaluates renewal requests based on the same criteria as initial requests, and also requires that the renewal applicant (1) has not departed the United States on or after August 15, 2012 without advance parole; (2) has continuously resided in the United States since his or her most recent DACA request was approved; and (3) has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise "pose a threat to national security or public safety."[27]

24. In 2015, USCIS conducted an additional screening of all individuals granted deferred action under DACA—including Mr. Ramirez—"to identify records that contained information indicating known or suspected gang association."[28]

---

[22] Ex. B, at 7 (USCIS DACA FAQs, Question 23).

[23] *Id.* at 23 (USCIS DACA FAQs, Question 65).

[24] *Id.*

[25] Ex. F, at 1 (Letter from USCIS Director León Rodríguez to Senate Judiciary Committee Chairman Charles E. Grassley (Apr. 17, 2015)) (hereinafter, "USCIS Letter").

[26] *Id.* at 2.

[27] Ex. B, at 18 (USCIS DACA FAQs, Question 51).

[28] Ex. F at 4 ¶ 2 (USCIS Letter).

25. Once DACA has been granted, internal USCIS "Standard Operating Procedures" dictate that, absent an "Egregious Public Safety" issue, DACA status should not be revoked until the government has provided a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination.[29] DHS policy further provides that the recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of DACA status.[30]

**Benefits Provided Under the DACA Program**

26. DACA confers numerous benefits on those who apply for and are granted DACA status. Notably, DACA recipients are granted the right not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect.[31]

27. DACA recipients are also eligible for work authorization. As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . ."[32]

28. DACA recipients are eligible to receive certain public benefits. These include Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses or unemployment insurance.[33] In Washington, DACA holders are also eligible for certain state financial aid programs and state-funded food assistance.[34]

---

[29] Ex. G, at 136 & App'x I (DHS National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA) (Aug. 28, 2013)) (hereinafter, "DACA SOP").

[30] *Id*. at 136 & App'x I.

[31] *See* Ex. B, at 5 (USCIS DACA FAQs, Question 9) ("[I]f an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended."); Ex. D, at 2 (2012 DACA Memorandum); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1059 (9th Cir. 2014) ("DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General.").

[32] Ex. B, at 2 (USCIS DACA FAQs, Question 1).

[33] *See* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Texas*, 809 F.3d at 148; *Ariz. Dream Act Coal.*, 81 F. Supp. 3d at 811.

[34] *See* Wash. Rev. Code § 28B.92.010; Wash. Admin. Code §§ 388-400-0050, 388-424-0001, 388-424-0030.

29. DACA serves as a gateway to numerous other benefits, and enables recipients to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants.[35]

30. DACA has enabled hundreds of thousands of Dreamers to "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."[36]

31. DACA also confers other immigration benefits and the ability to travel. For example, DACA recipients do not accrue time under Section 212(a)(9)(B)(i) of the Immigration and Nationality Act ("INA"),[37] and, at least prior to the Rescission Memorandum, could briefly depart the United States and legally return under certain circumstances.[38]

**The Government's Promise to Dreamers**

32. When the DACA program was first launched, many Dreamers were reluctant to voluntarily disclose information that could help facilitate their removal from the United States. To combat this fear, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes."[39]

33. The government has reiterated this commitment in its correspondence with Dreamers. Moreover, the approval notice granting deferred action under DACA lists only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA.[40]

34. The government's commitment to the DACA program is further codified in its publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood

---

[35] *See* Dkt. #38-1, at 2 (Amicus Curiae Brief of United We Dream).

[36] Ex. C, at 2 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[37] 8 U.S.C. § 1182(a)(9)(B)(i).

[38] Ex. B, at 19 (USCIS DACA FAQs, Question 57).

[39] Ex. C, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[40] Ex. H (DACA Approval Notice).

Arrivals (DACA)."[41] This document effectively limits the exercise of agency discretion concerning DACA applications with "nearly 150 pages of specific instructions for granting or denying deferred action." *Texas*, 809 F.3d at 173 (citation omitted) (citing the DACA SOP as evidence that DACA is not truly a discretionary program).

35. Numerous public officials from both political parties have reinforced this promise, and have recognized that Dreamers have relied on the government to keep its word. For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are 750,000 Dreamers who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."[42]

36. In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" Dreamers, who have "organize[d] [their] li[ves] around" the DACA program.[43]

37. In February 2017, Congressman Raúl Grijalva described DACA as a "commitment," and called for "the federal government to honor its word to protect" Dreamers.[44]

38. On March 29, 2017, then-Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer."[45]

39. On April 21, 2017, President Trump confirmed that his administration's policy is not to deport Dreamers, and suggested that "[D]reamers should rest easy."[46]

---

[41] Ex. G (DACA SOP).

[42] Ex. C, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[43] Transcript of CNN Town Hall with Speaker Paul Ryan, CNN (Jan. 12, 2017), http://cnn.it/2oyJXJJ.

[44] Congressional Progressive Caucus Leaders Respond to ICE Arrest of DACA Recipient (Feb. 16, 2017), https://cpc-grijalva.house.gov/press-releases/congressional-progressive-caucus-leaders-respond-to-ice-arrest-of-daca-recipient.

[45] Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico (Mar. 29, 2017), http://politi.co/2mR3gSN.

[46] Excerpts from AP interview with President Donald Trump, The Associated Press (Apr. 21, 2017), https://apnews.com/182009c26d70499a97d486afa8d7a34d.

**Mr. Ramirez Was Twice Granted Deferred Action Under DACA**

40. In late 2013, Mr. Ramirez first applied for deferred action and work authorization pursuant to DACA. As part of this process, Mr. Ramirez provided the government with his birth certificate, school records, and information about where he lived, and was required to attend a biometrics appointment so that USCIS could take his fingerprints and photographs. Mr. Ramirez was nervous about providing this information, but trusted that the government would keep its word. Mr. Ramirez was granted deferred action and work authorization in 2014.

41. In 2016, Mr. Ramirez reapplied for DACA, and once again was granted deferred action and work authorization after being subject to rigorous vetting. As part of this process, the government sent Mr. Ramirez an approval notice (the "2016 DACA Approval Notice") informing him that his request for deferred action had been granted. The 2016 DACA Approval Notice provides that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years" and is valid to May 4, 2018.[47] The 2016 DACA Approval Notice informed Mr. Ramirez that his deferred action could be terminated if he engaged in "[s]ubsequent criminal activity."[48]

42. DHS has therefore confirmed on three separate occasions prior to Mr. Ramirez's unlawful arrest that Mr. Ramirez does not pose a threat to national security or public safety—first in 2014 when he applied for DACA, then again in 2015 when USCIS conducted an additional screening of all DACA beneficiaries, and finally in 2016 when he reapplied for DACA.

**Mr. Ramirez's Unconstitutional Arrest and Subsequent Interrogation**

43. On February 10, 2017, at approximately 9:00 a.m., a team of ICE agents arrested Mr. Ramirez's father outside of the apartment where Mr. Ramirez, his father, and his brother were then living. The ICE agents subsequently entered the apartment; neither Mr. Ramirez nor his brother are aware of any consent to permit the ICE agents to enter or search the premises.

