1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

DANIEL RAMIREZ MEDINA,

CASE NO. C17-218 RSM

9

Plaintiff,

ORDER ON PENDING MOTIONS

10

v.

11

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

12

Defendants.

13

14

## I.   INTRODUCTION[1]

15

The Court does not endorse the Government's actions in this matter.  Outwardly, the

16

Government has pursued a nearly three-year vendetta against Plaintiff Daniel Ramirez Medina

17

("Mr. Ramirez").  Originally contacted by United States Immigration and Customs Enforcement

18

("ICE") agents by happenstance, and despite his DACA status,[2] Mr. Ramirez was detained

19

20

[1] The Court cites to documents utilizing the docket number and pagination applied by the Court's CM/ECF system.  Where appropriate and clear, the Court cites to numbered paragraphs or page and line number designations for transcripts.

21

22

23

24

[2] DACA, an acronym for "Deferred Action for Childhood Arrivals," is an established form of prosecutorial discretion available to "certain young people who were brought to this country as children and know only this country as home."  Dkt. #144-4 (Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012)).  Provided that an applicant satisfies certain guidelines, the United States Department of Homeland Security ("DHS") will consider approving deferred action—a conditional promise not to seek removal—"for a period of two years, subject

without any indication of criminal activity.  Speculating that Mr. Ramirez was affiliated with gangs, ICE pursued removal proceedings and detained Mr. Ramirez for 47 days before finally conceding that he was not a threat to public safety and releasing him on bond.  Nevertheless, the United States Citizenship and Immigration Services ("USCIS") asserted that ICE's actions automatically terminated Mr. Ramirez's DACA status.

Legal action forced the Government to reinstate Mr. Ramirez's DACA status.  But the Government immediately sought to terminate his DACA status, again relying on speculative arguments that he was a threat to public safety because of "gang affiliations."  When challenged before this Court, the Government provided no corroborating evidence.  Finding the Government's actions baseless, the Court directed the Government to not consider statements purportedly alleging or establishing that "Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety."

Mr. Ramirez's DACA status, however, was expiring.  Believing that he was free from further harassment, Mr. Ramirez sought to renew his DACA status—generally a routine exercise. The Government used the opportunity to scrutinize Mr. Ramirez's background.  After uncovering several-years-old and minor criminal transgressions that would not otherwise disqualify him for DACA, and seemingly against the individual adjudicator's conclusions, USCIS provided notice of its intent to deny Mr. Ramirez's application.  USCIS indicated that the denial was not on the basis that he was a threat to public safety, but because his "offense history" made him unsuitable

---

to renewal for a period of two years, and may [grant] employment authorization."  Dkt. #144-1 at 2; 8 C.F.R. § 274a.12(c)(14) (allowing employment authorization for non-citizens who have been approved for deferred action).  In this Order, the Court uses "DACA status" to refer to both the approval of deferred action and the grant of employment authorization.

for favorable prosecutorial discretion (an apparently meaningless distinction).  Once again faced with questionable treatment by the Government, Mr. Ramirez came before this Court.[3]

Mr. Ramirez seeks a preliminary injunction restoring his DACA status and protecting him from further discrimination at the hands of the Government.[4]  The Government maintains that it has absolute discretion to deny Mr. Ramirez's application, that the Court may not examine its reasons, and that this matter must be dismissed.[5]  As the Government's actions are examined in closer detail, they cultivate and nourish suspicion.  Despite the questionable actions of the Government, the Court is constrained by the law and has no basis to intervene.  The Court attributes the inequitable outcome here to our shared failure to address a flawed immigration system, an agency's misguided attempt to justify prior actions, an overzealous enforcement philosophy, and an unfortunate confluence of bad luck.

## II.    BACKGROUND

### A.  Mr. Ramirez Grows Up in the United States

Seeking a better life, Mr. Ramirez's parents brought him to this country when he was ten years old.[6]  Now 27, Mr. Ramirez has never left the United States.[7]  His family and his son are here.  His family describes him as shy, quiet, timid, calm, and family oriented.[8]  And now, the Government wants him deported.

---

[3] The Court heard oral argument on September 25, 2019.  Dkt. #157.

[4] Dkt. #147 (Plaintiff's Motion for Second Preliminary Injunction, Or, in the Alternative, to Compel Compliance with Preliminary Injunction Order).

[5] Dkt. #152 (Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint and Motion for Summary Judgment).

[6] Dkt. #35-1 at ¶ 2.

[7] *Id.*

[8] Dkt. #35-2 at ¶ 5; Dkt. #35-3 at ¶ 4; Dkt. #35-5 at ¶ 3.

ORDER – 3

Growing up with his mother, brother, and sister in California, Mr. Ramirez found school challenging, struggled academically, and was bullied.[9]  Gangs were prevalent in the area where Mr. Ramirez grew up and he found it impossible[10] not to know or interact with gang members.[11] But Mr. Ramirez was never interested in gang life and did not join a gang.[12]  Instead, he wanted to help support his family, so he dropped out of school and started working.[13]

Later, he recognized the opportunities school would have afforded him and began pursuing his education, but life took a different turn.  Mr. Ramirez's American-born son—his "world"—arrived in late 2013.[14]  Feeling the natural pressures of supporting his family and providing his son with a better life, Mr. Ramirez again left school and returned to providing for his family.[15]  DACA presented Mr. Ramirez with the promise of legal employment and better opportunities to provide for his family.

**B. Mr. Ramirez is Granted DACA Status**

Unable to deport every non-citizen, the Department of Homeland Security ("DHS") exercises broad discretion in setting its enforcement priorities.  *Arizona v. United States*, 567 U.S. 387, 396 (2012).  Deferred Action for Childhood Arrivals is one such exercise of discretion whereby non-citizens satisfying certain guidelines may seek deferred action "for a period of two years, subject to renewal for a period of two years, and may be eligible for employment

---

[9] Dkt. #35-1 at ¶¶ 2, 11; Dkt. #35-3 at ¶ 5; Dkt. #35-5 at ¶ 4.