44. Upon seeing Mr. Ramirez in the apartment, the ICE agents began to question him. Mr. Ramirez provided the agents with his name and birthdate, and told them that he was born in Mexico. At this point, one of the agents placed Mr. Ramirez in handcuffs.

---

[47] Ex. H (DACA Approval Notice).

[48] *Id.*

45. Mr. Ramirez told the ICE agents repeatedly that he had a legal work permit, but the ICE agents refused to release him. Mr. Ramirez's father also repeatedly informed the ICE agents that Mr. Ramirez had a legal work permit, and questioned why Mr. Ramirez was being detained. The ICE agents did not ask any questions at the apartment regarding whether Mr. Ramirez was involved with a gang, nor did they ask him about his tattoo.

46. The ICE agents did not have an arrest warrant for Mr. Ramirez, nor did they have any reason to believe that he had committed a crime or was not authorized to be in the United States. On the contrary, the ICE agents had reason to know that Mr. Ramirez had a work permit and was therefore lawfully living and working in the United States. Despite these facts, Mr. Ramirez was taken into custody and transported to an ICE holding facility in Tukwila, Washington.

47. At the holding facility, the ICE agents confiscated Mr. Ramirez's work permit. This permit was marked with a "C33" designation, which clearly identified Mr. Ramirez as a DACA recipient with work authorization pursuant to DACA.[49]

48. The ICE agents also fingerprinted Mr. Ramirez and used this information to access his records, which revealed that Mr. Ramirez has no criminal history, had twice been granted DACA status, and possessed valid employment authorization through May 4, 2018.

49. Defendants refused to release Mr. Ramirez even after they confirmed his DACA status. When Mr. Ramirez again protested that he had a work permit, he was told by Defendants that it did not matter because he "was not from the United States." Defendants subsequently cited Mr. Ramirez's receipt of DACA as evidence of his "illegal" status in the Form I-213.[50]

50. The ICE agents then began to interrogate Mr. Ramirez. They asked him at least five times whether he was in a gang, and each time he denied any gang affiliation. The ICE agents repeatedly pressed him as to whether he had ever known anyone who was a gang member. Mr. Ramirez told the agents that although that he knew students who had attended middle school and high school with him who were in gangs, he was not gang affiliated and never had been.

---

[49] Ex. G, at 116 (DACA SOP) ("To distinguish DACA-related EADs from other deferred action EADs, the (c)(33) code will be used.").

[50] Dkt. #93, at 29 (ICE CAR 000028 (I-213 Record of Deportable/Inadmissible Alien (Feb. 10, 2017))).

51. The ICE agents also interrogated Mr. Ramirez about the tattoo on his forearm. Mr. Ramirez obtained this tattoo when he was 18 years old—before he first applied for DACA. The tattoo consists of the words "La Paz – BCS" and a nautical star. "La Paz" is Mr. Ramirez's birthplace, and "BCS" stands for Baja California Sur, the region in which La Paz is located. Mr. Ramirez decided to include the city of his birth because he had seen others do the same, and ultimately selected the nautical star (rather than a whale's tail, which he had also considered) because he liked the way it looked. Nautical stars are popular symbols for tattoos.

52. During the interrogation, one of the ICE agents stated that if Mr. Ramirez was from Fresno, he was "definitely a gang member" because everyone in Fresno is a member of the "bulldogs" gang. He said that Mr. Ramirez's tattoo was a "bulldogs" tattoo. Mr. Ramirez repeatedly told the ICE agents that the tattoo is not a gang tattoo, but they refused to believe him.

53. Prior to his transfer to the Northwest Detention Center, the ICE agents asked Mr. Ramirez if there were any gangs with which he would like to avoid being placed for his safety. Mr. Ramirez again stated that he had no gang affiliation and would not have problems being placed with anyone. Upon continued questioning, Mr. Ramirez ultimately indicated that if he had to be placed with any group, he would prefer "the Paisas." Mr. Ramirez understands the colloquial use of "Paisas" to mean Mexicans, and was attempting to communicate that if given the option, he would prefer to be placed with other Mexicans. Mr. Ramirez, who has no criminal history and was never previously in custody, has no connection or affiliation whatsoever to the Paizas gang.

**Mr. Ramirez's Unconstitutional Detention**

54. Mr. Ramirez was then transferred to Northwest Detention Center, where he remained in custody for the next 47 days.

55. The Northwest Detention Center is a privately owned detention facility located on a contaminated "Superfund" site.[51] According to the Environmental Protection Agency, industrial

[51] U.S. Envtl. Prot. Agency, Fourth Five-Year Review Report for Commencement Bay Nearshore/Tideflats Superfund Site, Pierce Cty., Wash., at vi (Dec. 1, 2014), https://semspub.epa.gov/work/HQ/181285.pdf.

pollutants have been found in the soil and water near the Northwest Detention Center, and environmental remediation efforts at the site remain ongoing.[52]

56. In April 2017, hundreds of detainees at the Northwest Detention Center went on a hunger strike to protest the inhumane conditions at the facility, including poor hygiene, lack of access to medical care, lack of recreational opportunities, poor quality food, and unreasonable commissary prices.[53]

57. The more than six weeks that Mr. Ramirez spent at the Northwest Detention Center were extremely difficult for him. He spent his twenty-fourth birthday in detention, and was unable to see or speak to his young son for the duration of his detention. Mr. Ramirez had difficulty sleeping, and experienced significant distress, sadness, fear, and anxiety as a result of his unjust detention. Mr. Ramirez also began to experience vision problems, and was informed by the medical staff at the Northwest Detention Center that this was likely due to depression.

58. Defendants classified Mr. Ramirez as a "medium-high" security risk, and placed him in a housing unit with gang members and dangerous criminals. Mr. Ramirez requested that he be reclassified because, as he again explained, he was not, and never had been, gang affiliated, but this request was denied. Because of the government's false statements to the media, many of the detainees at the Northwest Detention Center believed that Mr. Ramirez was a gang member and questioned him about his gang affiliation. This caused Mr. Ramirez to fear for his personal safety, and he was afraid to leave his cell out of fear that he would be assaulted.

**The Government Revokes Mr. Ramirez's DACA Status and Work Authorization**

59. Defendants issued a Notice to Appear ("NTA") on February 10, 2017.[54] Defendants assert that Mr. Ramirez's DACA status terminated on the day the NTA was issued.[55]

---

[52] *Id.* at vi–vii.

[53] Mike Carter, *Hundreds of immigrant detainees at Tacoma ICE facility on hunger strike, activists say*, The Seattle Times (Apr. 12, 2017), http://www.seattletimes.com/seattle-news/group-hundreds-of-detainees-at-tacoma-ice-facility-on-hunger-strike; Steve Miletich, *ICE: Hunger strike winding down at Tacoma immigration detention center*, The Seattle Times (Apr. 14, 2017), http://www.seattletimes.com/seattle-news/crime/ice-hunger-strike-abates-at-detention-center.

[54] Dkt. #93, at 7–8 (ICE CAR 000005 (Notice to Appear)).

[55] *See* Dkt. #32, at 2–3 (Respondents' Brief Regarding the Court's February 14, 2017 Order).