[10] Mr. Ramirez's account is further supported by the expert testimony of Martin M. Flores and Edwina Barvosa.  Dkt. #35-7 at ¶ 15; Dkt. #35-8 at ¶¶ 8–9.

[11] Dkt. #35-1 at ¶¶ 19, 22; Dkt. #35-2 at ¶ 6.

[12] Dkt. #35-1 at ¶¶ 19–20; Dkt. #35-2 at ¶ 4; Dkt. #35-3 at ¶ 9; Dkt. #35-5 at ¶ 8; Dkt. #35-7 at ¶¶ 7–15; Dkt. #35-8 at ¶¶ 8, 10.

[13] Dkt. #35-3 at ¶ 7; Dkt. #35-5 at ¶ 5.

[14] Dkt. #35-1 at ¶ 8.

[15] *Id.*; Dkt. #35-5 at ¶ 5.

ORDER – 4

authorization."[16]  Being approved for DACA status is essentially a conditional promise from the Government that it will not seek removal for the applicable term.  During the period of deferred action, the Government authorizes the non-citizen to be employed legally within the United States, allowing for continued contribution to our communities.

Mr. Ramirez was nervous about seeking DACA status since he was a non-citizen and would be forced to make himself known to the Government.[17]  Applying would be a financial burden and, to prove he qualified, he would be required to share personal information with the Government.  Specifically, Mr. Ramirez had to submit evidence establishing that he:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.[18]

Mr. Ramirez was also required to submit to biometric testing and extensive background checks to establish whether his "presence in the United States threatens public safety or national

---

[16] Dkt. #144-1 at 2; 8 C.F.R. § 274a.12(c)(14) (allowing employment authorization for non-citizens who have been approved for deferred action).

[17] Dkt. #35-1 at ¶ 3–4.

[18] Dkt. #144-4.

ORDER – 5

security."[19]  Mr. Ramirez's misgivings did not manifest, and he felt a certain measure of relief after applying.[20]  But he still had to wait.

After waiting for several months, Mr. Ramirez found out that he had been approved for two years of DACA status.[21]  He believed that DACA status would allow him to live and work within the country without fear of being detained or deported.[22]

## C. Mr. Ramirez's Life and Transgressions

Mr. Ramirez carried on with a mostly normal life.  He found work picking oranges and, while it was a physically demanding job, it allowed him to better support his family.[23]  But, like many others, Mr. Ramirez's life was not spotless, and he had several interactions with law enforcement.  Shortly after applying for DACA status, and most alarmingly, Mr. Ramirez was the subject of an investigation for unlawful sexual intercourse with a minor.[24]  The mother of Mr. Ramirez's son was seventeen at the time she gave birth.[25]  Because Mr. Ramirez was twenty, a mandatory report was filed with the police and the incident was investigated.[26]  After learning that the mother and Mr. Ramirez had been in a committed and consensual relationship, planned to get married when they could, were both involved in raising the child, and had the support of

---

[19] Dkt. #144-2 at 24 (Q65).

[20] Dkt. #35-1 at ¶ 4.

[21] *Id.* at ¶ 6.

[22] *Id.*

[23] *Id.* at ¶ 7.

[24] Dkt. #153 at 32–34.

[25] *Id.* at 33.

[26] *Id.*

ORDER – 6

both their parents, police closed the case and referred it to the local prosecutor.[27]  No charges were ever filed, and Mr. Ramirez was never detained or arrested.[28]

Mr. Ramirez, after having been granted DACA status, was also stopped by law enforcement as he drove through Oregon.[29]  A search of the vehicle revealed that Mr. Ramirez possessed less than an ounce of marijuana.[30]  Mr. Ramirez received a non-criminal citation for possessing marijuana in violation of Oregon state law and for violating several traffic laws.[31]  Mr. Ramirez pleaded no contest to the marijuana citation and it was converted into a fine.[32]  Otherwise, Mr. Ramirez's record was limited to several[33] traffic citations over the years.[34]

After two years, now 2016, Mr. Ramirez sought to renew his status and was again subjected to the DACA application process.[35]  Review of his renewal application focused on: (1) whether he had initially qualified for DACA, (2) whether he had departed the United States without authorization, (3) whether he had continuously resided in the United States, and (4) whether he had been "convicted of a felony, a significant misdemeanor, or three or more misdemeanors . . . [or] otherwise pose[d] a threat to national security or public safety."[36]  The

---

[27] *Id.* at 33–34.

[28] *Id.* at 27.

[29] *Id.* at 35–41.

[30] *Id.*

[31] *Id.* at 38.

[32] *Id.* at 40–41, 102–03.

[33] Mr. Ramirez was cited for one traffic offense in 2012 before he was granted DACA status. Dkt. #153 at 82–83.  After being granted DACA status, Mr. Ramirez was cited for the Oregon incident and for two violations arising out of a traffic stop in California.  Dkt. #153 at 82–83.  Lastly, Mr. Ramirez was cited for four violations arising out of a single incident in 2016.  *Id.*

[34] *Id.* at 82–83.

[35] Dkt. #35-1 at ¶ 9.

[36] Dkt. #144-2 at 19 (Q51).