60. USCIS sent Mr. Ramirez a Notice of Action ("NOA") dated February 17, 2017. The NOA states that Mr. Ramirez's deferred action and employment authorization terminated on the date the NTA was issued, and provides that "[a]n appeal or motion to reopen/reconsider this notice of action may not be filed."[56]

61. Under DHS policy, the government must provide a "Notice of Intent to Terminate" and 33 days for a response prior to terminating DACA status, unless the case involves an "Egregious Public Safety" issue.[57] Mr. Ramirez was never provided with a Notice of Intent to Terminate, nor was he given 33 days to respond to such a notice or otherwise contest the revocation of his DACA status or work permit.

**The Government Publicly Labels Mr. Ramirez as a "Gang Member"**

62. After Mr. Ramirez sought relief from this Court on February 13, 2017, Defendants concocted a shifting story about the circumstances surrounding his arrest and detention. Defendants sought to justify their unlawful actions based on the false assertion that Mr. Ramirez is a gang member, and initiated a sustained campaign to publicly vilify him as such, despite knowing that there existed no reliable evidence to support such a characterization.

63. Spokespersons for ICE and DHS issued statements alleging that Mr. Ramirez was a gang member, and falsely informed the national media that the government possessed "corroborating evidence" to support that allegation. Additionally, on information and belief, Defendants coordinated with each other and leaked false information to members of the media in furtherance of this smear campaign.

64. On February 14, 2017, an ICE spokesperson stated that "ICE officers took Mr. Ramirez into custody *based on* his admitted gang affiliation and risk to public safety."[58] This false allegation contradicts the Form I-213 prepared by Defendants, which notes that ICE agents did not discuss Mr. Ramirez's purported gang affiliation with him until *after* he was transported to the

---

[56] Ex. I, at 1 (Notice of Action).

[57] Ex. G, at 136 & App'x I (DACA SOP).

[58] Sue Horton et al., *Mexican 'DREAMer' Nabbed in Immigrant Crackdown*, Reuters U.S. Top News (Feb. 14, 2017), http://www.reuters.com/article/us-usa-trump-immigration-arrest-exclusiv-idUSKBN15T307 (emphasis added).

ICE holding facility in Tukwila, Washington, at which point his DACA status and lack of a criminal record had been confirmed.[59]

65. On February 15, 2017, ICE officials were pressed by the news media for additional evidence demonstrating that Mr. Ramirez was a gang member. In response, Defendants informed the media that they had "additional evidence including photos and social media content that illustrate his gang affiliation."[60]

66. On February 15, 2017, an unnamed ICE official informed members of the national news media that there was corroborating evidence to support their allegations of gang membership.[61] No such corroborating evidence has been produced or filed in any court, despite requests by Mr. Ramirez and his counsel.

67. On February 15, 2017, DHS issued a statement labeling Mr. Ramirez as "a gang member."[62]

68. Defendants have since backed away from these false and defamatory allegations. For example, in their filings in this Court, Defendants have alleged merely that Mr. Ramirez "hangs out" with gang members.[63] In the Immigration Court, the government has admitted that the evidence does not support any conclusion that Mr. Ramirez is a threat to public safety.

---

[59] Dkt. #93, at 29 (ICE CAR 000028 (I-213 Record of Deportable/Inadmissible Alien (Feb. 10, 2017))).

[60] *First 100 Days: Chaffetz: We Want Inspector General to Investigate Leaks; Attorney for Arrested 'Dreamer' Speaks Out*, FoxNews.com (Feb. 15, 2017), https://www.foxnews.com/transcript/chaffetz-we-want-inspector-general-to-investigate-leaks-attorney-for-arrested-dreamer-speaks-out.

[61] '*DREAMer' Protected under Obama Detained in Seattle Area*, CBSnews.com (Feb. 15, 2017), http://www.cbsnews.com/news/daniel-ramirez-medina-dreamer-protected-under-obama-detained-in-seattle.

[62] *DHS Statement on Arrest of Alien Gang Member in Washington* (Feb. 15, 2017), https://www.dhs.gov/news/2017/02/15/dhs-statement-arrest-admitted-alien-gang-member-washington.

[63] *E.g.*, Dkt. #52, at 7 (Respondents' Motion to Dismiss).

**Mr. Ramirez Is Released from Custody After 47 Days in Detention**

69. Pursuant to an order of this Court, Mr. Ramirez received a bond hearing in Immigration Court on March 28, 2017.[64] At the bond hearing, Mr. Ramirez testified about his arrest, interrogation, and detention. Mr. Ramirez was released on bond on March 29, 2017.[65]

70. In a startling admission, counsel for the government conceded at the conclusion of the bond hearing that Mr. Ramirez is not a danger to the community. The government's statements (and lack of evidence) at the bond hearing affirm that the government has never had any justification for revoking Mr. Ramirez's DACA status or for detaining him for more than six weeks.

71. After considering the evidence, the Immigration Judge concluded that Mr. Ramirez is neither a flight risk nor a danger to the community and should be released on bond.[66] The Immigration Judge's decision to release Mr. Ramirez underscored Defendants' inability to support their allegations of gang affiliation.

**The Government Fails to Provide Any Credible Evidence to Support Its Gang Allegations**

72. Both before and after that bond hearing, Defendants have failed to produce any credible evidence to support their false allegations that Mr. Ramirez is gang affiliated. In sharp contrast, Mr. Ramirez submitted extensive evidence demonstrating that he is not, and never has been, a gang member. In addition to evidence demonstrating that he successfully passed three separate DHS background checks, Mr. Ramirez submitted numerous sworn declarations attesting to the fact that he has never had any gang affiliation.[67]

73. Additionally, three independent experts have rebutted Defendants' allegations that Mr. Ramirez is gang affiliated. Martin Flores, who has served as a gang expert in more than 700 cases, stated that he has "never seen a gang member with a similar tattoo nor would [he] attribute

---

[64] *See* Dkt. #69, at 3.

[65] Ex. J, at 1 (Notice to EOIR).

[66] Ex. K, at 1 (Custody Order); *see also* 8 C.F.R. § 236.1(c)(8) (2017).

[67] *E.g.*, Dkt. #35-1, ¶¶ 19–20 (Declaration of Daniel Ramirez Medina); Dkt. #35-2, ¶ 4 (Declaration of Josue L.); Dkt. # 35-3, ¶¶ 8–9 (Declaration of Luz L.); Dkt. #35-5, ¶ 8 (Declaration of Nancy L.).

this tattoo to have any gang-related meaning."[68] Another gang expert, Dr. Edwina Barvosa, similarly stated that there is "no apparent evidence that Mr. Ramirez Medina has ever been a gang member himself."[69] And Carlos García, a Mexican researcher who has written extensively on gangs in California and Central America, noted that "[a]ny argument about gang ties based on [Mr. Ramirez's] tattoo is weak at best; this tattoo does not show any gang affiliation."[70]

74. Despite the means and ample opportunity to collect evidence to support their claims, Defendants have failed to produce *any* credible evidence to support any of their allegations against Mr. Ramirez. Unlike Mr. Ramirez, Defendants have access to numerous (and perhaps all) law enforcement and public safety databases. Yet, Defendants have never suggested that they have located Mr. Ramirez's name or supposed gang affiliation in any of those databases or records. To the contrary, the government has admitted numerous times that Mr. Ramirez is not a public safety threat, including at his March 28, 2017 bond hearing and in USCIS's March 20, 2018 internal email confirming that there is not sufficient evidence to conclude he is a gang member or safety threat.