ORDER – 7

record is unclear and the parties dispute whether Mr. Ramirez was required to share any of his prior transgressions with USCIS at the time of his renewal. But his history would not have been disqualifying and the potential effect on his renewal remains speculative. In the end, the Government performed another background check,[37] raised no concerns, and again exercised its "ultimate discretion to determine [that] deferred action [was] appropriate in" Mr. Ramirez's case.[38] Mr. Ramirez was informed that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years," until May 4, 2018.[39]

Authorized to continue working legally and seeking better job opportunities to provide for his son and assist his mother, Mr. Ramirez came to Washington in late 2016.[40] He joined his brother and father who were already in Washington and began looking for work. But Mr. Ramirez's life again took a sudden unfortunate turn.

### D. Mr. Ramirez is Detained by ICE Under Questionable Circumstances

On February 10, 2017, at approximately 9:00 a.m., ICE agents arrested Mr. Ramirez's father outside of the apartment where Mr. Ramirez, his father, and his brother were living.[41] ICE agents entered the apartment[42] and found Mr. Ramirez asleep.[43] Mr. Ramirez was jolted from

---

[37] Unbeknownst to Mr. Ramirez, he "was [] subject to additional vetting in 2015" when USCIS did additional screening to identify DACA recipients with known or suspected gang associations. Dkt. #144 at ¶ 24; Dkt. #144-6 at 4. The Government took no action to alter Mr. Ramirez's status following the 2015 screening.

[38] Dkt. #144-2 at 19 (Q51); Dkt. #144-8.

[39] Dkt. #144-8.

[40] Dkt. #35-2 at ¶ 2; Dkt. #35-5 at ¶ 7.

[41] Dkt. #78-15 at ¶ 14.

[42] Whether ICE agents had proper consent to enter the apartment has always been in dispute. Mr. Ramirez asserts that he is unaware of his father providing consent. Dkt. #144 at ¶ 43. The record of detention completed by ICE agents indicates that consent was obtained. Dkt. #78-8 at 3.

[43] *Id.*

ORDER – 8

sleep and agents began to question him.[44]  Mr. Ramirez answered honestly, providing agents with

his name, birthdate, and place of birth—Mexico.[45]  Without understanding why, Mr. Ramirez

was placed in handcuffs.[46]  Mr. Ramirez began to repeatedly inform ICE agents that he had a

valid work permit,[47] but the agents refused to release him.[48]  Mr. Ramirez's father also attempted

to intervene, repeatedly reiterating that his son had a valid work permit and should not be

detained.[49]  Other than his official legal status, ICE agents had no proof, probable cause, or

reasonable suspicion of any criminal activity.[50]

        After arresting Mr. Ramirez and transporting him to a processing facility, ICE agents

confirmed that Mr. Ramirez had no known criminal history and had twice been granted DACA

status.[51]  Nevertheless, the agents chose to interrogate Mr. Ramirez and attributed additional

meaning to his innocuous answers that he knew gang members in middle and high school and

that they may have been Sureños.[52]  ICE agents also speculated that Mr. Ramirez's innocuous

tattoo of a nautical star and the words "La Paz-BCS," representing his birthplace, indicated gang

---

[44] *Id.* at ¶ 15.

[45] *Id.*

[46] *Id.*

[47] Mr. Ramirez's DACA status meant that he was considered "to be lawfully present in the United States" by DHS and "authorized by DHS to be present in the United States."  Dkt. #144-2 at 3 (Q1).

[48] *Id.* at ¶¶ 15, 17; Dkt. #144 at ¶¶ 45–46.

[49] Dkt. #78 at ¶ 46.

[50] Dkt. #32-2 at 1–4.

[51] Dkt. #32-2 at 3–4; Dkt. #144 at ¶¶45–49.

[52] Dkt. #78-15 at ¶¶ 19, 22; Dkt. #32-2 at 4.

ORDER – 9

affiliation.[53]   Without any corroborating evidence ICE concluded that Mr. Ramirez had gang

affiliations, detained him in the Northwest Detention Center, and initiated removal proceedings.[54]

### E.  Mr. Ramirez Seeks His Release

Mr. Ramirez sought habeas corpus relief from this Court to secure his release.[55]  As the

matter garnered national attention, the Government justified its actions by representing that Mr.

Ramirez was a gang member and a risk to public safety.[56]  Further, the Government represented

that it had corroborating evidence, "including photos and social media content that illustrate his

gang affiliation."[57]  Despite its concerns, this Court ultimately concluded that Mr. Ramirez had

to seek his release "in the context of his removal proceedings" and directed the Government to

schedule a bond hearing, as requested by Mr. Ramirez, within a week.[58]

At the subsequent custody redetermination hearing, the Government did not present any

evidence substantiating its continued assertions that Mr. Ramirez was affiliated with gangs.[59]

After the immigration judge necessarily found that Mr. Ramirez was not a threat to public safety,

---

[53] Dkt. #78-15 at ¶¶ 24–25; Dkt. #32-2 at 4.  Mr. Ramirez was born in La Paz, located in Baja California Sur ("BCS"), Mexico.  In prior proceedings, Mr. Ramirez established, with expert testimony, that his tattoo did not have any gang meaning or indicate any gang affiliations.  Dkt. #35-7 at ¶¶ 7–13.

[54] Dkt. #32-2 at 4; Dkts. #52-10 (notice to appear at removal proceedings) and #52-12 (custody determination).

[55] Dkt. #1.

[56] Dkt. #35-11 at 7; *see generally* Dkt. #144 at ¶¶ 50–68.

[57] Dkt. #35-11 at 22; *see generally id.* at 14–37.

[58] Dkt. #69 at 3.

[59] Dkt. #122-1; Dkt. #129 at 20:20–21:7.

ORDER – 10

1  Mr. Ramirez was released on a $15,000 bond.[60]  In total, the Government detained Mr. Ramirez

2  for 47 days before he secured his release.[61]

3  **F.  USCIS Attempts to Terminate DACA Status and ICE Removal Proceedings**

4       Although he was no longer detained, Mr. Ramirez was burdened with the Government's

5  continued crusade against him.  After ICE began removal proceedings in February 2017, USCIS

6  notified Mr. Ramirez that it was treating his DACA status as automatically terminated.[62]  Mr.