75. Likewise, Defendants placed great weight on Mr. Ramirez's alleged "gang tattoo," yet have never provided *any* evidence (from an expert or otherwise) that this tattoo is associated with gang membership. Defendants have been unable to do so because it is not a gang tattoo. Instead, Defendants shifted tacks, when, in Immigration Court they submitted "evidence" in the form of articles located on the internet that discuss how some gangs discourage their members from getting tattoos so they are not identified as gang members. In other words, Defendants first argued Mr. Ramirez's tattoo was a gang tattoo, and when that argument collapsed, argued that a lack of gang tattoos actually supports their contention that Mr. Ramirez was gang affiliated. That contention collapsed, too, when the Immigration Judge found, in January 2018 that "[Mr. Ramirez] was not in a gang, nor associated with one."

---

[68] Dkt. #35-7, ¶ 11 (Declaration of Martin M. Flores).

[69] Dkt. #35-8, ¶ 10 (Declaration of Edwina Barvosa, PhD).

[70] Jonathan Blitzer, *A case that could determine the future for Dreamers*, The New Yorker (Mar. 15, 2017), http://www.newyorker.com/news/news-desk/a-case-that-could-determine-the-future-for-dreamers.

76. At the May 1, 2018 hearing on Mr. Ramirez's Motion for Preliminary Injunction, the government stated that there is no "record that establishes, one way or the other, with absolute conclusiveness, about Mr. Ramirez's gang affiliations or lack thereof." Remarkably, that statement was made to this Court at the time the government's own record *did* show that Mr. Ramirez lacked gang affiliation—as confirmed by the government's own March 20, 2018 internal email, it knew that "there is not sufficient evidence to conclude [Mr. Ramirez] is currently a known or suspected gang member."[71]

**Defendants' Motion to Dismiss Is Denied in Its Entirety**

77. On June 26, 2017, Defendants filed a motion to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim.[72] On November 8, 2017, this Court denied that motion in its entirety.[73] This Court determined that the issues presented in this action—whether Defendants complied with their own non-discretionary procedures when taking Mr. Ramirez into custody, questioning him at the Tukwila facility and ultimately terminating his DACA status—do not trigger the jurisdiction-stripping provisions of the INA. This Court also determined that all claims advanced in the Second Amended Complaint were plausibly pleaded.

**The Government Is Twice Enjoined from Revoking Mr. Ramirez's DACA Status and Work Authorization**

78. On January 17, 2018, an Immigration Judge issued an order of removal directing Mr. Ramirez's return to Mexico, while also finding that "[Mr. Ramirez] was not in a gang, nor associated with one."[74] On February 6, 2018, Mr. Ramirez filed a motion for a preliminary injunction to restore his DACA and work authorization (the "Preliminary Injunction Motion").[75] While that motion was pending, in a separate action a preliminary injunction order was issued on February 26, 2018 by the United States District Court for the Central District of California in *Inland*

---

[71] Ex. A (Mar. 20, 2018 USCIS Email).

[72] *See* Dkt. #90 (Defendants' Mot. to Dismiss the Second Amended Complaint).

[73] *See* Dkt. #116 (Court's Nov. 8, 2017 Order).

[74] *See* Dkt. #122-1, at 35 (Third Supplemental Declaration of Daniel Ramirez Medina); Dkt. #124-1, p. 14 (Excerpt of Trans. of Oral Decision of Immigration Judge).

[75] *See* Dkt. #122 (Plaintiff's Motion for Preliminary Injunction).

*Empire-Immigrant Youth Collective v. Nielsen* ("*Inland Empire* Order"), No. 17-cv-2048. That order required the government to restore to a certified class of former DACA recipients their DACA status and work authorization. As a member of the *Inland Empire* class, Mr. Ramirez was to have his DACA restored.

79. On or about April 3, 2018, the government delivered two notices to Mr. Ramirez. One notice informed Mr. Ramirez that his DACA status and work authorization had been reinstated and extended to May 5, 2018, pursuant to the *Inland Empire* Order.[76] The government simultaneously issued Mr. Ramirez a NOIT to terminate his just-restored DACA status.[77] In other words, faced with the *Inland Empire* Order, the government restored Mr. Ramirez's status only to immediately begin new proceedings to wrongfully strip him of that status.

80. The government's stated basis for the issuance of the NOIT was its continued wrongful insistence that Mr. Ramirez posed a risk to public safety because he allegedly was gang affiliated. This theory was inconsistent with multiple background checks the government had previously run in connection with Mr. Ramirez's DACA application and renewals, the government's concession at his March 28, 2017 bond hearing that it had no evidence to support a finding that Mr. Ramirez was a risk to public safety,[78] and the Immigration Judge's January 2018 finding that he does not present a risk to public safety because the evidence submitted showed he was "not in a gang, nor associated with one."[79] And the government's stated basis for the NOIT flatly contradicted its own internal March 20, 2018 email assessment conceding Mr. Ramirez lacks any gang affiliation or criminal history.[80] The NOIT also stated that termination of Mr. Ramirez's DACA status was warranted because ICE was "actively pursuing" his removal, even though a removal order in and of itself is not a sufficient basis for termination of DACA status.

---

[76] *See* Ex. L, at 1 (Reinstatement Notice).

[77] *See* Ex. M, at 1 (Notice of Intent to Terminate).

[78] *See* Dkt. #122-1, at 31 (Mar. 28, 2017 Tr. of Oral Decision of I.J.).

[79] *See* Dkt. #124-1, at 14 (Jan. 17, 2018 Tr. of Oral Decision of I.J.).

[80] Ex. A (March 20, 2018 USCIS Email).

81. On May 15, 2018, this Court granted Mr. Ramirez's Preliminary Injunction Motion, concluding that Mr. Ramirez is likely to succeed on the merits of his claims because the government's continued reliance on "unfounded allegations" of gang affiliation was arbitrary, capricious, and an abuse of discretion and also implicated Mr. Ramirez's constitutional "right to an opportunity to be heard in a meaningful matter."[81] The remaining elements—irreparable harm, balance of hardships and the public interest—also favored preliminary injunctive relief.

82. Consistent with these rulings, this Court entered its Preliminary Injunction Order, in which it ordered that (1) "Defendants shall not terminate Plaintiff's DACA status and work authorization pending a final decision by this Court on the merits of his claims" and (2) "Defendant USCIS is ENJOINED from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety."[82]

**The Government Denies Mr. Ramirez's DACA Renewal Application**

83. On May 21, 2018, in an abundance of caution given that this Court had already enjoined Defendants from terminating his benefits, Mr. Ramirez submitted a request to the government to renew his DACA status and work authorization. Notwithstanding the Preliminary Injunction Order, on September 26, 2018, the government issued a Notice of Intent to Deny ("NOID") that request. The NOID stated that the government intended to deny Mr. Ramirez's renewal request for four reasons. The first—that ICE is actively pursuing Mr. Ramirez's removal—simply repeated one of the bases for the prior NOIT that this Court enjoined and is deficient for the reasons described above. Each of the other three attempted to portray Mr. Ramirez as a threat to public safety: (1) that he was reported for having sexual intercourse with his son's mother in 2013 (resulting in the conception of his son), when he was 20 years old and his son's mother was 17 years old, even though no charges were filed, the relationship was consensual, and both sets of parents approved of the relationship and the pregnancy that resulted therefrom; (2) Mr. Ramirez's own

---

[81] *Medina v. Dep't of Homeland Sec.*, 313 F. Supp. 3d 1237, 1251 (W.D. Wash. 2018) (internal quotations omitted); *see also* Dkt. #133, at 22–23 (Preliminary Injunction Order).