7  Ramirez amended his complaint before this Court to challenge the Government's actions up to

8  that point and USCIS's termination of his DACA status.[63]  At the same time, and despite the

9  legal action, ICE continued to pursue removal and, in January 2018, obtained an order of removal

10  for Mr. Ramirez.[64]

11       Across the country, the Government aggressively sought to terminate DACA status for

12  similarly situated non-citizens.  The Government's no-notice terminations of DACA status

13  prompted legal challenges.  Most relevant, the United States District Court for the Central District

14  of California certified a class that included all DACA recipients "who, after January 19, 2017,

15  have had or will have their DACA [status] revoked without notice or an opportunity to respond,

16  even though they have not been convicted of a disqualifying criminal offense."  *Inland Empire–*

17  *Immigrant Youth Collective v. Nielsen*, Case No. C17–2048-PSG-SHKx, 2018 WL 1061408, at

18  *22 (C.D. Cal. Feb. 26, 2018).  In the same order, the court enjoined the Government's "decisions

19  after January 19, 2017 to terminate the DACA [status] of class members, without notice, a

20

21  ―――――――――――――

   [60] Dkts. #144-10 and #144-11; Dkt. #122-1 at 33.

22  [61] Dkt. #78-22.

   [62] Dkt. #144-9.

23  [63] Dkt. #78.

24  [64] Dkt. #144 at ¶ 78.

ORDER – 11

1    reasoned explanation, or an opportunity to respond prior to termination," and ordered the

2    Government to "immediately [] restore those individuals' DACA [status], subject to their original

3    date of expiration."[65]  Mr. Ramirez was a part of the certified class.[66]

4    **G.  USCIS Again Attempts to Terminate Mr. Ramirez's DACA Status**

5            As required by court order, USCIS restored Mr. Ramirez's DACA status, providing him

6    notice of that action on April 3, 2018.[67]  The notice indicated that ten days had been added to the

7    term of his DACA status and that it was scheduled to expire on May 15, 2018.[68]  But if Mr.

8    Ramirez found any relief, it was fleeting.  USCIS concurrently gave Mr. Ramirez notice of its

9    intent to terminate his DACA status.[69]  USCIS indicated that in accordance with DACA Standard

10   Operating Procedures[70] ("SOP"), it had determined that Mr. Ramirez did "not warrant a favorable

11   exercise of prosecutorial discretion" under DACA.[71]  As support, and despite evidence to the

12   contrary, USCIS relied on the assertion of gang affiliation, "DHS' determination that you are an

13   enforcement priority, and the fact that ICE has informed USCIS that it is actively pursuing your

14   removal and you were recently ordered removed."[72]

15

16

---

17   [65] *Id.*

     [66] *See* Dkt. #133 at 5–6.

18   [67] Dkt. #144-12.

19   [68] *Id.*

20   [69] Dkt. #144-13.

     [70] The National Standard Operating Procedures ("SOP") issued by DHS describe the procedures
21   to be followed in adjudicating DACA requests and renewals.  Dkt. #144-7 (DACA National
     Standard Operating Procedures, dated April 4, 2013).  The SOP applies to all personnel
22   performing adjudicative functions and the procedures to be followed are not discretionary.  *Id.* at
     17.

23   [71] *Id.* at 3.

24   [72] *Id.*

ORDER – 12

Mr. Ramirez again found himself before this Court challenging the Government's attempt to terminate his DACA status on the basis that he was gang affiliated without any supporting evidence.[73]  Because the Government had never supported its gang affiliation claims, this Court found that "[the Government's] continued assertion that [Mr. Ramirez] is a gang member or gang-affiliated is arbitrary and capricious" and that further reliance on the allegations would likely deny him due process.[74]  Accordingly, the Court enjoined the Government "from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety."[75]  The Court's order had little practical effect on Mr. Ramirez's reinstated DACA status, however, as by its own terms it expired that day.[76]

---

[73] Dkts. #122 at 20–24 and #130.  At oral argument, the Government, perhaps misleadingly, represented to the Court that there was not definitive proof one way or the other as to Mr. Ramirez's possible gang membership.  Dkt. #129 at 21:1–7.  In actuality, the Government had checked Mr. Ramirez's history and, months earlier, concluded that his rap sheet did not include any criminality, that there was "not sufficient evidence to conclude that he is currently a known or suspected gang member," and that there was "NOT sufficient evidence to conclude this person is an [Egregious Public Safety] concern."  Dkt. #144-1 at 2.  An "Egregious Public Safety" concerns is defined in the SOP as:

> Any case where routine systems and background checks indicate that an individual is under investigation for, has been arrested for (without disposition), or has been convicted of, a specified crime, including but not limited to, murder, rape, sexual abuse of a minor, trafficking in firearms or explosives, or other crimes listed in the November 7, 2011, memorandum entitled <u>Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens</u>.

Dkt. #144-7 at 9.

[74] Dkt. #133 at 19–21; *see also, id.* at 16–19.

[75] *Id.* at 23.

[76] *Id.* at 23 n.7.