[82] *Id.* at 23.

admission that he was cited for possession of a small quantity of marijuana in Oregon in 2014; and (3) that he has not fully paid off certain fines he incurred for traffic violations. None of these other three grounds was previously cited by the government as a basis for terminating Mr. Ramirez's DACA status and work authorization, although *each was previously known* to the government at the time it renewed Mr. Ramirez's DACA in 2016—at which time it did not determine any to be a basis for denial of renewal—and certainly at the time it issued the April 3, 2018 NOIT. None of these bases suggests that Mr. Ramirez poses a public safety concern, and none establishes an adequate basis for termination of his DACA status. Indeed, USCIS conceded in its internal March 20, 2018 email describing his "current criminal history"—sent two months *after* it claimed it learned for the first time of the "offense history" that it now cites for denial—that Mr. Ramirez's file shows "no criminality" and that "[t]here is NOT sufficient evidence to conclude [he] is an [egregious public safety] concern."[83] Instead, these bases for denial of renewal—particularly when set in the context of the government's continuing campaign against Mr. Ramirez—are yet another unlawful attempt to terminate his DACA.

84. On October 24, 2018, Mr. Ramirez submitted his lengthy response to the NOID, objecting to the stated bases for denial of DACA renewal, providing evidence of the harm such denial would cause him, and confirming that doing so would be a violation of this Court's Preliminary Injunction Order.

85. On December 19, 2018, USCIS issued its final "Decision," denying Mr. Ramirez's DACA renewal application for the reasons contained in the NOID.[84] In doing so, Defendants violated the Preliminary Injunction Order which enjoins USCIS "from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege that Mr. Ramirez is a gang member, gang affiliated, *or a threat to public safety*."[85] Contrary to USCIS's perfunctory statement in the Decision that it was not relying on such information, the agency clearly was relying on statements and records dated prior to May 15, 2018 that it views as relevant to

---

[83] Ex. A (Mar. 20, 2018 USCIS Email).

[84] Ex. N (Dec. 19, 2018 Decision Denying DACA Renewal).

[85] Dkt. #133, at 23 (emphasis added).

whether Mr. Ramirez is a threat to public safety—the NOID cites the California Penal Code, the criminal U.S. Code, and references five traffic safety-related violations—in support of its stated conclusion that he "do[es] not warrant a favorable exercise of prosecutorial discretion."[86] USCIS's avoidance of the phrase "public safety" in issuing this NOID does not bring it beyond the scope of the Preliminary Injunction Order, as the substantive bases for the NOID are manifestly public safety-related. Moreover, the government's claim that it was unaware of or could not have known of these offenses at the time it renewed Mr. Ramirez's DACA in 2016 is incorrect, and irrelevant in any event given the mandates of the Preliminary Injunction Order. Therefore, not only is the government's latest action to deny renewal a violation of the APA and Mr. Ramirez's due process rights, but it violates this Court's Preliminary Injunction Order.

86. Moreover, the Preliminary Injunction Order requires that the government not "terminate [Mr. Ramirez's] DACA status and work authorization pending a final decision by [the] Court on the merits of his claims." However, USCIS did just that, denying renewal of Mr. Ramirez's DACA, even though such processed renewals are routinely approved 99% of the time. In so doing, Defendants have affirmatively terminated Mr. Ramirez's DACA and work authorization benefits, thereby violating the Preliminary Injunction Order for this additional reason.

**Mr. Ramirez Continues to Suffer Harm as a Result of Defendants' Unlawful Conduct**

87. Mr. Ramirez was detained from February 10, 2017 to March 29, 2017. He will never get back the six weeks that he spent in the Northwest Detention Center. Since his release, Mr. Ramirez has reunited with his family, but has been unable to fully piece his life back together. Mr. Ramirez must work to provide for himself and his family, but Defendants' actions have impaired his ability to find gainful employment.

88. Mr. Ramirez also continues to experience the profound emotional and psychological consequences of his detention. For more than six weeks, he was confined under conditions that caused him to experience significant distress, humiliation, embarrassment, discomfort, fear, and anxiety. He constantly feared that he would be attacked based on Defendant's false claims about his supposed gang affiliation.

[86] Ex. N, at 4 (Dec. 19, 2018 Decision Denying DACA Renewal).

89. Mr. Ramirez also continues to suffer the stigma of being associated with a gang. Not only has Mr. Ramirez's reputation been damaged as a result of Defendants' conduct, but the reputation of his family has suffered as well. Mr. Ramirez cares deeply about his family, and it has been very difficult for him to see how Defendants' actions have caused his family harm.

90. Further, Mr. Ramirez has suffered harm and significant distress arising out of both the unlawful issuance of the NOID and subsequent final Decision to deny his DACA renewal request. After this Court issued the Preliminary Injunction Order, Mr. Ramirez believed he would finally be treated fairly and justly by the government so that he could get back to living his life and providing for his family. That Preliminary Injunction Order provided Mr. Ramirez peace of mind that the government's campaign against him might finally cease. But Defendants were undaunted by this Court's order, and their continued pursuit of Mr. Ramirez and denial of his DACA renewal have caused him great additional emotional harm, have interfered with his ability to earn a living wage, to enjoy the other benefits of DACA status, to raise his son (who is a U.S. citizen), and to peacefully carry on living his life in the United States.

## CAUSES OF ACTION

## COUNT ONE

## ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS ACTION

91. Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

92. This Count is brought against all Defendants and seeks declaratory and injunctive relief under the APA.

93. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2017). Here, Defendants have acted arbitrarily and capriciously in taking actions to terminate Mr. Ramirez's DACA status on multiple occasions since they unlawfully detained him in February 2017. Three actions in particular embody such arbitrary and capricious treatment: (1) the revocation of Mr. Ramirez's DACA status and work authorization in February

2017; (2) the issuance of the NOIT in April 2018 in reliance on unfounded allegations of gang affiliation; and (3) the issuance of the December 19, 2018 Decision to deny Mr. Ramirez's DACA renewal request on the insufficient grounds provided, which also violated the terms of the Preliminary Injunction Order and contradict Defendants' own internal records. In each instance, the government acted in a manner that was arbitrary, capricious, an abuse of discretion, and in violation of the Defendants' own established procedures.

94. The February 2017 revocation of Mr. Ramirez's DACA status and work authorization constitutes final agency action and cannot be appealed.[87] The denial of Mr. Ramirez's renewal request in December 2018 also constitutes final agency action and cannot be appealed.[88]

95. Defendants' decision to revoke Mr. Ramirez's DACA status and work authorization in February 2017, despite the fact that multiple prior and more thorough analyses had concluded that he was eligible for DACA, and despite the government own internal determination that he does not present a public safety concern even after learning of the facts on which it based denial of renewal, is the sort of inconsistency that is the hallmark of arbitrary action. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1145 (9th Cir. 2015).[89] Indeed, as discussed above, Defendants examined Mr. Ramirez's background on at least three separate occasions and concluded that he was eligible for DACA. The decision to summarily reverse that conclusion was arbitrary, capricious, and an abuse of discretion. That the government again acknowledged that Mr. Ramirez is not a threat to public safety at his March 2017 bond hearing and in USCIS's March 20, 2018 internal email further underscores the arbitrary and capricious nature of his DACA revocation.