ORDER – 13

### H.  Mr. Ramirez Seeks Routine Renewal of His DACA Status

#### 1.  Mr. Ramirez Faces Increased Scrutiny

Having drawn national media scrutiny, Mr. Ramirez's case received additional scrutiny within the Government as well.[77]  When Mr. Ramirez applied to renew his DACA status, the Government had already been anticipating the application.[78]  USCIS attorneys learned of the application and sought to determine whether ICE had additional "non-gang" bases to consider Mr. Ramirez an enforcement priority.[79]  ICE did continue to consider Mr. Ramirez an enforcement priority, having learned of his prior transgressions in the context of his January 2018 removal proceeding.  ICE relayed the information it had learned, quoted as follows:

- Daniel Ramirez admitted having sex with an underage girl in California, in violation of CPC 261.5.  Police report offers details.  Admitted during removal proceedings that he knew age of consent in California is 18.
- He admitted during removal proceedings that he had acquired marijuana from a "friend" who had a medical marijuana authorization card.  He wrote to an Oregon court that he keeps marijuana with him at all times.
- He admitted violating Oregon law by possessing marijuana in his car while driving from Washington state to California.  Received citation.
- He has $4,000 in unpaid driving fines, according to his own cancellation application.[80]

The newly identified transgressions were a revelation for USCIS and the Government sought to learn more.  As the Government considered the information, it filtered from the attorneys to USCIS Service Center Operations Directorate ("SCOPS")—the division of USCIS tasked with adjudicating Mr. Ramirez's application—and to the individual adjudicator for Mr.

---

[77] Dkt. #153 at 13, 16, 19, 30, 48, 53.

[78] Dkt. #147-1 at 6 (¶ 2); Dkt. #153 at 13.

[79] Dkt. #153 at 12, 30.

[80] *Id.* at 11.

ORDER – 14

Ramirez's application.[81]  Prior to one strategy session, the adjudicator confirmed for SCOPS HQ that the newly learned information was not considered in Mr. Ramirez's prior approvals.[82]

### 2.  USCIS Adjudicator Favors Renewal

But the adjudicator called into question the importance of the transgressions on her consideration of the DACA application.  For instance, the adjudicator noted that Mr. Ramirez was not actually charged for having sex with an underage girl because she was the mother of his child, it was consensual and within a romantic relationship, and the age difference was small.[83] The adjudicator noted that "we have approved DACA requests with similar situations" and it does not appear "that [Mr. Ramirez] is a sexual predator."[84]  As to his possession of marijuana, the adjudicator noted that it was only a citation and that "[p]ossession of marijuana citations are generally not disqualifying for DACA."[85]  The adjudicator noted, further, that Mr. Ramirez's background checks had never revealed derogatory information or indications of gang affiliation and included only his single ICE detention.[86]

### 3.  USCIS Seeks to Deny Mr. Ramirez's Renewal Application

But the adjudicator's initial assessment was not credited, and she was directed to seek further information from ICE prior to making any decisions on the case.[87]  Upon receiving additional information from ICE, the adjudicator passed the information on to SCOPS HQ.[88]

---

[81] *Id.* at 10.

[82] *Id.* at 8, 10.

[83] *Id.* at 9.

[84] *Id.*

[85] *Id.*

[86] *Id.* at 8.

[87] *Id.* at 21.

[88] *Id.* at 6.

ORDER – 15

Resigned to her loss of control and cognizant that "[a]s there is national interest in this case, a lot of people will likely need to weigh in on the final decision," the adjudicator inquired as to "what the next steps will be and any timelines."[89]  Two days later, having apparently received direction, the adjudicator submitted a request for guidance ("RAG") to SCOPS HQ.[90]  SCOPS HQ determined[91] that Mr. Ramirez was not a "public safety concern" but considered his criminal history as a "derogatory factor in the consideration of deferred action under the totality of the circumstances."[92]  SCOPS HQ recommended that the adjudicator issue a Notice of Intent to Deny ("NOID") and included a draft NOID with its response.[93]

The NOID issued to Mr. Ramirez indicated that he was not a candidate for the exercise of prosecutorial discretion because: (1) ICE actively sought his removal, (2) in 2013 he had a sexual relationship resulting in the birth of his child while the child's mother was 17 and Mr. Ramirez was 20, (3) in 2014, he had pleaded no contest[94] to possession of marijuana, and (4) he had outstanding unpaid traffic fines.[95]

### 4.  Mr. Ramirez Responds but His Application is Denied

Mr. Ramirez submitted a response, arguing that denial of his application would violate the Administrative Procedure Act and this Court's preliminary injunction.[96]  After considering

---

[89] *Id.* at 6, 56.

[90] *Id.* at 61–67.

[91] The adjudicator received additional supporting information from ICE after submitting the RAG. Dkt. #153 at 85–400. There is no indication in the record that the adjudicator shared this information with SCOPS HQ. But SCOPS HQ apparently had access to the information as it is reflected in the RAG and the draft Notice of Intent to Deny.

[92] *Id.* at 63.

[93] *Id.* at 74–76, 53–54.

[94] A "no contest" is equivalent to a conviction under the DACA SOP. Dkt. #144-7 at 86.

[95] Dkt. #147-1 at 8–10.

[96] Dkt. #147-1 at 14–22.

ORDER – 16

the response, the adjudicator again appeared inclined to grant the renewal and advocated her case

within the agency.  The adjudicator referred to a guidance document indicating that even though

adjudications were "case-by-case . . . discretion should be applied consistently" and "similar fact

patterns should yield similar results."[97]   After noting this guidance, the investigator again

reiterated her position on Mr. Ramirez's history.[98]   As to the investigation into his relationship

with the mother of his son, the adjudicator noted that "nothing in the record would lead me, the

adjudicator, to believe [Mr. Ramirez] is a sexual predator."[99]   As to the marijuana possession

charge, she indicated that it "would not have been considered to be a conviction for a

misdemeanor . . . and I, as the adjudicating officer, would not have considered it a public safety

concern."[100]  Lastly, the adjudicator explained that "[t]o my knowledge, traffic fines have never

been evaluated as a discretionary factor which has led to the discretionary denial of a DACA

requires."[101]

      But the adjudicator was overruled by her superiors.[102]  The Branch Chief of the Waivers

and Temporary Services Branch (WATS)—apparently a part of SCOPS HQ—explained that

> [w]hile the decision to deny DACA based on ICE's confirmation that an
> individual is an enforcement priority is not automatic much the same way that
> approving a DACA request for an individual that meets the threshold criteria is
> not automatic, WATS believes that denial of this DACA request is appropriate in
> the exercise of USCIS's discretion for the reasons previously noted in our
> response to the RAG and included in the NOID.  The NOID response does not
> overcome or change our assessment of this case.[103]

---

[97] Dkt. #153 at 52.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.* at 50–51.