96. Defendants' assertions that Mr. Ramirez is gang affiliated were implausible and ran "counter to the evidence before the agency" (*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,

---

[87] As discussed above, the NOA expressly provides that an "appeal or motion to reopen/reconsider this notice of action may not be filed." Ex. I, at 1.

[88] Ex. N (Dec. 19, 2018 Decision Denying DACA Renewal) ("You may not file an appeal or motion to reopen/reconsider this decision.")

[89] *See also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). While an agency may change course based upon new "factual findings that contradict those" upon which it based its prior determination, it must provide a "detailed justification," particularly when the "prior policy has engendered serious reliance interests that must be taken into account." *Id.* at 515–16 (citing *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742 (1996)).

833 F.3d 1136, 1146 (9th Cir. 2016) (citation omitted)), as was their December 2018 determination that Mr. Ramirez had an "offense history" that warranted denial of his DACA renewal. Defendants had before it all relevant information regarding Mr. Ramirez's history, offense or otherwise, when improperly determining in April 2018 and December 2018 that he was a public safety concern. But that determination ran contrary to the evidence before USCIS, as in March 20, 2018 USCIS had determined and admitted that Mr. Ramirez had "[n]o criminality," that "there is not sufficient evidence to conclude he is currently a known or suspected gang member," and that "[t]here is NOT sufficient evidence to conclude [he] is an EPS concern."[90]

97. Relatedly, Defendants acted unlawfully and in violation of the *Accardi* doctrine because they failed to "adhere to [their] own internal operating procedures" when they summarily revoked Mr. Ramirez's DACA status and work authorization in February 2017 but failed to provide him the appropriate notice and opportunity to contest that determination. *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).[91]

98. Defendants then acted arbitrarily and capriciously in issuing Mr. Ramirez the NOIT the same day they restored his DACA status pursuant to the *Inland Empire* Order. As noted, the NOIT stated that Mr. Ramirez was a risk to public safety due to his alleged gang affiliation even though Defendants had twice acknowledged that there was no support for this conclusion—first, at his bond hearing in March 2017 and again in an internal DHS email dated approximately two weeks before the NOIT was issued, which stated that there was "[n]o criminality on [his] rap sheet" nor "sufficient evidence to conclude he is currently a known or suspected gang member."[92] Basing the NOIT on such baseless and discredited allegations was arbitrary and capricious, and this Court found in its Preliminary Injunction Order that Mr. Ramirez was likely to prevail on this argument.

---

90 Ex. A (Mar. 20, 2018 USCIS Email).

91 The *Accardi* requirement "extends beyond formal regulations," including to "policy statement[s]," "handbook[s]," "operating procedures," "Order[s]," "Weekly Bulletin[s]," unpromulgated rules documenting "usual practice," "Standards," and "Directive[s]." *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) (citing cases).

92 Ex. A (March 20, 2018 USCIS Email).

99. Defendants' denial of Mr. Ramirez's renewal request in December 2018 was also arbitrary and capricious. The government cites as the reason for the denial Mr. Ramirez's "offense history," which consists of a 2013 Police Report regarding Mr. Ramirez's romantic relationship with the mother of his son for which no investigation was ever initiated (and for which no charges were ever pursued given the consent of all parties and their families), a citation for possession of a small quantity of marijuana in 2014, and various tickets for traffic violations. The conclusion reached by Defendants that Mr. Ramirez no longer warrants favorable consideration for DACA due to his "offense history" cannot be lawfully reconciled with DHS's March 2018 determination that there is "[n]o criminality on [Mr. Ramirez's] rap sheet." Even setting aside this inconsistency, the denial of Mr. Ramirez's renewal request on this basis is arbitrary and capricious, as 99% of processed renewal requests are approved, including for DACA recipients who, like Mr. Ramirez, have committed minor, non-violent infractions in the past. Moreover, all of these facts were available to the government at the time it issued the NOIT, in April 2018, yet the government did not cite these minor, non-violent infractions at that time, doing so only after this Court blocked its efforts to terminate his DACA by falsely accusing him of gang membership. There is good reason why the government did not cite these bases in the April 2018 NOIT—they do not rise to the level of violent offenses warranting denial of DACA, and Defendants' reliance on them to deny renewal is arbitrary and capricious.

100. Defendants' denial of Mr. Ramirez's renewal request in December 2018 also violates the *Accardi* doctrine. Under the DACA SOP, a DACA request that presents "issues of criminality" must be reviewed and adjudicated by the USCIS Background Check Unit ("BCU") DACA Team.[93] In March 2018, approximately two months before Mr. Ramirez submitted his renewal request, a member of the BCU DACA Team determined that Mr. Ramirez had "[n]o criminality on [his] rap sheet." Defendants nonetheless denied Mr. Ramirez's most recent renewal request based on his alleged criminal or "offense" history. This was in violation of the SOP guidelines governing the processing of DACA applications for two reasons. First, it contravened the conclusion reached by the BCU DACA Team in March 2018 regarding Mr. Ramirez's lack of criminal history. The SOP does not provide for a process by which determinations of the BCU

[93] Ex. G, at 82, 93–96 (DACA SOP).

DACA Team with respect to an applicant's criminal history may be overridden. Second, there is no evidence whatsoever in administrative record that the BCU DACA Team actually adjudicated Mr. Ramirez's most recent renewal request and reached a conclusion contrary to the March 2018 determination.

101. For all of the foregoing reasons, Defendants violated the APA when revoking Mr. Ramirez's DACA status and work authorization in February 2017, issuing a NOIT based upon false allegations of gang affiliation in April 2018, and denying his renewal request in December 2018.

**COUNT TWO**

**ADMINISTRATIVE PROCEDURE ACT – UNCONSTITUTIONAL ACTION**

102. Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

103. This Count is brought against all Defendants and seeks declaratory and injunctive relief under the APA.

104. The APA dictates that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Here, Defendants violated the APA because their threats, revocations, and failure to renew Mr. Ramirez's DACA status and work authorization violated his rights under the Due Process Clause. The February 2017 revocation of Mr. Ramirez's DACA status and work authorization constitutes final agency action and cannot be appealed. The denial of Mr. Ramirez's renewal request in December 2018 also constitutes final agency action.[94]

105. Aliens who are physically present in the United States are guaranteed the protections of the Due Process Clause. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

106. The Constitution "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). A threshold

---

[94] *See supra* note 88.

inquiry in any case involving a violation of procedural due process "is whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of that interest." *Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1190–91 (9th Cir. 2015) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972)).

107. Here, Defendants deprived Mr. Ramirez of liberty interests protected by the Due Process Clause. As previously discussed, DACA grants beneficiaries the right not to be arrested or detained based solely on their immigration status during the time period that their deferred action is in effect. Such "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The term "liberty" also encompasses the ability to work, raise a family, and "form the other enduring attachments of normal life." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Roth*, 408 U.S. at 572. Where, as here, an individual reasonably relies on a conferred status to pursue these activities, the government cannot revoke that status without adequate procedural due process. *See Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that once a benefit is granted "continued possession may become essential in the pursuit of a livelihood").