[103] *Id.* at 51.

ORDER – 17

Flipping the consideration, WATS indicated that it was "unaware of any cases with similar fact patterns to this case that have been approved (i.e. ICE enforcement priority determination and the additional negative discretionary factors discussed in the NOID)."[104]   WATS continued to recommend denial.[105]

The adjudicator proposed to use a form denial letter with a simple and generic justification: "You have not established that you warrant a favorable exercise of prosecutorial discretion."[106]   But the adjudicator was again overruled and instructed to issue a denial that closely tracked the language of the NOID.[107]   An initial draft was circulated, and the adjudicator received back the "most recent version of the notice cleared through" the Office of Chief Counsel.[108]   After a final check with ICE to confirm that Mr. Ramirez was still considered an enforcement priority, the Government issued its denial of Mr. Ramirez's application on December 19, 2018.[109]   The denial indicated that Mr. Ramirez had not contested any underlying facts relied upon in the NOID and concluded that his application had been denied under the "totality of the circumstances."[110]

//

//

//

//

---

[104] *Id.* at 50.

[105] *Id.* at 50.

[106] *Id.* at 49.

[107] *Id.*

[108] *Id.* at 48.

[109] Dkt. #144-14.

[110] Dkt. #153 at 79.

ORDER – 18

1

### 5.   Litigation Continues

2

Following denial, Mr. Ramirez sought leave to amend this action to seek relief related to

3

the denial of his DACA renewal request.[111]  Both Mr. Ramirez's motion seeking a preliminary

4

injunction and the Government's motion seeking dismissal are pending before the Court.[112]

5

### III.   DISCUSSION

6

The Court first considers the Government's challenge to this Court's subject matter

7

jurisdiction and its ability to entertain Mr. Ramirez's complaints.

8

### A.   Legal Standard

9

Federal Rule of Civil Procedure 12 allows a party to move for dismissal based on a lack

10

of subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  When a court lacks subject matter

11

jurisdiction, it lacks the power to proceed, and its only remaining function is to dismiss.  *Steel*

12

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  Once the moving party has asserted

13

lack of subject matter jurisdiction, the court will presume that there is no jurisdiction and the

14

burden is on the party asserting jurisdiction to prove otherwise.  *Kokkonen v. Guardian Life Ins.*

15

*Co. of Am.*, 511 U.S. 375, 377 (1994).  "A jurisdictional challenge under Rule 12(b)(1) may be

16

made either on the face of the pleadings or by presenting extrinsic evidence."  *Warren v. Fox*

17

*Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214,

18

1242 (9th Cir. 2000)).

19

### B.   The Court Lacks Subject Matter Jurisdiction

20

The Government argues, pointing to 8 U.S.C. § 1252(g), that the Immigration and

21

Nationality Act specifically insulates USCIS's discretionary decision to deny Mr. Ramirez's

22

23

---

[111] Dkt. #140.

24

[112] Dkts. #147 and #152.

ORDER – 19

renewal application from this Court's review. Congress has provided that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). While the provision does not "cover[] the universe of deportation claims," the Supreme Court has opined, that "Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process" of the Immigration and Nationality Act.[113]   *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482, 485 (1999) ("*AADC*"); *see also Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 503–04 (9th Cir. 2018), *cert. granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, Case No. 18-587, 2019 WL 2649834 (June 28, 2019) ("*AADC* reads Section 1252(g) as responding to litigation over *individual* 'no deferred action' decisions, rather than a programmatic shift like the DACA rescission") (emphasis in original).

Mr. Ramirez argues vigorously that the Court has already determined it has jurisdiction to review USCIS decisions and that the Government merely rehashes its prior unsuccessful arguments.[114]   The Court did previously conclude that its review of actions taken by the Government in this case was not precluded by section 1252(g):

---

[113] The Supreme Court also noted that deferred action, as a form of prosecutorial discretion, is particularly ill-suited for judicial review. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84, 489–90 (1999); *Wayte v. United States,* 470 U.S. 598, 607–08 (1985) ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.").

[114] Dkt. #154 at 17–21.

ORDER – 20

1
2
3
4
5
6
7
8
9
10

[If Mr. Ramirez] were asking for review of the government's ultimate discretionary decision to terminate his DACA status, section 1252(g) would strip this Court of jurisdiction to review that determination.  [*AADC*, 525 U.S. at 485]; *Rodriguez v. Sessions*, 2017 U.S. App. LEXIS 3216, 2017 WL 695192, at *1 (9th Cir. Feb. 22, 2017) ("We lack jurisdiction to consider [the plaintiff's] eligibility for Deferred Action for Childhood Arrivals."); *Vasquez v. Aviles,* 639 F. App'x 898, 901 (3rd Cir. 2016) ("[Section 1252(g)] deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action.") (citing [*AADC*], 525 U.S. at 485); *Fabian-Lopez v. Holder*, 540 F. App'x 760, 761 n.2 (9th Cir. 2013) (determining that Section 1252(g) deprived the court of jurisdiction to consider the plaintiff's DACA eligibility).  However, the Court ultimately finds that none of the statutes relied upon by [the Government] applies to the narrower issues presented in this case; specifically, whether [the Government] complied with their own non-discretionary procedures when taking [Mr. Ramirez] into custody and questioning him at the Tukwila facility, which then led to the issuance of a[ Notice to Appear], rescission of his work authorization and, ultimately, termination of his DACA status.[115]