108. The fact that Defendants previously revoked Mr. Ramirez's DACA status and work authorization based on false allegations of gang affiliation also deprived him of protected liberty interests in his reputation. *See Paul v. Davis*, 424 U.S. 693, 709 (1976) (explaining that while reputation alone may not be a protected liberty interest, "the invocation of procedural safeguards" is justified when defamatory allegations accompany an altered legal status); *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). Defendants' denial of Mr. Ramirez's renewal application was similarly made on the erroneous grounds that he is a public safety threat, thereby furthering harm to his reputation.

109. Defendants also deprived Mr. Ramirez of property interests protected by the Due Process Clause. The property interests protected by the Due Process Clause "extend beyond tangible property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'" *Nozzi*,

806 F.3d at 1191 (citing *Roth*, 408 U.S. at 576–77). "A legitimate claim of entitlement is created [by] . . . 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Id.* Therefore, an individual has a protected property interest where they have a reasonable expectation of entitlement to that interest.

110. Here, Mr. Ramirez possessed a protected property interest in his DACA status and the numerous benefits provided to him under the DACA program. As discussed above, these benefits include, among other things, the ability to legally work in the United States,[95] eligibility for important state and federal benefits,[96] and the ability to travel internationally under certain circumstances. *See Texas*, 809 F.3d at 166 ("Deferred action . . . is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens. Though revocable, that change in designation would trigger . . . eligibility for federal benefits—for example, under title II and XVIII of the Social Security Act—and state benefits—for example, driver's licenses and unemployment insurance—that would not otherwise be available to illegal aliens."); *Ariz. Dream Act Coal.*, 757 F.3d at 1059 ("DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General.").

111. These protected property interests exist because of the government's decision to grant Mr. Ramirez these benefits, and by virtue of its promise to Mr. Ramirez (and hundreds of thousands of similarly situated young people) to adhere to the strict framework of the DACA program, including the ability to renew one's status. *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing."). In establishing and operating DACA under a well-defined framework and highly specific criteria, the

---

[95] Revocation of (or denial of renewal regarding) DACA is therefore the sort of "complete prohibition of the right to engage in a calling" that directly implicates the Due Process Clause. *Conn v. Gabbert*, 526 U.S. 286, 292 (1999).

[96] Courts routinely find that revocation of public benefits triggers the Due Process Clause. *See, e.g.*, *Mathews*, 424 U.S. at 332.

government created a reasonable expectation among DACA recipients—including Mr. Ramirez—that they are entitled to the benefits provided under the program.[97]

112. While DACA is premised on the exercise of prosecutorial discretion, that discretion is limited and constrained by the rules and criteria on which DACA is based and operated, and by the government's decision to twice grant Mr. Ramirez deferred action and work authorization. These constraints on discretion further support Mr. Ramirez's claim of a protected property interest. *See Nozzi*, 806 F.3d at 1191 (finding a protected property right in government benefits where government regulations "greatly restrict the discretion" of those who administer the benefits) (citation omitted).

113. Defendants' conduct in depriving Mr. Ramirez of his protected liberty and property interests is evaluated under the three-part *Eldridge* test. "[I]n *Mathews v. Eldridge*, the Supreme Court set forth a three-part inquiry to determine whether the procedures provided to protect a liberty or property interest are constitutionally sufficient. First, courts must look at the nature of the interest that will be affected by the official action, and in particular, to the degree of potential deprivation that may be created. Second, courts must consider the fairness and reliability of the existing procedures and the probable value, if any, of additional procedural safeguards. Finally, courts must assess the public interest, which includes the administrative burden and other societal costs that would be associated with additional or substitute procedures." *Nozzi*, 806 F.3d at 1192–93 (internal quotations and citations omitted). This test requires courts to balance the affected interests to see whether the procedures provided are constitutionally sufficient.

114. Here, both the revocation of and then the denial of renewal of Mr. Ramirez's DACA status and work authorization without adequate procedural protections fail the *Eldridge* test. First, Mr. Ramirez's protected interests are extremely significant—they include, among other things, his physical liberty, his right to be free from arrest or detention based solely on his immigration status, and his ability to earn a living to help support himself and his family. Second, the procedures provided were wholly inadequate. "The essence of due process is the requirement . . . [of] notice . . .

---

[97] "[T]he identification of property interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the state." *Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002) (citations omitted).

[and] a meaningful opportunity to present [one's] case." *Mathews*, 424 U.S. at 348–49. Here, Defendants initially revoked Mr. Ramirez's DACA status without any advance notice.[98] Defendants then continued to rely on unsubstantiated allegations of gang affiliation in threatening to terminate Mr. Ramirez's DACA status, and subsequently failed to give fair and impartial consideration to his DACA renewal application after deciding that they would take whatever steps necessary to terminate Mr. Ramirez's DACA, including attempting to skirt this Court's Preliminary Injunction Order to deny a routine renewal. This Court has already held that such conduct "implicates [Mr. Ramirez's] right to an opportunity to be heard in a meaningful manner."[99] And third, there is no credible burden "associated with additional or substitute procedures," or public benefit from their absence. *Nozzi*, 806 F.3d at 1193 (internal quotations and citations omitted).[100]

115. Separate from the inadequate procedural protections it has provided Mr. Ramirez throughout this process, the government's treatment of Mr. Ramirez also violates his substantive rights under the Due Process Clause. The government's actions demonstrate that it has not been motivated by a legitimate purpose; rather, the government has been motivated by animus and spite toward an individual who challenged the government's false allegations and stood up for his individual rights. Such illegitimate and retaliatory rationales cannot support the government's deprivation of Mr. Ramirez's protected liberty and property interests. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) ("The touchstone of due process is protection of the individual against arbitrary action of the government." (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974))); *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1166 (S.D. Cal. 2018) ("[S]ubstantive due process protects against government power arbitrarily and oppressively exercised.").

116. For similar reasons, Defendants' retaliatory actions have violated Mr. Ramirez's rights under the First Amendment. Even if the government's actions were lawful, which they were

---

[98] The risk of "erroneous deprivation" is particularly high where, as here, an agency disregards its own extensive prior due diligence in favor of a spur-of-the-moment judgment by a few individuals based on extremely limited evidence. Under these circumstances, *any* "additional procedural safeguards" would have had obvious "probable value." *Nozzi*, 806 F.3d at 1193.

[99] *Medina*, 313 F. Supp. 3d at 1251 (internal quotations omitted).

[100] As previously noted, Defendants also violated the government's policy of providing notice and 33 days to respond before terminating DACA status. *See* Dkt. #78-6, Ex. F, at 132, Appendix I (DACA SOP).

not, such "[o]therwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016); *see also Wilkie v. Robbins*, 551 U.S. 537, 555 (2007) ("[T]he government may not retaliate for exercising First Amendment speech rights."). To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity[,] and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien*, 818 F.3d at 932 (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006) and holding that complaint stated a plausible First Amendment retaliation claim).