11
12
13
14

But the circumstances of this case have changed.  Mr. Ramirez is no longer challenging the Government's attempt to terminate his existing DACA status based on unsupported allegations of gang affiliation.  Mr. Ramirez's DACA status already expired.  His current action

15
16
17
18
19
20
21
22
23
24

---

[115] Dkt. #116 at 12.  *See also*, *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018) ("procedural due process claim challenges the non-discretionary process by which DACA statuses are decided, not the decision to grant or deny deferred action" and does not implicate agency discretion); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016) (jurisdictional bars do not apply to claims which "are collateral to, or independent of, the removal process"); *Chaudhry v. Barr*, Case No. 19-CV-0682-TLN-DMC-P, 2019 WL 3713762, at *5 (E.D. Cal. Aug. 7, 2019) ("section 1252(g) does not divest courts of jurisdiction over cases that do not address issues of prosecutorial discretion") (citing *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1118 (9th Cir. 2001)); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328 (N.D. Ga. June 12, 2017); *Torres v. U.S. Dep't of Homeland Sec.*, Case No. C17-1840-JM-NLS, 2017 WL 4340385 (S.D. Cal. Sept. 29, 2017).  Similarly, under the Administrative Procedure Act, judicial review of decisions committed to agency discretion is permissible if the decision exceeds the agency's jurisdiction or violates agency regulations or policies.  *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (noting "jurisdiction to review allegations that an agency has abused its discretion by exceeding its legal authority or by failing to comply with its own regulations"); *Probodanu v. Sessions*, 387 F. Supp. 3d 1031, 1045 (C.D. Cal. 2019) (review permissible where there are "statutes, regulations, established agency policies, or judicial decisions that provide a meaningful standard against which to assess" an agency's action) (quoting *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003)).

seeks to challenge the Government's discretionary decision to deny his application to renew his DACA status.

Importantly, many of the Court's previous due process concerns are mollified in this posture.  The Government did not strip Mr. Ramirez of a status he held at the relevant time.[116] Mr. Ramirez does not challenge the veracity of the underlying conduct that the Government relies upon in making its decision.[117]  The Government followed the procedures outlined in its SOP[118] and provided Mr. Ramirez notice and an opportunity to be heard.  Mr. Ramirez cannot establish that the Government previously discounted his transgressions because he cannot establish that

---

[116] "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution."  *Garcia Herrera v. McAleenan*, 379 F. Supp. 3d 1143, 1151 (E.D. Wash. 2019) (quoting *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994)).  The Court does not address whether Mr. Ramirez had some interest in presumptive renewal of his DACA status.  The Court does note, however, that this argument would appear to be far more compelling in a situation where the Government reverses course and denies an application without any changes in the factual record. *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 967 (9th Cir. 2015) (change in agency position on the same record must be supported by good reasons).

[117] *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (agency must engage in reasoned decisionmaking and "[a] method for disfavoring deportable aliens that bears no relation to these matters—that neither focuses on nor relates to an alien's fitness to remain in the country—is arbitrary and capricious").

[118] Mr. Ramirez's various arguments that the Government violated a non-discretionary duty under the DACA SOP fall short.  *See* Dkt. #147 at 21–25; Dkt. #154 at 19–21.  First, the Government retains significant discretion in considering issues of criminality.  Dkt. #144-7 at 82–84 (DHS retaining discretion even when criminality is not disqualifying).  Second, Mr. Ramirez relies on overstatements of the evidence for some arguments.  *See e.g.*, Dkt. #147 at 24 (alleging that the Government reviewed the cited criminal history prior to previous approvals). Third, Mr. Ramirez fails to tie some allegations to underlying provisions of the SOP.  *See, e.g.*, Dkt. #149 at 15 (asserting that adjudicator involving supervisors violated SOP); Dkt. #154 at 18– 19 (asserting that violation of the Court's preliminary injunction violated the SOP).  Fourth, Mr. Ramirez at times relies on overly restrictive readings of the SOP provisions at issue.  *See e.g.*, Dkt. #154 at 15, 21 (treating "non-disqualifying" events essentially as "qualifying" events); *compare* Dkt. #149 at 15 (asserting adjudicator cannot involve others) *with* Dkt. #144-7 at 90, 107 (SOP anticipating involvement of counsel and supervisors).

the Government previously knew of the transgressions.  In this situation, Mr. Ramirez has not established a basis for this Court to second guess the Government's discretionary decision.

The Court does not imply that the record is incapable of a more sinister reading.  The Government gave Mr. Ramirez's application an inordinate amount of scrutiny.  When the Government's manufactured basis for action dissolved, it searched for a new basis. Unfortunately for Mr. Ramirez, there was derogatory information for the Government to discover.  Outside of this case, there is no indication that the Government would otherwise pursue non-disqualifying but derogatory information such as this.  The Government does not indicate that it has ever denied renewal applications on similar concerns outside of Mr. Ramirez's case. The Government gives no indication it is normal for an adjudicators' apparent opinions to be cast aside by other agency staff.  *Compare* Dkt. #153 at 52 (adjudicator not concerned with derogatory information and noted that DACA status had been granted in similar circumstances) *with id.* at 50 (WATS "unaware of any cases with similar fact patterns . . . that have been approved").

The Court is left with the impression that Mr. Ramirez's application was treated differently.  There are, frankly, many indications that give the Court pause to wonder if the Government had it out for Mr. Ramirez.  Conversely, the agency's in-depth consideration and discussion of the unique circumstances presented in Mr. Ramirez's case would not necessarily violate agency policy[119] or Mr. Ramirez's rights.[120]  In situations such as these, the Court has,

---

[119] Mr. Ramirez does not point to SOP provisions indicating that the adjudicator must discharge her duties independently of other agency staff.