117. Defendants' decision to deny renewal of Mr. Ramirez's DACA status and work authorization in December 2018 violated the First Amendment's prohibition against retaliation for protected speech. Mr. Ramirez first filed suit to challenge the government's unconstitutional conduct on February 13, 2017, and Defendants have consistently taken punitive and retaliatory action against him ever since. "Litigation seeking to expose . . . wrongful governmental activity is, by its very nature, a matter of public concern" that is protected by the First Amendment. *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 927 (9th Cir. 2004); *see also id.* at 925 ("[P]roceedings before a judicial or administrative body constitute a matter of public concern if they bring to light potential or actual discrimination, corruption, or other wrongful conduct by government agencies or officials."). In an abundance of caution, Mr. Ramirez submitted a request to renew his DACA less than one week after the Preliminary Injunction Order, which enjoined Defendants from terminating his DACA. Four months later, in the next action Defendants took with respect to Mr. Ramirez's renewal application, Defendants informed Mr. Ramirez of their intent to deny his request. In light of the history of Defendants' treatment of Mr. Ramirez—and considering the fact that virtually all DACA renewal requests are granted—the motivation behind Defendants' denial of Mr. Ramirez's request is clear: to silence Mr. Ramirez and to retaliate against him for his efforts to pursue relief for Defendants' past unlawful conduct.

118. For all of the foregoing reasons, the threatened and actual revocation of Mr. Ramirez's DACA status and work authorization, and the denial of his DACA renewal application, violated his rights under the Due Process Clause and the First Amendment, and was therefore in violation of the APA.

**COUNT THREE**

**EQUITABLE ESTOPPEL**

119. Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120. This Count is brought against all Defendants and seeks a declaration that Defendants are equitably estopped from terminating Mr. Ramirez's DACA status and work authorization.

121. The government may be subject to equitable estoppel in an immigration case if it has engaged in "affirmative misconduct." *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1165 (9th Cir. 2005). Equitable estoppel against the government also requires a showing that the government has "made a knowing false representation or concealment of material facts to a party ignorant of the facts, with the intention that the other party rely on it, where the other party actually and detrimentally relies on it" and that its "wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Mukherjee v. I.N.S.*, 793 F.2d 1006, 1008–09 (9th Cir. 1986) (quoting *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir. 1985)).

122. Here, Defendants should be estopped from terminating or declining to renew Mr. Ramirez's DACA status and work authorization. Defendants repeatedly, intentionally, and falsely asserted that Mr. Ramirez is gang affiliated or otherwise presents a risk to public safety. Mr. Ramirez is, to this day, ignorant of Defendants' motivation in instituting and pursuing an unlawful course of harassing conduct to deny him of the benefits to which he is entitled under DACA—except as retaliation against Mr. Ramirez for exercising his rights. Defendants have now however, improperly and wrongfully adopted a new gambit to attempt to deprive Mr. Ramirez of his DACA, using information that the government had available to it all along, but that it never previously raised in connection with his prior approved DACA renewal nor in the April 2018 NOIT, which was principally based on the false accusation of gang affiliation.

123. Believing he was protected against further government abuse by the Preliminary Injunction Order (which he expected the government would not violate), Mr. Ramirez reasonably relied on the government's prior false statements of alleged gang affiliation as the principal basis for attempting to terminate his DACA (which it reiterated at the May 1, 2018 hearing on the Preliminary Injunction Motion):

> THE COURT: Let me ask you this: Is the plaintiff correct that by filing the notice to terminate, that you intend to once again rely on the allegations that Mr. Ramirez is a gang member, has associated with gang members, and therefore needs to have that DACA status terminated?
>
> MR. ROBINS: Essentially, yes, Your Honor.[101]

124. Mr. Ramirez understandably believed that this allegation—false as it was—was the government's principal basis on which it would attempt to terminate his DACA, and that if it was aware of existing legitimate bases on which to terminate (or refuse to renew) his benefits, it would have at the very least included them in the April 2018 NOIT. But based on the government's representations in the NOIT and at the May 1, 2018 hearing, he did not and could not have expected the government to dredge up past minor violations—of which the government was aware at the time it issued the April 2018 NOIT—as a pretext to deny his DACA renewal and attempt to skirt requirements of the Preliminary Injunction Order, particularly where other DACA recipients' renewals are routinely granted in the face of such minor violations.

125. Mr. Ramirez planned his future based on the government's representations in this regard, including planning to work using his employment authorization to provide for his son. In that belief, he reasonably relied on the government's prior representations in connection with the NOIT and its statements to this Court in submitting his DACA renewal application in good faith and paying the renewal fee; therefore, he expected that his renewal application would be fairly processed and approved as it had been before (as processed renewals are routinely approved, 99% of the time).

126. The injustice to Mr. Ramirez arising out of Defendants' misconduct outweighs any possible harm to the public interest by the restoration of his benefits. Mr. Ramirez has lived in the

[101] Dkt. # 130-1, p. 25 (Trans. of May 1, 2018 Hrg., p. 20).

United States since he was ten years old, has gone to school and worked here, and is the father of a United States citizen for whom he wishes to provide, but the government's retaliatory campaign and false representations have severely impaired his ability to do so.

**COUNT FOUR**

**DECLARATORY RELIEF**

127. Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

128. As explained above, Defendants' revocation of Mr. Ramirez's DACA status and work authorization in February 2017, and their decision to deny renewal of his DACA in December 2018, violated his rights under the First and Fifth Amendments. Mr. Ramirez therefore seeks a declaration that: (i) he has constitutionally protected interests in his DACA status and the benefits conferred thereunder; and (ii) Defendants' revocation of these interests was unlawful and invalid. *See Akhtar v. Burzynski*, 384 F.3d 1193, 1202 (9th Cir. 2004); *Walters v. Reno*, 145 F.3d 1032, 1036, 1042–44 (9th Cir. 1998).

129. For the same reasons, Mr. Ramirez is entitled to an order directing Defendants to reinstate his DACA status. 5 U.S.C. § 706.

**DEMAND FOR JURY TRIAL**

130. Mr. Ramirez demands a jury trial on his claims.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Ramirez prays that this Court grant the following relief:

(1) Award damages according to proof;

(2) Find the agency actions to deny Mr. Ramirez's DACA to be arbitrary and capricious and unlawful;

(3) Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that: (i) Mr. Ramirez has constitutionally protected interests in his DACA status and the benefits conferred thereunder; and (ii) Defendants' revocation of and failure to renew Mr. Ramirez's DACA status and benefits was unlawful and in violation of his constitutional rights;

(4) Order Defendants to reinstate Mr. Ramirez's DACA status and work authorization;

(5) Enjoin Defendants from terminating or declining to renew Mr. Ramirez's DACA status and work authorization;

(6) Award Mr. Ramirez reasonable costs and attorneys' fees; and

(7) Grant any other and further relief that this Court may deem fit and proper.

DATED: May 29, 2019

Seattle, Washington

Respectfully submitted,

/s/ Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS JR. (CA SBN 132099), *pro hac vice*
ETHAN D. DETTMER (CA SBN 196046), *pro hac vice*
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice*
NATHANIEL L. BACH (CA SBN 246518), *pro hac vice*

/s/ Mark D. Rosenbaum
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice*
JUDY LONDON (CA SBN 149431), *pro hac vice*
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice*

/s/ Luis Cortes Romero
IMMIGRANT ADVOCACY & LITIGATION CENTER, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice*

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document should automatically be served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Theodore J. Boutrous, Jr.*