[120] The Court does not agree with the Government's position, at oral argument, that the Government's decision in this case would be insulated from review even if the Government acted with malice or animus in denying Mr. Ramirez's application. Dkt. #158 at 44:7–17; *but see Ragbir v. Homan*, 923 F.3d 53, 64 (2d Cir. 2019) ("To remove that decision from the scope of section 1252(g) because it was allegedly made based on unlawful considerations would allow plaintiffs to bypass § 1252(g) through mere styling of their claims.").  Regardless, the record does not establish that animus or malice alone drove the decision.  At most it was one factor

and will continue, to defer to agency experience and expertise and trust the public servants discharging our laws. Accordingly, Mr. Ramirez has not carried his burden of establishing this Court's subject matter jurisdiction.

## C. Defendants Did Not Violate the Court's Prior Preliminary Injunction

Relying on the Court's inherent ability to enforce its own orders, Mr. Ramirez is left to argue that the Government necessarily concluded that Mr. Ramirez was a de facto "threat to public safety" in violation of the Court's prior preliminary injunction.[121]  Under the preliminary injunction, the Government was not to adopt or rely on any "record made as of this date purporting to allege or establish that Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety."[122]  As Mr. Ramirez points out, the documents detailing his prior transgressions were already created as of the date of the Court's preliminary injunction.[123]

But the Court does not find that enforcement of its prior order is procedurally appropriate. *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (courts have inherent power to enforce orders).  The injunction was entered on the allegations of the Second Amended Complaint.[124] Mr. Ramirez has now filed a Third Amended Complaint[125] and does not establish that a preliminary injunction survives the filing of an amended complaint without further order of the Court.  "It is well-established in our circuit that an 'amended complaint supersedes the original, the latter being treated thereafter as non-existent.'"  *Ramirez v. Cty. of San Bernardino*, 806 F.3d

---

considered in the exercise of prosecutorial discretion.  The Court cannot tinker with and tweak the decisionmaking process.

[121] Dkt. #154 at 13, 19.

[122] Dkt. #133 at 23.

[123] Dkt. #147 at 18–19; Dkt. #154 at 23–25.

[124] Dkt. #133; Dkt. #78.

[125] Dkt. #144.

ORDER – 24

1002, 1008 (9th Cir. 2015) (citations omitted).   And, where a complaint is dismissed, an injunction based on that complaint is dissolved. *Rodriquez v. 32nd Legislature of Virgin Islands*, 859 F.3d 199, 207 (3d Cir. 2017) ("[a] preliminary injunction cannot survive the dismissal of a complaint") (quoting *Venezia v. Robinson*, 16 F.3d 209, 211 (7th Cir. 1994)); *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1253 (10th Cir. 2006) (preliminary injunction "is ipso facto dissolved by a dismissal of the complaint or the entry of a final decree in the cause") (quoting *Fundicao Tupy S.A. v. United States,* 841 F.2d 1101, 1103 (Fed. Cir. 1988)).   The logical conclusion is that the filing of the Third Amended Complaint—asserting different claims than the Second Amended Complaint—dissolved the Court's injunction.

Regardless, Mr. Ramirez does not establish a violation of the Court's previous order.  The distinction between considering whether Mr. Ramirez is a "threat to public safety" and whether his "offense history" makes him unsuitable for prosecutorial discretion is unquestionably a narrow one, and one that Mr. Ramirez maintains is merely pretext.  As Mr. Ramirez notes, criminal codes are generally intended to protect public safety.  Dkt. #154 at 15 (citing *United States v. Goldfine*, 538 F.2d 815, 827 (9th Cir. 1976) ("All would agree that the criminal law seeks to prevent harmful results.")).  But, as the Government points out, the DACA SOP does draw some distinction between the terms "issues of criminality" and "threat to public safety."[126] Further, Mr. Ramirez points to no authority establishing that the Court's preliminary injunction should be read so broadly as too encompass information that was never before the Court.

//

//

---

[126] Dkt. #156 at 12–13 (citing to support in DACA SOP and DACA FAQs).

ORDER – 25

# IV.     CONCLUSION

Having been brought here at the age of ten, Daniel Ramirez Medina is American in all ways but legal status.  His transgressions should not be ignored, and they were not.  The criminal justice system addressed his transgressions as it would the transgressions of any other American.  But unlike U.S. citizens, Mr. Ramirez's transgressions could also be employed to work a far greater detriment on his—and his family's—future.

After a questionable detention, the Government hounded Mr. Ramirez for close to three years.  Upon review, the Court is left with the uneasy feeling that the Government did not honestly consider the facts of Mr. Ramirez's case to arrive at a just conclusion.  Rather, it appears the Government considered only whether the facts supported its desired and preordained conclusion.  This is not a just exercise of prosecutorial discretion.  Yet the law as it stands precludes the courts from intervening and assuring equal justice under law.  Until Congress has the courage to fully address our nation's much needed immigration reform, there will continue to be cases like this in which courts are compelled to reach unjust, though legally correct, results.

Having reviewed the briefing, along with the remainder of the record, the Court hereby finds and ORDERS:

1.  Plaintiff's Motion for Second Preliminary Injunction, Or, in the Alternative, to Compel Compliance with Preliminary Injunction Order (Dkt. #147) is DENIED.

2.  Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint and Motion for Summary Judgment (Dkt. #152) is GRANTED.

3.  All of Mr. Ramirez's claims asserted in his Third Amended Complaint (Dkt. #144) are DISMISSED without prejudice.

//

//

ORDER – 26

4.  This matter is CLOSED.

DATED this 9th day of October 2019.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 27